**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| USA GYMNASTICS, INC., | Case No. 18-09108-RLM-11 |
| Debtor. | Adv. Proc. No. 1:19-ap-50012 |

| | |
|---|---|
| USA GYMNASTICS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| ACE AMERICAN INSURANCE COMPANY f/k/a | ) |
| CIGNA INSURANCE COMPANY, GREAT | ) |
| AMERICAN ASSURANCE COMPANY, LIBERTY | ) |
| INSURANCE UNDERWRITERS INC., NATIONAL | ) |
| CASUALTY COMPANY, RSUI INDEMNITY | ) |
| COMPANY, TIG INSURANCE COMPANY, | ) |
| VIRGINIA SURETY COMPANY, INC. f/k/a | ) |
| COMBINED SPECIALTY INSURANCE | ) |
| COMPANY, WESTERN WORLD INSURANCE | ) |
| COMPANY, ENDURANCE AMERICAN | ) |
| INSURANCE COMPANY, AMERICAN | ) |
| INTERNATIONAL GROUP, INC., AMERICAN | ) |
| HOME ASSURANCE COMPANY, and DOE | ) |
| INSURERS, | ) |
| | ) |
| Defendants. | ) |

**USA GYMNASTICS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY
JUDGMENT**

## I.    INTRODUCTION

This is an insurance coverage dispute arising out of liability policies sold to USA
Gymnastics ("USAG"). Over 350 women have asserted claims alleging that USAG is legally
responsible for sexual abuse committed by former USAG volunteer Larry Nassar ("Nassar"). In
the last year, these lawsuits and claims have spurred a range of related investigations,

administrative claims, and criminal prosecutions. These matters have generated substantial defense costs for USAG and its employees, both past and present.

Liberty Insurance Underwriters ("LIU"), one of USAG's claims-made insurers, has wrongfully refused to pay these defense costs. USAG is entitled to an order declaring that coverage exists for these expenses and compelling LIU to pay for them.

## II.    STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

LIU sold a claims-made policy to USAG covering the period from May 16, 2016 to May 16, 2017. [Dkt. 2-14 at 130–64 (MP_003182–MP_003216).] The policy covers claims first made against an insured during the policy period, as well as post-policy claims that are related to a claim initially made during the policy period. [*Id.* §§ 1, 9.2, 23.13, 23.22 at 132, 138–40.]

### A.    Underlying Facts

On May 25, 2016, USAG received its first demand letter from a former athlete alleging abuse by Larry Nassar. [Ex. 1, Shollenbarger Aff. (Mar. 1, 2019) ¶ 4.] Over the next several months, many plaintiffs sued USAG, generally alleging that USAG is legally responsible for sexual abuse committed against them by Nassar. [*Id.* ¶ 5.] LIU has acknowledged receiving notice of these claims, which fell within LIU's policy period. [*Id.* ¶ 6.] Additional lawsuits followed, and LIU also has acknowledged receiving notice of these later-filed claims. [*Id.*] These lawsuits have been ongoing since 2016 and are the main subject of this adversarial proceeding. [*Id.*] The past year, however, has generated several other developments.

*Formal USOC actions.* On January 25, 2018, the U.S. Olympic Committee ("USOC") informed USAG that it was ordering a formal investigation into USAG. [*Id.* ¶ 7.] USAG provided notice of this investigation to LIU. [*Id.*] USOC's authority for that order originates from the Ted Stevens Olympic and Amateur Sports Act, which gives USOC the ability to

recognize, supervise, and terminate Olympic National Governing Bodies ("NGBs"). [*Id.*]; 36 U.S.C. §§ 220521–25. Ropes & Gray conducted this investigation.[1] [Ex. 1, Shollenbarger Aff. ¶ 7.] The USOC's letter warned USAG that, if it did not cooperate with the investigation, USOC would terminate USAG's NGB status. [*Id.*]

Despite fully complying with this formal investigation, the USOC began decertifying proceedings anyway on November 5, 2018, again invoking its authority under the Ted Stevens Act. [*Id.* ¶ 8, Ex. B, USOC Compl., ¶ 10 (citing 36 U.S.C. §§ 220521(d), 220505(b)(8)).] USAG notified LIU of the USOC Complaint. [Ex. 1, Shollenbarger Aff. ¶ 8.]

*The Indiana Attorney General's Investigation.* On February 26, 2018, the Indiana Attorney General issued a Civil Investigative Demand ("IAG Investigation" or "CID") to USAG and its officers. [*Id.* ¶ 9, Ex. C.] The Attorney General is investigating USAG for potentially violating Indiana law, including the provisions governing nonprofit organizations in Indiana. [*Id.*] The Attorney General is similarly investigating USAG's officers and directors. [*Id.*] The Attorney General's 110 interrogatories and 91 document requests make it clear that the focus of the investigation is the Nassar abuse. [*Id.* at 2–31.] At the conclusion of its investigation, the Attorney General may have power to seek judicial dissolution of USAG. *See* IND. CODE § 23-17-24-1(a)(1). USAG tendered this claim to LIU as well. [Ex. 1, Shollenbarger Aff. ¶ 9.]

*The Congressional Hearings.* Both houses of Congress have launched formal investigations into USAG and its employees, seeking testimony from USAG employees and requiring numerous documents to be collected, reviewed, and produced to Congress. [*Id.* ¶ 10, Ex. D, U.S. House Ltrs., Ex. E, U.S. Senate Ltrs.] Congress specifically requested Kerry Perry, then-CEO, and Rhonda Faehn, former Senior Vice President of USAG, to testify. [*Id.*] Though

---

[1] Ropes & Gray completed its report and released it to the public on December 10, 2018.

USAG representatives were not ordered to appear and testify, USAG was not free to refuse Congress's "invitation." [*See id.*] Had USAG declined to testify, it likely would have been served with a Congressional subpoena. The ensuing testimony was given under oath. *See* 2 U.S.C. §§ 191; 18 U.S.C. §§ 1001, 1621. USAG promptly tendered these claims to LIU. [Ex. 1, Shollenbarger Aff. ¶ 10.]

*The Amy White Deposition*. In one of the pending lawsuits by a survivor, a current USAG employee, Amy White, was served with a subpoena to testify in Indianapolis, Indiana on October 29, 2018. [*Id.* ¶ 11.] White began her employment with USAG on January 2, 2013. [*Id.*] USAG provided notice of this deposition to LIU and requested that it reimburse White for her attorneys' fees. [*Id.*]

*Criminal Defense Matters*. Three of USAG's employees or former employees also requested that LIU provide each with criminal defense counsel for matters related to Nassar. On June 29, 2018, Debra Van Horn was indicted for sexual assault in Texas. [*Id.* ¶ 12, Ex. F, Texas Indictments, at 13–14.] USAG employed Van Horn from January 6, 2014 to January 22, 2018, which includes some time when Nassar volunteered for USAG. [Ex. 1, Shollenbarger Aff. ¶ 12.] The indictment alleges Van Horn's presence in a room while Nassar abused "Ruth" (a pseudonym for a gymnast). [*Id.* at Ex. F, Texas Indictments at 13–14.] It states that Van Horn, "acting as a party with one or more individuals, intentionally or knowingly caused" this abuse. [*Id.* at 13.] Parallel indictments against Nassar allege that he actually committed the sexual assault. [*Id.* at 1–12.] LIU acknowledges getting notice of this claim from Van Horn's counsel. [Ex. 1, Shollenbarger Aff. ¶ 12.]

The indictment against Steve Penny (the former USAG CEO from April 4, 2005 to March 16, 2017) was filed on September 28, 2018, and accuses him of "tampering with evidence." [*Id.* ¶ 12, Ex. G, Penny Indictment.] The indictment alleges that, while he was

President and CEO, Penny ordered a USAG employee to remove documents from the Karolyi Ranch. [*Id.*] The indictment further alleges that Penny destroyed or concealed these documents with knowledge of the pending investigation. [*Id.*] White has been identified as a potential witness to the criminal allegations against Penny. [Ex. 1, Shollenbarger Aff. ¶ 12.] USAG requested that LIU provide criminal defense counsel to Penny and to White. [*Id.*]

Collectively, these matters have generated substantial costs for USAG, totaling, to date, over $1,427,624 that has yet to be reimbursed by insurance. [*Id.* ¶ 14.] USAG expects to incur additional costs. Counsel is required in all of these matters—anything USAG's representatives say while responding to these investigations can and will be used against USAG in the underlying litigation. Moreover, Van Horn, White, and Penny, as insureds under the policy, are also entitled to a defense. [Dkt. 2-14, § 23.10–23.12, at 138.]

**B.    Policy Terms & LIU's Shifting Coverage Positions**

The LIU Policy covered the period between May 16, 2016, and May 16, 2017. [Dkt. 2-14, at 130.] Its insuring agreements provide coverage to USAG and its employees for "all **Loss** which they shall become legally obligated to pay as a result of a **Claim** first made during the **Policy Period** . . . for a **Wrongful Act** which takes place before or during the **Policy Period**."[2] [*Id.* § 1, at 132.] The policy imposes a duty to defend on LIU and requires LIU to pay "defense costs." [*Id.* § 2.] Under the policy, "defense costs" are "reasonable and necessary fees (including attorneys' fees and experts' fees) and expenses incurred in the defense of a **Claim**." [*Id.* § 23.4, at 137.] Defense costs do not erode the policy's $5 million limit. [*Id.* § 9.1, at 134, 153.]

LIU denied coverage to Nassar himself, asserting that he was not an "Insured Person" under the policy. [Ex. 2, Bond Aff. (Mar. 1, 2019) ¶ 6, Ex. B, at 12.] Specifically, it asserted that

---

[2] **Loss** is defined in § 23.14, at 142, 147–48; **Claim** is defined in § 23.3, at 147; **Policy Period** is defined in § 23.18, at 130, 139; and **Wrongful Act** is defined in § 23.22, at 139–40.

