**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| USA GYMNASTICS, INC., | Case No. 18-09108-RLM-11 |
| Debtor. | Adv. Proc. No. 1:19-ap-50012 |

| | |
|---|---|
| USA GYMNASTICS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| ACE AMERICAN INSURANCE COMPANY f/k/a | ) |
| CIGNA INSURANCE COMPANY, GREAT | ) |
| AMERICAN ASSURANCE COMPANY, LIBERTY | ) |
| INSURANCE UNDERWRITERS INC., NATIONAL | ) |
| CASUALTY COMPANY, RSUI INDEMNITY | ) |
| COMPANY, TIG INSURANCE COMPANY, | ) |
| VIRGINIA SURETY COMPANY, INC. f/k/a | ) |
| COMBINED SPECIALTY INSURANCE | ) |
| COMPANY, WESTERN WORLD INSURANCE | ) |
| COMPANY, ENDURANCE AMERICAN | ) |
| INSURANCE COMPANY, AMERICAN | ) |
| INTERNATIONAL GROUP, INC., AMERICAN | ) |
| HOME ASSURANCE COMPANY, and DOE | ) |
| INSURERS, | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF USA GYMNASTICS' BRIEF IN SUPPORT
OF MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST CHUBB**

# I.    INTRODUCTION

Chubb[1] sold three years of primary and excess insurance policies to USA Gymnastics ("USAG") and owes USAG up to $45 million in limits for sexual-abuse related claims. The proceeds from the Chubb policies are critical to USAG's ability to resolve the survivors' allegations that USAG is legally responsible for sexual abuse committed by Larry Nassar ("Nassar") or by other persons (collectively, the "Sexual Abuse Claims"). Chubb, however, argues that its policy limits are much lower. Chubb contends that if a perpetrator abused multiple people in more than one of its policy periods, Chubb only has to pay a single policy year's limits—the limits in the first year the perpetrator abused someone during its policies. Chubb's flawed interpretation significantly reduces available coverage. For example, Chubb's position results in only $11 million (instead of $33 million) of available limits for Nassar claims alone. Chubb's position is incorrect, for two basic reasons.

*First*, Chubb incorrectly applies the "channeling" language in the primary policies to the excess policies, even though doing so contradicts the excess policies' clear terms. Chubb's excess policies each state that $10 million in limits is available "during each annual period." Payment of the excess limits is determined by the excess policies' obligation to pay above any "exhausted" or "reduced" primary limit. Chubb concedes that all three excess policies cover sexual abuse claims, but it contends that "channeling" language in the primary policies means that Chubb's maximum exposure is one set of excess limits. However, Chubb itself labeled this "channeling" language as a "Limit of Insurance." The excess policies explicitly instruct the

---

[1] "Chubb" collectively refers to Chubb North American Claims, which is the claims administrator for ACE American Insurance Company ("ACE"), which succeeded to the liabilities of CIGNA Insurance Company ("CIGNA"). CIGNA sold the 1998-99 and 1999-2000 policies at issue here. ACE sold the 2000-01 policy. *See infra* note 2.

reader to <u>ignore</u> anything "related to" the primary policies' "limits of insurance" terms when interpreting the scope of coverage under the excess policies. Moreover, the deemer clause in the primary policy, on which Chubb relies, is a "limit" term in substance as well as in form. The primary policies' limits terms are also "inconsistent with" the excess policies' terms—another situation where the excess policy instructs the reader to ignore primary-policy terms. So even if Chubb's strained reading of the ambiguous language in its primary policies is correct (and it is not), then that reading still cannot control coverage under the excess policies. The full three years of excess coverage are available.

***Second***, the language in the primary policies does not support the coverage-limiting outcome Chubb seeks. Chubb's argument is cobbled together from a convoluted mishmash of four ambiguous clauses, none of which actually say what Chubb claims they do. The essential failure in Chubb's argument is that the primary policies do not include any term expressly channeling claims from all three policy periods into one year. Other insurers have used such terms, but Chubb did not. This failure renders the "limits" terms in the primary policy's endorsement ambiguous at best. Chubb's failure to include such an other-policy-period channeling term means that only claims falling within the individual policy period are aggregated. At a minimum, this lack of clarity in Chubb's alleged "channeling" language requires that the primary policies be construed in favor of coverage for USAG. There are separate limits for each perpetrator within each policy period.

Chubb's refusal to accept the real limits of its coverage in all three policy years impedes USAG's ability to reach a global resolution among its carriers and the sexual abuse survivors. For this reason, USAG seeks an expedited hearing on its partial summary judgment motion and the entry of an order declaring that limits from all three Chubb policy years are available for the

- 3 -

Sexual Abuse Claims.

## II.     STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Chubb sold three primary CGL policies and three CGL excess policies to USAG between 1998 and 2001.[2] [Dkt. 2-6; Dkt. 2-7; and Dkt. 2-8, at 1–284; MP_000595–1321; Compl. Ex. 4, Tabs 17–22.]

### A.     The Chubb Primary Policies

Each of Chubb's primary policies contains an endorsement that provides "Physical Abuse or Sexual Misconduct Liability Coverage."[3] [Dkt. 2-6, at 12–13; Dkt. 2-7, at 204–05; Dkt. 2-8, at 261–62 (hereinafter referred to as the "Sexual Abuse Coverage").] Each endorsement bars coverage under "this insurance" for "physical abuse or sexual misconduct," "[e]xcept to the extent coverage is provided by this endorsement." [E.g., Dkt. 2-6, at 12.] *Physical Abuse* is defined as "actual, alleged, or threatened physical maltreatment." [*Id.* at 13, §4.] *Sexual Misconduct* is defined as "any conduct, whether actual, alleged, or threatened, of a sexual nature." [*Id.*]

These endorsements contain their own insuring agreements for physical or sexual abuse, rather than modifying other coverages in the policy. [*Id.* at 12, §1.a–b.] The endorsements specifically apply to abuse that occurs "during the policy period" [*id.*, at §1.b(3)(a)], or "during any <u>subsequent</u> policy period in which [the insurer] issued a policy which would apply . . . except for a provision that such 'bodily injury' or 'sexual misconduct' be caused by an act of 'physical abuse' or 'sexual misconduct' first committed during its policy period." [*Id.*, §1.b(3)(b)

---

[2] The three primary policies were written annually, and were in force from August 1, 1998 to August 1, 1999 (the "1998 policy"), from August 1, 1999 to August 1, 2000 (the "1999 policy"), and from August 1, 2000 to August 1, 2001 (the "2000 policy"). The three annual excess policies were in force during the same time periods. [Dkt. 2-4, at 1.]

