**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| USA GYMNASTICS, | ) | Case No.  18-09108-RLM-11 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| USA GYMNASTICS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. Case No. 19-50012 |
| | ) | |
| ACE AMERICAN INSURANCE | ) | |
| COMPANY f/k/a CIGNA INSURANCE | ) | |
| COMPANY, GREAT AMERICAN | ) | |
| ASSURANCE COMPANY, LIBERTY | ) | |
| INSURANCE UNDERWRITERS INC., | ) | |
| NATIONAL CASUALTY COMPANY, | ) | |
| RSUI INDEMNITY COMPANY, TIG | ) | |
| INSURANCE COMPANY, VIRGINIA | ) | |
| SURETY COMPANY, INC. f/k/a | ) | |
| COMBINED SPECIALTY INSURANCE | ) | |
| COMPANY, WESTERN WORLD | ) | |
| INSURANCE COMPANY, ENDURANCE | ) | |
| AMERICAN INSURANCE COMPANY, | ) | |
| AMERICAN INTERNATIONAL GROUP, | ) | |
| INC., AMERICAN HOME ASSURANCE | ) | |
| COMPANY, AND DOE INSURERS, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**ACE AMERICAN INSURANCE COMPANY'S MEMORANDUM OF LAW IN
OPPOSITION TO USA GYMNASTICS' MOTION FOR PARTIAL SUMMARY
JUDGMENT AND IN SUPPORT OF ITS CROSS-MOTION FOR PARTIAL SUMMARY
JUDGMENT**

## I.    __INTRODUCTION__

Defendant ACE American Insurance Company, f/k/a Cigna Insurance Company ("AAIC" or "Chubb") hereby submits this brief in opposition to USA Gymnastics' ("USAG") Motion for Partial Summary Judgment Against Chubb [Dkt. # 174] and its brief in support [Dkt. #175] and in support of Chubb's Cross-Motion for Partial Summary Judgment.

The factual background of the issue presented by these cross-motions can be briefly stated as follows, without disclosing any discussions subject to the mediation privilege: USAG faces claims by hundreds of victims of sexual abuse by Larry Nassar, including several dozen alleging abuse commencing in the 8/1/1998 to 8/1/2001 time frame.  USAG also faces a smaller number of claims of abuse during the same time frame allegedly committed by several other perpetrators.  Chubb has informed USAG and other insureds that the maximum limit of liability applicable to liability arising from abuse by a single perpetrator—for example, Larry Nassar—is $11 million total.  Chubb acknowledges that USAG's liability, if any, arising from abuse by other perpetrators is subject to separate "Each Act" limits for each of those other perpetrators, subject ultimately to the policies' annual aggregate limits.

Chubb's position on this issue is based on a straightforward application of one unambiguous provision contained in all three of its primary policies.  That provision—referred to herein as the "Deemer Clause"—reads as follows:

> <u>All</u> acts or omissions which cause or contribute to "physical abuse" or "sexual misconduct" **by a single individual** for whose conduct any insured is legally responsible **shall be considered a single act, subject to the Each Act limit of insurance**, regardless of the number of acts or omissions, number of persons injured, number of insureds responsible or number of locations involved.

Dkt. 175-1, at 3 (emphasis added).  Chubb's position is simple: "all" means all, and "single act" means single act.  The "Each Act" limit under the Chubb primary policies is $1 million.  The

limit under Chubb's follow-form excess policies is $10 million.  Therefore, the total applicable limit of liability for abuse **by a single perpetrator** is $11 million.

USAG attempts to convince the Court that "all" does not really mean "all," and that "single act" effectively means three acts, one per year.  In the alternative, USAG argues that even if Chubb's position is correct regarding the primary policies, USAG receives coverage under excess policies where there is none under the primary policies to which the excess policies follow form.  In other words, according to USAG, two of the three excess policies provide $10 million of coverage even though they "follow form" to primary policies that pay nothing at all. The excess policies expressly preclude this anomalous result by providing that if the primary policy does not pay a loss, the corresponding excess policy also does not pay that loss.  USAG mischaracterizes Chubb's position as "cobbled together from a convoluted mishmash of four ambiguous clauses," when, in fact, it is USAG that attempts to manufacture ambiguity through a contorted reading of various, irrelevant clauses.  When the Deemer Clause is read in context of Chubb's primary policies as a whole, that context confirms that the Deemer Clause means what it says: that **all** abuse by a single perpetrator is deemed a **single act** subject to one Each Act limit; that is, $11 million total ($1 million primary, $10 million excess).

## II.    <u>STATEMENT OF MATERIAL FACTS NOT IN DISPUTE</u>

AAIC insured USAG under Commercial General Liability Policy No. G19421752, which was in effect for three annual periods commencing on August 1, 1998 and

ending on August 1, 2001 (the "Primary Policies").[1]  Based upon appropriate due diligence,

complete copies of the Primary Policies are attached to an appendix to this motion ("Chubb

Appendix") as Exhibits A, B and C, respectively.  The Primary Policies contain an endorsement

titled "Physical Abuse or Sexual Misconduct Liability Coverage," which for brevity's sake will

be referred to herein as the "Abuse Coverage."  The Abuse Coverage endorsement can be found

on the 13th and 14th pages of the 1998-1999 Primary Policy (Chubb App., Ex. A).  The identical

endorsement is also attached to both of the other Primary Policies.  It reads in full:

> Except to the extent coverage is provided by this endorsement, this
> insurance does not apply to any claim or "suit" which seeks damages
> arising out of or in any way related, in whole or in part, to the actual,
> alleged or threatened "physical abuse" or "sexual molestation" by any one
> of any person at any time.

