

**Robyn L. Moberly**
**United States Bankruptcy Judge**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| In re:<br><br>USA GYMNASTICS,<br>　　　　　　Debtor. | Chapter 11<br><br>Case No. 18-9108-RLM-11 |
| USA GYMNASTICS,<br>　　Plaintiff,<br><br>v.<br><br>ACE AMERICAN INSURANCE COMPANY f/k/a<br>CIGNA INSURANCE COMPANY, GREAT<br>AMERICAN<br>ASSURANCE COMPANY, LIBERTY INSURANCE<br>UNDERWRITERS INC., NATIONAL CASUALTY<br>COMPANY, RSUI INDEMNITY COMPANY, TIG<br>INSURANCE COMPANY, VIRGINIA SURETY<br>COMPANY, INC. f/k/a COMBINED SPECIALTY<br>INSURANCE COMPANY, WESTERN WORLD<br>INSURANCE COMPANY, ENDURANCE<br>AMERICAN INSURANCE COMPANY,<br>AMERICAN HOME ASSURANCE COMPANY, and<br>DOE INSURERS,<br><br>　　　　Defendants. | Adv. Pro. No. 19-50012<br>in 18-09108-RLM-11 |

## BANKRUPTCY COURT'S PROPOSED FINDINGS AND CONCLUSIONS WITH RESPECT TO USAG'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND LIU'S CROSS- MOTION FOR SUMMARY JUDGMENT

In accordance with 28 U.S.C. 157(c)(1), the Bankruptcy Court now tenders its proposed findings and conclusions :

This matter came before the Court on the *Motion for Partial Summary Judgment* (the "**Motion**") filed by Debtor and Plaintiff ("**USAG**") against Defendant Liberty Insurance Underwriters ("**LIU**") for an order pursuant to FED. R. CIV. P. 56(a), made applicable to this Adversary Proceeding through FED. R. BANKR. P. 7056, and S.D. Ind. L.R. B-7056-1, declaring the Debtor's rights under an insurance policy sold by LIU that is the property of the Debtor's estate. [Dkt. 26, 27] In response, LIU filed a *Cross-Motion for Summary Judgment* (the "**Cross-Motion**") [Dkt. 130] and a *Memorandum of Law in Opposition* to the Motion (the "**Opposition**"). [Dkt. 131] USAG filed a *Combined Response and Reply Brief* (the "**Response**") [Dkt. 146], and LIU filed a *Reply Memorandum in Further Support of its Cross-Motion* (the "**Reply**") [Dkt. 163] USAG filed a Surreply in response to new evidence designated in the Reply. [Dkt. 165] The Court held oral argument on September 17, 2019. The motions are now ripe for decision.

### LIU's CONSENT OR WAIVER

The court must first address USAG's contention that, by filing its own Motion for Summary Judgment, LIU has either consented to this court's jurisdiction to enter a final order in this matter or has waived its right to entry of final judgment by the District Court.

The issue before the court is a non-core claim upon which final judgment must be rendered by an Article III court absent consent of the parties. 28 U.S.C. §157(c)(2).  A litigant may waive its right to Article III final disposition of its claim through implied consent. *Wellness Intern. Network, Ltd. v. Sharif,* 135 S.Ct. 1932, 1947 (2015)("[n]othing in the Constitution requires that consent to adjudication by a bankruptcy court be express."). The key inquiry is whether "the litigant or counsel was made aware of the need for consent and the right to refuse it, and still

2

voluntarily appeared to try the case before the non-Article III adjudicator." *Id.* at 1948; *Roell v. Withrow*, 538 U.S. 580, 588, n.5, 123 S.Ct 1696.  It is "good practice for courts to seek express statements of consent or non-consent" and that is amplified by Fed. R. Bankr. P. 7012 (b) which requires that a responsive pleading include a statement that the party does or does not consent to entry of final orders or judgment by the bankruptcy court.  *Wellness*, 135 S.Ct. at 1948, n. 13.

USAG filed this Complaint for Declaratory Judgment on February 1, 2019. LIU's Answer to the Complaint stated in paragraph 3, "LIU does not consent to the Bankruptcy Court entering a final order or judgment in this case." (Dkt. 105).  LIU, along with several other defendants, filed in this court a Motion for Withdrawal of the Reference (Dkt. 37) which contained in bold type RELIEF IS SOUGHT FROM A UNITED STATES DISTRICT JUDGE in the caption.  LIU and other defendants filed a Motion for Stay pending disposition of that motion by the District Court (Dkt. 38).  The court, in the May 15, 2019 hearing, heard oral argument and denied the Motion to Stay Proceedings as to LIU only. (Dkt. 147)  The first full paragraph of LIU's Motion for Summary Judgment (Dkt. 130) was followed by footnote 1 that stated LIU, with the other defendants, had moved for withdrawal of the reference and that it did not consent to this Court's jurisdiction.  That same footnote appeared in LIU's brief in opposition to USAG's motion and in support of its cross-motion (Dkt. 131, n.1) and its reply in further support of its cross-motion (Dkt. 163, n.1). LIU also joined in the other defendants' renewed Motion to Withdraw the Reference after the District Court denied the first such motion. (Dkt. 208).

The District Court has not withdrawn the reference.  The pending Motion to Withdraw the Reference did not stay the proceedings in the bankruptcy court under Fed. R. Bankr. P. 5011(c). The bankruptcy court denied the stay as to LIU.  LIU filed its Cross-Motion for Summary Judgment here because currently there is no alternative forum available in which to pursue the relief it seeks.  (See, *Stern v. Marshall*, 564 U.S. 462, 493 (2011) "Pierce did not truly consent to resolution of Vickie's claim in the bankruptcy court proceedings.  He had nowhere else to go if he

wished to recover from Vickie's estate.")  LIU had no choice but to proceed in this court and reserve its right to final adjudication by an Article III court.  LIU has neither impliedly consented to this court's jurisdiction nor waived its right to entry of final judgment by the District Court by filing its cross-motion.  For that reason, this Court makes its proposed findings and conclusions for *de novo* review by the District Court pursuant to 28 U.S.C. §157(c)(1).

### GOVERNING LAW

The parties agree that Indiana law governs this coverage dispute. As a federal court exercising diversity jurisdiction, this Court is required to follow the law as articulated by the Indiana Supreme Court. See *Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1090 (7th Cir. 1999). If that Court has not spoken to the issue, a federal court must predict how the Indiana Supreme Court would decide the question. *Id.*

The instant matter involves an insurance coverage dispute arising out of "claims made" directors and officers (D & O) policy sold to USA Gymnastics ("USAG") by Liberty Insurance Underwriters ("LIU") and, specifically, its duty to defend its insured. LIU issued a Nonprofit Executive Advantage Policy to USAG for the policy period May 16, 2016 through May 16, 2017. The policy required LIU to "pay on behalf of the **Insureds** all **Loss** which they shall become legally obligated to pay as a result of a **Claim** first made during the **Policy Period** or **Discovery Period**, if applicable, against the **Insureds** for a **Wrongful Act** which takes place before or during the **Policy Period**."[1] The policy is a claims-made policy, meaning that only claims first made during the policy period may be considered for coverage.

### POLICY PROVISIONS

The policy at issue defines a "claim" as:

---

[1] Policy §1.  Throughout this document, terms in bold are defined terms in the policy.

