**November 14, 2019**



_/s/ Robyn L. Moberly_
**Robyn L. Moberly**
**United States Bankruptcy Judge**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

| | |
|---|---|
| In re:<br><br>USA GYMNASTICS,<br>               Debtor. | Chapter 11<br><br>Case No. 18-9108-RLM-11 |
| USA GYMNASTICS,<br>     Plaintiff,<br><br>v.<br>ACE AMERICAN INSURANCE COMPANY f/k/a CIGNA INSURANCE COMPANY, GREAT AMERICAN ASSURANCE COMPANY, LIBERTY INSURANCE UNDERWRITERS INC., NATIONAL CASUALTY COMPANY, RSUI INDEMNITY COMPANY, TIG INSURANCE COMPANY, VIRGINIA SURETY COMPANY, INC. f/k/a COMBINED SPECIALTY | Adv. Pro. No. 19-50012<br>in 18-09108-RLM-11 |

1

INSURANCE COMPANY, WESTERN WORLD INSURANCE COMPANY, ENDURANCE AMERICAN INSURANCE COMPANY, AMERICAN HOME ASSURANCE COMPANY, and DOE INSURERS,

    Defendants.

**BANKRUPTCY COURT'S PROPOSED FINDINGS AND CONCLUSIONS WITH RESPECT TO USAG'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND ACE'S CROSS- MOTIONS FOR SUMMARY JUDGMENT**

In accordance with 28 U.S.C. 157(c)(1), the Bankruptcy Court now tenders its proposed findings and conclusions :

This matter came before the Court on the *Motion for Partial Summary Judgment* (the "**Motion**") filed by Debtor and Plaintiff ("**USAG**") against Defendant Ace American Insurance Company f/k/a/ CIGNA Insurance Company ("**Ace**") for an order pursuant to FED. R. CIV. P. 56(a), made applicable to this Adversary Proceeding through FED. R. BANKR. P. 7056, and S.D. Ind. L.R. B-7056-1, declaring the Debtor's rights under an insurance policy sold by Ace that is the property of the Debtor's estate. [Dkt. 174, 175] In response, Ace filed a *Cross-Motion for Summary Judgment* (the "**Cross-Motion**") [Dkt. 216] and a *Memorandum of Law in Opposition* to the Motion (the "**Opposition**"). [Dkt. 217] USAG filed a *Combined Response and Reply Brief* (the "**Response**") [Dkt. 231], and Ace filed a *Reply Memorandum in Support of its Cross-Motion* (the "**Reply**") [Dkt. 239] The Court held oral argument on October 30, 2019.  The motions are now ripe for decision.[1]

---

[1] The issue before the court is a non-core claim upon which final judgment must be rendered by an Article III court absent consent of the parties. 28 U.S.C. §157(c)(2).  Ace does not consent to entry of final judgment by the Bankruptcy Court in this matter and moved for withdrawal of the reference on March 5, 2019. (Dkt. 37). The District Court denied that motion since mediation was underway.  Ace has filed a second motion for withdrawal of the reference on August 20, 2019. (Dkt. 192).   That motion remains pending at this time.  Ace  has neither impliedly consented to this court's jurisdiction nor waived its right to entry of final judgment by the District Court by filing its cross-motion.  See *Wellness Intern. Network, Ltd. v. Sharif*, 135 S.Ct. 1932, 1947 (2015).

2

USAG has been named as a defendant in hundreds of lawsuits involving sexual abuse perpetrated upon athletes by Dr. Larry Nassar, a USAG volunteer. The instant matter involves an insurance coverage dispute arising out of primary general commercial liability and excess liability policies issued each year for 1998, 1999 and 2000. Mediation resumes in mid-November. USAG's reorganization depends on its ability to reach a global resolution among its carriers and the sexual abuse survivors.

## GOVERNING LAW

The parties agree that Indiana law governs this coverage dispute. As a federal court exercising diversity jurisdiction, this Court is required to follow the law as articulated by the Indiana Supreme Court. See *Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1090 (7th Cir. 1999). If that Court has not spoken to the issue, a federal court must predict how the Indiana Supreme Court would decide the question. *Id.*

## INDIANA COURTS' INTERPRETATION OF TERMS OF INSURANCE CONTRACTS

Generally, in Indiana, contracts for insurance are subject to the same rules of interpretation as are other contracts. *Asbury v. Indiana Union Mutual Insurance Co.* 441 N.E.2d 332 (Ind. Ct. App. 1982); *American Economy Insurance Co. v. Liggett*, 426 N.E.2d 136 (Ind. Ct. App. 1981). If the policy language is clear and unambiguous, it should be given its plain and ordinary meaning. *Spears v. Jackson*, 398 N.E.2d 718 (Ind. Ct. App. 1980); *Vernon Fire and Casualty Insurance Co. v. American Underwriters, Inc.*, 356 N.E.2d 693 (Ind. Ct. App. 1976).