"[c]overage under Liberty's Policy is limited to employees and other insured persons acting *within the scope of their capacities as such*. . . . Liberty denies coverage for Nassar for sexual abuse to the extent Nassar seeks coverage under Liberty's policy as it is plainly evident he was not acting within the scope of his employment or duties for USAG when he committed the acts of sexual abuse." [*Id.* (emphasis in original).] USAG has not disputed this denial as it relates to Nassar individually.

LIU has acknowledged around 100 claims USAG submitted. [*Id.* ¶ 5, Ex. A, at 17–25.] However, since LIU began issuing coverage determinations in January 2017, however, its position has shifted considerably. LIU's first <u>five</u> coverage letters, spanning over a year, expressly or implicitly agreed to defend the claims under a reservation of rights. [*Id.* at ¶ 6, Ex. B, at 4, 10–14; *id.* ¶ 7, Ex. C, at 2; *id.* at ¶¶ 10–11, Ex. F–G; *id.* at ¶ 12, Ex. H, at 4–6.] Each of these letters conceded that the lawsuits, the USOC investigation, and the U.S. House investigation were "Claims" alleging "Wrongful Acts" and were covered by the policy's insuring agreements. [*Id.* at ¶ 6, Ex. B, 7–14; *id.* at ¶ 7, Ex. C, 5–8; *id* at ¶ 10, Ex. F, 6, 8–9; *id.* at ¶ 11, Ex. G, at 6–9; *id.* at ¶ 12, Ex. H, at 5–6.] Moreover, LIU argues in most of these letters that <u>all</u> of these claims "allege the same or Interrelated Wrongful Acts in USAG and/or its employees being negligent in its supervision of Nassar." [*See, e.g.*, *id.* at ¶ 6, Ex. B, at 10.] As a result, LIU stated that it would "treat the Nassar Claims . . . as one '**Claim**' under the 2016 policy, subject to a single aggregate sub-limit of liability."[3] [*Id.*; *id.* at ¶ 7, Ex. C, at 8 ("Liberty has concluded that [the first] three matters allege 'Interrelated Wrongful Acts' and as such, will be treated as one Claim").]

---

[3] USAG disputes that this sublimit applies, but that issue relates to indemnity, not defense. LIU's policy places no limit on defense costs. [Dkt. 2-14, § 9.1, at 134, 153.] Because the present motion is directed only to LIU's duty to defend, the Court need not address the applicable limit at this point.

This "interrelatedness" argument was connected to the basis for LIU's reservation of rights. In all of the letters, LIU reserved its rights because it believed a claim might have been made against USAG in 2015, before the LIU policy incepted. [*Id.* at ¶ 6, Ex. B, at 13–15; *id.* at ¶ 7, Ex. C, at 13; *id.* at ¶ 10, Ex. F, at 13–17; *id.* at ¶ 11, Ex. G, at 13–16; *id.* at ¶ 12, Ex. H, at 5.] This suspicion was based on reports that some women had voiced concerns within USAG in June 2015 about Nassar's conduct. [*Id.*] If there were truly "Claims" made during this timeframe, the interrelatedness argument could potentially place all the Nassar claims outside LIU's policy period, absolving it of all coverage obligations.[4] [*Id.*] LIU also reserved its rights under several exclusions, including the conduct exclusion and the bodily injury exclusion. [*Id.* at ¶ 6, Ex. B, at 10–13.]

USAG did not hear from LIU for the next six months. [*Id.* at ¶ 9, Ex. E.] When it did, LIU had engaged new counsel and was asserting defenses inconsistent with its first five letters. [*Id.*] In the Van Horn matter, it disavowed its "interrelatedness" argument, even though Van Horn is being prosecuted as an alleged accomplice to Nassar. [*Id.* at 6.] A month after the Van Horn letter, LIU repudiated its earlier coverage positions on the USOC investigation and the Congressional hearings. Regarding the USOC investigation, LIU now argues that the USOC does not "allege any 'Wrongful Acts' as to USAG," [*id.* ¶ 5, Ex. A, at 9.] and is not a "Claim" under the policy. [*Id.*] This new position contradicts LIU's earlier coverage positions. [*Id.* at ¶ 6, Ex. B, at 7–10.] Regarding the Congressional investigations, LIU now asserts that the investigations are not a "Claim" under the policy. [*Id.* at ¶ 5, Ex. A, at 9.] This also contradicts LIU's earlier coverage position. [*Id.* at ¶ 6, Ex. B, at 7–10.]

---

[4] In fact, no "Claim" was ever made to USAG about Nassar's conduct prior to LIU's policy period. [Ex. 2, Bond Aff. ¶ 7, Ex. C, at 1–2 (acknowledging that the earliest demand letter was sent to USAG on May 25, 2016, during LIU's policy period, and that the earliest lawsuit was filed on October 26, 2016, also during LIU's policy period).

Although it agreed to continue funding a small percentage of the defense in the sexual abuse lawsuits, the Van Horn and October 26 letters made it clear that LIU believes it has no coverage obligations at all. [*Id.* at 15.]

First and foremost, LIU argued that Nassar's guilty pleas for ten of Nassar's victims barred coverage to USAG for every claim brought by the hundreds of women allegedly abused by Nassar. [*Id.* at ¶ 5, Ex. A, at 11.] Second, it claimed the bodily injury exclusion barred coverage for the lawsuits, [*id.* at 13], and for the Van Horn indictment. [*id.* at ¶ 9, Ex. E, at 5–6.] Third, it asserted that the IAG's Investigation did not "allege any wrongful acts as to USAG" and was not a "Claim" under the policy. [*Id.* at ¶ 5, Ex. A, at 9–10.] Fourth, it claimed that the Van Horn indictment did not allege a "Wrongful Act" and reserved its rights to deny coverage if the conduct exclusion was satisfied as to Van Horn. [*Id.* at ¶ 9, Ex. E, at 4, 6–7.] Finally, LIU continued to reserve its rights on whether the first claim against USAG was made during the policy period. [*Id.* at ¶ 5, Ex. A, at 10.] LIU has not responded to USAG's request for defense counsel for White or Penny.

After LIU's October 26 letter, the USOC began administrative decertification proceedings against USAG under the Ted Stevens Olympic and Amateur Sports Act, 36 U.S.C. § 220521(d). [Ex. 1, Shollenbarger Aff. ¶ 8, Ex. B.] In spite of its earlier recognition that the USOC inquiry was related to the other Nassar claims,[5] LIU insisted that the decertification proceeding—which arose directly out of the USOC inquiry[6]—was unrelated to the rest of the Nassar claims. [Ex. 2, Bond Aff. ¶ 8, Ex. D, at 2–4.] Thus, LIU argued, the decertification

---

[5] [Ex. 2, Bond Aff. ¶ 6, Ex. B, at 2–4, 9–10.]

[6] [Ex. 1, Shollenbarger Aff. ¶ 8, Ex. B, USOC Compl., ¶ 12–13, 16 (citing athlete abuse and alleged issues complying with the independent investigation); *id.* at ¶ 7 (noting that, at the beginning of the investigation, USOC warned USAG that "if it did not cooperate with the investigation" into the cause of the Nassar abuse, then "USOC would terminate USAG's NGB status.").]

complaint was not "made" until after the LIU policy expired. [*Id.* at 3–4.] LIU also repeated its reliance on the conduct exclusion. [*Id.*]

USAG filed its Chapter 11 petition with this Court on December 5, 2018. It commenced this adversary proceeding against its insurers on February 1, 2019. [Dkt. 1, at 1.] Before USAG filed this petition, LIU had moved to dismiss USAG's coverage action against it, arguing the conduct exclusion.[7] [Ex. 2, Bond Aff. ¶ 14, Ex. J.] That case was dismissed as a result of this bankruptcy proceeding. However, LIU's motion presents a developed analysis of why LIU thinks the conduct exclusion applies, and so USAG addresses it here.

### III.    LEGAL STANDARDS

A court must grant summary judgment when the movant shows that there is no genuine dispute for trial on a particular issue. Fed. R. Civ. P. 56(a); Fed. R. Bankr. P. 7056; S.D. Ind. B-7056-1(a). Summary judgment is particularly appropriate on contract interpretation, which is a pure issue of law for the court. *See Am. Nat'l Fire Ins. Co. v. Rose Acre Farms*, 846 F. Supp. 731, 735 (S.D. Ind. 1994) (Indiana law); *Wagner v. Yates*, 912 N.E.2d 805, 808 (Ind. 2009). This is even more true in the insurance context, since ambiguities in the policy are not resolved by a jury, but instead are construed against the insurer as a matter of law. *Id.*; *State Auto. Mut. Ins. Co. v. Flexdar, Inc.*, 964 N.E.2d 845, 848 (Ind. 2012); *Am. States Ins. Co. v. Kiger*, 662 N.E.2d 945, 947 (Ind. 1996).

LIU's indemnity obligations are not the subject of this motion. Rather, this motion focuses on LIU's duty to *defend* USAG and its employees. The parties agree that Indiana law governs the meaning of USAG's policies. [Ex. 2, Bond Aff. ¶ 14, Ex. J, at 7, n.17.]

---

[7] In the brief, LIU says that Nassar was an "employee" of USAG. [Ex. 2, Bond Aff. ¶ 14, Ex. J, at 9, n.18.] But Nassar was never an employee of USAG, and LIU cited no evidence in its motion to support this "fact." [*Id.*]

### A.    Indiana Precedent on Policy Interpretation

Indiana has adopted a set of rules for interpreting insurance contracts. Federalism requires this Court to adhere strictly to these rules; where no specific guidance exists, the Court must predict how the Indiana Supreme Court would resolve the issue. *See Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1090 (7th Cir. 1999).