[3] A copy of this endorsement is attached as **Exhibit 1.**

(emphasis added).] Each primary policy requires that an act of "physical abuse" or "sexual misconduct" be "first committed during the policy period." [Dkt. 2-6, at 12, §1.b(2); Dkt. 2-7, at 204; Dkt. 2-8, at 261.]

The sexual-abuse endorsements also contain their own separate "Limits of Insurance" sections, labeled as such. [*Id.* at 12–13, §3.] They provide both an "Each Act" limit of $1 million and an "aggregate" limit of $5 million. [*Id.* at 12.] The "Limits of Insurance" section of the endorsements includes the following language:

> a. All acts or omissions which cause or contribute to "physical abuse" or "sexual misconduct by a single individual for whose conduct any insured is legally responsible shall be considered a single act, subject to the Each Act limit of insurance, regardless of the number of acts or omissions, number of persons injured, number of insureds responsible or number of locations involved.

> b. The Each Act of "Physical Abuse" or "Sexual Misconduct" limit of insurance shown above is the most we will pay in judgments or settlements for a single act of "physical abuse" or "sexual misconduct," or both. If this policy provides a General Aggregate limit, the "Physical Abuse" or "Sexual Misconduct" Aggregate limit shall be part of and not in addition to the General Aggregate limit. The most we will pay in total judgments or settlements during any policy period is the "Physical Abuse" or "Sexual Misconduct" Aggregate limit to the extent there is coverage available in any applicable General Aggregate limit.

> c. If this coverage form and any other coverage form or policy for the same policy period issued by us or any company affiliated with us apply, the maximum applicable limits of insurance available under all coverage forms or policies shall not exceed the highest applicable limits of insurance under any one coverage form or policy.

[*Id.* at 13, §3.a–c (emphasis added).] Chubb does not dispute that there are numerous claimants who Nassar or other perpetrators first abused during all three policy periods.

**B.    The Chubb Excess Policies**

Each of Chubb's three excess policies has an identical insuring agreement.[4] [Ex. 2, P&C

---

[4] Copies of the relevant portions of the excess policies are attached as **Exhibit 2.**

Excess Ins. Agmt., at 1, §I.A; Dkt. 2-7, at 2–9; Dkt. 2-8, at 2–8, 277–84.] The excess policies separately and independently promise to pay for "injury or damage covered by the UNDERLYING INSURANCE . . . that takes place during OUR policy period." [Ex. 2, at 1, §I.A.] Under these policies, Chubb agreed to "pay on YOUR behalf the ULTIMATE NET LOSS in excess of the applicable limits of the UNDERLYING INSURANCE listed in the attached Schedule of UNDERLYING INSURANCE (whether such insurance is collectible or not)."[5] [*Id.*] There is no dispute that the Chubb primary policies are the "underlying insurance" for purposes of these excess policies.

Under each excess policy, all "Definitions, Terms, Conditions, Limitations, and Exclusions of the UNDERLYING INSURANCE, in effect at the inception date of this policy, apply to this coverage." [*Id.*] This incorporation or "following form" language comes with two important caveats: The terms of the underlying policy do not control the excess coverage if they "relate to premium, subrogation, any obligation to defend, limits of insurance, cancellation or any renewal agreement," or if "they are inconsistent with provisions of this policy." [*Id.* (emphasis added).]

Each of Chubb's excess policies separately promises to pay up to $10 million "for all covered damages sustained during each annual period of this policy." [Ex. 2, at 1, §1.B; Dkt. 2-7, at 2; Dkt. 2-8, at 2, 277 (emphasis added).] Although these are labeled as "each occurrence" limits, there is effectively only one limit available because the excess policies' aggregate limit is also $10 million. [*Id.*] The excess policies further provide that "if the UNDERLYING

---

[5] The term *ultimate net loss* is defined as "the amount paid or payable in cash in the settlement or satisfaction of claims for which the INSURED is liable, either by adjudication or compromise with OUR written consent, after making proper deduction for all recoveries and salvages." [*Id.* at 4, §III.F.] An *occurrence* is defined as "an accident including continuous and repeated exposure to substantially the same general harmful conditions." [*Id.*, §III.C.]

INSURANCE limit has been reduced or exhausted solely by reason of losses paid thereunder arising out of OCCURRENCES which take place during OUR policy period, then this policy shall: [1.] In the event of reduction, pay the excess of the reduced underlying limit; [2.] In the event of exhaustion continue in force as UNDERLYING INSURANCE." [Ex. 2, at 1, §1.B.]

### III.    LEGAL STANDARD

A court must grant partial summary judgment to a party when there is no genuine dispute of material fact and the party is entitled to judgment as a matter of law on a specific issue. Fed. R. Civ. P. 56(a). Summary judgment is a particularly useful tool when confronting questions of law "because there are no genuine issues of material fact that must be resolved." *See Am. Nat'l Fire Ins. Co. v. Rose Acre Farms*, 846 F. Supp. 731, 735 (S.D. Ind. 1994). Contract-interpretation cases fit into this category. *Id.*

In Indiana, the meaning of an insurance policy is a pure issue of law. *See id.* If a policy is ambiguous, the court must construe it in favor of coverage rather than submitting the ambiguity to a jury. *Eli Lilly & Co. v. Home Ins. Co.*, 482 N.E.2d 467, 471 (Ind. 1985). Thus, it is particularly appropriate for a court to use summary judgment to rule on the meaning of terms in an insurance policy, as there are typically no factual issues to resolve. *Rose Acre Farms*, 846 F. Supp. at 735.