### Limits of Insurance

| | |
|---|---|
| Each Act of "Physical Abuse" or "Sexual Misconduct" | 1,000,000 |
| "Physical Abuse" or "Sexual Misconduct" Aggregate | 5,000,000 |

Unless modified by this endorsement, all other provisions in the policy to
which it is attached remain in effect.

1.  **INSURING AGREEMENT**

    a.  We will pay those sums that the insured becomes legally obligated
        to pay as damages because of "bodily injury" or "personal injury"
        to which this insurance applies arising out of "physical abuse" or
        "sexual misconduct" against any person while in the care, custody,
        or control of any insured.

---

[1] The 1998-1999 policy and the 1999-2000 renewal were issued by Cigna Insurance Company
("Cigna").  Effective July 2, 1999, ACE Limited purchased Cigna Corporation's property and
casualty business.  In that transaction, certain assets and companies (including Cigna Insurance
Company) were sold to, and certain liabilities attributable to those assets and companies were
acquired by, ACE Limited.  Following that transaction, Cigna Insurance Company's name was
changed to ACE American Insurance Company ("AAIC").  AAIC then issued the 2000-2001
renewal policy to USAG.  In January 2016, ACE Limited acquired the Chubb Corporation and
adopted the "Chubb" name, becoming Chubb Limited.  AAIC still exists under that name, as an
affiliate of Chubb Limited.  For this reason, AAIC is still the proper party to this proceeding, but
the parties refer to AAIC informally as "Chubb."

We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "personal injury" to which this insurance does not apply.

The amount we will pay for damages is limited as described in 3. LIMITS OF INSURANCE.

We will have no further obligation to pay any claim or judgment or defend any "suit" after the Limits of Insurance under this coverage form have been used up by the payment of judgments or settlements.

b.  This insurance applies to "bodily injury" or "personal injury" only:

(1) if the "bodily injury" or "personal injury" is caused by an act of "physical abuse" or "sexual misconduct" committed in the "coverage territory"; and

(2) if the "bodily injury" or "personal injury" is caused by an act of "physical abuse" or "sexual misconduct" first committed during the policy period; and

(3) so long as the "bodily injury" or "personal injury" is sustained:

(a)     during the policy period; or

(b)     during any subsequent period in which we, or any company affiliated with us, have issued a policy which would apply to such "bodily injury" or "personal injury" except for a provision that such "bodily injury" or "personal injury" be caused by an act of "physical abuse" or "sexual misconduct" first committed during its policy period.

## 2.  WHO IS AN INSURED

SECTION II – WHO IS AN INSURED, Part 2.a. is amended as follows:

With respect to his coverage, none of the following is an insured:

Any person or organization who participated in, directed, or, after becoming aware of "physical abuse" or "sexual misconduct," failed to act in a way to prevent "physical abuse" or "sexual misconduct" and/or failed to report to the authorities, any act of "physical abuse" or "sexual misconduct."

4

SECTION II – WHO IS AN INSURED, Part 2.a. is amended to include the following:

Student teachers who are teaching for the insured on a temporary basis as a part of their educational requirements, but only for acts within the scope of their duties for the insured.

Volunteer workers, but only while acting at the insured's direction and within the scope of their duties for the insured.

3. **LIMITS OF INSURANCE**

   a. All acts or omissions which cause or contribute to "physical abuse" or "sexual misconduct" by a single individual for whose conduct any insured is legally responsible shall be considered a single act, subject to the Each Act limit of insurance, regardless of the number of acts or omissions, number of persons injured, number of insured responsible or number of locations involved.

   b. The Each Act of "Physical Abuse" or "Sexual Misconduct" limit of insurance shown above is the most we will pay in judgments or settlements for a single act of "physical abuse" or "sexual misconduct", or both.  If this policy provides a General Aggregate limit, the "Physical Abuse" or "Sexual Misconduct" Aggregate limit shall be part of and not in addition to the General Aggregate limit.  The most we will pay in total judgments or settlements during any policy period is the "Physical Abuse" or "Sexual Misconduct" Aggregate limit to the extent there is coverage available in any applicable General Aggregate limit.

   c. If this coverage form and any other coverage form or policy for the same policy period issued by us or any company affiliated with us apply, the maximum applicable limits of insurance available under all coverage forms or policies shall not exceed the highest applicable limits of insurance under any one coverage form or policy.

4. **DEFINITIONS**

With respect to the coverage provided by this endorsement, the definition of "bodily injury" includes mental anguish resulting from "physical abuse" or "sexual misconduct" of the person injured while in the care, custody or control of any insured.

"Physical abuse" means actual, alleged, or threatened physical maltreatment.

"Sexual misconduct" means any conduct, whether actual, alleged, or threatened, of a sexual nature.

*See, e.g.*, Chubb App., Ex. A, "Physical Abuse Or Sexual Misconduct Liability Coverage" Endorsement.