(a) a written demand for monetary or non-monetary relief against an **Insured**;

(b) the commencement of a civil or criminal judicial proceeding or arbitration against an **Insured**; or

(c) the commencement of a formal criminal administrative or regulatory proceeding or formal investigation against an **Insured**, including any brought before the Equal Employment Opportunity Commission or any similar state, local, or territorial governmental agency; including any appeal therefrom.  A **Claim** will be deemed first made on the date an **Insured** receives a written demand, complaint, indictment, notice of charges, or order of formal investigation." [2]

The policy defines the term "Insureds" to include both the "Insured Organization" and "Insured Persons". [3]  The term "Insured Organization" is "any entity named in item 1 of the declaration". [4]  USAG is the entity named in the Declarations. The term "Insured Person" as defined by the policy means "one or more natural persons who were, now are, or shall hereafter be duly elected or appointed directors, trustees, officers, employees, committee members or volunteers of the Insured Organization, or, with respect to a Subsidiary operating outside the United States, their functional equivalent, regardless of title." [5]

The genesis of most, if not all, of the claims asserted against USAG for which USAG seeks coverage stems from the sexual abuse perpetrated upon athletes by Dr. Larry Nassar ("Nassar") and the lawsuits brought against USAG because of Nassar's abuse (the "Nassar Athlete Lawsuits").  There seems to be an easily resolved dispute about whether Nassar was a volunteer or an employee of USAG.  Since "Insured Person" includes both employees

---

[2] Policy §23.3.  Note that Endorsement 4 to the policy adds the word "formal" before the word "investigation" to emphasize that a level of formality is required for an investigation to be a covered claim.  However, the word "formal investigation" was already part of the definition under § 23.3 and are the last two words in the definition of Claim.

[3] Policy §23.10.

[4] Policy §23,11.

[5] Policy §23.12

and volunteers, this factual dispute is of no consequence and does not create a genuine issue of material fact.

The policy defines "Wrongful Act" as: "(a) any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty, or **Employment Practices Wrongful Act** committed or attempted by the **Insured Persons** in their capacities as such or by the **Insured Organization** or (b) any matter claimed against the **Insured Persons** solely by reason of their status as **Insured Persons**." [6] The policy further provides: "All **Claims** arising from the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed one **Claim** and subject to a single limit of liability. Such **Claim** shall be deemed first made on the date the earliest of such **Claims** is first made, regardless of whether such date is before or during the **Policy Period.**" [7]

"**Interrelated Wrongful Acts**" means "Wrongful Acts that have as a common nexus any fact, circumstance, situation, event, transaction, clause or series of causally connected facts, circumstances, situations, events, transactions, or causes."[8]

The LIU policy contains a Conduct Exclusion which provides as follows:

> "This Policy does not apply to any Claim made against any Insured: … based upon, arising from, or in any way related to: (a) any Insureds gaining in fact any personal profit, remuneration or advantage to which they were not legally entitled; or (b) any deliberately dishonest, malicious or fraudulent act or omission or any willful violation of law by any **Insured;** provided, however, this exclusion shall only apply if it is finally adjudicated that such conduct in fact occurred. For purposes of determining the applicability of this section, the **Wrongful Act** of any **Insured Person** shall not be imputed to any other **Insured Person.**" [9]

---

[6] Policy §23.22.
[7] Policy §9.2.
[8] Policy §23.13.
[9] Policy §4.9.

The LIU policy contains a Bodily Injury Exclusion which bars coverage for "any Claim made against any Insured" for "(a) bodily injury, sickness, disease, death or (b) emotional distress, mental anguish….provided that part[s] (b)…of this exclusion shall not apply to any Claim brought by or on behalf of any Third Person"[10]

Finally, the LIU Policy contains a prior notice exclusion that bars coverage for "any Claim made against any Insured… based upon, arising from, or in any way related to any error, misstatement, misleading statement, act, omission, neglect or breach of duty which has been reported or has been the subject of any notice under any insurance policy of which this Policy is a renewal or replacement or under any other policy which it may exceed in time." [11]

## DEMANDS AND INVESTIGATIONS

USAG received its first written demand letter from a former athlete alleging abuse by Nassar on May 25, 2016, according to the affidavit of James Scott Shollenbarger, Chief Financial Officer for USAG. (Dkt. 27-1) LIU questions whether this was the first claim received by USAG relating to Nassar and references possible discussions or allegations that may have occurred previously wherein gymnasts may have reported abuse possibly by Nassar to certain coaches, trainers and other adults. LIU also alleges that USAG maintained a file containing complaints against as many as 54 other coaches over a ten year period. LIU makes passing reference that one or more of these may constitute prior notice. However, LIU designates no evidence and makes no cogent argument that this chatter constituted notice of Nassar's actions. A party cannot create a genuine dispute of fact under Rule 56 by speculating. *Pugh v. City of Attica*, 259 F.3d 619, 625 (7th Cir. 2001). If LIU believed it needed discovery on this issue, it was required to "show by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). It has not done so, and so the Court

---

[10] Policy §4.1.
[11] Policy §4.3.

finds no genuine dispute on the "first-made" issue. *Woods v. City of Chicago,* 234 F.3d 979, 990 (7th Cir. 2000) (holding that the failure to submit the required affidavit "alone justifies affirmance of the district court's decision" to grant a motion for summary judgment without additional discovery). Since the duty to defend arises under any circumstances where coverage may be required, the possibility that there could be a defense to coverage does not negate the duty to defend, as will be discussed later herein.

Since there is no designated evidence of prior notice of Nassar's conduct and there are no allegations of a prior written demand regarding Nassar having been received by USAG, the Court finds the first written demand against USAG relating to the Nassar wrongful conduct occurred on May 25, 2016.

Intense fallout occurred shortly thereafter. Individual lawsuits were filed by abuse survivors. The United States Olympic and Paralympic Committee ("USOC") sent a letter to USAG on January 25, 2018 advising that a formal investigation (the "USOC Investigation") was being launched into "exactly who knew and who should have known of USAG athlete reports of abuse by Dr. Nassar (and when) and did not report those allegations appropriately, and of what systemic failures may have contributed to these failures to report".[12] The letter further stated that failure to cooperate would result in revocation of USAG's status as the national governing body for gymnastics ("NGB"). The USOC is a federally chartered corporation authorized by the Ted Stevens Olympic and Amateur Sports Act, 36 U.S.C. § 220501, *et. seq.* The Act established the USOC as the body which has the authority to approve and revoke membership in the USOC and has the authority to recognize an amateur sports organization such as the NGB for gymnastics and also has the authority to revoke its status as the NGB for

---

[12] Shollenbarger Affidavit, Dkt #27-1 ¶7.

gymnastics. Ultimately, on November 5, 2018, the United States Olympic Committee brought a complaint against USAG seeking revocation of its membership in the USOC and its recognition as the NGB for the sport of gymnastics.[13]  Revocation of its status as the NGB for gymnastics would be the death knell for USA Gymnastics.

On February 26, 2018, the Atty. Gen. of Indiana, Curtis T. Hill, Jr. initiated a Civil Investigative Demand ("CID") against USA Gymnastics, Inc. (the "IAG Investigation").  The CID stated that the Attorney General "has reasonable cause to believe that you may be in possession, custody, or control of documentary material or may have knowledge of a fact that is relevant to an investigation being conducted to determine whether (1) USA Gymnastics, Inc., ("USAG") has exceeded or abused the authority conferred on the corporation by law and continues to do so, wasted or misapplied corporate assets, is no longer able to carry out the corporation's purpose, or otherwise violated Indiana law…" and whether any corporate officer or director has violated his or her duties under relevant Indiana law. The Demand contained interrogatories and requests for production related to sexual abuse claims brought against USAG.[14]  It is clear that the Indiana Attorney General was making demands pursuant to his statutory authority, not mere inquiries.