The Indiana Supreme Court in *Beam v. Wausau Ins. Co.*, 765 N.E.2d 524, 528 (Ind. 2002) spoke to some special rules of construction of insurance contracts that have been developed due to the disparity in bargaining power between insurers and insureds. The court observed that, "[i]f a contract is clear and unambiguous, the language therein must be given its plain meaning," quoting *Allstate Ins. Co. v.*

3

*Boles,* 481 N.E.2d 1096, 1101 (Ind.1985). But, "[w]here there is ambiguity, insurance policies are to be construed strictly against the insurer and the policy language is viewed from the standpoint of the insured." *Bosecker v. Westfield Ins. Co.*, 724 N.E.2d 241, 244 (Ind. 2000) (quoting *Am. States Ins. Co. v. Kiger*, 662 N.E.2d 945, 947 (Ind.1996)). Any ambiguity in a policy term is interpreted in favor of the policyholder and in favor of coverage. *Eli Lilly & Co. v. Home Ins. Co.*, 482 N.E.2d 467, 470–71 (Ind. 1985). If there is more than one reasonable construction of a term, then it is ambiguous. *Id.* A disagreement among courts as to the meaning of a particular contractual provision is evidence that an ambiguity may exist. But a division of authority is only evidence of ambiguity; it does not establish conclusively that a particular clause is ambiguous. *Thomson Inc. v. Insurance Co. of North America,* 11 N.E.3d 982, 993 (Ind. Ct. App. 2014), *Hartford Acc. & Indem. Co. v. Dana Corp.*, 690 N.E.2d 285, 295 (Ind. Ct. App. 1997); *Travelers Indem. Co. v. Summit Corp. of Am.*, 715 N.E.2d 926, 938 (Ind. Ct. App. 1999). An ambiguity must be resolved in favor of the insured and so an insurer may not offer extrinsic evidence to prove the meaning of policy terms. *Eli Lilly & Co.*, 482 N.E.2d at 471.

When reviewing an insurance policy, a court construes the insurance policy as a whole and considers all of the provisions of the contract and not just the individual words, phrases or paragraphs. *Briles v. Wausau Ins. Co.*, 858 N.E.2d 208, 213 (Ind. Ct. App. 2006). A court must accept an interpretation of the contract language that harmonizes the provisions, rather than one that supports conflicting versions of the provisions. *Id.* As such, a court "should not construe the language of a contract so as to not to render any words, phrases, or terms ineffective or meaningless." *Mahan v. Am. Standard Ins. Co.*, 862 N.E.2d 669, 676 (Ind. Ct. App. 2007).

4

POLICY PROVISIONS

THE PRIMARY POLICIES

USAG bought three primary insurance policies containing endorsements that provided coverage for "Physical Abuse or Sexual Misconduct". The three primary policies were written annually and were in force from August 1, 1998 to August 1, 1999 (the "1998 policy"), from August 1, 1999 to August 1, 2000 (the "1999 policy") and from August 1, 2000 to August 1, 2001 (the "2000 policy"). USAG also purchased corresponding excess policies that were in force for the same time periods. The provisions of the three primary policies were identical, as were the provisions of the three excess policies. Each primary policy provided for a $1 million limit for a "single act" of sexual abuse by the same perpetrator with a $5 million aggregate and each corresponding excess policy provided for an additional $10 million in coverage. Since the motions concern only the acts of a single perpetrator, Nassar, the $5 million aggregate does not come into play here.