The essential principle of Indiana insurance law is that "[a]n insurance policy should be so construed as to effectuate indemnification . . . rather than to defeat it." *Masonic Acc. Ins. Co. v. Jackson*, 164 N.E. 628, 631 (Ind. 1929). If there is any ambiguity in a policy term, it must be interpreted in favor of the policyholder and in favor of coverage. *Eli Lilly & Co. v. Home Ins. Co.*, 482 N.E.2d 467, 470–71 (Ind. 1985). A term is ambiguous if reasonable persons may honestly differ as to the meaning of the policy language. *Id.* The fact that policy terms have been accorded different meanings by different courts is itself important evidence of ambiguity. *Hartford Acc. & Indem. Co. v. Dana Corp.*, 690 N.E.2d 285, 295 (Ind. Ct. App. 1997); *Travelers Indem. Co. v. Summit Corp. of Am.*, 715 N.E.2d 926, 938 (Ind. Ct. App. 1999).

If a policyholder's interpretation of a term is reasonable, then that construction governs as a matter of law. *Eli Lilly & Co.*, 482 N.E.2d at 470–71. The policyholder need not prove that its interpretation of a term is the only reasonable interpretation. *See id.* Conversely, in order to defeat coverage, an insurer must prove that its construction of the policy is the <u>only</u> plausible reading. *Am. Econ. Ins. Co. v. Liggett*, 426 N.E.2d 136, 144 (Ind. Ct. App. 1981) ("Where any reasonable construction can be placed on a policy that will prevent the defeat of the insured's indemnification for a loss covered by general language, that construction will be given.").

Exclusions are subject to especially strict scrutiny. *Kiger*, 662 N.E.2d at 947, 949; *Asbury v. Ind. Union Mut. Ins. Co.*, 441 N.E.2d 232, 242 (Ind. Ct. App. 1982). An exclusion can bar

coverage only when its terms "clearly and unmistakably" apply. *Asbury*, 441 N.E.2d at 242; *Kiger*, 662 N.E.2d at 947, 949; *Masonic*, 164 N.E. at 631 (holding that coverage "will not be destroyed by language of exception, unless such exception shall be clear, and free from reasonable doubt."). LIU bears the burden of showing that an exclusion applies, *FLM, LLC v. Cincinnati Ins. Co.*, 27 N.E.3d 1141, 1143 (Ind. Ct. App. 2015), and any lack of certainty in the application of an exclusion must be resolved in favor of coverage. *Kiger*, 662 N.E.2d at 947.

**B.    Special Rules Applicable to an Insurer's Duty to Defend**

LIU's duty to defend is broader than its duty to indemnify. *Seymour Mfg. Co. v. Commercial Union Ins. Co.*, 665 N.E.2d 891, 892 (Ind. 1996). Insurers may be required to defend claims even if they are not ultimately required to indemnify the policyholder. *See id.* Instead, if the claims against the insured "arguably fall within the described [acts] for which coverage is provided," so that there is any possibility of coverage, then Indiana requires the insurer to defend as a matter of law. *Id.*; *Ind. Ins. Co. v. N. Vermillion Cmty. Sch. Corp.*, 665 N.E.2d 630, 635 (Ind. Ct. App. 1996); *Trisler v. Ind. Ins. Co.*, 575 N.E.2d 1021, 1023 (Ind. Ct. App. 1991); *Fed. Ins. Co. v. Stroh Brewing Co.*, 127 F.3d 563, 566 (7th Cir. 1997) (Indiana law) (observing that an insurer's duty to defend is "expansive" and requires the insurer to defend its policyholders against suits alleging facts that *might* be covered).

*Seymour* illustrates the breadth of the duty. There, the Indiana Supreme Court held that the insurer owed a defense as a matter of law, even though the insurer offered evidence that several defenses to coverage might apply. *Seymour*, 665 N.E.2d at 892. The insurer argued and cited evidence that the contamination at issue might not be covered because it was "expected or intended," and thus would run afoul of both the pollution exclusion and the required accidental nature of an "occurrence." *Id.* However, the Court held that a defense was owed regardless, and

- 11 -

awarded summary judgment on the duty to defend. *Id.*

LIU has a duty to defend if *any* claim (or any part of a claim) may be covered. *Liberty Mut. Ins. Co. v. OSI Indus., Inc.*, 831 N.E.2d 192, 200 (Ind. Ct. App. 2005). Even if some claims are not covered, LIU still must defend the entire case. *Id.*; *see Fid. & Guar. Ins. Co. v. Kocolene Mktg. Corp.*, 2002 U.S. Dist. LEXIS 8518, *12 (S.D. Ind. 2002) (Indiana law). Even if only a small portion of the conduct alleged falls within the scope of the Policy, LIU must defend. *OSI Indus.*, 831 N.E.2d at 200; *Curtis-Universal, Inc. v. Sheboygan Emergency Med. Servs.*, 43 F.3d 1119, 1122 (7th Cir. 1994). Once the duty to defend is triggered, LIU must continue defending until it shows conclusively that there is *no* potential for coverage—in other words, that coverage *cannot* conceivably apply to *any* claim asserted against the policyholder on *any* set of facts that might be proven. *OSI Indus.*, 831 N.E.2d at 200; *Stroh Brewing Co.*, 127 F.3d at 566.

## IV.    ARGUMENT

As detailed below, LIU has breached its duty to defend. All of the Nassar Claims[8] are "claims" as defined by the policy. The policy also deems each claim as "first made" during the LIU policy period because each involves "Interrelated Wrongful Acts" covered by the policy. As detailed below, the exclusions invoked by LIU do not block the duty to defend. Finally, the amounts expended by USAG in defending the Nassar Claims are "reasonable and necessary" under Indiana law.

Aside from the small percentage it is contributing the defense of the survivors' lawsuits, LIU has refused to defend any of the Nassar Claims. [Ex. 2, Bond Aff. ¶ 5, Ex. A, at 15.] LIU has also indicated its belief that it owes no defense in the lawsuits either. [*Id.*] Because it owes a

---

[8] USAG uses the term "Nassar Claims" to refer to the "bodily injury and/or emotional distress" lawsuits filed by Nassar's alleged victims; the USOC Ropes & Gray investigation; the USOC decertification proceeding; the IAG Investigation; the Congressional investigations; and the criminal proceedings involving Van Horn, Penny, and White.

defense on *all* of the claims, LIU has breached its duty to defend. The Court should declare that LIU is in breach, order it to reimburse USAG and its employees for all sums spent in defending these claims, and compel it to pay for the ongoing defense of all the Nassar Claims.

**A.      All of the Nassar Claims Are "Claims," as that Term Is Defined by the LIU Policy.**

LIU broadly defined "Claim" to include "the commencement of a civil or criminal judicial proceeding" or "the commencement of a formal criminal, administrative or regulatory proceeding or investigation against an Insured." [Dkt. 2-14, § 23.3(b)–(c), at 137, 147.] Each matter for which USAG seeks a defense is either a "proceeding" or an "investigation" under the policy. [*Id.*]

In its early coverage letters, LIU conceded that the USOC investigation and the U.S. House investigation were "Claims" under this definition. [Ex. 2, Bond Aff. ¶ 6, Ex. B, at 4, 7.] It also conceded that these claims alleged a "Wrongful Act." [*Id.*] The Court should reject LIU's attempts to repudiate this confession. *Motorists Mut. Ins. Co. v. Johnson*, 218 N.E.2d 712, 718 (Ind. Ct. App. 1966); *see Gov'tl Interins. Exch. v. City of Angola*, 8 F. Supp. 2d 1120, 1129 (N.D. Ind. 1998) (observing that an insurer cannot "argue[] a specific defense to coverage" and then later "change[] course 180 degrees" and "rais[e] a defense that was the complete opposite of their earlier position."); [Ex. 2, Bond Aff. ¶ 6, Ex. B, at 9–10; *id.* at ¶ 8, Ex. D, at 2–4.] But even if this reversal was permissible, LIU's inability to decide what its *own policy* means is conclusive evidence of ambiguity, requiring a construction in favor of the policyholder. *See Flexdar*, 964 N.E.2d at 848; *Kiger*, 662 N.E.2d at 947 & n.1.

The Senate investigation and the IAG's Investigation are also "Claims." The Senate and the House sent similar letters to USAG's officers, demanding that they give testimony, provide documents, and answer questions on similar subjects—USAG's actions with respect to Nassar. If

the House's letter is a "Claim," the Senate's must be one as well. [*See* Ex. 1, Shollenbarger Aff. ¶ 10, Ex. D, U.S. House Ltrs.; Ex. E, U.S. Senate Ltrs.] Similarly, a Civil Investigative Demand is a tool used by the Attorney General at the beginning of a formal investigation into allegedly wrongful conduct. IND. CODE §§ 4-6-3-3, 4-6-3-5, 4-6-3-6. The CID states that USAG and its officers and directors are under investigation by the Attorney General. [Ex. 1, Shollenbarger Aff. ¶ 9, Ex. C, Ind. Att'y Gen. CID at 1.] LIU was correct in conceding that it is also a "Claim" under the policy.[9] [Ex. 2, Bond Aff. ¶ 5, Ex. A, at 10; Dkt. 2-14, § 23.3(b)–(c), at 137, 147.]

Further, the criminal proceedings are "Claims" against "Insured Persons" under the policy. [Dkt. 2-14, §§ 23.3(b)–(c), 23.10–23.12, at 137–38, 147.] LIU's policy defines an "Insured Person" as "one or more natural persons who were, now are, or shall hereafter be duly elected or appointed directors, trustees, <u>officers</u>, <u>employees</u>, committee members or volunteers of" USAG. [Dkt. 2-14, § 23.13, at 150 (emphasis added).] Van Horn, Penny, and White[10] were all employees at the time of the alleged conduct. [Ex. 1, Shollenbarger Aff. ¶ 12.] As formal criminal proceedings or investigations involving USAG employees, they are "Claims."[11] [Dkt. 2-

---

[9] LIU's assertion that the CID does not "allege any Wrongful Acts as to USAG" is perplexing. [Ex. 2, Bond Aff. ¶ 5, Ex. A, at 9.] The IAG's Investigation declares that the Attorney General is investigating USAG and its officers and directors for violating the entire universe of Indiana law. [Ex. 1, Shollenbarger Aff. ¶ 9, Ex. C, Ind. Att'y Gen. CID at 1.] Unless LIU contends that *no* violation of Indiana law would constitute a "wrongful act," then the IAG's Investigation is covered. USAG provides a more detailed wrongful-act analysis below, in the section on interrelatedness.