Indiana has adopted a set of rules for interpreting insurance policies. The most essential is that "[a]n insurance policy should be so construed as to effectuate indemnification . . . rather than to defeat it." *Masonic Acc. Ins. Co. v. Jackson*, 164 N.E. 628, 631 (Ind. 1929). Under Indiana law, a policy term is ambiguous if reasonable persons may honestly differ as to the meaning of the policy language. *Id.* The fact that policy terms have been accorded different meanings by different courts is itself important evidence of ambiguity. *Hartford Acc. & Indem. Co. v. Dana*

*Corp.*, 690 N.E.2d 285, 295, 298 (Ind. Ct. App. 1997); *see also Travelers Indem. Co. v. Summit Corp. of Am.*, 715 N.E.2d 926, 938 (Ind. Ct. App. 1999). If there is any ambiguity in a policy term, Indiana interprets it in favor of the policyholder and in favor of coverage. *Eli Lilly & Co.*, 482 N.E.2d at 470–71.

If a policyholder's interpretation is reasonable, then that construction governs as a matter of law. *Eli Lilly & Co.*, 482 N.E.2d at 471. The policyholder need not prove that its interpretation of a term is the only reasonable one. *Id.* "Where *any* reasonable construction can be placed on a policy that will prevent the defeat of the insured's indemnification for a loss covered by general language, that construction will be given." *Am. Econ. Ins. Co. v. Liggett*, 426 N.E.2d 136, 144 (Ind. Ct. App. 1981) (emphasis supplied). Conversely, to defeat coverage, an insurer must prove that its construction of the insurance agreement is the *only* plausible or reasonable reading. *Id.*

Exclusions from and limitations on coverage are subject to especially strict scrutiny. *Kiger*, 662 N.E.2d at 947, 949; *Asbury v. Ind. Union Mut. Ins. Co.*, 441 N.E.2d 232, 242 (Ind. Ct. App. 1982). Limitations and exclusions bar coverage only when their terms "clearly and unmistakably" apply. *Asbury*, 441 N.E.2d at 242; *Kiger*, 662 N.E.2d at 947, 949; *Masonic*, 164 N.E. at 631 (holding that coverage "will not be destroyed by language of exception, unless such exception shall be clear, and free from reasonable doubt."). Chubb bears the burden of showing that a limitation applies, *FLM, LLC v. Cincinnati Ins. Co.*, 27 N.E.3d 1141, 1143 (Ind. Ct. App. 2015). Any lack of certainty in the application of an exclusion must be resolved in favor of coverage as a matter of law. *Kiger*, 662 N.E.2d at 947.

## IV.   ARGUMENT

The policies Chubb sold to USAG provide up to $45 million in limits for the Sexual Abuse Claims, including $33 million for the Nassar-related claims. USAG is entitled to $1

million per perpetrator (up to the $5 million aggregate limit) for each of the three primary policies, and one $10 million aggregate limit for each of the three excess policies.

**A.     Each of the excess policies provides a separate $10 million limit, regardless of Chubb's construction of the underlying policies.**

Regardless of how a court construes Chubb's Physical Abuse or Sexual Misconduct endorsements in the primary policies, each of the three excess policies indisputably has a $10 million aggregate limit.

Each excess policy is triggered whenever the loss exceeds the limit of any coverage in the underlying insurance.[6] The policies expressly instruct the reader to disregard the terms of the underlying insurance if they "relate to . . . limits of insurance" or are "inconsistent with provisions of this policy." Chubb elected to define the primary policy's single-act deemer clause, which it says channels all claims into a single act as a "Limit of Insurance." Chubb labeled the primary policy's deemer clause this way, as a "Limit of Insurance." And that clause, indeed, operates to <u>define</u> the Sexual Abuse Coverage's "Each Act" limit. Because the deemer clauses are "limits" in both form and substance—by the policies' own terms—the Court must ignore them when determining the amount of excess coverage that is available for the Sexual Abuse Claims.

Moreover, the excess policies state that the $10 million limit is only applicable "during each annual policy period." This limit is explicitly measured by an "each occurrence" and "ultimate net loss" standard, rather than the "Each Act" limits standard used by the primary

---

[6] The excess policy states that its limits "shall apply separately" to "any other coverage for which the UNDERYLING INSURANCE provides an aggregate limit." [Ex. 2, at 1, §I.B.] Chubb's Sexual Abuse Coverage endorsement has an aggregate limit. [Ex. 1, at 1.] Any argument that the excess policies are not triggered by the exhaustion of the endorsement's limits is wholly without merit.

policies. Thus, the excess policies' limits provisions are inconsistent with the primary policies' limits terms, and the excess policies' terms control the excess coverage.

1.  *The "deemer" terms in the primary policies are "Limits of Insurance" in both form and substance, and they do not control the excess policies.*

The excess policies pay the "ULTIMATE NET LOSS in excess of the applicable limits of the UNDERLYING INSURANCE . . . whether such insurance is collectible or not." [Ex. 2, at 1, §I.A.] Chubb concedes that all three excess policies cover certain sexual-abuse claims, but contends that the "deemer" terms from the <u>primary</u> policies "Limits of Insurance" section control coverage under the <u>excess</u> policies.