AAIC also issued Excess Liability Policy No. XCP G19498305 for the period of August 1, 1998 to August 1, 1999, No. XCP G20086427 for the period of August 1, 1999 to August 1, 2000; and No. XCP G20125858 for the period of August 1, 2000 to August 1, 2001 (the "Excess Policies"; together with the Primary Policies, the "Policies"). Based upon appropriate due diligence, complete copies of the Excess Policies are attached hereto as Exhibits D, E and F, respectively, to the Chubb Appendix. The Excess Policies are each subject to a limit of liability of $10 million and apply in excess of the "UNDERLYING INSURANCE," defined as the policies listed in the Schedule of Underlying Insurance, which include the Primary Policies. *See* "Declarations" and §§ I.a. and III.g. of Chubb App., Exs. D, E, and F. The Excess Policies only apply to "injury or damage covered by the UNDERLYING INSURANCE." *See, e.g.*, Ex. D, § I.A. The Excess Policies further provide that "[i]f the UNDERLYING INSURANCE does not pay a loss for reasons other than the exhaustion of an aggregate limit of insurance, then WE shall not pay such loss." *See id.* All of the terms of the scheduled underlying policies (including the Primary Policies) apply to the Excess Policies "unless they are inconsistent with provisions of this policy, or relate to premium, subrogation, any obligation to defend, the payment of expenses, limits of insurance, cancellation or any renewal agreement." *See id.*

### III.    ARGUMENT

#### A.  Legal Standards for Interpretation of Insurance Policies

Under Indiana law, "[i]nsurance contracts are governed by the same rules of construction as any other contract." *Holiday Hospitality Franchising, Inc. v. AMCO Ins. Co.*, 983 N.E.2d 574, 577 (Ind. 2013). Accordingly, clear and unambiguous language is given its ordinary meaning "in order to accomplish the primary goal of contract interpretation: 'to determine the intent of the parties at the time the contract was made as disclosed by the language used to express their rights and duties[.]'" *Id.* at 577-78 (quoting *First Fed. Sav. Bank of Ind. v. Key Markets, Inc.*, 559 N.E.2d 600, 603 (Ind. 1990)). "Also, '[a]n insurance policy that is unambiguous must be enforced according to its terms, even those terms that limit an insurer's liability.'" *Empire Fire & Marine Ins. Co. v. Frierson*, 49 N.E.3d 1075, 1079 (Ind. Ct. App. 2016) (quoting *Haag v. Castro*, 959 N.E.2d 819, 823 (Ind. 2012)).

Insurance companies are free to limit their liability in a manner not inconsistent with public policy as reflected by statutes or case law, and plainly expressed exceptions, exclusions and limitations are entitled to construction and enforcement as expressed. *Allstate Ins. Co. v. Boles*, 481 N.E.2d 1096, 1098 (Ind. 1985).  Thus, courts adhere to the principle that an insurance company is "free to determine by its contract what risks it is undertaking to insure, provided policy provisions do not violate statutory mandates or are against public policy." *Cincinnati Ins. Co. v. Mallon*, 409 N.E.2d 1100, 1103 (Ind. Ct. App. 1980).

When reviewing an insurance policy, a court construes the insurance policy as a whole and considers all of the provisions of the contract and not just the individual words, phrases or paragraphs. *Briles v. Wausau Ins. Cos.*, 858 N.E.2d 208, 213 (Ind. Ct. App. 2006).  Moreover, a court must accept an interpretation of the contract language that harmonizes the provisions, rather than one that supports conflicting versions of the provisions. *Id.* As a result, a court

"should construe the language of a contract so as not to render any words, phrases, or terms ineffective or meaningless." *Mahan v. Am. Standard Ins. Co.*, 862 N.E.2d 669, 676 (Ind. Ct. App. 2007). Additionally, the power to interpret contracts does not extend to changing their terms and a court will not give insurance policies an unreasonable construction to provide additional coverage. *Briles*, 858 N.E.2d at 213. Accordingly, a court cannot extend coverage beyond that provided in the policy, and cannot "rewrite the clear and unambiguous language of the insurance contract." *Sell v. United Farm Bureau Family Life Ins. Co.*, 647 N.E.2d 1129, 1131-32 (Ind. Ct. App. 1995).

"When confronted with a dispute over the meaning of insurance policy terms, Indiana courts afford clear and unambiguous policy language its plain, ordinary meaning. By contrast, courts may construe—or ascribe meaning to—ambiguous policy terms only." *Erie Indem. Co. for Subscribers at Erie Ins. Exch. v. Estate of Harris by Harris*, 99 N.E.3d 625, 630 (Ind. 2018) (citing *Holiday Hospitality Franchising*, 983 N.E.2d at 577). An ambiguity exists where a policy provision is susceptible to more than one interpretation and reasonable persons would differ as to its meaning. *Briles*, 858 N.E.2d at 213. "However, an ambiguity does not exist merely because the parties proffer differing interpretations of the policy language." *Id.*

As the Indiana Supreme Court recently explained:

> [W]e caution that parties to an insurance contract may not invite judicial construction by creating ambiguity. They may not make a term ambiguous by simply offering different policy interpretations. Cf. *Puryear v. Progressive N. Ins. Co.*, 790 N.E.2d 138, 141 (Ind. Ct. App. 2003). In other words, ambiguity does not arise from mere disagreement over a policy term's meaning—that is, where "one party asserts an interpretation contrary to that asserted by the opposing party." [*Wagner v. Yates*, 912 N.E.2d 805, 810 (Ind. 2009)]. Rather, insurance policy provisions are ambiguous only if they are "susceptible to more than one **reasonable** interpretation." *Holiday Hosp. Franchising, Inc.*, 983 N.E.2d at 578 (emphasis added).

> When evaluating alleged ambiguities—whether there exist two reasonable interpretations for one policy term—courts read insurance policies "from the perspective of . . . ordinary policyholder[s] of average intelligence." *Allgood v. Meridian Sec. Ins. Co.*, 836 N.E.2d 243, 246-47 (Ind. 2005). If reasonably intelligent policyholders would honestly disagree on the policy language's meaning, then we will find the term ambiguous and subject to judicial construction. *Id.* at 247. Conversely, if reasonably intelligent policyholders could not legitimately disagree as to what the policy language means, we deem the term unambiguous and apply its plain ordinary meaning.

*Estate of Harris*, 99 N.E.3d at 630.