Several committees of the United States House and Senate initiated investigations (the "Congressional Investigations") and sent letters to USAG with requests for sworn testimony before Congressional committees, production of documents and, in some cases, for follow-up information.  Many of the letters explicitly stated their investigations stemmed from the allegations of abuse against Nassar, and all of them referenced policies and

---

[13] Exhibit "B" to Shollenbarger affidavit, Dkt 27-1, p. 73
[14] Exhibit "C" to Shollenbarger affidavit  Dkt 27-1, p. 79

procedures related to sexual abuse of athletes.[15]  Most of the requests could elicit evidence damaging to USAG, if such evidence existed.

Two of USAG's former employees, Stephen Penny and Deborah Van Horn, have been indicted in a Texas court for crimes they allegedly committed (the "Penny and Van Horn Criminal Matters").  Amy White, another employee of USAG, has also been involved as a witness in the criminal and civil cases arising from the Nassar abuses.

USAG has sought a defense from LIU for all of these matters.  LIU has participated in the cost of the defense of the Nassar civil lawsuits brought by gymnasts under a reservation of rights, along with other insurers.  Initially, LIU assured USAG that some of the investigations were "Claims" covered by the policy but LIU ultimately denied coverage and has refused to provide or pay for a defense for any of the matters described herein.

### INDIANA COURTS' INTERPRETATION OF TERMS OF INSURANCE CONTRACTS

Generally, in Indiana, contracts for insurance are subject to the same rules of interpretation as are other contracts. *Asbury v. Indiana Union Mutual Insurance Co.* 441 N.E.2d 332 (Ind. Ct. App. 1982); *American Economy Insurance Co. v. Liggett* , 426 N.E.2d 136 (Ind. Ct. App. 1981).  If the policy language is clear and unambiguous, it should be given its plain and ordinary meaning. *Spears v. Jackson* , 398 N.E.2d 718 (Ind. Ct. App. 1980); *Vernon Fire and Casualty Insurance Co. v. American Underwriters, Inc.*, 356 N.E.2d 693 (Ind. Ct. App. 1976).

The Indiana Supreme Court in *Beam v. Wausau Ins. Co.*, 765 N.E.2d 524, 528 (Ind. 2002) spoke to some special rules of construction of insurance contracts that have been developed due to the disparity in bargaining power between insurers and insureds.  The court observed that, "[i]f a contract is

---

[15] Paragraph 10 Shollenbarger affidavit, exhibits "D" and "E" Dkt. 27-1, p. 113 and 131

clear and unambiguous, the language therein must be given its plain meaning" quoting *Allstate Ins. Co. v. Boles,* 481 N.E.2d 1096, 1101 (Ind.1985). But, "[w]here there is ambiguity, insurance policies are to be construed strictly against the insurer and the policy language is viewed from the standpoint of the insured." *Bosecker v. Westfield Ins. Co.*, 724 N.E.2d 241, 244 (Ind. 2000) (quoting *Am. States Ins. Co. v. Kiger*, 662 N.E.2d 945, 947 (Ind.1996)). Any ambiguity in a policy term is interpreted in favor of the policyholder and in favor of coverage. *Eli Lilly & Co. v. Home Ins. Co.*, 482 N.E.2d 467, 470–71 (Ind. 1985). If there is more than one reasonable construction of a term, then it is ambiguous. *Id.* A disagreement among courts as to the meaning of a particular contractual provision is evidence that an ambiguity may exist. But a division of authority is only evidence of ambiguity. It does not establish conclusively that a particular clause is ambiguous. *Thomson Inc. v. Insurance Co. of North America,* 11 N.E.3d 982, 993 (Ind. Ct. App. 2014), *Hartford Acc. & Indem. Co. v. Dana Corp.*, 690 N.E.2d 285, 295 (Ind. Ct. App. 1997); *Travelers Indem. Co. v. Summit Corp. of Am.*, 715 N.E.2d 926, 938 (Ind. Ct. App. 1999). An ambiguity must be resolved in favor of the insured and so an insurer may not offer extrinsic evidence to prove the meaning of policy terms. *Eli Lilly & Co.*, 482 N.E.2d at 471.

In Indiana, the duty to defend is broader than the duty to indemnify. *Seymour Mfg. Co., Inc. v. Commercial Union Ins. Co.*, 665 N.E.2d 891, 892 (Ind. 1996). The duty is triggered if there is any potential for coverage. *Id.*; *Property Owners Ins. Co. v. Virk Boyz Liquor Stores,* LLC, 219 F. Supp. 3d 868, 873 (N.D. Ind. 2016) (applying *Seymour*). The duty continues until the insurer shows conclusively that there is no potential for coverage for any claim. *Federal Ins. Co. v. Stroh Brewing Co.*, 127 F.3d 563, 566 (7th Cir. 1997); *Liberty Mut. Ins. Co. v. OSI Indus., Inc.,* 831 N.E.2d 192, 200 (Ind. Ct. App. 2005). An insurer is not required to defend its insured where the claims

11

asserted are "clearly excluded under the policy." *Jim Barna Log Sys. Midwest, Inc. v. Gen. Cas. Ins. Co.*, 791 N.E.2d 816, 823 (Ind. Ct. App. 2003) (it was clear and unequivocal that log home seller's insurance did not provide coverage for negligent advice, intentional or reckless acts, nor allegations of conversion or misrepresentation or allegations of deceptive practices and therefore there was no duty to defend), disapproved on other grounds as stated in *Trinity Homes LLC v. Ohio Cas. Ins. Co.*, 864 F. Supp.2d 744, 753 n.4 (S.D. Ind. 2012). If there is any potential for coverage, the insurer has a duty to defend. *Seymour,* 665 N.E.2d at 891.

ANALYSIS

At the outset, it is important to note that Indiana takes a different approach to the construction of insurance policy language than many states and this is especially true when considering exclusions to policies. The following language from *State Auto. Mut. Ins. Co. v. Flexdar, Inc.*, 964 N.E.2d 845, 848 (Ind.2012) succinctly states Indiana's approach to insurance contract interpretation:

> "Interpretation of an insurance policy presents a question of law that is particularly suitable for summary judgment. See *Cinergy Corp. v. Associated Elec. & Gas Ins. Servs., Ltd.,* 865 N.E.2d 571, 574 (Ind.2007); *Bosecker v. Westfield Ins. Co.,* 724 N.E.2d 241, 243 (Ind.2000). "It is well settled that where there is ambiguity, insurance policies are to be construed strictly against the insurer and the policy language is viewed from the standpoint of the insured." *Allstate Ins. Co. v. Dana Corp.*, 759 N.E.2d 1049, 1056 (Ind.2001) (internal quotation marks omitted) (quoting *Bosecker*, 724 N.E.2d at 244). This is especially true where the language in question purports to exclude coverage. *USA Life One Ins. Co. of Ind. v. Nuckolls,* 682 N.E.2d 534, 538 (Ind.1997). Insurers are free to limit the coverage of their policies, but such limitations must be clearly expressed to be enforceable. *W. Bend Mut. v. Keaton*, 755 N.E.2d 652, 654 (Ind.Ct.App.2001), trans. denied. "Where provisions limiting coverage are not clearly and plainly expressed, the policy will be construed most favorably to the insured, to further the policy's basic purpose of indemnity." *Meridian Mut. Ins. Co. v. Auto–Owners Ins. Co.*, 698 N.E.2d 770, 773 (Ind.1998). Where ambiguity exists not because of extrinsic facts but by reason of the language used, the ambiguous terms will be construed in favor of the

insured for purposes of summary judgment. *See Cinergy,* 865 N.E.2d at 574.