The endorsements contained their own insuring agreements for physical or sexual abuse. The insuring agreement provided that it will "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'personal injury' to which this insurance applies arising out of 'physical abuse' or 'sexual misconduct' against any person while in the care, custody or control of any insured."[2] "Bodily injury" included mental anguish resulting from 'physical abuse' or 'sexual misconduct'. The policy defined "physical abuse" as "actual, alleged or threatened physical maltreatment" and "sexual misconduct" as "any conduct, whether actual, alleged or threatened, of a sexual nature."[3]

The policy applied only to claims made for "bodily injury" or "personal injury" caused by an act of "physical abuse" or "sexual misconduct" committed in the

---

[2] Policy §1(a).
[3] Policy §4

5

"coverage territory"[4] and the injury had to be first committed during the policy period.[5] "Bodily injury" or "personal injury" also had to have been sustained during the policy period or "during the subsequent period" in which Ace or one of its affiliates "have issued a policy which would apply to such 'bodily injury' or 'personal injury' except for a provision that such 'bodily injury' or 'personal injury' be caused by an act of 'physical abuse' or 'sexual misconduct' first committed during its policy period." [6]

The section entitled "Limits of Insurance" provides:

### 3. LIMITS OF INSURANCE

> a. All acts or omissions which cause or contribute to "physical abuse" or "sexual misconduct" by a single individual for whose conduct any insured is legally responsible shall be considered a single act, subject to the Each Act limit of insurance, regardless of the number of acts or omissions, number of persons injured, number of insured responsible or number of locations involved.
>
> b. The Each Act of "Physical Abuse" or "Sexual Misconduct" limit of insurance shown above is the most we will pay in judgments or settlements for a single act of "physical abuse" or "sexual misconduct", or both. If this policy provides a General Aggregate limit, the "Physical Abuse" or "Sexual Misconduct" Aggregate limit shall be part of and not in addition to the General Aggregate limit. The most we will pay in total judgments or settlements during any policy period is the "Physical Abuse" or "Sexual Misconduct" Aggregate limit to the extent there is coverage available in any applicable General Aggregate limit.
>
> c. If this coverage form and any other coverage form or policy for the same policy period issued by us or any company affiliated with us apply, the maximum applicable limits of insurance available under all coverage forms or policies shall not exceed the highest applicable limits of insurance under any one coverage form or policy.

Subsection (a) is a "deemer" clause where all acts of sexual abuse by one person is deemed to be a "single act", regardless of the number of acts, persons injured,

---

[4] Policy §1(b)(1).
[5] Policy §1(b)(2)
[6] Policy §1(b)(3)

6

number of insureds responsible, or number of locations involved.[7]  Coverage for a "single act" was limited to the Each Act limit of insurance which was $1 million for Each Act with an aggregate of $5 million under subsection (b).[8]   Subsection (c) is an "anti-stacking" provision where Ace would pay out under only one policy if coverage was also provided under any other policy issued by Ace for the same policy period.[9]

## THE EXCESS POLICIES

The excess policies apply to the injury or damage covered by the primary, or underlying policy.  Under the excess policy insuring agreements, Ace agreed to pay the "ultimate net loss" in excess of the applicable limits of the underlying policy.  The excess policy provisions were "follow form" in that the underlying policy's definitions, terms, conditions, limitations and exclusions applied to coverage under the excess policy "unless they are inconsistent with provisions of this policy or relate to …limits of insurance."[10]  Coverage under the excess policy is triggered when the amount of coverage under the underlying policy is either reduced or exhausted.  In the case of coverage reduction, Ace agreed to pay the excess of the reduced underlying limit.  In the case of coverage exhaustion, Ace agreed that the excess policy would continue in force as the underlying agreement.[11]

### The "Deemer" Clause  in the Primary Policy is not Ambiguous

Nassar abused athletes over all three policy years and there were victims he first abused in each of the three policy years.  USAG argues that it is entitled to $33 million in coverage for the aggregate of the three years' policies for the Nassar related claims and a total aggregate of $45 million for all sexual abuse claims.  Ace does not dispute that $45 million is available for all sexual abuse claims but contends that the "deemer clause" channels payment of all Nassar related claims

---

[7] Policy §3(a)
[8] Policy §3(b)
[9] Policy §3(c)
[10] Excess policy §1A
[11] Excess policy §1B(1) and (2)

7

over the three policy years to the $11 million in coverage limits available in 1998 since Nassar "first committed" the abuse in 1998.

The first step in any coverage analysis is determining what event must occur for potential coverage to commence under the terms of the insurance policy. The operative event implicating coverage is also known as the "trigger" of coverage:

> The issue is largely one of timing: what must take place within the policy's effective dates for the potential of coverage to be 'triggered'? A policy that has not been triggered does not provide any coverage, while a policy that has been triggered may or may not provide coverage. Whether coverage is ultimately established in any given case may depend on the consideration of many additional factors, including the existence of express conditions or exclusions in the particular insurance policy, the availability of certain defenses that might defeat coverage, and a determination of whether the facts of the case will support a finding of coverage. The determination of the trigger of coverage depends on the policy language, rather than the type of injury alleged or the theory of liability pled.