[10] This refers to White's identification as a witness in the criminal proceedings. Defense of the White subpoena and deposition in one of the survivor lawsuits is covered as a reasonable and necessary cost of defending USAG in the *survivor lawsuit*.

[11] LIU's argument that the claims against Van Horn do not allege a "Wrongful Act" is also incorrect. [Ex. 2, Bond Aff. ¶ 9, Ex. E, at 4.] Van Horn is being accused of acting "as a party" to Nassar's criminal conduct. [Ex. 1, Shollenbarger Aff. ¶ 12.] This is certainly an "alleged error . . . act, omission, neglect, or breach of duty" that the policy would cover. [Ex. 2, Bond Aff. ¶ 9, Ex. E, at 4.] And because Van Horn allegedly committed this crime while on duty as a USAG employee, [Ex. 1, Shollenbarger Aff. ¶ 12], whether she was acting "in her capacity" as an employee is irrelevant at the duty-to-defend stage—because there only needs to be a possibility

14, §§ 23.3(b)–(c), 23.13, at 137, 147, 150.]

**B.    The First Nassar Claim Was Made in May 2016, During LIU's Policy Period.**

To be eligible for coverage under LIU's policy, a claim must be "first made" during the 2016–17 policy period. [Dkt. 2-14, § 1, at 132.] Under the policy, a third party's report of abusive behavior is not a "Claim" unless it constitutes a "*written demand* for monetary or non-monetary *relief*," or unless a lawsuit or proceeding is actually "commence[d] . . . against an insured." [*Id.* § 23.3(a)–(b), at 137, 147 (emphasis added).]

In several of its letters, LIU suggested that the first "Claim" was made prior to May 16, 2016, the date its policy incepted. [Dkt. 2-14, at 130; *e.g.*, Ex. 2, Bond Aff. ¶ 10, Ex. F, at 13–17; *id.* at ¶ 5, Ex. A, at 9–11; *id.* at ¶ 6, Ex. B, at 13–15.] These assertions are based on oral reports received by USAG, and reported to the FBI, in June 2015 that raised concerns about Nassar. [*Id.*; Ex. 1, Shollenbarger Aff. ¶ 13, Ex. H, R&G Rept., at 58–100.] LIU also pointed to concerns allegedly raised to John Geddert, the manager of a USAG member gym, in 1998. [Ex. 2, Bond Aff. ¶ 5, Ex. A, at 10.]

None of these facts show that a "Claim" was made before LIU's policy period. These athlete concerns were not written, and they did not "demand" anything from USAG. They also did not come with a civil summons to appear in court. [*Id.*]; *see St. Paul Mercury Ins. Co.*, 268 F. Supp. 2d 1035, 1047–48 (C.D. Ill. 2003); *Nat'l Union Fire Ins. Co. v. Willis*, 139 F. Supp. 2d 827, 832–34 (S.D. Tex. 2001) (a "Claim" must actually demand some relief covered by the policy). Instead, as LIU acknowledges, the first demand letter was received by USAG on May 25, 2016, and the first lawsuit was filed shortly thereafter. [Ex. 1, Shollenbarger Aff. ¶ 4–5; Ex.

---

for coverage. *Seymour*, 665 N.E.2d at 892; *Stroh Brewing Co.*, 127 F.3d at 566. Since she was on duty at the time of the alleged offense, it is possible the alleged wrongful act was done "in her capacity" as a USAG employee. [Ex. 2, Bond Aff. ¶ 9, Ex. E, at 4.]

2, Bond Aff. ¶ 7, Ex. C, at 1–2.] Both of these events occurred during LIU's policy period, which commenced on May 16, 2016. [Dkt. 2-14, at 130.]

In sum, there can be no dispute that the first actual "Claim" was made against USAG while the LIU policy was in force. None of the LIU Policy's exclusions disclaim coverage based purely on the insured's prior knowledge of facts that *could possibly* lead to a claim;[12] indeed, they only bar coverage if a notice of circumstance has been actually provided under a predecessor policy. [*See id.* § 4.3, at 133.] LIU cannot cite to such a notice here.

The initial Nassar Claims were "first made" during LIU's policy period. The next question is whether the policy treats all subsequent Nassar Claims as covered under the LIU policy. It does, and so LIU is required to defend USAG from all Nassar Claims.

## C.    All of the Nassar Claims Arise from the Same Wrongful Acts (or Interrelated Wrongful Acts), and Therefore Are One "Claim" First Made on May 25, 2016— During LIU's Policy Period.

LIU's next attempted defense is that some of the claims were "first made" <u>after</u> the LIU policy expired. [Ex. 2, Bond Aff. ¶ 8, Ex. D, at 2–3; *id.* at ¶ 9, Ex. E, at 6–7.] This argument ignores the way LIU's policy treats interrelated claims. Under the policy's "deemer" language, any claim arising out of the same or similar facts as the first Nassar claim is covered under the LIU policy—even if it did not materialize until after the policy expired.

---

[12] LIU does not contend that it asked about this information or that USAG's response was misleading. [Ex. 2, Bond Aff. ¶ 6, Ex. B, at 13–14.] LIU instead argued that the policy language in the "Notice of Claim" and "Notice of Circumstance" clauses required USAG to report these informal concerns to LIU. [*Id.*]

This is incorrect. The "Notice of Claim" provision does not apply because there was no "Claim" until May 25, 2016, and USAG has been promptly reporting claims since then. [*Id.* at ¶ 7, Ex. C, at 1–3; Dkt. 2-14, § 7.2, at 134, 145.] And the "Notice of Circumstance" clause does not apply because it simply gives the policyholder an option to "lock in" coverage for wrongful acts taking place during the policy period in case an actual "Claim" is not made until after the policy expires. [Dkt. 2-14, § 8, at 134; 12 NEW APPLEMAN ON INSURANCE LAW § 148.03[1][a][iii][D]. *First Horizon Nat'l Corp. v. Houston Cas. Co.*, 2016 U.S. Dist. LEXIS 62288, at *20–21 (W.D. Tenn. 2016).

- 16 -

Under the policy, all "claims arising from the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed one **Claim** subject to a single limit of liability. Such **Claims** shall be deemed first made on the date the earliest of such **Claims** is first made . . . ." [Dkt. 2-14, § 9.2, at 134; Ex. 2, Bond Aff. ¶ 6, Ex. B, at 9.] This language means that if a post-policy claim is based on the same or similar "Wrongful Act" or "Interrelated Wrongful Acts" that generated a claim first made and reported during the policy period, then the insurer must cover the post-policy claim. *Adi WorldLink, LLC v. RSUI Indem. Co.*, 2017 U.S. Dist. LEXIS 150505, at \*24–25 (E.D. Tex. 2017).

The policy defines a "Wrongful Act" as "any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty . . . committed or attempted by the **Insured Persons** in their capacities as such or by the **Insured Organization**." [Dkt. 2-14, § 23.22(a), at 139.] Wrongful acts are "interrelated" if they "have as a common nexus <u>any</u> fact, circumstance, situation, event, transaction, cause[,] or series of causally connected facts, circumstances, situations, or events." [*Id.* § 23.13, at 138 (emphasis added).] All of the Nassar claims—including the proceedings and investigations at issue here—clear this hurdle.[13]

Although the policy does not define the term "nexus," the ordinary understanding of the word is "a relationship or connection between people or things." *Columbus Life Ins. Co. v. Arch Ins. Co.*, 2016 U.S. Dist. LEXIS 64449, at \*22 (N.D. Ind. 2016).[14] A nexus does not require

---

[13] USAG's 2017–2018 D&O carrier (RSUI) has taken the position that the claims *are* interrelated, and has refused to provide coverage on that ground. [Ex. 2, Bond Aff. ¶ 13, Ex. I, at 5–6.]

[14] *See also* MERRIAM–WEBSTER ONLINE DICTIONARY, *Nexus*, https://www.merriam-webster.com/dictionary/nexus ("A connected group or series") (retrieved Jan. 24, 2019); THE WOLTERS KLUWER BOUVIER LAW DICTIONARY, DESK ED., *Nexum (Nexus)* ("A relationship or connection.") (2012); *Travelers Indem. Co. v. Summit Corp. of Am.*, 715 N.E.2d 926, 937 (Ind. Ct. App. 1999) ("Because policy terms are interpreted from the perspective of an ordinary

- 17 -

identical parties or legal theories. *See Weaver v. Axis Surplus Ins. Co.*, 2014 U.S. Dist. LEXIS 154746, at *40 (E.D.N.Y. 2014). Instead, where the policy's language refers to "*any* fact . . . or series of casually or logically connected facts . . . it is immaterial that one claim may involve additional facts or allegations because all that is required is any common fact . . . or series of casually or logically connected facts." *Id.* (quotations removed). Stated differently, the question is whether the claims "share operative facts" with one another, rather than simply sharing the same "window dressing." *Emmis Communs. Corp. v. Ill. Nat'l Ins. Co.*, 323 F. Supp. 3d 1012, 1027 (S.D. Ind. 2018) (emphasis removed).

All of the Nassar Claims have a central operative fact: Nassar's abuse. Each claim concerns, to some extent, USAG's alleged negligence in addressing Nassar's actions. Far from being mere "window dressing," this alleged negligence—which LIU concedes is the substance of the lawsuits against USAG—is at the core of each investigation and criminal proceeding against USAG or its employees. *Emmis*, 323 F. Supp. 3d at 1027; [Ex. 2, Bond Aff. ¶ 14, Ex. J, at 4–5.]

*The USOC Matters.*[15] Last year, USAG cooperated with a USOC-commissioned investigation into USAG's knowledge and actions with respect to Nassar. [Ex. 1, Shollenbarger Aff. ¶ 7.] The purpose of this investigation was to identify "exactly who knew and who should have known of USAG athlete reports of abuse by Dr. Nassar (and when) and did not report those allegations appropriately, and of what systemic failures may have contributed to these failures to report." [*Id.*] USAG was ordered to comply with this investigation or lose its NGB status. [*Id.*] The report alleges an entire "ecosystem" of wrongful acts that enabled Nassar to commit his

---

policyholder of average intelligence we refer to the . . . [d]ictionary definition of the words not otherwise defined in the polic[y].").