This is incorrect. Chubb explicitly labeled the each-act "deemer" mechanism as a "Limit of Insurance" in the primary policies. [Dkt. 2-6, at 13, §3.] The excess policies do not follow form as to those limits of insurance terms because the excess policies state—in plain and unambiguous words—that terms of the underlying insurance do not apply if "they . . . relate to premium, subrogation, any obligation to defend, the payment of expenses, [or] limits of insurance." [Ex. 2, at 1, §I.A (emphasis added).]; *Coleman Co. v. Cal. Union Ins. Co.*, 960 F.2d 1529, 1533 & n.8 (10th Cir. 1992) (observing that the excess insurer, having deleted this language, was bound by the limits calculation formula in the underlying policy); *Stryker Corp. v. XL Ins. Am., Inc.*, 2013 U.S. Dist. LEXIS 90305, *13–14 (W.D. Mich. 2013) (holding that identical language "follows form to the underlying [primary] policy inasmuch as it insures against the same risks. That does not mean that the [excess] policy cannot include conditions of coverage that differ from the underlying [primary] policy.").

Indeed, in *Stryker*, the excess insurer <u>avoided</u> coverage precisely because it had defenses different than those in the primary policy. *Stryker*, 2013 U.S. Dist. LEXIS 90305 at *12–14. What's good for the goose is good for the gander. Having labeled its deemer clauses as "Limits

- 10 -

of Insurance," Chubb cannot argue that they nonetheless control the excess policies, when these very excess policies state the primary policies' "limits of insurance" <u>do not</u> control. Without the primary policies' "Limits of Insurance" terms, there is no basis for Chubb to claim that all acts of abuse are a "single act" for purposes of excess coverage. [*See* Ex. 3, at 1–2 (providing a copy of the endorsement with limits sections removed).]

The deemer clauses also operate as limits in substance. *Benjamin Moore & Co. v. Aetna Cas. & Sur. Co.*, 843 A.2d 1094, 1104 (N.J. 2004) (treating a deductible amount as part of the "limits" because it "is specifically described as a functional piece of the 'Limits of Insurance,' and, as a matter of logic, operates that way in all cases."). The deemer clauses purport to cap (or "limit") Chubb's primary-policy liability at $1 million per "act" of sexual misconduct. [Dkt. 2-6, at 12.] This "Each Act" limit is defined by the "Limits of Insurance" section, which explains that "all acts or omissions which cause or contribute to" abuse by a single individual are "a single act, subject to the Each Act limit of insurance." [*Id.* at 13, §3.a.] The deemer clauses are a "functional piece" of the "Each Act" limit that Chubb invokes under the primary policies, they "operate[] that way in all cases," and they must be considered as such. *Benjamin Moore & Co.*, 843 A.2d at 1104.

Chubb claims that the disregard-the-limits term in the excess policy only refers to the dollar numbers in the excess policies. Thus, according to Chubb, this term only means that the $1 million "Each Act" limit of the primary policies is replaced with a $10 million limit from the excess policies. Chubb's argument borders on the frivolous. <u>Chubb</u>, not USAG, decided to characterize the "Each Act" terms as "Limits of Insurance." [Ex. 1, at 2, §3.] <u>Chubb</u>, not USAG, wrote the excess policies to state that the "Limits of Insurance" provisions in the primary policies do not apply to the excess policies. Chubb's attempt to penalize <u>USAG</u> for Chubb's own drafting

choices is precisely why policy language is construed against the insurer. *Kiger*, 662 N.E.2d at 947. ("This strict construal against the insurer is driven by the fact that the insurer drafts the policy and foists its terms upon the customer. . . . [W]e buy their forms or we do not buy insurance.") (quotations omitted).

Chubb may argue that it meant for the deemer clauses to be substantive coverage terms and not "Limits of Insurance." But that does not matter. "Courts must interpret an insurance policy as written, not as the insurance company wishes it were written." *Schmitz v. Great Am. Assur. Co.*, 337 S.W.3d 700, 707 (Mo. 2011); *Strauss v. Chubb Indem. Co.*, 771 F.3d 1026, 1033 (7th Cir. 2014) (Wisconsin law) ("Although the Chubb defendants undoubtedly would prefer [coverage-limiting terms] under the Policy, when they have failed to do so in the insurance contract itself, this court will not rewrite the contract . . . to release the insurer from a risk it could have avoided through a more foresighted drafting of the policy.") (quotations and alterations omitted). Insurance companies, including Chubb, frequently complain that courts may not rewrite a policy to provide "a better policy of insurance than the one purchased." *Longobardi v. Chubb Ins. Co.*, 582 A.2d 1257, 1260 (N.J. 1990). It follows that the Court may not rewrite a policy to make it worse—but that is precisely what Chubb seeks here.

Chubb's primary policies are plainly written so that the deemer clauses are part of the "Limits of Insurance." The excess policies specifically disclaim the underlying "Limits of Insurance" or anything "related to" those limits. Here, that includes the "Each Act" deemer clause. Thus, the deemer clauses cannot, and do not, impact coverage under the excess policies.

Chubb's contrary position is not only wrong, "there is no rational, principled basis for it." *Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 520 (Ind. 1993). If Chubb continues to insist on this argument, it may be subject to frivolous litigation penalties. *See Royal Crown Bottling Corp. v.*

*Cincinnati Insurance Company,* Cause No. 49D02-0708-PL-033992 (Marion County Super. Ct. October 27, 2008); *Pollution Control Industries, Inc. v. Greenwich Insurance Company,* Cause No. 45D04-0505-PL-00018 (Lake County Super. Ct. August 26, 2008); *State Farm Fire & Casualty Company v. Cefali,* Cause No. 45D04-0507-PL-00030 (Lake County Super. Ct. January 25, 2007). Copies of the above decisions are attached as **Exhibit 4**.