Moreover, a split of legal authority on the meaning of similar contract terms does not necessarily mean that those terms are ambiguous. *Allgood*, 836 N.E.2d at 248  A disagreement among courts as to the meaning of a particular contractual provision is evidence that an ambiguity may exist, but a division of authority is only evidence of ambiguity.  *Id.*  Such a disagreement does not establish conclusively that a particular clause in an insurance policy is ambiguous, and Indiana courts are not obliged to agree that those courts that have reached different results have read the policy correctly.  *Id.*  Finally, the "[f]ailure to define a term in an insurance policy does not necessarily make it ambiguous." *Colonial Penn Ins. Co. v. Guzorek*, 690 N.E.2d 664, 667 (Ind. 1997).

## B.  The USAG Primary Policies Cap "<u>All</u>" Liability Arising From Abuse By a Single Perpetrator at One "Each Act" Limit

USAG and Chubb agree that, pursuant to the exclusionary language at the start of the endorsement, the Abuse Coverage is the sole coverage available under the Policies for claims alleging sexual abuse.  *See, e.g.*, Chubb App., Ex. A, "Physical Abuse Or Sexual Misconduct Liability Coverage" Endorsement, p. 1.  Endorsements providing exclusive and targeted coverage for claims arising from sexual abuse are commonly used in policies issued to organizations susceptible to these claims.  These endorsements typically contain "deemer" clauses providing that all abuse by a single perpetrator (or of a single victim, in some cases) is

"deemed" a single act or occurrence, in order to cap the risk underwritten with respect to a catastrophic series of related incidents.

These deemer clauses (while manuscripted and all slightly different) have been uniformly enforced by courts throughout the country. *See Church Mut. Ins. Co. v. First United Pentecostal Church of Parma*, 1:11CV2201, 2012 WL 3619812, at *6 (N.D. Ohio Aug. 21, 2012) ("The unambiguous language makes plain that the Each Claim Limit ($100,000) applies when one person commits the sexual misconduct, even if the sexual misconduct consists of: (1) multiple sex acts; (2) against more than one person; and those acts were (3) committed over a period of time."); *Knowledge Learning Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, CIV. 1O-188-ST, 2010 WL 4964308, at *3 (D. Or. Nov. 30, 2010) (enforcing policy provision that "all 'bodily injury' and 'personal and advertising injury' arising out of the acts of abuse or molestation by one person or two or more persons acting together toward any one person will be deemed a single 'occurrence.'"); *TIG Ins. Co. v. Smart Sch*., 401 F. Supp. 2d 1334, 1339 (S.D. Fla. 2005) (enforcing "unambiguous language that serves to collapse all sexual misconduct by a single perpetrator into a single occurrence"); *TIG Ins. Co. v. Merryland Childcare & Dev. Ctr., Inc*., No. 04-2666 B, 2007 WL 316571, at *6 (W.D. Tenn. Jan. 31, 2007) (same); *United States Underwriters Ins. Co. v. The Hands of our Future, LLC*, CV N14C-10-175 CEB, 2016 WL 4502003, at *5 (Del. Super. Ct. Aug. 19, 2016) (holding that deemer clause was "unambiguous" insofar as it collapsed all acts by the same perpetrator into one "occurrence"); *TIG Insurance Co. v. San Antonio YMCA*, 172 S.W.3d 652 (Tex. App. 2005) ("Under the policy's unambiguous language, all of [the alleged perpetrator's] alleged acts of sexual abuse, 'regardless of the number of persons involved, or the number of incidents or locations involved, or the period of time during which the acts of sexual molestation or abuse took place,' constitute a single Sexual

Abuse Occurrence."); *Preferred Risk Mut. Ins. Co. v. Watson*, 937 S.W.2d 148, 150 (Tex. App. 1997) ("[W]e hold that 'all' of the Grace Temple employee's alleged acts of sexual misconduct and 'any' alleged breach of duty that may have contributed to those acts, collectively constitute a single 'occurrence' under the policy in question.").

> As one court aptly observed, "All means all":

> The policy unambiguously states that "all acts ... by one person ... will be considered one occurrence." The Court agrees with GuideOne's repeated assertion that "All means all." While the policy could have included language reemphasizing that all acts are one occurrence, "regardless of the number of persons involved, or the number of incidents or locations involved, or the period of time during which the acts of ... abuse took place," as Defendants maintain is required, the policy is unambiguous as written.

*GuideOne Specialty Mut. Ins. Co. v. Doe*, 07-0866-CV-W-ODS, 2008 WL 2699431, at *2 (W.D. Mo. June 30, 2008).

> Again, the Deemer Clause here provides:

> <u>All</u> acts or omissions which cause or contribute to "physical abuse" or "sexual misconduct" **by a single individual** for whose conduct any insured is legally responsible **shall be considered a single act, subject to the Each Act limit of insurance**, regardless of the number of acts or omissions, number of persons injured, number of insureds responsible or number of locations involved.

*See, e.g.*, Chubb App., Ex. A, "Physical Abuse Or Sexual Misconduct Liability Coverage" Endorsement, § 3.a. (emphasis added).

Application of the Deemer Clause to this case is straightforward.  This case, unfortunately, presents precisely the scenario contemplated by the Deemer Clause: many acts of abuse by a single perpetrator, Larry Nassar, involving many injured victims, many locations and multiple insureds allegedly responsible.  With respect to such a scenario, the contracting parties agreed that only one Each Act limit applies to "all" such liability.  Since the Abuse Coverage applies to abuse "first committed" during the policy period (pursuant to Section 1.b.(2)), it is the

Each Act limit of the first applicable policy that applies; here, the 1998-1999 policy. *See, e.g.*, Ex. A, "Physical Abuse Or Sexual Misconduct Liability Coverage" Endorsement, § 1.b.2.