The duty to defend is broader than the duty to indemnify because the duty to defend arises whenever there is a potential for coverage given the allegations of the claim taken as true in light of the reasonable facts known and available to the insurer. *American States Ins. Co. v Aetna Life & Casualty Co.,* 379 N.E.2d 510, 518 (Ind. Ct. App. 1978), *citing United States Fidelity and Guaranty Company v Baugh,* 257 NE2d 699 (Ind. Ct. App. 1970); *Virk Boyz Liquor Stores,* 219 F.Supp3d at 873; *Seymour,* 665 N.E.2d at 891. The LIU policy provides a right and duty to defend any Claim or Wrongful Act.[16] In other words, the duty to defend is not limited to a Claim, as defined under the policy, but also any Wrongful Act "involving the Insureds".

## The Intentional Acts ("Conduct") Exclusion and the Anti-Imputation Clause

The Conduct Exclusion contains three elements: (a) an insured must have committed the prohibited conduct, (b) there must be a final adjudication that the conduct occurred by the insured, and (c) the claim must be based upon, arising from or in any way related to the prohibited and adjudicated conduct.

As discussed at length above, insurance contract exclusions are subject to strict scrutiny. *Kiger,* 662 N.E.2d at 947. Insurance contracts are contracts of adhesion and under Indiana law, any exclusion in an insurance contract must be plainly stated and all doubts or ambiguities are resolved against the insurer. *Virk Boyz Liquor,* 219 F. Supp.3d at 873.

The LIU policy contains an "Enhancement Endorsement for NonProfit Risks" which states: "It is agreed that the Policy is hereby amended as

---

[16] To the extent there is an ambiguity in the LIU policy's definition of a claim, it should be noted that LIU's counsel on March 12, 2018 wrote a letter to counsel for USAG stating that the USOC and Congressional investigations constituted "Claims". Liu has subsequently renounced this policy interpretation. Exhibit "B" to Doc #27-1

follows:  The last paragraph of Section 4 is deleted and replaced with the following:  For purposes of determining the applicability of Sections 4.1 through 4.9, the **Wrongful Act** of any **Insured Person** shall not be imputed to any other **Insured Person**." [17]  LIU's position with regard to Nassar's status is not always clear.  LIU posits that since Nassar is alleged to have molested several hundred women, that his actions were not within the boundaries of his position as a volunteer (or even as an employee) and, at times, LIU states that Nassar is therefore not an insured.  The problem for LIU is that if Nassar is not an Insured, there is no construction under which his actions could be imputed to any insured.  At the same time, since Nassar was a volunteer, or an employee, LIU contends that he was an insured and therefore his actions are imputed to other insureds.  Regardless of Nassar's status as an insured or not, it is the opinion of the court that the duty to defend does not hinge on this issue.  Nassar's conduct has only been adjudicated as to the ten crimes on which a guilty verdict was entered.[18] There are hundreds of claims that have not been adjudicated.  Meanwhile, LIU contends that once Nassar pled guilty to any willful violation of the law, none of the claims for the same or similar conduct are covered by the policy. The language of the policy controls and it states that the exclusion only applies to willful violations of the law that have been adjudicated.  The exclusion only bars coverage for the ten cases that have been finally adjudicated, not for the others.  If LIU intended for all claims which allege similar wrongful conduct (mass torts) to be excluded, whether finally adjudicated or not, LIU could have so stated.  USAG's interpretation of the

---

[17] The last sentence of section 4, which is explicitly deleted by the Enhancement to Coverage, provided that the anti-imputation provision only applied to section 4.9.  However, the Enhancement to Coverage extended the anti-imputation provision to all of paragraph 4 (Claim Exclusions).

[18] Larry Nassar was convicted on November 22, 2017 of seven counts of First Degree Criminal Sexual Conduct and on November 29, 2017 of an addition three counts of First Degree Criminal Conduct.  All convictions were in Michigan.  Dkt #27-2, page 9 of 153, October 26, 2018 coverage letter from LIU to USAG's coverage counsel.

"final adjudication" requirement is reasonable and an ordinary policyholder of average intelligence would conclude that the exclusion only bars coverage for indemnity for costs arising from a finally adjudicated intentional wrongful act.

LIU further contends that because the policy treats all claims as "related" and as a "single claim", then all related claims must be subject to the exclusion cited above, whether finally adjudicated individually or not. It seems obvious that the treatment of related claims as a single claim has the purpose of allocating liability between claims-made policies in successive years. It would be unreasonable to treat all "inter-related claims" as the exact same claim for any and all purposes. If the first reported claim was never adjudicated, are all later claims not adjudicated? If any one claim is finally adjudicated, are the hundreds of other claims also finally adjudicated?  LIU drafted the policy and should have included language clearly and unambiguously stating the breadth of this exclusion, if it was so intended.

Likewise, LIU has taken the position that the Nassar related Karolyi litigation and the All Olympia lawsuits (referred to as the "Revocation Lawsuits") are not encompassed by LIU's duty to defend, based upon the Intentional Acts or Conduct exclusion of the policy.

USAG points the Court to *Frankenmuth Mut. Ins. Co. v Williams,* 690 N.E.2d 675 (Ind. 1997) wherein the defendant's husband admitted to molesting the plaintiff tort victim while defendant was babysitting her. Defendant was sued by the plaintiff tort victim and her mother for permanent emotional damages as a result of the defendant's negligent supervision of her husband.  Frankenmuth argued that there was no insurance coverage because the injuries resulted from an intentional act.  The policy excluded coverage for injuries "caused intentionally by or at the direction of any insured" *Id.* at 678.  The Court noted that the plaintiffs were conflating the guilty husband's criminal acts and the wife's negligent conduct. Of course, there was no allegation that the defendant wife's conduct was

intentional.  The claim against the wife was for negligence which exposed the child to the risk.  The Court noted in a footnote that excluding "negligence from the insurance policy was not consistent with the justification for such exclusions, which is the assumption that such acts would be encouraged, or at least not dissuaded, if insurance were available to shift the financial burden from the wrongdoer to the insurer" *Id.*, fn 4, citing *American States Ins. Co, v Borbor,* 826 F.2d 888 (9th Cir. 1987).  Obviously, the abuse survivors do not allege that USAG intentionally allowed the abuse to occur but rather that USAG breached various duties it owed to the athletes.  Therefore, this exclusion does not apply to deny a defense to USAG in the interrelated Nassar matters.

The secondary position taken by LIU is that the "any insured" language bars coverage and eliminates the duty to defend.  LIU cites to *Holiday  Hospitality Franchising, Inc. v AMCO Ins. Co.,* 983 N.E.2d 574 (Ind. 2013) which also involved a sexual molestation.  The insurance policy in the *Holiday Hospitality* case provided a duty to defend and coverage for claims for bodily injury and personal and advertising liability.  The policy explicitly excluded coverage for "the actual or threatened abuse or molestation by anyone of any person while in the care, custody or control of *any* insured," for the negligent hiring or retention "of a person for whom *any* insured is or ever was legally responsible" and who commits the abuse (emphasis in original).  *Id.* at 581 .  The Court held that the use of the word "any" conclusively barred coverage for all co-insureds.