*In re Feature Realty Litigation,* 468 F. Supp.2d 1287, 1294 (E.D. Wash. 2006).

The "trigger" found in the insuring agreement is "bodily injury" or "personal injury" caused by *an act* of "physical abuse" or "sexual misconduct" committed in the coverage territory during the policy period.[12] Whether the triggering event ultimately establishes coverage depends on the policy language. The insuring agreement provided that "the amount we will pay for damages is limited "as described in 3. LIMITS OF INSURANCE." The deemer clause contained in those limits provides that the acts committed by a single perpetrator would be considered a "single act" subject to the Each Act coverage limit. It does not provide for any or all acts "committed within the policy period". The latter part of the clause demonstrates the expansiveness of "all". "All" is "regardless" of the number of acts, persons injured, insureds responsible or locations involved. "All acts or omissions" is not modified nor limited by a time frame and the other expressly stated benchmarks regarding number of acts, persons injured, insureds responsible and locations are not temporally limited either. The term "all acts or omissions" is not

---

[12] Policy §1(b)(1) and (2)

ambiguous. The absence of a temporal limit does not give rise to the inference that it must mean acts committed only within the policy period. There is no limiting language in this deemer clause. The Court will not rewrite this clause to impute a time limitation and expand coverage beyond that provided for in the contract. *Sell v. United Farm Bureau Family Life Ins. Co.*, 647 N.E.2d 1129,1131-32 (Ind. Ct. App. 1995).

USAG refers to paragraph (c) of the Limits of Insurance which contains the time limitation "for the same policy period". Paragraph (c) is an "anti-stacking" provision where the policy would not apply at all if USAG was covered by another Ace policy with a higher aggregate limit "for the same policy period". Paragraph (c), unlike (a), applies to all acts *by all perpetrators* and is temporally limited to policies within the same period. USAG would not be allowed to "stack" coverages under different policies issued by ACE for the same policy period. However (a) is limited to all acts by a single perpetrator. If anything, the reference to "for the same policy period" bolsters Ace's contention that it knew how to add a temporal limitation to its insurance coverage limits and did so in paragraph (c) with respect to liability for all perpetrators for policy stacking purposes. Had it intended for paragraph (a) to contain the same temporal limit for all acts by a single perpetrator, it would have so provided. It did not.

Ace's reading of the deemer clause is the only reading that comports with the insuring agreement. Coverage is triggered for sexual abuse "first committed" during the policy period or sustained (1) during the policy period or (2) during any subsequent period in which Ace issued a policy applicable to injury for sexual abuse except for the requirement that the perpetrator's abuse be first committed during its policy period. "First committed" refers to the triggering event, e.g the "act" of abuse by a single perpetrator, not to each victim of that abuse. Its measure is the act, not the victim nor the claim a victim has. It is undisputed that there are victims who were first abused by Nassar in 1999 and 2000, but the trigger is a perpetrator's first act, not when a particular victim was first abused. The insuring

9

agreement contemplates application of coverage under "this" policy *to subsequent policy years* to the act of sexual abuse "first committed" within that policy period. The deemer clause reiterates this focus on "act" by its emphasis on "all acts" without time limitation.

## Only the 1998 Excess Policy Coverage is Available

USAG's arguments with respect to the excess policies likewise fail. Its argument that Ace is liable for $33 million in coverage for the Nassar related claims is premised on reading the "deemer clause" to contain a temporal limit which the Court has already found should not be imputed. USAG next argues that the excess policy does not incorporate the deemer clause and thus it does not apply to the 1999 and 2000 excess policies.