[15] USAG also notes that LIU already admitted that these events are "interrelated" Nassar claims. [Ex. 2, Bond Aff. ¶ 6, Ex. B, at 4–10.] It cannot repudiate that position now. *City of Angola*, 8 F. Supp. 2d at 1129; *Johnson*, 218 N.E.2d at 718.

abuse. [*Id.* ¶ 13, Ex. H, R&G Rept. at 2.] These are the same "operative facts" alleged by the civil plaintiffs. *Emmis*, 323 F. Supp. 3d at 1027; [Ex. 1, Shollenberger Aff. ¶ 7, Ex. A, LM Doe Second Am. Compl., ¶ 69 ("Defendants failed to implement reasonable safeguards to avoid acts of unlawful sexual contact by the Perpetrator (NASSAR) . . . including avoiding placement of the Perpetrator (NASSAR) in a position where contact and interaction with children is an inherent function); *id.* ¶ 85 ("Despite having a duty to do so, Defendants failed to adequately train and supervise all staff to create a positive and safe environment, specifically including training to perceive, report[,] and stop inappropriate sexual conduct . . . specifically including the Perpetrator (NASSAR), with children").]

The decertification proceeding is an offshoot of these same allegations. The USOC has stated that it started the decertification process because it questions whether USAG can fix the issues that led to the Nassar abuse. [*Id.* ¶ 8, Ex. B, USOC Compl., ¶¶ 11–21.] Moreover, USOC cites the Nassar lawsuits as an additional reason why it chose to decertify USAG. [*Id.*] As a result, the decertification proceeding has the required "common nexus of <u>any</u> fact, circumstance, situation, event, transaction, [or] cause" to be an interrelated act. [Dkt. 2-14, § 23.13, at 138 (emphasis added).]

*The Indiana Attorney General's Investigation.* The same is true for the Indiana Attorney General's Investigation. The 110 interrogatories and 91 document requests in the CID make it clear that the focus of the investigation is the Nassar abuse. [Ex. 1, Shollenberger Aff. ¶ 9, Ex. C, Ind. Att'y Gen. CID, at 2–31.] Absent the Nassar abuse and the subsequent allegations against USAG, this investigation would never have begun. *Emmis*, 323 F. Supp. 3d at 1028 (observing that two claims are "interrelated" when there is a "direct causal connection between the two cases at issue" so that the first claim caused the second). So once again, this proceeding has

Nassar's abuse and USAG's alleged negligence as a "common nexus" with the same facts, circumstances, and events as the survivor lawsuits, which LIU agreed to defend. [Dkt. 2-14, § 23.13, at 138.]

*The Van Horn Indictment.* The Van Horn indictment is even more obviously related to Nassar. It deals with an instance where Van Horn was allegedly in the same room as Nassar when he abused an athlete. [Ex. 1, Shollenbarger Aff. ¶ 12, Ex. F, Texas Indictments, at 13.] It is therefore plainly rooted in the same operative facts generating the claimants' theories against USAG.

*The Congressional Investigations.*[16] The Congressional document requests and transcripts point to the same conclusion. Both houses of Congress demanded vast amounts of information surrounding USAG's conduct with respect to Nassar. [*Id.* ¶ 10, Ex. D., U.S. House Ltrs., Ex. E, U.S. Senate Ltrs.] Over the course of several months, USAG representatives attended multiple hearings where they were questioned by Senators and Representatives about how Nassar continued for so long without being caught. U.S. HOUSE COMMITTEE ON ENERGY & COMMERCE, OVERSIGHT & INVESTIGATIONS SUBCOMM., *Examining the Olympic Community's Ability to Protect Athletes from Sexual Abuse* (May 23, 2018), prelim. tr. at 97–100; U.S. SENATE COMMITTEE ON COMMERCE, SCIENCE & TRANSPORTATION, CONSUMER PROTECTION SUBCOMM., *Strengthening and Empowering U.S. Amateur Athletes: Moving Forward With Solutions* (July 24, 2018) (Remarks of Sen. Moran). Congress demanded that USAG "implement serious reforms moving forward." *Id.* This investigation is driven by USAG's handling of the Nassar issues. It is covered.

---

[16] Again, LIU already admitted that the House hearing is an "interrelated" Nassar claim. [Ex. 2, Bond Aff. ¶ 6, Ex. B, at 4–10.] It cannot repudiate that position now. *City of Angola*, 8 F. Supp. 2d at 1129; *Johnson*, 218 N.E.2d at 718.

*The Karolyi Ranch Records*.[17] According to the Ropes & Gray Report, in 2016, Texas Rangers "showed up unannounced at the Karolyi Ranch" in Walker County, Texas. [Ex. 1, Shollenbarger Aff. ¶ 13, Ex. H, R&G Rept. at 105.] Amy White was present when they arrived. [*Id.*] When White told Steve Penny about the Rangers, Penny allegedly instructed her to immediately pack up "anything that ha[d] Nassar's name on it," in addition to some other documents, and hand-deliver them to USAG's Indianapolis office. [*Id.* at 105–06.] White complied. [*Id.*]

A Walker County Grand Jury charged Penny with "tampering with evidence" based on these events. [*Id.* at 7, 108–09.] A month and a half before this indictment was released, White was identified as a witness in this case. [Ex. 1, Shollenbarger Aff. ¶ 12.] From this, it is easy to infer that White was being identified as a witness to the events leading to Penny's indictment for removing the records from the Ranch. *See Millennium Labs., Inc. v. Allied World Ins. Co.*, 135 F. Supp. 3d 1165, 1174 (S.D. Cal. 2015) (requiring less specificity from a policyholder to trigger coverage when a DOJ investigation was "shrouded in secrecy").

These actions are all different chapters in the same story. Each arises from the same set of operative facts—Nassar's abuse of USAG athletes and USAG's response to that abuse. The survivor lawsuits make similar claims. [Ex. 1, Shollenbarger Aff. ¶ 5, Ex. A, LM Doe Compl., ¶¶ 11–16, 61–86.] This easily satisfies the LIU Policy's requirement that interrelated claims "have as a common nexus any fact, circumstance, situation, event, transaction, cause[,] or series of causally connected facts, circumstances, situations, or events." [Dkt. 2-14, § 23.13, at 138.] Regardless, even though some claims involve additional facts, this is "immaterial . . . because all

---

[17] LIU has yet to respond to USAG's tender of these claims. This unreasonable delay bars it from raising any coverage defenses to these claims. *See Protective Ins. Co. v. Coca-Cola Bottling Co.*, 423 N.E.2d 656, 661–62 (Ind. Ct. App. 1981); *Stroh Brewing Co.*, 127 F.3d at 571. Regardless, the facts show that these claims are covered under a fair reading of the policy.

that is required is any common fact . . . or series of casually or logically connected facts." *Weaver*, 2014 U.S. Dist. LEXIS 154746, at *40. Consequently, all of the Nassar claims are considered "first made" under LIU's policy. As a matter of law, then, LIU owes a defense to USAG on each of them. *Seymour*, 665 N.E.2d at 892.

## D.     None of the Exclusions Cited by LIU Allow It to Avoid Its Duty to Defend.

LIU invokes two exclusions in its effort to limit or bar coverage. LIU can refuse to defend USAG only if it can show that there is absolutely *no* potential for coverage on *any* claim. *Seymour*, 665 N.E.2d at 892. It cannot make that showing here.

As *Seymour* illustrates, the potential that an exclusion *might* apply does not alter LIU's duty to defend. *Id.* Additionally, since this case involves a wide variety of interrelated claims, LIU must defend them all even if an exclusion bars coverage for part of a claim, the entirety of a particular claim, or even multiple claims. *OSI Indus., Inc.*, 831 N.E.2d at 200; *Curtis-Universal*, 43 F.3d at 1122. This is because the claims are all based on the same underlying facts and cannot be separated from one another. *See id.* Abandoning the policyholder in one forum (such as the criminal proceedings) could have disastrous consequences in another (potentially covered) forum. The duty to defend is a holistic endeavor—an insurer must defend the policyholder from *all* related claims. An insurer may not pick and choose the claims it wants to defend. *See id.*

### 1.     *The Conduct Exclusion*

LIU claims it owes no duty to defend USAG in any of the numerous claims brought by hundreds of women against USAG because Nassar pleaded guilty to ten counts of criminal sexual conduct. [Ex. 2, Bond Aff. ¶ 8, Ex. D, at 3–4.] This is wrong.

The policy contains a "Conduct Exclusion," which bars coverage for a claim "based upon, arising from, or in any way related to . . . any deliberately dishonest, malicious or

- 22 -

fraudulent act or omission or any willful violation of law by any **Insured**." [Dkt. 2-14, § 4.9, at 133, 145.] However, the exclusion also states that it "shall only apply if it is *finally adjudicated* that such conduct in fact occurred." [*Id.* (emphasis added).] It also provides that "the **Wrongful Act** of any **Insured Person** shall not be imputed to any other **Insured Person**." [*Id.*] LIU claims this language imputes Nassar's guilt to USAG. This argument fails. It is defeated by LIU's own admission and because it rests on three unfounded inferences.

Only acts by *insureds* trigger this exclusion. LIU previously asserted that Nassar was not an "insured" when he committed the abuse. [Ex. 2, Bond Aff., ¶ 6, Ex. B, at 12.] It cannot now claim he *was* an "insured" in order to avoid coverage. The Second Circuit has squarely addressed this issue and found that a conduct exclusion cannot apply when the insurer had previously claimed that the abuser was not an "assured" under the policy. *Hartford Roman Catholic Diocesan Corp. v. Interstate Fire & Cas. Co.*, 905 F.3d 84, 89 (2d Cir. 2018). In *Hartford*, the insurer refused to provide coverage for an abusive priest. *Id.* It based this position on the argument that the priest was not an "assured" because he "act[ed] outside the course and scope of his priestly duties . . . when he allegedly sexually abused" the victim. *Id.* When the insurer later tried to invoke an "any assured" clause to deny coverage to the Archdiocese, the Second Circuit barred it from doing so—having argued that the priest was not an "assured," the insurer could not now invoke the conduct exclusion, which, like the one in LIU's policy, only applies to acts of an "assured" (or "insured"). *Id.* This alone is sufficient to sink LIU's reliance on the conduct exclusion.