2.      *The excess policies expressly state that the $10 million limit is only applicable "during each annual policy period."*

The excess policies <u>also</u> state that the terms of the underlying insurance do not apply to the extent they are "inconsistent with provisions of this policy." [Ex. 2, at 1, §I.A.] Chubb's argument is that the primary policies' deemer clauses leave USAG with only one $10 million limit for all three years of Nassar claims that fall under Chubb's policies. However, each of the excess policies expressly states to the contrary that its limit "shall be the total of OUR liability for all covered damages sustained during <u>each annual policy period</u>." [*Id.*, §I.B (emphasis added).] In other words, each excess policy promises to pay up to $10 million for injuries sustained during its annual policy period. None of the excess policies provides that its limit applies to injuries sustained during a prior or subsequent policy period, as would be the case if Chubb's one-limit-for-three-years argument were correct. Thus, to the extent that the primary policies purport to confer only one limits' worth of insurance over three years of coverage, that term is indisputably "inconsistent" with the excess policies' promise of a separate $10 million in limits. These terms cannot apply to the excess policies.

3.      *The "Each Act" measurement in the primary policies is superseded by the inconsistent "Each Occurrence" and "Ultimate Net Loss" measurement in the Excess Policies.*

Finally, it is not permissible to use the "Each Act" deemer clause from the primary policies to determine coverage under the excess policies. That term, too, is "inconsistent with"

the provisions of the excess policies. [Ex. 2, at 1, §I.A.]

The excess policies measure coverage by "ultimate net loss" resulting from "each occurrence" that takes place during the policy period. [Ex. 2, at 1, §§I.A, I.B.]; *Stryker Corp.*, 2013 U.S. Dist. LEXIS 90305, at *16 ("The definition of Ultimate Net Loss is part of the words of coverage."). They further provide that "[i]f the UNDERLYING INSURANCE limit has been reduced or exhausted solely by reason of losses paid thereunder arising out of OCCURRENCES which take place during [the] policy period," then the excess policy will "pay the excess of the reduced underlying limit" or "continue in force as UNDERLYING INSURANCE" (if exhausted, rather than reduced) during that policy year. [*Id.*, §I.B.]

The primary policies' $1 million "Each Act" deemer clause is plainly a "reduced" limit. Otherwise, the Sexual Abuse Coverage's insuring agreements would provide up to $5 million in aggregate limits if there were five abuse claimants during the policy year. By "deeming" all abuse by a single perpetrator as one "act," Chubb is only liable for up to $1 million for these claims, rather than $5 million.

But the excess policies do not have this restriction. Once the underlying policy pays its underlying limit—including a "reduced underlying limit"—based on something that would qualify as an "occurrence" under the excess policy, then that year's excess policy steps in and "pay[s] the excess" of the "ultimate net loss" for any such occurrence, up to the excess policy's limits. [Ex. 2, at 1, §§I.A, I.B.] That limit is measured not by the "reduced underlying limits" of the primary policy, but solely by (1) the damages caused by "occurrences" which fall within that excess policy period, and (2) the $10 million limit promised by the excess policy for "damages sustained during each annual period." [*Id.*]; *see Amway Distribs. Bens. Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 391–92 (6th Cir. 2003) (finding that broader definition of advertising injury

- 14 -

in excess policy controlled over narrower primary policy terms). Thus, measuring excess coverage by using an "Each Act" deemer clause imports into the excess policies a concept that is completely alien to them. And at the same time, it ignores the plain language of the Chubb excess policies, which limit liability in a wholly different manner.

In sum, Chubb is incorrect that only one excess policy is available (as an example) for the Nassar claims. The excess policies operate on their own terms and displace the "limits" language that restricts Chubb's claims coverage at the primary-insurance level.

**B.  Each of the primary policies provides a separate "Each Act" limit for Nassar-related claims because there is at least one claimant who was first abused during each of the three Chubb policy years.**

Chubb is also wrong about the limits of its primary policies. Its main argument is that USAG is entitled to only one year's worth of Sexual Abuse Coverage under the primary policies for all Nassar related abuse, and one year's worth of coverage for any other perpetrator's abuse. This "channeling" argument is wrong. Neither the insuring agreements nor the "limits" section of the Sexual Abuse Coverage expressly restrict USAG's coverage for abuse by Nassar or other perpetrators to one of Chubb's three policies.

1.  *The language that Chubb used in the deemer clauses is convoluted, confusing, and unclear.*

As an initial matter, the language Chubb invokes is "so befuddled that any number of meanings could be read into it." *Iowa–Des Moines Nat'l Bank v. Ins. Co. of N. Am.*, 459 F.2d 650, 653 (8th Cir. 1972). Barriers to coverage must "clearly and unmistakably" apply before they are effective. *Asbury*, 441 N.E.2d at 242; *Flexdar*, 964 N.E.2d at 848. All confusion is construed against the insurer. *Cinergy Corp. v. Assoc. Elec. & Gas Ins. Servs., Ltd.*, 865 N.E.2d 571, 576 (Ind. 2007); *New Castle Cnty. v. Nat'l Union Fire Ins. Co.*, 174 F.3d 338, (3d Cir. 1999) ("Convoluted or confusing terms are the problem of [the insurer], not the [policyholder.]")

(quotations omitted). The clauses on which Chubb relies are precisely the "shapeless mass[] of words," that cannot limit coverage. *Ocean Acc. & Guar. Co. v. Econ. Erectors, Inc.*, 224 F.2d 242 (7th Cir. 1955). Here they are:

**1. Insuring Agreement**

* * * * *

1.b. This insurance applies to "bodily injury" or "personal injury" only: . . . (3) so long as the "bodily injury" or "personal injury" is sustained (a) during the policy period; or (b) during any subsequent policy period in which we, or any company affiliated with us, have issued a policy which would apply to such "bodily injury" or "personal injury" except for a provision that such "bodily injury" or "personal injury" be caused by an act of "physical abuse" or "sexual misconduct" first committed during its policy period.