USAG argues that because some clauses in other cases included language such as "regardless of the period of time," such language is **required** for the Deemer Clause to apply across policy periods. *See* Dkt. 175, at 20. But the latter does not follow from the former. The fact that the Deemer Clause does not expressly state "regardless of the period of time" does not mean that a temporal limitation can be read into the clause. *Briles v. Wausau Ins. Cos.*, 858 N.E.2d 208, 213 (Ind. Ct. App. 2006) ("[T]he power to interpret contracts does not extend to changing their terms."). Any abuse involving multiple acts, multiple victims and multiple locations is also bound to involve an extensive period of time. The Primary Policies' omission of the redundant phrase "regardless of the period of time" is of no consequence.

USAG cites no case law supporting its position with respect to the Deemer Clause. Rather, USAG cites only cases making observations regarding "convoluted" or "confusing" terms. *See* Dkt. 175, at 15-17. But none of the cases cited by USAG involve issues or policy language remotely similar to this case. The fact that another court may have described entirely different policy language as "confusing" does not render the language in the Policies here confusing. The language here is actually quite simple and, more importantly, unambiguous.

### C. The Context of the Deemer Clause Only Confirms that "All" Means All.

USAG argues that "all" does not really mean all; rather, it only means abuse committed during that particular year. Dkt. 175, at 18. USAG argues that since all three policies are triggered, limits under all three policies must apply. *Id.* USAG's argument presumes that the policy for each year must be examined entirely in isolation for all purposes, as if the others do not exist. Thus, USAG effectively re-writes "single act" to mean three acts, one during each year. Under Indiana law, however, a court cannot extend coverage beyond that provided in the

policy, and cannot "rewrite the clear and unambiguous language of the insurance contract." *Sell v. United Farm Bureau Family Life Ins. Co.*, 647 N.E.2d 1129, 1131-32 (Ind. Ct. App. 1995).

Also under Indiana law, "[i]n determining the amount due for loss under an insurance policy, the true meaning of the contract must be ascertained from all of its provisions, and not from the literal or technical construction of an isolated or special clause." *Allstate Ins. Co. v. United Farm Bureau Mut. Ins. Co*., 618 N.E.2d 31, 33 (Ind. Ct. App. 1993). The Primary Policies were written as annual periods under one policy number; *i.e.*, distinct but related contracts, renewed year-to-year.  The relevant terms of the three policies are **identical**. Furthermore, the terms of the Abuse Coverage explicitly contemplate and address multiple successive renewal periods issued by AAIC or an affiliate.  Section 1.b.(2) requires that the abuse be first committed during the policy period.  *See, e.g.*, Chubb App., Ex. A, "Physical Abuse Or Sexual Misconduct Liability Coverage" Endorsement, § 1.b.2.  Section 1.b.(3) then requires that the injury occur during the policy period or "**during any subsequent period in which we, or any company affiliated with us, have issued a policy** which would apply … except for" the requirement that the abuse be "first committed during its policy period" (emphasis added).  *Id.* at § 1.b.(3).  Thus, in Section 1, the Abuse Coverage endorsement has already established that it addresses liability for abuse occurring during multiple successive years when AAIC or an affiliate issued renewal coverage.

USAG also relies on Section 3.c., which provides that if the Abuse Coverage under these policies and any other coverage form or policy **for the same policy period** issued by AAIC or an affiliate both apply, the maximum applicable limits of insurance available under all coverage forms or policies shall not exceed the single highest applicable limit. Dkt. 175, at 21. USAG argues that this proves that the Policies only "channeled" liability to one policy within a

13

single year.  *Id.*  But Section 3.c. addresses a different situation.  It addresses all covered liability **regardless of the number of perpetrators**, and **all** limits of liability (both "Each Act" and Aggregate), but is temporally limited to policies in the same year.  Thus, if AAIC (or an affiliate) issued another policy during the same year that covered USAG for sexual abuse liability and had a higher aggregate limit, this policy would not apply **at all**.[2]  On the other hand, Section 3.a. applies to a more limited circumstance—abuse by the same perpetrator—but that clause is **not** limited temporally to "the same policy period."  Thus, in fact, Section 3.c. further demonstrates that when a clause in the Abuse Coverage endorsement applies only to events in the particular policy period, **it says so explicitly**.  Otherwise, "all" means all.  *Cf. Holiday Hospitality Franchising, Inc. v. AMCO Ins. Co.*, 983 N.E.2d 574, 581 (Ind. 2013) (holding that "any" insured is unambiguous and means **any** insured).

### D.  Where Only One Primary Limit Applies, Only One Excess Limit Applies Under the "Follow-Form" Excess Policies.

#### 1.  Each Excess Policy Follows Form to the Underlying Primary Policy.

Chubb's position with respect to the Excess Policies is equally simple.  The Excess Policies are "follow form" policies, insofar as they follow the terms of the "UNDERLYING INSURANCE."  *See, e.g.*, Chubb App., Ex. D, § I.A.  A "follow form" policy "insures the same risks covered by the underlying policy …, but provides coverage to the insured in addition to and in excess of the coverage provided by" the underlying policy.  *Hartford Acc. & Indem. Co. v. Chicago Hous. Auth.*, 12 F.3d 92, 95 (7th Cir. 1993).  Thus, "interpretation of the extent of coverage afforded by" the follow-form excess policy "will be dictated by the terms of" the underlying followed policy.  *Id.*

---

[2] Chubb is not aware of such a policy.