As USAG points out, the policy language of *Frankenmuth* is far more similar to the LIU policy exclusion than is the policy language of *Holiday Hospitality.*  The LIU policy exclusion does not reference negligent hiring or supervision torts but the *Holiday Hospitality* exclusion does.  The *Holiday Hospitality* exclusion puts the purchaser of the policy on notice that there was no coverage for negligence for any insured related to abuse by anyone.  That is not the case in the LIU policy.  LIU does not exclude coverage for

16

negligence nor specifically mention an exclusion for the actual or threatened abuse of a person. The word "any" can mean every insured or it can mean the specific insured who committed the wrongful act, without more clarifying language. *Frankenmuth* was the earlier of the Indiana Supreme Court cases but *Holiday Hospitality* does not expressly overrule it or even mention it. If the Indiana Supreme Court intended to overrule significant caselaw, it would have addressed it directly. Simply put, *Holiday Hospitality* does not overrule the holding in *Frankenmuth.* It addresses different contract language.

The policy considerations also point toward a narrow interpretation of the LIU exclusion. It's hard to imagine purchasing a policy that would provide no coverage to the innocent insureds if any one of them intentionally committed an intentional wrongful act. An average policyholder of reasonable intelligence would read the LIU policy exclusion to only bar coverage for the offending person.

LIU's argument goes one step further and contends that the anti-imputation clause actually imputes the exclusion to USAG because it specifically states that there is no imputation to Insured Persons but doesn't mention Insured Organization. LIU contends that, by omission, the exclusion is imputed to the Insured Organization. However, if the anti-imputation clause was intended to exclude coverage to the Insured Organization, it should have simply stated that the wrongful acts of any Insured is not to be imputed to other Insured Persons but *is* imputed to the Insured Organization, especially since the Organization is the Parent Organization named in the Declarations. Organizations are comprised of individuals whose efforts, endeavors, and energy are generated toward the mission of the organization. The exclusion, as argued by LIU, would bar coverage for all instances of liability arising from intentional wrongful conduct of any of the Parent Organization's covered individuals and leaves the Organization without insurance.

17

### The Congressional and USOC Investigations are "Claims"

LIU first argues that it has no obligation to defend the Congressional Investigations or the USOC Investigation because they are not "Claims."[19]

USAG alleges that the Congressional Investigations and the USOC Investigation are "claims" and thus LIU has the duty to defend. LIU contends that these investigations are neither "formal proceedings" nor "formal investigations" as provided for in the definition of "claim" under subsection (c). The terms "formal," "investigation," and "proceeding" are not defined in the policy. LIU relies on a handful of non-Indiana cases that confine a "proceeding" to judicial or quasi-judicial proceedings and limit "formal investigations" to ones where a subpoena is issued or other similar coercion is actively present. But LIU's "claim" definition picks up lawsuits in a separate section (§23.3(b)), and so the proceedings and investigations referred to in §23.3(c)) must mean something more.

### "Proceedings"

LIU cites two non-Indiana cases to define the plain meaning of "proceeding". One case defined it as a "formal legal action or hearing conducted in a court of law or before some other official tribunal". *See Office Depot v. Nat'l Union Fire Ins. Co.*, 734 F.Supp2d 1304, 1319 (S.D. Fla. 2010). Another court defined "proceeding" as "the regular and orderly progression of a lawsuit, including all acts and events between the time of commencement and the entry of judgment" or "any procedural means for seeking redress from a tribunal or agency." *MusclePharm Corp. v. Liberty Ins. Underwriters, Inc.*, 712 Fed. Appx. 745, 755 (10th Cir. 2017). *Office Depot* recognized that, while a "proceeding" surely includes a "legal action" or "lawsuit", it also is broad enough to cover "the business conducted by a court or other official body; a hearing." *Office Depot*, 734 F.Supp.2d at 1319. These cases demonstrate that a "proceeding" means more than a "legal action" or a "lawsuit".

---

[19] Policy §23.3

The plain meaning of 'proceeding" is broader than "suit" and Indiana courts have held that the narrower term "suit" is elastic enough to include "adversarial administrative proceedings". *Dana Corp.*, 690 N.E.2d at 296. *American Chemical Service, Inc. v. U.S. Fidelity & Guaranty Co.*, No. 2:13-cv-177 JVB, 2015 WL 1524590 (N. D. Ind. April 2, 2015). Both *Dana* and *American Chemical* involved an insurer's duty to defend "any suit" or "lawsuit" against insureds who had been served with either a "PRP" (potentially responsible person) letter or "§104" demand for information or documents from the EPA. Both courts found that the insurer had a duty to defend as those actions fit the definition of "suit" or "lawsuit" under the policies.

### "Formal Investigation"

LIU argues that the Congressional and USOC investigations are not "formal investigations" because a "formal" investigation requires some sort of coercive or compulsory process as opposed to a mere "request for information and explanation." *Hoyt v. St. Paul Fire & Marine Ins. Co.*, 607 F.2d 864, 866 (9th Cir. 1979) (stating that a "request for information and explanation" cannot transform an ***inquiry*** into a "Claim" (emphasis added)); *accord ACE Am. Ins. Co. v. Ascend One Corp.*, 570 F. Supp. 2d 789, 796 (D. Md. 2008) (noting that "investigative demands have been found to constitute a claim" when "the insured was ***required*** to produce testimony and documents pursuant to an ongoing investigation of its activities" as the goal was ultimate prosecution, but non-compulsory investigations would not constitute a claim (emphasis added)). LIU argues that there is a difference between complying with a mandatory demand for document production or testimony in the context of an intended prosecution against the insured, and cooperating with a non-coercive, oversight investigation that does not pose an immediate risk of, or result in, a lawsuit.

The insured in *Hoyt* was sued for malpractice for tax consequences arising from a will he had drawn. The insured received a letter from the attorney handling the decedent's estate that wondered why the insured included provisions in the will

19

that simply created substantial taxes.  Nothing in the *Hoyt* case suggested that the definition of "claim" under that policy included an "investigation".  The court there found that the letter was merely a request for information or explanation and did not constitute a "claim" under the policy.  *Hoyt,* 607 F.2d at 866.  The *ACE American* case involved a policy where a "claim" was defined as "a civil, administrative or regulatory investigation against any Insured commenced by the filing of a notice of charges, investigative order or similar document".  *ACE American*, 570 F.Supp2d at 793.  The insured there was served with both a subpoena and a Civil Investigative Demand and thus those "investigations" were covered.  *Id.* at 796.

The insureds in both *Office Depot* and *Musclepharm* were denied coverage for investigations that were not compulsory.  The insured in *Office Depot* sought recovery of costs incurred in voluntarily responding to an SEC investigation that did not culminate in the filing of a judicial or administrative complaint by the SEC against the company or its officers or directors.  The policy in *Office Depot* defined "claim" as "a civil, criminal or administrative or regulatory investigation of an Insured Persons".  That definition was further narrowed to cover only such investigations where the insured was identified in writing by the investigation authority as a target against whom a proceeding may be commenced or, in the case of SEC investigations, one where the Insured Person had been served with a subpoena.  *Office Depot*, 734 F.Supp2d at 1320.  Because neither of these "discrete signal points" had yet occurred when the insured cooperated with the SEC and voluntarily provided documents and made its officers and directors available for sworn testimony, costs incurred in that voluntary act of cooperation were not covered.  *Id.* at 1321.