The excess policy was a "follow form" which applied the primary policy's "Definitions, Terms, Conditions, Limitations, and Exclusions" of the primary policy in effect unless they were "inconsistent with the provisions of this policy" or "relate to…limits of insurance." USAG contends that this carve-out for "limits of insurance" signifies that the deemer clause, which is contained in the "Limits of Insurance" under the primary policy, should be ignored. The first letters of the terms "Definitions, Terms, Conditions, Limitations, and Exclusions" are capitalized in the excess policy. Their capitalization connotes that they are not generic terms. See, *3GJD, LLC v. Millenium Brothers, LLC,* CV156024483, 2017 WL 5202840 at \*3 (Conn. Super. Ct. September 28, 2017). Indeed, they "follow form" to their primary policy counterparts. While the first letters of "Limits of Insurance" are capitalized in the primary policy, they are not under Section 1A of the excess policy. However, Section 1B of the excess policy is titled "Limits of Insurance" and deals with the limit of Ace's liability. The lower-cased "limits of insurance" reference in Section 1A of the excess policy gives the inference that the term is used generically. That is the only logical reading of this section since the excess policy itself contains its own "Limits of Insurance" provision in Section 1B. The exclusion of matters that

"relate to" the "limits of insurance" in Section 1A simply means that the excess policy follows form with the primary policy liability limits, unless the excess policy contains higher dollar coverage limits as set out in the separate "Limits of Insurance" in Section 1B.  It does not serve to exclude application of the deemer clause to the excess policies.  This is the only interpretation that comports with the terms "Limits of Insurance" and "limits of insurance" in the excess policy and the general rule that the excess policy is triggered only when the primary policy pays. *Union Carbide Corp. v. Affiliated FM Ins. Co.*, 891 N.Y.S. 2d 347, 350 (N.Y. App. Div. 2009)(excess policy followed form to underlying policy regarding number of years' limits available even though limits of liability were excepted from follow form clause); *Air & Liquid Sys. Corp. v. Allianz Underwriters Ins. Co.*, Civil Action No. 11-247, 2013 WL 5436934 at *25, (W.D.Pa. September 27, 2013) (underlying policy provision regarding non cumulation provision applied to excess even though follow form clause in excess policy did not apply to limits of liability); *Metro Life Ins. Co. v. Aetna Cas. & Sur. Co.,* X04CV950115305S, 1999 WL 244642 at *3 (Conn. Super. Ct. April 16, 1999) (underlying policy's provision regarding number of limits applied even though follow form clause in excess excepted out limits of liability.)

USAG then points to inconsistencies between the primary policy and the excess policy to eliminate application of the deemer clause.  The excess policy provides that Ace's limit of liability "shall be the total of OUR liability for all covered damages sustained during each annual period of this policy". The excess policy provides that Ace will pay the "ultimate net loss" in excess of the applicable limits of the underlying insurance.[13]   The ultimate net loss is measured by the underlying policy's limit that has been reduced or exhausted by payment for losses for "occurrences" which take place "during OUR policy year."[14]  USAG contends that these provisions in the excess policy are inconsistent with the deemer clause and the Each Act limitation. The provisions merely describe the aggregate limit

---

[13] Excess Policy §1A
[14] Excess Policy §1B

11

available under the excess policy. They do not negate the fact that Nassar's acts are deemed a "single act" subject to the $1 million limit. They are applicable to other "acts" that would be subject to the annual aggregate limit, including abuse perpetrated by parties other than Nassar.

USAG posits that the 1999 and 2000 excess policy limits are available even if the deemer clause applies to the excess policies. USAG contends that the 1999 and 2000 policies were triggered because some victims were first abused by Nassar in those later years. If the deemer clause applies, USAG argues, recovery for any and all Nassar abuses is channeled to the "Each Act" $1 million limit under the 1998 policy. But, because that coverage is either reduced or exhausted, the excess policies for 1999 and 2000 are triggered. This premise fails for two reasons. First, the 1999 and 2000 policies are not triggered because the triggering event is the first act of abuse by a single perpetrator, not when a victim is first abused by a single perpetrator who has committed acts of sexual abuse in prior policy years. That single perpetrator is Nassar and the act was first committed under the 1998 policy. Second, the excess policies clearly provide that if the underlying insurance does not pay a loss for reasons other than the exhaustion of an aggregate limit of insurance, the excess policy will not pay a loss. If the 1999 and 2000 primary policies have paid nothing, their excess policies pay nothing.

The coverage at issue here deals with only the Nassar related claims which by definition arise from acts committed by a single perpetrator. The acts were "first committed" under the 1998 policy and that policy's limits of insurance apply. Those acts are deemed a single act subject to the "Each Act" $1 million cap. The 1998 excess policy is likely triggered because the 1998 primary policy will pay the loss for the Nassar related claims which will likely exceed limits of the primary policy. USAG is entitled to coverage of $11 million.

Accordingly, the Court proposes the District Court GRANT Ace's Cross Motion For Summary Judgment and DENY USAG's Motion For Partial Summary Judgment.

# # #