The inferences upon which LIU relies are equally weak. First, LIU insists that by using the term "any insured" rather than "the insured," the parties displayed a "contractual intent" to bar recovery to all innocent co-insureds. [Ex. 2, Bond Aff. ¶ 14, Ex. J, at 12.] Second, it claims

that a "severability of insureds" clause does not protect USAG because it says "Insured Person" rather than "Insured" or "Insured Organization." [*Id.* at 13–14.] Fourth, LIU assumes that Nassar's guilty plea to ten counts of criminal abuse allows it to refuse a defense for the hundreds of other Nassar claims. [*Id.* at 2–12; *id.* at ¶ 5, Ex. B, at 5.] None of these inferences hold water.

The Indiana Supreme Court has expressly rejected LIU's first inference. *Frankenmuth Mut. Ins. Co. v. Williams*, 690 N.E.2d 675, 678–80 (Ind. 1997) (rebuffing an insurer's "attempt to conflate the conduct of White with that of her husband in order to bring [both] within the intentional-act exclusion"). So has a federal court, applying Indiana law. *Am. Family Mut. Ins. Co. v. Bower*, 752 F. Supp. 2d 957, 970–71 (N.D. Ind. 2010) (noting "that the fundamental principle relied upon by the Indiana Supreme Court [was] that insurance policy exclusions that preclude coverage for intentional or illegal acts do not preclude coverage for the negligent actions of other insureds under the same policy.").[18] Both *Frankenmuth* and *Bower* interpreted intentional-act exclusions that used the term "any insured." *Frankenmuth*, 690 N.E.2d at 678; *Bower*, 752 F. Supp. 2d at 969–70. Importantly, as in the present case, these decisions dealt with negligence claims against innocent co-insureds based on the conduct of a convicted child molester. *Frankenmuth*, 690 N.E.2d at 979–80; *Bower*, 752 F. Supp. 2d at 960–61, 967–68.

This Court must follow *Frankenmuth*. *Rugg & Knopp*, 165 F.3d at 1090. As a result, LIU's citation to *other* states' decisions is not persuasive.[19] [Ex. 2, Bond Aff. ¶ 14, Ex. J, at 12–

---

[18] The Indiana legislature has even expressed the importance of protecting innocent co-insureds. IND. CODE § 27-2-24-8 (providing protections for innocent co-insured in the property context). This strong public policy concern—coupled with the benefit of providing injured parties compensation—strongly favor USAG's interpretation.

[19] LIU cites cases from eight other jurisdictions to support its reading of the "any insured" language. [Ex. 2, Bond Aff. ¶ 14, Ex. J, at 10–13.] But there are at least as many cases going the other way. *See, e.g.*, *Minkler v. Safeco Ins. Co. of Am.*, 232 P.3d 612, 623–24 (Cal. 2010); *Premier Ins. Co. v. Adams*, 632 So. 2d 1054, 1057 (Fla. Ct. App. 1994); *Brumley v. Lee*, 963 P.2d 1224, 1227–28 (Kan. 1998); *Safeco Ins. Co. of Am. v. White*, 913 N.E.2d 426, 430–36

- 24 -

14.] Several are also distinguishable and are not based on the foundations of Indiana law addressed above.[20]

Other Indiana cases support the outcome here as well. Indiana courts have recognized that LIU's focus on mutual "contractual intent" is a misnomer—instead, "the insurer drafts the policy and foists its terms upon the customer . . . we buy their forms or we do not buy insurance." *Am. States Ins. Co. v. Kiger*, 662 N.E.2d 945, 947 (Ind. 1996) (quotations omitted); *see also Visteon Corp. v. Nat'l Union Fire Ins. Co.*, 2013 U.S. Dist. LEXIS 111109 at *16–17 (S.D. Ind. 2013) (explaining that insurance policies are not negotiated in the traditional "back-and-forth" way, but policy terms are a take-it-or-leave-it deal). Thus, the insurer's "intent" in using certain language "must be clearly expressed" before it can be used to deny coverage. *Flexdar*, 964 N.E.2d at 848. This prevents an insurer from leaving words "deliberately obscure, intending to decide at a later date what meaning to assert." RESTATEMENT (SECOND) OF CONTRACTS § 206, cmt. *a*.

The "any insured" clause demonstrates the need for this rule. Do the words "any insured" simply communicate that the exclusion negates coverage to "any" insured who commits a willful

---

(Ohio 2009); *West Am. Ins. Co. v. AV&S*, 145 F.3d 1224, 1229 (10th Cir. 1998) (Utah law); *Transp. Indem. Co. v. Wyatt*, 417 So. 2d 568, 571 (Ala. 1982); *Worcester Mut. Ins. Co. v. Marnell*, 496 N.E.2d 158, 161 (Mass. 1986); *Am. Nat'l Fire Ins. Co. v. Estate of Fournelle*, 472 N.W.2d 292, 295 (Minn. 1991). At a minimum, such judicial disagreement on the meaning of the words "any insured" highlights an ambiguity that must be construed in favor of the policyholder. *Hartford Acc. & Indem. Co. v. Dana Corp.*, 690 N.E.2d 285, 295 (Ind. Ct. App. 1997); *Travelers Indem. Co. v. Summit Corp. of Am.*, 715 N.E.2d 926, 938 (Ind. Ct. App. 1999).

[20] *Prot. Strategies, Inc. v. Starr Indem. & Liab. Co.*, 2014 U.S. Dist. LEXIS 56652, *16 (E.D. Va. 2014) (construing a D&O policy which expressly stated that "the knowledge possessed by, or any Wrongful Act committed by, an Insured Person who is a past or current [CEO] . . . shall be imputed to the company" and holding that the CEO's guilty plea was thus imputed to the entity); *Twin City Fire Ins. Co. v. CR Techs.*, 90 F. Supp. 3d 1320, 1322–25 (S.D. Fla. 2015) (exclusion applied to the insured who *committed the crime*); *XL Spec. Ins. Co. v. Agoglia*, 2009 U.S. Dist. LEXIS 36601, at *39–40 (S.D.N.Y. 2009) (construing the words "any insured" in a *prior-knowledge* exclusion, not an intentional-act exclusion).

wrong, and not just "the" named insured? Or does it imply that one bad apple spoils coverage for the whole barrel? The exclusion does not say. But in Indiana, if an exclusion does not "clearly and unmistakably" apply, then the insurer loses. *Asbury*, 441 N.E.2d at 242; *Masonic*, 164 N.E.2d at 631. It is not difficult to state in an exclusion that "one insured's intentional act will be imputed to all insureds." *See Prot. Strategies*, 2014 U.S. Dist. LEXIS 56652, at *16 (construing a policy that expressly imputed a CEO's conduct to the organization). That would clear things right up. Of course, the insurer might find it hard to sell policies that say this—organizations might not buy insurance that disappears when just one employee breaks the law on purpose.[21]

LIU is trying to find a crucial, massive limitation on coverage in words that do not clearly communicate that limit to a customer. This is why courts construe such language against the insurer. It is a classic example of "deliberately obscure" language that cannot be used to defeat coverage. RESTATEMENT (SECOND) OF CONTRACTS § 206, cmt. *a*; *Flexdar*, 964 N.E.2d at 848. If an insurance company wants to limit coverage in such a severe way, it must be "honest about its offer up front" with the customer—or else it must bear the consequences. *Clemons v. Norton Healthcare Inc.*, 890 F.3d 254, 267 (6th Cir. 2018); *Flexdar*, 964 N.E.2d at 848.

LIU's second technical argument fares no better. The severability-of-insureds clause in the policy flatly states that "the **Wrongful Act** of any **Insured Person** shall not be imputed to

---

[21] LIU has also reserved its right to deny coverage under this exclusion for the Van Horn matter. [Ex. 2, Bond Aff. ¶ 9, Ex. E, at 7.] However, it concedes that this exclusion cannot be used to avoid its duty to defend that case, because no final adjudication has established her wrongful conduct. [*Id.*] As a result, even if LIU's argument on this exclusion had any merit *as to USAG*, it does not negate the duty to defend as to the rest of the Insured Persons. For example, the House and Senate letters were directed to Kerry Perry, then-CEO, and Rhonda Faehn, one of USAG's prior Senior Vice Presidents ("Insured Persons") and not USAG (an "Insured Organization"). Likewise, the CID is directed not only to USAG but also to USAG's officers ("Insured Persons"). Van Horn, White, and Penny are in the same protected group of "Insured Persons." Thus, even if Nassar's bad acts are imputed to the Insured Organization, as LIU argues, they cannot be imputed to other Insured Persons, as LIU admits. As a result, LIU still must provide a defense on all claims. *OSI Indus.*, 831 N.E.2d at 200; *Curtis-Universal*, 43 F.3d at 1122.

any other **Insured Person**." [Dkt. 2-14, § 4.9, at 133, 145.] LIU argues that since this clause mentions "Insured Persons" but not an "Insured Organization," the parties intended to impute any employee's wrongful act to any insured entity. [Ex. 2, Bond Aff. ¶ 14, Ex. J, at 13–14.] This argument is based on two flawed premises.