* * * * *

**3. Limits of Insurance**

a. All acts or omissions which cause or contribute to "physical abuse" or "sexual misconduct" by a single individual for whose conduct any insured is legally responsible shall be considered a single act, subject to the Each Act limit of insurance, regardless of the number of acts or omissions, number of persons injured, number of insureds responsible or number of locations involved.

b. The Each Act of "Physical Abuse" or "Sexual Misconduct" limit of insurance shown above is the most we will pay in judgments or settlements for a single act of "physical abuse" or "sexual misconduct," or both. If this policy provides a General Aggregate limit, the "Physical Abuse" or "Sexual Misconduct" Aggregate limit shall be part of and not in addition to the General Aggregate limit. The most we will pay in total judgments or settlements during any policy period is the "Physical Abuse" or "Sexual Misconduct" Aggregate limit to the extent there is coverage available in any applicable General Aggregate limit.

c. If this coverage form and any other coverage form or policy <u>for the same policy period</u> issued by us or any company affiliated with us apply, the maximum applicable limits of insurance available under all coverage forms or policies shall not exceed the highest applicable limits of insurance under any one coverage form or policy.

[*Id.* at 13, §1.b(3), §3 (emphasis added).] "Good luck to the average insurance buyer in deciphering the meaning of th[ese] provision[s]." *Gearhart v. Mut. of Enumclaw Ins. Co.*, 378

P.3d 454, 457 (Idaho 2016).[7] They certainly do not <u>clearly</u> say what Chubb contends—that all abuse by a single perpetrator shall be covered under only one policy period, regardless of the number of policy periods triggered.

Parsing these "befuddled" paragraphs only lends more credence to the argument that they do not <u>unambiguously</u> mean what Chubb claims. *Iowa–Des Moines Nat'l Bank*, 459 F.2d at 653. The insuring agreements require that the abuse occur in one of two timeframes: (a) "during the policy period;" or (b) "during any <u>subsequent</u> policy period in which [the insurer] issued a policy which would apply . . . <u>except for</u> a provision that such 'bodily injury' or 'sexual misconduct' be caused by an act of 'physical abuse' or 'sexual misconduct' first committed during its policy period." [Dkt. 2-6, at 12, §1.b(3) (emphasis added).] The apparent function of clause (b) is to make sure Chubb will pay for more than just damage during the initial policy period.

Thus, this language only amounts to a complex allocation clause. An example shows how it works. Say a survivor is first abused during the first Chubb policy period, but she is <u>also</u> abused during the second Chubb policy period. Ordinarily, each policy would pay separately for the abuse occurring in its respective period. *See Soc'y of the Roman Catholic Church of the Diocese of Lafayette & Lake Charles v. Interstate Fire & Cas. Co.*, 26 F.3d 1359, 1365–66 (5th Cir. 1994) (Louisiana law). But if the second policy requires that "such 'bodily injury' or 'sexual misconduct' be caused by an act . . . first committed during its policy period," [Dkt. 2-6, at 12, §1.b(3)(b)], as Chubb's policies do, then the second year of abuse ends up being uninsured.

---

[7] The *Gearhart* policy stated that "If there is other applicable similar insurance **we** will pay only **our** share. **Our** share is the proportion that **our** limit of liability bears to the total of all applicable limits. If this policy and any other policy providing similar insurance apply to the **accident**, the maximum limit of liability under all the policies shall be the highest applicable limit of liability under any one policy. However, insurance **we** provide with respect to a vehicle **you** do not own shall be excess over any other collectible insurance." *Gearhart*, 378 P.3d at 457.

Clause (b) expands the scope of the insuring agreements to make sure this does not happen.

Chubb, however, claims that this provision supports its coverage-reducing "channeling" argument. This is where its argument falters. If later policies cover the claim, clause (b) in an earlier policy is inapplicable. [*Id.*] The second and third Chubb policies <u>do</u> cover some of the claims. There are numerous claimants who were first abused <u>during each of the three Chubb policy years</u>, but not before then. The policies contain language requiring that the "act of 'physical abuse' or 'sexual misconduct' [be] first committed during the policy period." [Dkt. 2-6, at 12, §1.b(2); Dkt. 2-7, at 204; Dkt. 2-8, at 261.] But this only means that these subsequent policies do not cover abuse <u>beginning</u> in a prior year and continuing into the current one. [*Id.*] Nothing in the 1999 policy bars coverage for a person who is first abused in 1999, let alone requires that her claim be channeled back to the 1998 policy. [*Id.*] And why would it? This person is precisely the claimant envisioned by the insuring agreements—one who suffers injury from abuse "first committed during the policy period." Thus, a claimant first abused in 1999 has no coverage under the 1998 policy, and so on. Since she <u>is</u> covered under the 1999 policy, clause (b) from the 1998 policy cannot apply to her.

2.    *Chubb's attempt to identify a limitation across policy periods from these clauses is unavailing.*

Chubb resorts to a tortured reading of the "Limits of Insurance" section in order to justify its "channeling" argument. This argument is without merit.

The "Limits of Insurance" section does not help Chubb. That clause consolidates "[a]ll acts or omissions which cause or contribute to 'physical abuse' or 'sexual misconduct'" and provides that they "shall be considered a single act, subject to the Each Act limit of insurance, regardless of the number of acts or omissions, number of persons injured, number of insureds responsible or number of locations involved." [Dkt. 2-6, at 13, §3.a (emphasis added).

Conspicuously absent from this clause is language stating that the "single act" rule applies without regard for <u>when</u> the abuse took place.[8] Stated differently, it does <u>not</u> say that only one "Each Act" limit applies to abuse perpetrated by one individual through all three policy periods. [*Id.*] Insurers can, and have, included this sort of time-restricting language in their policies. *E.g.*, *Penn State Univ. v. Pa. Mfgs. Ass'n Ins. Co.*, No. 03195, 2016 Phila. Ct. Com. Pleas LEXIS 158, *1, *24–30 (May 4, 2016) (Sandusky/Paterno scandal); *TIG Ins. Co. v. Smart Sch.*, 401 F. Supp. 2d 1334, 1339–41 (S.D. Fla. 2005) (construing a deemer consolidating all acts of abuse under one policy "regardless of . . . the period of time during which the acts of sexual abuse took place"). Chubb's failure to be equally specific at the very least renders the policy ambiguous. *See Essex Ins. Co. v. Doe*, 511 F.3d 198, 201 (D.C. Cir. 2008); *Flexdar, Inc.*, 964 N.E.2d at 848.