Therefore, in the case of extended abuse by a single perpetrator, since the Primary Policies limit coverage to a single year's Each Act limit, the Excess Policies do the same. Notably, the Excess Policies make no explicit reference to sexual abuse coverage at all. Rather, the Excess Policies "follow form" generally to the Primary Policies, covering the same risk on the same terms but with a different limit ($10 million) and at a higher trigger point (*i.e,*, only in excess of the underlying limits). *See, e.g.*, Chubb App., Ex. D, Declarations and § I.A. It is only because of that "follow-form" clause that the Abuse Coverage extends to the Excess Policies in the first instance. The Excess Policies provide the same coverage, but at the excess level. By the same token, since only the first year's "Each Act" limit applies to liability for abuse by the same perpetrator, only that same year's excess policy applies to that liability.

### 2. Each Excess Policy Only Pays if the Underlying Primary Policy Pays.

The Excess Policies each provide as follows: "If the UNDERLYING INSURANCE **does not pay** a loss for reasons other than the exhaustion of an aggregate limit of insurance, then **WE shall not pay** such loss" (emphasis added). *See, e.g.*, Chubb App., Ex. D, § I.A. Thus, under the express terms of each of the Excess Policies, they only provide coverage if the corresponding Primary Policy **actually pays** a loss (unless the underlying aggregate limit is exhausted). If the underlying Primary Policy "does not pay," then the corresponding Excess Policy will not pay. Due to the Deemer Clause, only the first applicable Primary Policy will pay liability with respect to a specific perpetrator, as all of that perpetrator's acts are deemed a "single act." Therefore, only the Excess Policy in that year can possibly pay for that same liability. This framework is consistent with the purpose and function of "follow-form" excess policies generally.

**3.  The Exception for "Limits of Liability" Does Not Result in Coverage Under a Follow-Form Excess Policy When the Underlying Primary Policy Pays Nothing at All.**

USAG argues that even if all liability under the Primary Policies is capped at one year's Each Act limit of $1 million, all three of the Excess Policy limits still apply, for a total of $30 million.  Dkt. 175, at 9-15.  According to USAG, two of the excess policies provide coverage even though they follow form to primary policies that **do not pay at all**.  This is not how follow-form policies work.  USAG's interpretation "would create a significant difference between the coverage schemes of the two policies; a difference that could not have been intended by any of the parties."  *Chicago Housing Auth.*, 12 F.3d at 96.

To reach this anomalous result, USAG relies heavily on the inclusion of "limits of liability" among the exceptions to the Excess Policies' follow-form clause.  *See* Dkt. 175, at 10-13.  But this exception simply means that the excess limit is $10 million rather than $1 million.  That is not only the simplest and most intuitive reading of the follow-form clause; it is the **only** interpretation that can be harmonized with the clause restricting coverage to where the underlying primary policy actually pays.  *See Briles v. Wausau Ins. Cos.*, 858 N.E.2d 208, 213 (Ind. Ct. App. 2006) (interpretation that harmonizes policy provisions is favored).

Chubb's interpretation is also supported by case law from around the country. For example, in *Union Carbide Corp. v. Affiliated FM Ins. Co*., 947 N.E.2d 111, 113 (N.Y. 2011), New York's highest court held that the excess policy followed form to the underlying policy with respect to the **number of years' limits** available, even though limits of liability were excepted from the follow-form clause.  *See Union Carbide Corp. v. Affiliated FM Ins. Co*., 891 N.Y.S.2d 347, 350 (N.Y. App. Div. 2009) (intermediate appellate opinion which noted existence of exception).

Another court applied a similar analysis in *Air & Liquid Sys. Corp. v. Allianz Underwriters Ins. Co.*, Civil Action No. 11-247, 2013 WL 5436934, at *25 (W.D. Pa. Sept. 27, 2013). In that case, so-called "non-cumulation" provisions in the underlying policies precluded "stacking" successive years' limits in cases of continuous and progressive losses. The court held that the excess policies "followed form" to and incorporated these provisions—again, even though the follow-form clause did not apply to limits of liability. *See id.* In yet another example, the court held that the follow-form excess policy incorporated the followed policy's provisions regarding **number** of limits—once again, even though the follow-form clause applied "except with respect to limits of liability." *Metro. Life Ins. Co. v. Aetna Cas. & Sur. Co.*, X04CV 950115305S, 1999 WL 244642, at *3 (Conn. Super. Ct. Apr. 16, 1999).[3]

Thus, the **only** reasonable interpretation of the "limits of liability" exception to the follow-form clause is that the Excess Policy limits are $10 million in excess of underlying insurance, rather than $1 million in excess of nothing. This is the interpretation utilized by other courts, cited above. It is also the **only** interpretation that can be harmonized with the provision that each Excess Policy will only pay if the underlying Primary Policy pays.

### 4. The Case Law Cited by USAG Is Inapposite

None of the case law cited by USAG on this issue actually supports its position. In *Coleman, Inc. v. California Union Ins. Co.*, the court held that the excess policy **did** follow form to the underlying primary policy with respect to whether the limits were eroded by defense expenses. 960 F.2d 1529, 1534 (10th Cir. 1992). USAG cites and mischaracterizes footnote 8 to that opinion as assigning significance to the deletion of "this language"—implying to this Court that the provision addressed by the footnote is similar to the one at issue here, and that the Tenth

---

[3] Unlike Indiana, which prohibits citations to trial court opinions, Connecticut permits such citations. *See* Connecticut Manual of Style, pp. 63-64 (https://www.jud.ct.gov/Publications/Manual_of_style.pdf).