The definition of "claim" in the *Musclepharm* case expressly was contingent upon the insured person receiving a "Wells Notice" or target letter in connection with the investigation.  *Musclepharm,* 712 Fed. Appx. at 753.  The court logically concluded that the "claim" definition was not triggered until the Wells Notices were issued and

therefore there was no coverage for costs incurred in the insured's voluntary response to SEC inquiries before that point.  *Id* at 755.

All of these cases are distinguishable in that the definition of claim in those policies either did not include "investigation" or the "investigation" covered was contingent upon the further documentary evidence identifying the insured as a target or the filing of some type of notice.  There is no such contingency in the Policy here. LIU argues that none of USAG's officers or employees were subpoenaed.  LIU could have written a triggering event into the definition of claim here (such as service of a subpoena upon the Insured) as did the insurer did in *ACE American*.  It did not.

The plain meaning of "formal" does not include a compulsory element. "Formal" includes "relating to or involving…structure", "following with established form, custom or rule" and "done in due or lawful form", "characterized by punctilious respect for form," or "rigidly ceremonious."[20]    Nothing in the plain meaning of "formal investigation" requires a compulsory process.  Rather, the adjective "formal" refers to the character of an investigation, not to any instrument compelling cooperation. Thus, a "formal investigation" connotes an orderly or official inquiry conducted according to established forms, customs or rules.

Congressional hearings are "formal" in any ordinary sense of the word. They involve sworn testimony, document production, virtually unfettered cross-examination, and plenty of lawyers. The USOC Investigation was also "formal" (and coercive) because the USOC required USAG to comply with the investigation or lose its status as an NGB.  [Dkt. 133-4, at 2–4.] At the very least, the term "formal" is ambiguous and must be construed in favor of coverage. *Eli Lilly & Co.*, 482 N.E.2d at 470–71; *Kiger*, 662 N.E.2d at 947–48 (holding that different construction of terms by insurers evinces ambiguity).

---

[20] *Formal*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/formal (definitions 2 and 3); *Summit*, 715 N.E.2d at 937 (holding that ordinary policyholders may consult a dictionary for undefined terms).

Even if a compulsory element can be read into the plain meaning of "formal investigation", the Congressional and USOC Investigations still qualify. The record contains excerpts from the May 23, 2018 and June 5, 2018 congressional hearings that demonstrate that USAG's failure to cooperate with document or witness production would result in substantial risks and the likely issuance of subpoenas for the same. An even more compelling outcome would have resulted from failure to cooperate with the USOC's investigation. The Ted Stevens Olympic and Amateur Sports Act discussed previously gave the USOC plenary power over U.S. Olympic organizations and NGB's. 36 U.S.C. §220521. The statute expressly allows the USOC to "place conditions on [a NGB's] continued recognition." *Id.* §220521(d). The USOC has the power to decertify an NGB and without USOC recognition, USAG would not be able to operate as an "Olympic" entity. §220521 (a), (c). The USOC investigation was a precursor to the later USOC decertification proceeding that sought to strip USAG of its NGB status. The very NGB status upon which USAG staked its continued viability was threatened. It is disingenuous to describe the USOC investigation as noncompulsory. Both the Congressional investigation and the USOC investigation are "formal proceedings" and "formal investigations" and thus are "claims".

### The Bodily Injury Exclusion does not Apply to the Nassar Athlete Lawsuits or the Van Horn Criminal Matter

LIU contends that it has no duty to defend the Nassar Athlete Lawsuits and the Van Horn Criminal Matter because of the Policy's "bodily injury exclusion". [21] While this provision excludes claims for bodily injury, emotional distress and mental anguish, it contains a carve-out for emotional-distress and mental anguish claims brought by or on behalf of any third person. Of particular note is that the Policy excludes claims "for" bodily injury, and not "arising out of or related to" bodily injury.

---

[21] Policy §4.1.

LIU argues that Nassar Athlete Lawsuits are based on the sexual assault of minors (i.e., bodily injury) and it is of no moment that the Nassar Athlete Lawsuits do not specifically state a cause of action for bodily injury.  LIU cites *Breland v. Arena Football One*, LLC, 221 F. Supp. 3d 799, 804 (E.D. La. 2016) for the proposition that courts have applied a "for" exclusion like the one in the LIU Policy to find that there is no coverage where the underlying claim is one that falls within the applicable exclusion, regardless of the stated cause of action or form of the claim. The Court in *Breland* found that the bodily injury exclusion in a D&O policy precluded coverage for claims brought by a professional football player.  However, in that case, the claim against the insured did seek damages for medical expenses related to concussions, a bodily injury, so it was not a stretch to find that the claim was "for" a bodily injury.  LIU further attempts to illustrate the point that the stated cause of action does not control and cites *L.A. Lakers, Inc. v. Fed. Ins. Co.*, No. CV 14-7743  DMG (SHx), 2015 WL 2088865 at *5-9 (C.D. Cal. Apr. 17, 2015) where the court held that the invasion of privacy exclusion in D&O policy precluded coverage for injuries claimed in a cause of action for violation of the Telephone Consumer Protection Act (TCPA).  The court there reasoned that the TPCA was enacted to protect the privacy interests of telephone subscribers, and thus, a stated cause of action for a TPCA violation fell under the "invasion of privacy" exclusion and was not covered.

The exclusion here is "for" bodily injury claims, not claims "arising from or related to" bodily injury claims.  The latter excludes a wider net of claims, including claims for lost wages.  Nothing in the record indicates that the Nassar Athlete Lawsuits allege damages solely for physical injury to the athletes.  Nothing in the record indicates that the Nassar Athlete Lawsuits state a cause of action under a statute that implicitly can be interpreted as a claim "for" bodily injury.

Even if the Nassar Athlete Lawsuits state claims "for" bodily injury, they are excepted under the carve-out for emotional distress and mental anguish claims of third parties. Virtually all of the athlete lawsuits seek relief for emotional and

23

mental injury, and LIU has not rebutted this fact. The duty to defend requires LIU to defend the entire case if one aspect of it is covered, even if the claims also seek excluded relief. *Seymour,* 665 N.E.2d at 892; *Stroh Brewing Co.,* 127 F.3d at 566; *OSI Indus., Inc.,* 831 N.E.2d at 200.

LIU's application of the bodily injury exclusion to the Van Horn Criminal Matter is similarly unpersuasive. A criminal charge, even one alleging bodily injury, is a claim "for" an offense against the State, not a claim "for" bodily injury. See *Shelter Mut. Ins. Co. v. Bailey*, 513 N.E.2d 490, 497 (Ill. Ct. App. 1987); *In re Barr,* 13 S.W.3d 525, 533 (Tex. 1998); *State v. Almendarez*, 301 S.W.3d 886, 893 (Tex. Ct. App. 2009). At the very least, this is a reasonable way to interpret the exclusion, and it governs as a matter of law. *Liggett*, 426 N.E.2d at 144. ("Where any reasonable construction can be placed on a policy that will prevent the defeat of the insured's indemnification for a loss covered by general language, that construction will be given.")  Neither the Nassar Athlete Lawsuits nor the Van Horn indictment is excluded from coverage under the bodily injury exclusion.