First, LIU assumes that without this textual guarantee to an **Insured Person**, the deliberate act of one individual insured would be imputed to all other insureds. That is not how policy interpretation works in Indiana. Except as imposed by law, **all** limitations on coverage "must be clearly expressed to be enforceable." *Flexdar*, 964 N.E.2d at 848. And in this state, absent language expressly imputing the conduct of one insured to another, the courts are not authorized to do so. *Frankenmuth*, 690 N.E.2d at 678. Thus, LIU's affirmation that "the **Wrongful Act** of any **Insured Person** shall not be imputed to any other **Insured Person**" does not mean such acts will be imputed to an Insured Organization. By recognizing a guarantee to some insureds, the policy does not somehow, by omission, reduce the guarantees to other insureds. Absent a clear, express limitation, no such limit exists. *Flexdar*, 964 N.E.2d at 848. To the extent that the "Insured Person" language would be rendered surplusage, the redundancy is the insurer's own creation, and cannot prejudice the policyholder.

Second, LIU misapplies the *expressio unius* canon of interpretation. *Steve Silveus Ins., Inc. v. Goshert*, 873 N.E.2d 165, 174–75 (Ind. Ct. App. 2007). The canon holds that "to express or include one thing implies the exclusion of the other." *Id.* But, by definition, the canon cannot be used to limit coverage in an insurance policy. Exclusions only apply if they are clear. *Flexdar*, 964 N.E.2d at 848. But if an exclusion would not apply without the help of an inference, then the exclusion is not clear. *Summit Corp.*, 715 N.E.2d at 938–39 (observing that exclusions may not be implied or inferred to block coverage to which they do not expressly apply). Based, as it is, on

negative inferences from the text, *expressio unius* is of doubtful value when reading an insurance-policy exclusion. *Id.* In fact, *Goshert* actually refused to apply the canon because the policy was ambiguous and, therefore, had to be construed against the insurer. *Goshert*, 873 N.E.2d at 175.

But even if it could apply, the canon is a poor fit for the argument LIU wants to make. *Expressio unius* is most persuasive in cases where the thing expressed is a departure from the ordinary. As one legal-interpretation expert has pointed out:

> If Mother tells Sally, "Don't hit, kick, or bite your little sister Anne," Sally is *not* authorized by *expressio unius* to "pinch" her sister. The reason is that the normative baseline (discerned from prior practice or just family culture) is "no harming sister," and the directive was [simply] an expression of such a baseline . . . . Contrariwise, where the directive in question is a departure from the normative baseline, the canon ought to have greater force. For example, if Mother tells Sally, "You may have a cookie [or] a scoop of ice cream," Sally has implicitly been forbidden to snap up that candy bar lying on the kitchen table.

WILLIAM ESKRIDGE, ET AL., CASES AND MATERIALS ON STATUTORY INTERPRETATION 335 (West Am. Casebook Series 2012). What ought to be clear to Sally is equally clear here. The "normative baselines" in Indiana are that (1) exclusions cannot be implied, but rather must be clearly expressed, and (2) the wrongful conduct of one insured is not imputed to any other insured. *Frankenmuth*, 690 N.E.2d at 678. An insurer who expressly recognizes that rule in one context is not implicitly repudiating it in all others. *See* F. REED DICKERSON, THE INTERPRETATION AND APPLICATION OF STATUTES 234–35 (1975) ("Far from being a rule, [*expressio unius*] is not even lexicographically accurate, because it is simply not true, generally, that the mere express conferral of a right or privilege in one kind of situation implies the denial of the equivalent right or privilege in other kinds.")

LIU's argument also makes little sense in practice. A policyholder who buys entity coverage and employee coverage reasonably expects it is getting more coverage, not less.

*Liggett*, 426 N.E.2d at 144 ("The reasonable expectation of the innocent insured that coverage will exist must be vindicated.") Yet the exact opposite is true under LIU's argument. An organization that simply buys entity coverage would be insured against negligent-supervision claims based on the intentional torts of its employees. But if the organization includes employee coverage in this policy, it ends up with virtually no entity coverage—since organizations can only act through their agents, one bad agent would spoil coverage for the whole entity. Thus, in seeking to procure more indemnity, the policyholder acquires less.

This cannot be true. Such a construction does violence to fundamental principles of Indiana insurance law: that "[a]n insurance policy should be so construed as to effectuate indemnification . . . rather than to defeat it," *Masonic*, 164 N.E. at 631, and that an insurer should not be able to collect premiums for coverage that, in practice, does not exist. *Webster v. Pekin Ins. Co.*, 713 N.E.2d 932, 937 (Ind. Ct. App. 1999); *Kiger*, 662 N.E.2d at 948 ("That an insurance company would sell a 'garage policy' to a gas station when that policy specifically excluded the major source of potential liability, is, to say the least, strange."). If the insurer wants to impose such a bizarre and counterintuitive limit on coverage, it must do so clearly, and not by a series of convoluted, backdoor inferences. *Flexdar*, 964 N.E.2d at 848; *Nat'l Mut. Ins. Co. v. Curtis*, 867 N.E.2d 631, 636 (Ind. Ct. App. 2007) (rejecting an insurer's argument because "only a very hardy soul" would have been able to understand its "convoluted" reading of the policy).

Finally, LIU's argument based on Nassar's guilty pleas relies on impermissible bootstrapping. *See Summit Corp.*, 715 N.E.2d at 938–40. Nassar was convicted on *ten* counts of sexual abuse. [Ex. 2, Bond Aff. ¶ 5, Ex. A, at 5.] But USAG is named in at least *ninety-five* lawsuits brought by hundreds of plaintiffs, most of whom are not the women involved in the Nassar plea. [*Id.* at 17–25.] LIU also knows that USAG has been the target of several major

investigations which do not arise out of these ten cases. [*Id.*] LIU points to no language in the policy that allows it to refuse a defense on the hundreds of unadjudicated claims merely because Nassar pleaded guilty to ten of them. LIU's policy requires the opposite—adjudicated claims. [Dkt. 2-14, § 4.9, at 133, 145.] Thus, even if LIU's any-insured argument is correct (and it is not), then LIU can only refuse a defense for the ten claims where a "final adjudication" exists.

2.     *The Bodily Injury Exclusion*

LIU also cites a bodily injury exclusion to avoid coverage for all the Nassar survivor-related claims. This position is also wrong.[22]

As an initial matter, the exclusion does not bar coverage for claims of "emotional distress" or "mental anguish . . . brought by or on behalf of any Third Party." [Dkt. 2-14, §§ 4.1, 23.21, at 132, 148.] LIU admits that the claims against USAG include claims of "shock, emotional distress[,] . . . embarrassment[,] . . . humiliation[,]" and the like. [Ex. 2, Bond Aff. ¶ 6, Ex. B, at 10.] This alone requires LIU to assume the defense of every Nassar lawsuit, since they all make such allegations. *See OSI Indus.*, 831 N.E.2d at 200; *Kocolene Mktg. Corp.*, 2002 U.S. Dist. LEXIS 8518, at *12 ("If recovery in the underlying suit is premised upon several theories of liability . . . the insurer has a duty to defend if just one theory falls within the policy's coverage."); *Curtis-Universal*, 43 F.3d at 1122. Since LIU is required to indemnify USAG against the emotional-distress claims asserted by the Nassar plaintiffs, it must defend all of the lawsuits. *Id.* End of story.

This exclusion also does not apply to the investigations or the criminal proceedings for another reason. In contrast with broader exclusions in other D&O policies that bar claims

---

[22] In addition to being wrong, it undermines LIU's claim that the investigations and prosecutions are not "related" to the underlying lawsuits. *Supra*, Part IV.C. If LIU wants to deny coverage on, for example, the Congressional investigation because it "arises out of" bodily injury, it must concede that the investigation is related to the bodily injury claims raised in the lawsuits.

"arising out of or related to" bodily injury, LIU's exclusion only applies to claims "for" bodily injury torts. [Dkt. 2-14, § 4.1, at 132.] These are materially different terms. *See, e.g.*, 4 NEW APPLEMAN ON INSURANCE LAW §§ 25.06[10] 26.07[3][c] (explaining that the terms "for" and "arising out of or related to" have different meanings); *Landing Council of Co-Owners v. Fed. Ins. Co.*, 247 F. Supp. 3d 802, 810–12 (S.D. Tex. 2017); *Clark v. Gen. Acc. Ins. Co. PR.*, 1996 U.S. Dist. LEXIS 20809, *4–11 (D. V.I. 1996) (explaining that even when the background to a claim involves property damage, the exclusion does not apply when the lawsuit is aimed at the parallel misconduct of directors and officers rather than the event causing the property damage).

The investigations are not claims "for" bodily injury. Instead, they are "formal criminal, administrative or regulatory proceeding[s] or formal investigation[s] against" USAG for its alleged failures as an organization. [Dkt. 2-14, § 23.3(c), at 147.] Congress has criticized USAG for its alleged failure to supervise, detect, or stop Nassar. *See* U.S. HOUSE COMMITTEE ON ENERGY & COMMERCE, OVERSIGHT & INVESTIGATIONS SUBCOMM., *Examining the Olympic Community's Ability to Protect Athletes from Sexual Abuse* (May 23, 2018), prelim. tr. at 98, 117–19. The Ropes & Gray investigation sought evidence of the same alleged structural failures, [Ex. 1, Shollenbarger Aff., ¶ 13, Ex. H, R&G Rept., at 1–20], and the USOC complaint seeks to decertify USAG on similar grounds. [*Id.* ¶¶ 7–8, Ex. B, USOC Compl., ¶¶ 10–21.] The IAG's Investigation alleges violations of the Indiana Nonprofit Corporations Law—something far afield from bodily injury, which should trigger a Nonprofit D&O policy. [*Id.* ¶ 9, Ex. C, Ind. Att'y Gen. CID at 1.]