Even if Chubb's interpretation of its limits clause was reasonable, so is USAG's. Courts interpreting CGL policies in sexual-abuse cases generally construe the policy terms as applying only to acts occurring in the period the policy is in force, unless the policy expressly says otherwise. *Diocese of Lafayette & Lake Charles*, 26 F.3d at 1365–66 (5th Cir. 1994) (stating that it "flouts the policy language" to say that an act actually occurring in one year took place in another, unless the policy says so expressly); *Interstate Fire & Cas. Co. v. Archdiocese of Portland*, 35 F.3d 1325, 1329–30 (9th Cir. 1994) (Oregon law) ("[T]he assuring clause makes it clear that this is true only of multiple exposures occurring *during the period of insurance*.").

Thus, it is reasonable for USAG, upon reading the policy, to conclude that Chubb's

---

[8] Chubb's insuring agreements address timing, but only in a limited way. They provide that the abuse must be "first committed" during the policy year to be covered. But nowhere does the insuring agreement say that abuse first occurring in <u>subsequent</u> policy years is covered under a <u>prior</u> policy, and no other.

"Limits of Insurance" clause only applies to aggregate the abuse without regard to the number of plaintiffs, instances of abuse, or locations involved <u>during one policy period.</u> *Compare with Roman Catholic Diocese of Joliet, Inc. v. Interstate Fire Ins. Co.*, 685 N.E.2d 932, 938–39 (Ill. Ct. App. 1997) (Illinois law) (construing a generic CGL policy to allow one occurrence-based limit <u>per claimant</u> abused during the policy year); *Diocese of Duluth v. Liberty Mut. Grp.*, 565 B.R. 914, 924 (Bankr. D. Minn. 2017) (Minnesota law) (construing a generic CGL policy to allow one occurrence-based limit <u>per improper touching</u>). Even states that rely on a "first occurrence" theory as a default construction of CGL policies in sexual-abuse cases require some sort of temporal language in the deemer clause to extend its operation beyond the policy period. *Penn State*, 2016 Phila. Ct. Com. Pleas LEXIS 158, *1, *24–30.

Paragraph "b." in the Limits section does not accomplish this. That paragraph provides that:

> The Each Act of "Physical Abuse" or "Sexual Misconduct" limit of insurance shown above is the most we will pay in judgments or settlements for a single act of "physical abuse" or "sexual misconduct," or both. If this policy provides a General Aggregate limit, the "Physical Abuse" or "Sexual Misconduct" Aggregate limit shall be part of and not in addition to the General Aggregate limit. The most we will pay in total judgments or settlements <u>during any policy period</u> is the "Physical Abuse" or "Sexual Misconduct" Aggregate limit to the extent there is coverage available in <u>any applicable General Aggregate</u> limit.

[Dkt. 2-6, at 13, §3.b (emphasis added).] Chubb contends that the use of the word "any" in this paragraph means that a single "Each Act" limit applies to abuse in all three policy periods. Not so. Notice the parallel structure of this sentence: The most Chubb will <u>pay</u> "during <u>any</u> policy period" is the "Each Act" limit, to the extent there is coverage <u>available</u> "in <u>any</u> applicable General Aggregate limit." [*Id.* (emphasis added).] This language can easily be read as stating that Chubb will pay a separate "Each Act" limit for "any" policy that has unexhausted aggregate

limits.[9] Otherwise, the parallel usage of "any policy period" and "any applicable General Aggregate limit" makes no sense. Why would Chubb pay toward another policy's aggregate limit if, as Chubb contends, there is only coverage for that abuse under the first Chubb policy? Chubb's interpretation, which is inconsistent with its own policy terms, cannot be the only reasonable interpretation.

Looking at the section as a whole further proves the reasonableness of USAG's position. Part "c." of the limits section contains an "anti-stacking" clause for multiple limits triggered during "the same policy period." [Dkt. 2-6, at 13, §3.c (emphasis added).] Why would Part "c." contain such an anti-stacking clause if, as Chubb argues, Part "b." already channels all claims from other policies under this one? Common sense says that if you cannot get multiple limits for any policy periods, you do not get multiple limits from the same period. Chubb's reading of Parts "a." and "b." renders this language from Part "c." meaningless.  This is not how insurance policies should be construed. *State Farm Mut. Auto. Ins. Co. v. Jakubowicz*, 56 N.E.3d 617, 619 (Ind. 2016) (Indiana courts "construe the language of an insurance policy so as not to render any words, phrases or terms ineffective or meaningless"). At the very least, this means that the endorsement is ambiguous and must be construed in USAG's favor.

---

[9] The mere addition of the word "any" in a section talking about individual and aggregate limits is a confusing way to try and accomplish the result Chubb seeks here. There is a good reason why other policies include a temporal element in a separate deemer clause, rather than in a section talking about interrelated limits. *E.g.*, *Penn State*, 2016 Phila. Ct. Com. Pleas LEXIS 158, *1, *24–30. The term's placement in the Penn State policy made it clear to the policyholder that the single-act rule applies to abuse occurring at any point in time. *Id.* Chubb's obscure placement of this word does not unambiguously accomplish the same thing as the Penn State policies did. *Masten v. AMCO Ins. Co.*, 953 N.E.2d 556, 572 (Ind. Ct. App. 2011) ("[B]ecause we construe insurance policies as a whole in each case, prior cases that focus upon similar or identical language in a policy are not necessarily determinative of later cases because the insurance policies as a whole are likely to differ.") (reversing judgment for insurer because the language structure was different than in a previous case).