Circuit adopted USAG's interpretation of it.  *See* Dkt. 175, at 10.  USAG's description of the footnote is inaccurate on multiple levels.  First, as noted, the issue in that case was whether costs eroded the limit of liability; nothing in that case supports USAG's argument that the exception entitles it to coverage under the Excess Policy even if the corresponding Primary Policy pays nothing.  Second, the relevant aspect of the clause in *Coleman* was the exception for "any obligation to investigate and defend and pay for any costs and expenses to any of the same."  Third, the Tenth Circuit **rejected** the argument that the exception was dispositive of the cost-erosion issue in either direction.  Thus, the court's point in the cited footnote was actually the **opposite** of that represented by USAG and in a factual context which is entirely different and irrelevant.

Further, *Stryker Corp. v. XL Insurance America, Inc.* merely rejected the insured's categorical assertion that a follow-form excess insurer "has no defenses other than the defenses" raised by the underlying primary carrier.  *See* 2013 WL 3276408 (W.D. Mich. Jun. 27, 2013).  That is not Chubb's position here.  *Stryker* has absolutely no bearing on the issue at hand.  Finally, *Benjamin Moore v. Aetna* addressed how deductibles apply in a series of primary policies; it had nothing to do with excess insurance at all.  *See* 843 A.2d 1094, 1105 (N.J. 2004).

### 5.  <u>The Aggregate Limit and Exhaustion Provisions Are Irrelevant</u>

USAG cites a few other clauses in the Excess Policies as somehow supportive of its reading, even though these clauses have no bearing on the issue.  First, USAG cites the Excess Policies' basic description of the aggregate limit as limiting Chubb's liability for damages "during each annual period of this policy."  Dkt. 175, at 13.  USAG fails to explain how this provision has anything to do with the Deemer Clause.  It does not. It simply describes an aggregate limit.  Even if all abuse by a single perpetrator is deemed one "act," there could still be—and, indeed, allegedly are—other "acts" that would be subject to the annual aggregate

limits. And there is no inconsistency with the Primary Policies; the Primary Policies describe the aggregate limit in the same manner.

But the Primary Policies also provide, per the Deemer Clause, that in the specific instance of extensive abuse by the same perpetrator, all such abuse is deemed a "single act" and subject to one "Each Act" limit (which is $1 million). There is nothing in the Excess Policies negating the Deemer Clause as to that particular circumstance. Also, contrary to USAG's representation, the Excess Policies' provision describing the operation of the "per occurrence" limit does *not* state that it applies "during each annual period of the policy." *See* Dkt. 175-2, at 2; Dkt. 175, at 9. And again, the Excess Policies each state that if the underlying Primary Policy does not pay the loss, the corresponding Excess Policy does not pay the loss, either. *See, e.g.*, Chubb App., Ex. D, § I.A.

USAG also cites the provision in the Excess Policies stating that "[i]f the UNDERLYING INSURANCE limit has been reduced or exhausted **solely by reason of losses paid thereunder**," the Excess Policy will, "in the event of reduction, pay in excess of the reduced underlying limit;" or, "in the event of exhaustion, continue in force as UNDERLYING INSURANCE." Dkt. 175, at 14 (emphasis added). This clause provides that if the underlying policy's aggregate limit is eroded **by payment of claims**, the excess policy recognizes that erosion and applies in excess of whatever remains, if anything. This clause is standard to virtually every excess or umbrella policy and essentially says, "if a prior claim or suit eroded the underlying primary policy's aggregate limit, we will recognize that erosion for purposes of our trigger point." The clause, in fact, supports Chubb's position. It provides that exhaustion of underlying limits can only occur by actual payment of claims. If two of the underlying Primary Policies have paid nothing, they necessarily have not been "reduced or exhausted solely by

19

reason of loses paid thereunder[.]"  Again, this confirms that the Excess Policy only pays if the underlying Primary Policy pays, or the aggregate limit has been exhausted.

USAG also notes the lack of an explicit reference to the phrase "Each Act" in the Excess Policies.  Dkt. 175, at 15.  This argument misses the point.  The result of the Deemer Clause is that coverage under the Primary Policies is capped at a single Each Act limit of $1 million under the 1998-1999 Primary Policy.  The 1998-1999 Excess Policy follows form to that policy and has its own limit of $10 million.  Therefore, those combined limits of $11 million apply.  The other two Excess Policies (1999-2000 and 2000-2001) do not apply, not because the Excess Policies have their own "Each Act" limit, but because they follow form to Primary Policies that pay nothing at all.

### E. USAG Inappropriately Cites Inapposite, Non-Citable, and/or Overruled State Trial Court Rulings

Finally, USAG engages in a personal attack against Chubb and claims that "Chubb's contrary position is not only wrong, 'there is no rational, principled basis for it.'"  Dkt. 175, at 12 (*quoting Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 520 (Ind. 1993)).  USAG threatens that "[i]f Chubb continues to insist on this argument, it may be subject to frivolous litigation penalties."  Dkt. 175, at 12. In *Hickman*, the Indiana Supreme Court recognized a tort cause of action for an insurer's breach of its duty of good faith towards its insured. 622 N.E.2d at 517. As the Indiana Supreme Court explained:

> We also note that this new cause of action does not arise every time an insurance claim is erroneously denied. For example, a good faith dispute about the amount of a valid claim or about whether the insured has a valid claim at all will not supply the grounds for a recovery in tort for the breach of the obligation to exercise good faith. This is so even if it is ultimately determined that the insurer breached its contract. **That insurance companies may, in good faith, dispute claims, has long been the rule in Indiana**.

*Id.* at 520 (emphasis added).