### Interrelated Wrongful Acts

LIU contends that the Penny and Van Horn Criminal Matters and the Amy White matters arose after its policy terminated and are not related to claims "first made" during its policy period. It argues that these claims are insufficiently related to the Nassar claims to justify treating them as "first made" during the LIU policy. These are LIU's only interrelatedness objections, though some other claims arose after the policy period ended. LIU has forfeited any argument on the claims it did not argue. *Woodruff v. Am. Family Mut. Ins. Co.*, 291 F.R.D. 239, 242 (S.D. Ind. 2013).

Penny is the former CEO of USAG and was indicted in the State of Texas for the third degree felony of tampering with physical evidence.  Specifically, he was accused of intentionally destroying or concealing records and documents related to

Larry Nassar  that were kept at the Karolyi Ranch in Walker County, Texas with the intent to impair the availability as evidence in the investigation. [22]

Van Horn also is a former USAG trainer and employee and was indicted in the State of Texas for the second degree felony of sexual assault of a child. The indictment reads that she did "then and there, acting as a party with one or more individuals, intentionally or knowingly cause the penetration of the female sexual organ of Ruth (a pseudonym) by defendant's finger, without the consent of Ruth (a pseudonym)." [23] LIU reads this language to mean that Van Horn herself perpetrated the sexual assault.  USAG, in its opening Brief in Support of its Motion for Partial Summary Judgment contends that Van Horn's indictment "deals with an instance where Van Horn was allegedly in the same room as Nassar when he abused an athlete." (Dkt. 27, p. 20).

Amy White was subpoenaed to appear and testify before a grand jury in Walker County, Texas, but nothing in the materials designated by the parties indicates that White in fact did appear and testify.  Ms. White was also subpoenaed to appear and testify in a deposition in one of the athlete lawsuits against Nassar.

LIU alleges that it has no duty to defend the Penny and Van Horn Criminal Matters or the White deposition or grand jury matters because those claims were made outside the Policy Period and do not constitute "Interrelated Wrongful Acts". The Policy covered claims first made against an insured during the Policy Period as well as post-policy claims that were related to a claim initially made during the policy period.[24]  As previously discussed, a post-policy claim must be based on the same or similar "wrongful act" or "interrelated wrongful act" that generated a claim first made within the policy period to be covered.[25]  And an "Interrelated Wrongful Act" must have as a "common nexus any fact, circumstance, situation, event, transaction, cause

---

[22]  Shollenbarger Affidavit, Dkt. 27-1, p. 158
[23]  Shollenbarger Affidavit, Dkt. 27-1, p. 143
[24]  Policy § 9.2
[25]  Policy § 23.22

or series of causally connected facts, circumstances, situations, events, transactions or causes."[26]

Claims must share a "sufficient factual nexus" to be "interrelated". *Glascoff v. OneBeacon Midwest Ins. Co.*, No. 13 Civ. 1013 (DAB), 2014 WL 1876984 at *5 (S.D.N.Y. May 8, 2014). A "sufficient factual nexus" exists where the claims "are neither factually nor legally distinct, but instead arise from the common facts and where logically connected facts and circumstances demonstrate a factual nexus among the [c]laims." *Weaver v. Axis Surplus Ins. Co.,* No. 13-CV-7374 (SJF)(ARL), 2014 WL 5500667 at *12 (E.D.N.Y. October 30, 2014).

Courts have interpreted identical or substantially similar language in several contexts. The District Court for the Northern District of Indiana applied Ohio law in interpreting this identical language in *Columbus Life Ins. Co. v. Arch Ins. Co.*, No. 3:14-CV-01659, 2016 WL 2865952 (N. D. Ind. May 17, 2016). There, a financial and tax advisor recommended that his client establish a "Section 419 Plan", and later, a "Section 79 Plan". The client sued the advisor, alleging that he knew, but intentionally withheld from the client, that the IRS considered those plans to be an abusive tax shelter for which contributions were not deductible. A second client sued the advisor in a Texas state court for fraud, negligent representation, negligence, and unjust enrichment for the misrepresentations he made to induce the client into participating in the plans. The second client's claim was made outside the policy period and the policy there, like the Policy here, was a "claims made" policy which covered "related" post policy claims. The claims were found to be related because both arose out of the agent's misrepresentation of the tax advantages of the plans. *Id.* at *9.

In *Weaver*, the Court found that a criminal indictment against an insured company's CEO for conspiracy, mail fraud and wire fraud in connection with the company's operation was interrelated to a prior 2007 letter to the company from the Maryland Attorney General concerning the company selling business opportunities

---

[26] Policy§ 23.13

in violation of disclosure and antifraud provisions of the Maryland Business Opportunities Sales Act. Both claims involved false statements about the profits and earnings to be earned from business opportunities with the company.  The 2007 letter and the criminal indictment were deemed one claim.  *Weaver*, at *13.

In *Ciber, Inc. v. ACE American Ins. Co*, 261 F. Supp 3d. 1119 (D.Colo. 2017), the developer of a surveillance system that procured the bid to install cameras by the city of New Orleans sued the insured who was an outside contractor for the city's technology work.  The suit alleged the insured copied the developer's system and sold it to others.  A data systems company who was part of the team that developed the surveillance system later sued the insured and alleged that the insured and the developer entered into a kickback scheme that resulted in the misappropriation of the company's confidential and business information.  The claims were interrelated because they both arose from the "single scheme" involving the surveillance system project and sought a single outcome to cut out the developer and data systems company from current and future business dealings.  *Id.* at 1128.  In all three of these cases, the claims were factually and legally similar enough to establish a "common nexus".

Claims that may share only a tenuous factual overlap have been found not to be interrelated.  In *Glascoff*, the board members of a failed bank taken over by the FDIC received demand letters from the FDIC asserting claims of breach of fiduciary duties of loyalty due to their failure to supervise and manage the Bank's affairs to ensure compliance with banking regulations. The letter cited the board members' deficient policies, internal controls, and practices and was especially critical of the members' failure to act on allegations of improper conduct of the Bank's former CEO.  A subsequent claim was brought by plaintiffs who alleged that the Bank's CEO fraudulently induced them to invest money with certain companies.  The suit accused the board members of lax oversight of the CEO and lack of internal controls.  The Court found that the claims were not interrelated because the FDIC letter alleged that the board members failed to act on allegations concerning the CEO while the investors' lawsuit alleged failure to oversee and control the CEO.

27

The two claims did not share parties, legal theories or requests for relief. *Glascoff* at *7.

The exact language found in the Policy was interpreted to find that the specific litigation exclusion did not apply in *Pfizer, Inc. v. Arch Ins. Co.*, C.A. No. N18C-01-310 PRW CCLD, 2019 WL 3306043 at *10 (Del. July 23, 2019)[27]. In *Pfizer*, the insured was a co-marketer of the drug Celebrex. Shareholders sued the insured for fraudulent and misleading statements made regarding the gastrointestinal health risks of the drug which led to a loss of millions of dollars once the health risks were revealed. A later claim was filed by plaintiffs who sued the insured and its executives for false representations and omissions regarding Celebrex's cardiovascular risks. While both claims involved representations about the drug, the court found that the two claims "involved entirely distinct misrepresentations of very different health risks associated with Celebrex" and were not interrelated.