This is also true for the criminal cases involving Penny and White. There is no reasonable argument that these cases assert claims *for* bodily injury. [*Id.* ¶ 12.] Instead, they relate to alleged obstruction of justice and tampering with evidence. [*Id.*]

The exclusion simply does not apply to any criminal matter. An indictment is not a claim "for" bodily injury. It is a claim "for" a violation of the criminal law and seeks to punish the offender. *See Shelter Mut. Ins. Co. v. Bailey*, 513 N.E.2d 490, 497 (Ill. Ct. App. 1987); *see also In re Barr*, 13 S.W.3d 525, 533 (Tex. 1998); *State v. Almendarez*, 301 S.W.3d 886, 893 (Tex. Ct. App. 2009). A claim is only "for" bodily injury if it seeks damages to remedy bodily injury or property damage. *See Snohomish Cty. v. Allied World Nat'l Assur. Co.*, 276 F. Supp. 3d 1046, 1059 (W.D. Wash. 2017) ("[W]hatever a loss of consortium claim is, it is *not* a claim *for* bodily injury.") (emphasis in original). A criminal prosecution or investigation, however, does not seek to redress bodily injury. *See Barr*, 13 S.W.2d at 533; *Almendarez*, 301 S.W.3d at 893. Thus, these claims do not fall within the exclusion.

Under Indiana law, all restrictions on coverage "must be clearly expressed to be enforceable." *Flexdar*, 964 N.E.2d at 848. This is particularly true when it comes to policy exclusions. *See id.* The bodily injury exclusion does not clearly apply here. Consequently, it does not negate coverage, and even more clearly, it does not block the duty to defend. LIU must defend USAG against each claim.

**E.    LIU Must Reimburse USAG for Defense Costs Already Spent and Assume the Defense of All Nassar Claims.**

Since LIU must defend USAG from all of the Nassar Claims, it has a duty to pay all reasonable defense costs. LIU has paid a small percentage of USAG's defense costs in the underlying survivor lawsuits, according to a cost-sharing agreement between USAG's insurers. [*E.g.*, Ex. 2, Bond Aff. ¶ 5, Ex. A, at 15.] It should continue to pay these costs. However, LIU has not paid for the defense of the congressional hearings, the Ropes & Gray investigation, or the IAG's Investigation. Instead, it has forced USAG to incur $1,372,548.90 in legal fees for those matters. [Ex. 1, Shollenbarger Aff. ¶ 14.] USAG also spent $55,076.00 in legal-research fees for

the civil lawsuits. [*Id.*] LIU should be ordered to immediately reimburse USAG for these costs.

The policy defines "Defense Costs" broadly. Such costs include all "reasonable and necessary fees (including attorneys' fees and experts' fees) and expenses incurred in the defense of a **Claim**." [Dkt. 2-14, § 23.4, at 137.] The Indiana courts have interpreted this language to require "a full defense against the allegations . . . to protect [the insured] from whatever may happen." *Thomson Inc. v. Ins. Co. of N. Am.*, 11 N.E.3d 982, 1026–27 (Ind. Ct. App. 2014). Under both the policy and the law, LIU has a separate duty to defend each "particular case at issue." *Id.* at 1025; [Dkt. 2-14, § 2, at 132.]

The policy treats the lawsuits, investigations, and prosecutions as individual claims in their own right.[23] [*Id.* § 23.3, at 137, 147.] The definition of a "Claim" in the policy includes "a written demand for monetary relief," "the commencement of a civil or criminal judicial proceeding against an **Insured**," and "the commencement of formal criminal, administrative, or regulatory proceedings, or formal investigation against the **Insured**." [*Id.*] Courts have treated similar inquiries as "claims" triggering coverage. *See, e.g.*, *Polychron v. Crum & Foster Ins. Cos.*, 916 F.2d 461, 463 (8th Cir. 1990) (grand jury); *Joseph P. Bornstein, Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 828 F.2d 242, 245 (4th Cir. 1987) (regulatory proceedings); *Dan Nelson Auto. Grp. v. Universal Underwriters Grp.*, 2008 U.S. Dist. LEXIS 4987, at *12–17 (D. S.D. 2008) (CID from state attorney general).

Although it has paid a small portion of the defense bills in the survivor lawsuits, it left

---

[23] Although the policy "deems" all the Nassar proceedings as one "Claim," this is only relevant to determining whether coverage extends beyond the termination date of the policy. [Dkt. 2-14, § 9.2, at 134.] LIU cannot (and does not) contend that it is only obliged to provide a defense for the first Nassar lawsuit filed against USAG. Similarly, because the policy treats each proceeding as a "Claim" in its own right, LIU would be required to provide a full defense in that context even if the initial claims were settled. [*Id.* § 23.3, at 137, 147.]

USAG to fend for itself in all other fora. [Ex. 2, Bond Aff. ¶ 5, Ex. A, at 15.] When an insurer does this, Indiana courts presume that the policyholder's legal fees are "reasonable and necessary." *Thomson*, 11 N.E.2d at 1023–24. This presumption exists for two reasons. *Id.* First, "the policyholder, which is defending itself without any assurance it will be reimbursed, provides a market-based check on the amounts spent, a better check than any court can provide after-the-fact." *Id.* Second, "it is unfair to let a breaching insurer nit-pick costs later when it could have—had it honored its duty to defend—initially directed the defense in any reasonable way it wished." *Id.*

LIU cannot rebut that presumption here. *Thomson* refused to second-guess market-tested fees in a massive, toxic-tort class action litigated in Taiwan. 11 N.E.2d at 990, 1023–27. In its analysis, the court looked, in part, to the complexity and difficulty of the case. *Id.* at 1025 (citing Ind. R. Prof. Conduct 1.5). The Nassar case, likewise, is not a run-of-the-mill mass-tort case. It is the largest sexual abuse scandal in sports history. It is at the center of a sexual-assault maelstrom that has shaken public confidence in our cultural institutions. As evidenced by this Chapter 11 filing, it threatens to destroy USAG itself. Since LIU has refused to defend anything except a tiny portion of the civil lawsuits, it cannot second-guess USAG's decision to retain top counsel in the other cases.

USAG's CFO has reviewed defense counsel's invoices for each of the investigations and prosecutions, as well as litigation counsel's legal-research fees. [Ex. 1, Shollenbarger Aff. ¶ 14.] USAG's out-of-pocket expenses for these matters total $1,427,624.90. [*Id.*] LIU should be required to pay these costs with no further delay, especially given USAG's financial condition.

## CONCLUSION

LIU must defend USAG on all fronts. As a result, the court should **GRANT** this motion and (1) declare that LIU had a duty to defend USAG and its current and former employees on all of the Nassar Claims; (2) order LIU to provide a complete defense to USAG and its current and former employees on all Nassar Claims until there is no possibility for coverage on any Nassar Claim; (3) order LIU to reimburse USAG $1,427,624.90, plus prejudgment interest (8% simple interest); (4) order LIU to reimburse USAG's former and current employees (Penny, White, and Van Horn) their incurred defense costs, plus pre-judgment interest (8% simple interest).

Respectfully Submitted,

/s/ *Christopher E. Kozak*
George M. Plews (#6274-49)
Gregory M. Gotwald (#24911-49)
Tonya J. Bond (#24802-49)
Steven A. Baldwin (#34498-49)
Christopher E. Kozak (#P82156)
PLEWS SHADLEY RACHER & BRAUN LLP
1346 N. Delaware St.
Indianapolis, IN 46202-2415
(317) 637-0700
*Attorneys for USA Gymnastics*
gplews@psrb.com
ggotwald@psrb.com
tbond@psrb.com
sbaldwin@psrb.com
ckozak@psrb.com

### CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2019, a copy of the foregoing Brief in Support was filed electronically.  Notice of this filing will be sent to the following parties through the Court's Electronic Case Filing System.  Parties may access this filing through the Court's system.

| | |
|---|---|
| Scott P. Fisher<br>Drewry Simmons Vornehm, LLP<br>sfisher@DSVlaw.com<br><br>George R. Calhoun V<br>Ifrah PLLC<br>george@ifrahlaw.com<br>*Counsel for TIG Insurance Company* | James P. Moloy<br>Bose McKinney & Evans LLP<br>jmoloy@boselaw.com<br><br>Kevin P. Kamraczewski<br>Law Offices of Kevin P. Kamraczewski<br>kevin@kevinklaw.com<br><br>Robert B. Millner<br>Ronald D. Kent<br>Susan M. Walker<br>Dentons US LLP<br>robert.millner@dentons.com<br>ronald.kent@dentons.com<br>susan.walker@dentons.com<br>*Counsel for Virginia Surety Company Inc.,*<br>*f/k/a Combined Specialty Insurance Company* |
| Jeffrey B. Fecht<br>Riley Bennett Egloff LLP<br>jfecht@rbelaw.com<br>*Counsel for RSUI Indemnity Company* | Laura A. DuVall<br>Ronald J. Moore<br>Office of the U.S. Trustee<br>Laura.duvall@usdoj.com<br>Ronald.moore@usdoj.com<br>*Counsel for U.S. Trustee* |

/s/ *Christopher E. Kozak        /*
Christopher E. Kozak

I, Tonya J. Bond, certify that on March 4, 2019, a copy of the foregoing Brief in Support will be served via U.S. mail on the following:

| | |
|---|---|
| Ace American Insurance Company<br>f/k/a Cigna Insurance Company<br>CT Corporation System<br>150 W. Market St., Ste. 800<br>Indianapolis, IN 46204-2814 | Great American Assurance Company<br>CT Corporation System<br>150 W. Market St., Ste. 800<br>Indianapolis, IN 46204-2814 |
| Liberty Insurance Underwriters Inc.<br>Corporation Service Company<br>135 N. Pennsylvania St., Ste. 1610<br>Indianapolis, IN 46204-2448 | National Casualty Company<br>Corporation Service Company<br>135 N. Pennsylvania St., Suite 1610<br>Indianapolis, IN 46204-2448 |
| Western World Insurance Company | Endurance American Insurance Company |

| | |
|---|---|
| 300 Kimball Dr., Ste. 500<br>Parsippany, NJ 07054 | c/o CT Corporation System. Registered Ag<br>150 W Market St., Ste. 800<br>Indianapolis, IN 46204-2814 |
| American International Group, Inc.<br>175 Water St., Floor 18<br>New York, NY 10038-4976 | American Home Assurance Company<br>c/o CT Corporation System. Registered Ag<br>150 W. Market St., Ste. 800<br>Indianapolis, IN 46204-2814 |

*/s/ Tonya J. Bond*
Tonya J. Bond