In sum, Chubb's policies do not contain language <u>clearly</u> channeling all abuse over three years into just one policy. It is Chubb's burden to show this limitation beyond any doubt. Since it is reasonable for USAG to construe the limits as applying only within their respective policy periods, USAG's construction governs as a matter of law. *Eli Lilly & Co.*, 482 N.E.2d at 470–71. Since, for example, there are individuals who claim first abuse by Nassar in each of Chubb's primary policy periods, there is a separate limit available for each policy year for the Nassar claims. [Dkt. 2-6, at 12; Dkt. 2-7, at 204; Dkt. 2-8, at 261.]

## CONCLUSION

Chubb is incorrect when it says that there is only one primary and one excess policy limit available for any single perpetrator. The Court should declare that: (1) Chubb must provide one "Each Act" limit for each separate perpetrator in each of its primary policy periods (up to its aggregate limit); and (2) all three of Chubb's excess limits are available for the Nassar-related claims, as well as for claims related to other perpetrators.

August 7, 2019                                Respectfully Submitted,

/s/ *Christopher E. Kozak*
George M. Plews (#6274-49)
Gregory M. Gotwald (#24911-49)
Tonya J. Bond (#24802-49)
Steven A. Baldwin (#34498-49)
Christopher E. Kozak (#35554-49)
PLEWS SHADLEY RACHER & BRAUN LLP
1346 N. Delaware St.
Indianapolis, IN 46202-2415
(317) 637-0700
gplews@psrb.com
ggotwald@psrb.com
tbond@psrb.com
sbaldwin@psrb.com
ckozak@psrb.com

-and-

JENNER & BLOCK LLP
Catherine L. Steege (admitted *pro hac vice*)
Dean N. Panos (admitted *pro hac vice*)
Melissa M. Root (#24230-49)
353 N. Clark Street
Chicago, Illinois 60654
(312) 923-2952
csteege@jenner.com
dpanos@jenner.com
mroot@jenner.com

*Counsel for the Debtor*

## CERTIFICATE OF SERVICE

I hereby certify that on August 7, 2019, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties through the Court's Electronic Case Filing System. Parties may access this filing through the Court's system.

| | |
|---|---|
| Scott P. Fisher<br>Drewry Simmons Vornehm, LLP<br>sfisher@DSVlaw.com<br><br>George R. Calhoun V<br>Ifrah PLLC<br>george@ifrahlaw.com<br>*Counsel for TIG Insurance Company* | James P. Moloy<br>Bose McKinney & Evans LLP<br>jmoloy@boselaw.com<br><br>Kevin P. Kamraczewski<br>Law Offices of Kevin P. Kamraczewski<br>kevin@kevinklaw.com<br><br>Robert B. Millner<br>Ronald D. Kent<br>Susan M. Walker<br>Dentons US LLP<br>robert.millner@dentons.com<br>ronald.kent@dentons.com<br>susan.walker@dentons.com<br>*Counsel for Virginia Surety Company Inc.,*<br>*f/k/a Combined Specialty Insurance Company* |
| Jeffrey B. Fecht<br>Riley Bennett Egloff LLP<br>jfecht@rbelaw.com<br><br>Cassandra L. Jones<br>Walker Wilcox Matousek LLP<br>cjones@wwmlawyers.com<br>*Counsel for RSUI Indemnity Company* | Wendy D. Brewer<br>Phillip A. Martin<br>Fultz Maddox Dickens PLC<br>wbrewer@fmdlegal.com<br>pmartin@fmdlegal.com<br><br>Abigail E. Rocap<br>Bates Carey LLP<br>arocap@batescarey.com<br>*Counsel for Endurance American Insurance*<br>*Company* |
| Harley K. Means<br>Stephen J. Peters<br>Kroger Gardis & Regas, LLP<br>hmeans@kgrlaw.com<br>speters@kgrlaw.com<br><br>Eric D. Freed<br>Cozen & O'Connor<br>efreed@cozen.com<br>*Counsel for ACE American Insurance*<br>*Company f/k/a CIGNA Insurance Company* | Bruce L. Kamplain<br>Cynthia E. Lasher<br>Norris Choplin Schroeder LLP<br>bkamplain@ncs-law.com<br>clasher@ncs-law.com<br>*Counsel for Western World Insurance*<br>*Company* |

| | |
|---|---|
| Ginny L. Peterson<br>Casey R. Stafford<br>Kightlinger & Gray, LLP<br>gpeterson@k-glaw.com<br>cstafford@k-glaw.com<br><br>Nancy D. Adams<br>Mathilda S. McGee-Tubb<br>Laura Bange Stephens<br>Mintz Levin Cohn Ferris Glovsky & Popeo, PC<br>nadams@mintz.com<br>msmcgee-tubb@mintz.com<br>lbstephens@mintz.com<br>*Counsel for Liberty Insurance Underwriters, Inc.* | Hans H. J. Pijls<br>Dinsmore & Shohl LLP<br>Hans.pijls@dinsmore.com<br>*Counsel for National Casualty Company* |
| Susan N.K. Gummow<br>Igor Shleypak<br>Foran Glennon Palandech Ponzi & Rudloff PC<br>sgummow@fgppr.com<br>ishleypak@fgppr.com<br>*Counsel for American International Group, Inc. & American Home Assurance Company* | Karen M. Dixon<br>Michael M. Marick<br>Skarzynski Marick & Black LLP<br>kdixon@skarzynski.com<br>mmarick@skarzynski.com<br><br>Joshua D. Weinberg<br>Katherine M. Hance<br>Shipman & Goodwin LLP<br>jweinberg@goodwin.com<br>khance@goodwin.com<br>*Counsel for Great American Assurance Company* |
| U.S. Trustee<br>Office of U.S. Trustee<br>ustpregion10.in.ecf@usdoj.gov | Catherine L. Steege<br>Melissa M. Root<br>Jenner & Block LLP<br>csteege@jenner.com<br>mroot@jenner.com<br>*Counsel for Debtor USA Gymnastics* |

/s/ *Christopher E. Kozak*
Christopher E. Kozak