USAG's incomplete citation to *Hickman* does not establish that Chubb acted in bad faith. What the Indiana Supreme Court actually stated in *Hickman* was that as an example of bad faith, "an insurer which denies liability knowing that there is no rational, principled basis for doing so has breached its duty." *Id.* The fact that USAG disagrees with Chubb's coverage position does not mean that Chubb has no "rational, principled basis" for it. As demonstrated above, Chubb's position is supported by the unambiguous language of its policies and case law from multiple jurisdictions. USAG's citation to *Hickman* is also ironic considering the Indiana Supreme Court reversed an award of punitive damages against an insurer. *Id.* at 523.

In support of this argument, USAG cites to three Indiana trial court orders. Dkt. 175, at 12; Dkt. 175-4. USAG's citation to these orders is inapt for multiple reasons. First, it is inappropriate to cite Indiana trial court decisions, and the Indiana Court of Appeals has admonished counsel for doing so. *Indiana Dep't of Nat. Res. v. United Minerals, Inc.*, 686 N.E.2d 851, 857 n.1 (Ind. Ct. App. 1997). Second, the rationale of one of the trial court orders cited by USAG has been rejected by both the Indiana Court of Appeals and by Judge Barker of this District (a fact USAG omitted from its brief). *See Thomson v. Insurance Co. of N. Am.*, 11 N.E.3d 982, 1019-20 (Ct. App. Ind. 2014) (rejecting *State Farm Fire & Cas. Co. v. Anthony J. Cefali*, Case No. 45D04-0507-PL-00030, 2007 WL 1152987 (Jan. 25, 2007)); *see also Trinity Homes LLC v. Ohio Cas. Ins. Co.*, No. 1:04-cv-1920-SEB-DML, 864 F. Supp. 2d 744, 759 S.D. Ind. 2012) (same); *Irving Materials, Inc. v. Ohio Cas. Ins. Co.*, No. 1:03-cv-361-SEB-TAB, 2008 WL 687126, at *5 (S.D. Ind. March 10, 2008) (same).

Even if Indiana trial court orders could be properly considered, the orders cited by USAG are of no moment. USAG's citation to *Hickman* apparently conflates frivolous litigation fee awards under Ind. Code § 34-52-1-1(b) (which were at issue in the trial court orders) (Dkt. 175-

4, at 22-24, 32-33, 46-47) with an Indiana common law claim for bad faith punitive damages. The imposition of sanctions by this Court, however, is a procedural matter controlled by federal law, not state law. *Klayman v. Judicial Watch, Inc.*, 314 F. Supp. 3d 308, 312 (D.D.C. 2018) ("Because such sanctions are grounded in the inherent power of the federal courts, they are governed by federal law even when the district court sits in diversity.").

Finally, each of the trial court orders cited by USAG addressed an insurer's refusal to defend its insured. Dkt. 175-4, at 23, 28, 37. Here, Chubb is defending USAG pursuant to a reservation of rights, and the dispute currently before the Court concerns the amount of indemnity potentially available to USAG under the Chubb Policies for certain categories of claims. As established by *Hickman*, this is a good faith dispute by Chubb regarding the amount of coverage potentially available to its insured. *Hickman*, 622 N.E.2d at 520 ("[A] good faith dispute about the amount of a valid claim or about whether the insured has a valid claim at all will not supply the grounds for a recovery in tort for the breach of the obligation to exercise good faith.").

Accordingly, USAG's personal attacks against Chubb for asserting a coverage position supported by its policy language and case law should not be given any credence. If only one Primary Policy pays, it follows inexorably that only one follow-form Excess Policy pays.

## **CONCLUSION**

For the foregoing reasons, USAG's Motion for Partial Summary Judgment should be denied. Chubb maintains that the District Court should withdraw the reference with respect to this Adversary Proceeding and reserves its jurisdictional challenge in that regard. However, should this Court decide to address the substance of the issues raised by USAG's Motion for

Partial Summary Judgment, Chubb's Motion for Partial Summary Judgment should be granted for the same reasons.

Respectfully submitted.

Dated:  September 5, 2019

KROGER, GARDIS & REGAS, LLP

By____*/s/ Stephen J. Peters*_____
Stephen J. Peters, Attorney No. 6345-49
Harley K. Means, Attorney No. 23068-32
111 Monument Circle, Suite 900
Indianapolis, IN 46204-5125
(317) 692-9000
speters@kgrlaw.com
hmeans@kgrlaw.com

*Counsel for Defendant ACE American Insurance Company f/k/a CIGNA Insurance Company*

COZEN O'CONNOR

By____*/s/ Jonathan Toren*_____
Jonathan Toren, *Admitted Pro Hac Vice*
Eric Freed, *Admitted Pro Hac Vice*
999 Third Avenue, Suite 1900
Seattle, Washington 98104
(206) 340-1000
jtoren@cozen.com
efreed@cozen.com

*Counsel for Defendant, Defendant, ACE American Insurance Company f/k/a CIGNA Insurance Company*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on September 5, 2019, a copy of the foregoing ***Memorandum Of Law in Opposition to USA Gymnastics' Motion For Partial Summary Judgment and in Support of Its Cross-Motion for Partial Summary Judgment*** was filed electronically. Notice of this filing will be sent to the following parties through the Court's Electronic Case Filing System. Parties may access this filing through the Court's system.

Respectfully submitted.

Dated:  September 5, 2019                COZEN O'CONNOR


By     */s/ Jonathan Toren*
Jonathan Toren, *Admitted Pro Hac Vice*
Eric Freed, *Admitted Pro Hac Vice*
999 Third Avenue, Suite 1900
Seattle, Washington 98104
(206) 340-1000
(206) 621-8783 (Fax)
jtoren@cozen.com
efreed@cozen.com

*Counsel for Defendant, Defendant, ACE American Insurance Company f/k/a CIGNA Insurance Company*

LEGAL\42706516\2