USAG argues that the criminal matters are plainly "related" to the Nassar claims and that they share the same "operative facts": the Nassar abuse and USAG's response to that abuse. *Emmis Communs. Corp. v. Ill. Nat'l Ins. Co.*, 323 F. Supp. 3d 1012, 1027 (S.D. Ind. 2018), *aff'd on reh'g without op'n*, 937 F.3d 836, (7th Cir. 2019). However, the court in *Emmis Communications Corp.* found that lawsuits were not "interrelated" because they did not share common *operative* facts that provided support for the various legal claims that were being made. *Id.* at 1027. The court noted that "operative" facts were those "facts that form the basis of the cause of action asserted in the lawsuits." *Id.*

Even if these criminal matters originated from Dr. Nassar's conduct, such circumstances are insufficient to establish that they all are "interrelated" claims. Courts generally find claims to be distinct from one another, and therefore not interrelated, where different plaintiffs, different facts, and different allegations are involved. *See Lehigh Valley Health Network v. Exec. Risk Indem., Inc.*, No. 1999-cv-5916, 2001 WL 21505 (E.D. Pa. Jan. 10, 2001).

---

[27] *Pfizer* is an unpublished Delaware state court decision which is cited for its analysis and not as precedent.

The Penny Criminal Matter does not share the same "operative" facts as the Nassar claims. Penny was indicted on the distinctly different charge of tampering with physical evidence, not with failure to properly supervise Dr. Nassar or with being present in the same room when Dr. Nassar committed the abuse. While it is true that Penny's tampering with evidence would not have happened "but for" Nassar's abuse, the "but for" causation has been rejected as too tenuous to satisfy the "causally connected" requirement. *Ciber*, 261 F. Supp3d. at 1127 (in interpreting a substantially similar definition of "interrelated wrongful acts", the court there noted that "there is no basis to conclude that this Policy term incorporates a causal relationship or "but-for" test."). Amy White's subpoena to testify in front of a grand jury related to the Penny indictment is not interrelated for the same reason. The White deposition is a different matter. The record indicates that this deposition is in one of the Nassar athlete lawsuits. This matter does arise from the same "operative facts" of Nassar's abuse and thus it is an "interrelated" claim.

The Court finds that there is a genuine issue of material fact as to the nature of the Van Horn Criminal Matter. It is not clear from the record whether Van Horn was merely in the same room as Nassar when he abused an athlete or whether she herself perpetrated the abuse. The former is an "interrelated" act; the latter is not.

In sum, the Penny Criminal Matter and White subpoena matters are not "interrelated" with the Nassar claims. The White deposition matter, however is. There is a genuine issue of material fact as to whether the Van Horn Criminal Matter is "interrelated" and thus neither USAG nor LIU will be granted summary judgment on this discreet issue.

### Endorsement No. 6 "Sub-Limit Endorsement"

USAG addressed a new issue in its Response to LIU's Motion for Summary Judgment (Dkt. #146). In discussions between counsel, LIU has asserted that Endorsement No. 6 limits its coverage to $250,000 for "Third Party EPL" claims. Third Party EPL is not a defined term under the policy and therefore USAG argues

there cannot be any sub-limit to the policy for coverage that is not extended nor defined.

Typically, a party may not raise a new issue in a Reply to the Response to that party's Motion for Summary Judgment. The procedural posture of this issue is different because the Plaintiff filed a Motion for Partial Summary Judgment and the Defendant filed a Motion for Summary Judgment thereafter. So, the issue of the sublimit was actually raised in the Plaintiff's Response to the Defendant's Motion for Summary Judgment. The Defendant then filed a Reply to this issue (part VI of Dkt. #163) and the Plaintiff filed a Sur-Reply which is permitted under Local Rule B-7056-1(d). The issue has been fully briefed. The context of this adversary proceeding is significant. The parties have been participating in mediation for months and a second mediator has been brought in, at the expense of the defendants, to mediate the insurance issues. The next series of mediation sessions begins November 19. For a full exploration of settlement possibilities, certain unknowns must be resolved. It is in the best interests of the Debtor, the insurance carriers, and the Survivors' Committee for the mediation to result in a settlement. The delay and costs of mass tort litigation across the country, a "rush to the courthouse" by claimants, with the possibility of inconsistent results convince the Court that resolving the sub-limit endorsement at this time is critical. There is no gamesmanship apparent to the Court and no prejudice will result to LIU because the issue has been briefed by both parties. Therefore, in the interests of justice, the Court will address the issue of the "EPL" Sub-limit Endorsement.

Endorsement No. 6 states:

It is agreed that Item III of the Declarations Page is hereby amended by the addition of the following:
ITEM III.    LIMIT OF LIABILITY:    $250,000 in the aggregate for the **Policy Year**.
It is further agreed that the Limit of Liability provided under this endorsement is part of, and not in addition to, the Limit of Liability provided for in Item III of the Declarations and shall only apply as respects to:

Third Party EPL

All other terms, conditions, and exclusions of this Policy remain unchanged.

The parties agree that Third Party EPL is not a defined term under the policy. LIU points out the policy that was in effect prior to the LIU policy at issue here stated that the sublimit applied to "any Claim brought by or on behalf of any Third Party for Employment Practices Wrongful Acts".[28]

In the policy at issue, there is a definition for "Employment Practices Wrongful Acts", but not for "Third Party EPL", the coverage referred to in the Sub-Limit Endorsement. LIU's citation to extrinsic evidence to explain an ambiguous term is strictly forbidden by Indiana law. An insurer may not offer extrinsic evidence to prove the meaning of policy terms. *Eli Lilly & Co.,* 482 N.E.2d at 471. The rules of insurance contract interpretation have been exhaustively set forth hereinabove. It cannot be determined if LIU made a mistake by using undefined and ambiguous terms in its Endorsement, or if the policy contained a definition for Third Party for Employment Practices Wrongful Acts when it should have contained a definition for Third Party EPL, or if the inclusion of the Sub-limit Endorsement was itself a mistake. But, in any case, the undefined term has no common meaning and results in an unenforceable ambiguity in the policy.[29]

USAG concedes certain matters are not covered by the LIU policy. They are the 7 non-Nassar matters involving 3 athletes, 3 coaches and one lawyer's lawsuit; a lawsuit filed against Katherine Gordon, and several yet to be filed survivor lawsuits. USAG agrees that summary judgment should be entered in favor of LIU on these matters. USAG has not requested

---

[28] LIU cites to new evidence of the 2015-2016 LIU policy attached to the Supplemental Adams Declaration for comparison purposes.

[29] The Court would note that USAG could have avoided this discussion entirely by designating evidence that Nassar was a volunteer, not an employee, if that is true which would have eliminated the additional briefing.

reimbursement from LIU for any litigation or other costs occasioned by the filing of this bankruptcy matter and they are not addressed in this decision.

Based on the foregoing, the Court proposes that:

(1)    USAG's motion for partial summary judgment shall be granted, in part, and that LIU has a duty to defend all claims against USAG with respect to the Nassar Athlete Lawsuits, the Revocation Lawsuits, the IAG Investigation, the Congressional Investigations, the USOC Investigation and the White deposition matter;

(2)    LIU's cross motion for summary judgment shall be granted and LIU has no duty to defend the Penny Criminal Matter, the White grand jury testimony regarding the Penny indictment, and the non-Nassar matters involving 3 athletes, 3 coaches and one lawyer's lawsuit, the lawsuit filed against Katherine Gordon, and several yet to be filed survivor lawsuits;   and

(3)    There is a genuine issue of material fact precluding summary judgment for either party with respect to the Van Horn Criminal Matter.

#   #   #