## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | |
|---|---|
| In re:<br><br>USA GYMNASTICS,[1]<br><br>        Debtor. | Chapter 11<br><br>Case No. 18-9108-RLM-11 |
| USA GYMNASTICS,<br><br>        Plaintiff,<br><br>v.<br><br>ACE AMERICAN INSURANCE COMPANY f/k/a CIGNA INSURANCE COMPANY, GREAT AMERICAN ASSURANCE COMPANY, LIBERTY INSURANCE UNDERWRITERS INC., NATIONAL CASUALTY COMPANY, RSUI INDEMNITY COMPANY, TIG INSURANCE COMPANY, VIRGINIA SURETY COMPANY, INC. f/k/a COMBINED SPECIALTY INSURANCE COMPANY, WESTERN WORLD INSURANCE COMPANY, ENDURANCE AMERICAN INSURANCE COMPANY, AMERICAN HOME ASSURANCE COMPANY, and DOE INSURERS,<br><br>        Defendants. | Adv. Pro. No. 19-50012<br>in 18-09108-RLM-11 |

## USA GYMNASTICS' OBJECTIONS TO THE BANKRUPTCY COURT'S PROPOSED ORDER RE: USA GYMNASTICS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND ACE AMERICAN INSURANCE COMPANY'S AND CIGNA INSURANCE COMPANY'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

---

[1] The last four digits of the Debtor's federal tax identification number are 7871. The location of the Debtor's principal office is 130 E. Washington Street, Suite 700, Indianapolis, Indiana 46204.

## I.      INTRODUCTION

This is an insurance coverage action seeking insurance proceeds to compensate 500+ survivors asserting claims against USA Gymnastics ("USAG") for sexual abuse perpetrated by Larry Nassar and others. This dispute involves three successive years of primary and excess liability insurance policies ACE[1] sold to USAG during the years 1998 to 2001. The ultimate issue presented by the parties' cross-motions is whether underlying lawsuits alleging sexual abuse by Larry Nassar implicate all three years of ACE's liability insurance policy limits—totaling $33 million. The Bankruptcy Court concluded that they did not, eliminating $22 million worth of coverage for the survivors. USAG respectfully submits that this conclusion was in error.

Each policy promises to cover USAG for sexual abuse claims, provided the abuse is "first committed" against an individual during its policy year. No one disputes that the lawsuits against USAG allege that new individuals had abuse "first committed" against them in each of these three years. It also is undisputed that those allegations consequently implicate, or "trigger," all three years of ACE's insurance policies. ACE admits this: "As long as . . . the abuse against the claimant was first committed during the policy period, during one of our three periods[,] it triggers . . . coverage." [**Exhibit A**, Tr. of October 30, 2019 Hr'g, at 64:7–13.]

Despite the absence of any dispute between the parties on this point, the Bankruptcy Court held that only the <u>first</u> ACE policy was triggered. The stated rationale for this conclusion was that "the triggering event is the first act of abuse by a single perpetrator, not when a victim is first abused by a single perpetrator who has committed acts of sexual abuse in prior policy years." [Dkt. 275, at 12.] Neither party advocated for this position—indeed, both rejected it.

---

[1] In this Objection, "ACE" refers to three separate entities: ACE American Insurance Company, which sold the policies in 2000, CIGNA Insurance Company (ACE's predecessor-in-interest), which sold the policies in 1998 and 1999, and Chubb, which is handling the claims for ACE.

The Bankruptcy Court's erroneous decision that the Year 2 and Year 3 primary policies (defined below) were not "triggered" was carried up into the excess policies for the Year 2 and Year 3 policy periods, which the Bankruptcy Court found were not triggered either. [*Id.*] Both of these conclusions were error. These errors cost USAG—and the survivors—$22 million of available coverage. The Court should **REJECT** these findings and **RECOMMIT** the issue to the Bankruptcy Court for reconsideration on the premise that all six policies are triggered. In the alternative, the Court should **GRANT** USAG's motion and **DENY** ACE's Cross-Motion.

## II.    REQUEST FOR ORAL ARGUMENT

Oral argument will assist the Court in ruling on USAG's objection. The stakes here are enormous—if the policy means what the Bankruptcy Court held, the Nassar survivors will lose $22 million in insurance money to satisfy their claims.

Additionally, the policy endorsement at issue here was drafted from scratch by ACE's underwriters before it was sold to USAG. To the best of USAG's knowledge, there are no cases interpreting the exact language in dispute here. The parties have been required to argue the issues using only common sense and the basic tools of insurance-policy interpretation. The lack of precedent on these terms (and the potential precedent that will be set by this Court's opinion) warrant a hearing. Future insurers will look at this Court's analysis for guidance on whether or not to adopt the language ACE used here in order to deny coverage in sexual-abuse cases. A hearing is necessary to make sure the Court gets it right.

### III.   STATEMENT OF MATERIAL FACTS NOT IN DISPUTE[2]

**A.   Background Facts**

Dr. Larry Nassar abused hundreds of athletes. The survivors allege abuse over two decades and in locations around the world, including at the Olympics. Nassar tended to abuse a survivor repeatedly, over a period of several years. As a result, the lawsuits against USAG allege individual spans of abuse that impact multiple policy years. And because Nassar abused so many athletes, those spans are many and varied.

For ACE's coverage purposes, the survivors are grouped into three categories:

- Claimants who were <u>first</u> abused by Nassar during the first ACE policy period, which ran from August 1, 1998 to August 1, 1999 (the "Year 1 Claimants")

- Claimants who were <u>first</u> abused by Nassar during the second ACE policy period, which ran from August 1, 1999 to August 1, 2000 (the "Year 2 Claimants")

- Claimants who were <u>first</u> abused by Nassar during the third ACE policy period, which ran from August 1, 2000 to August 1, 2001 (the "Year 3 Claimants")

Without deciding whether there are in fact survivors coming within each of these three categories, or how many there are, the Bankruptcy Court proceeded on the undisputed assumption that there is at least one claimant coming within each.

**B.   The Insurance Policies**

ACE sold three primary and three excess policies to USAG. Both the primary and the excess policies cover the same three years, with each excess policy providing $10 million in limits over its related primary policy.[3]

---

[2] USAG and ACE have only sought declaratory relief from the Court at this stage of the case. USAG brought the motion to resolve a dispute between it and ACE about the scope of its policies in order to move settlement discussions along. The facts of individual survivors' claims are not before the Court and need not be disclosed for the Court to grant either party's motion.

[3] The three primary policies each cover one-year periods and were in force from August 1, 1998 to August 1, 1999 (the "Year 1 Primary Policy"), from August 1, 1999 to August 1, 2000 (the

1.      *The Primary Policies*

The three primary policies each contain a "Physical Abuse or Sexual Misconduct Liability Coverage" form. The parties refer to this endorsement as the "Sexual Abuse Coverage." [*See* Dkt. 175-1, at 2–3 (endorsement only);[4] Dkt. 217-2, at 12–13 (1998–99 endorsement); Dkt. 217-3, at 195–96 (1999–2000 endorsement); Dkt. 217-4, at 253–54 (2000–01 endorsement).] The Sexual Abuse Coverage contains its own insuring agreement, conditions, definitions, and limits of insurance. ACE and USAG agree that the Sexual Abuse Coverage is the only coverage available under the ACE policies for the Nassar claims.

Each primary policy promises to pay "those sums the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'personal injury' to which this insurance applies arising out of 'physical abuse' or 'sexual misconduct' against any person . . . ." [Dkt. 175-1, §1.a, at 2.] Each primary policy's Insuring Agreement states that its Sexual Abuse Coverage will apply to (i) "bodily injury" suffered by an individual <u>during the policy period</u> that (ii) results from "physical abuse" or "sexual misconduct" that is "first committed" against <u>that</u> individual <u>during the policy period.</u> [*See id.* (emphasis added).] Each policy's Insuring Agreement further provides that its Sexual Abuse Coverage will extend to "bodily injury" the claimant sustains after the policy expires, so long as (i) the claimant was first abused during the policy period and (ii) ACE or its affiliates continued to issue qualifying coverage thereafter. [*Id.* §1.b(3).][5]

---

"Year 2 Primary Policy"), and from August 1, 2000 to August 1, 2001 (the "Year 3 Primary Policy"), respectively. The three excess policies were in force during the same time periods. [Dkt. 217-5, at 2; Dkt. 217-6, at 2; Dkt. 217-7, at 3.]

[4] The two-page endorsement is identical in all three policies. Because the policies are lengthy and largely tangential to the dispute here, USAG cites to Dkt. 175-1 for the Court's convenience.

[5] Specifically, the second criterion covers situations where the injury is sustained "during any <u>subsequent</u> period in which we, or any company affiliated with us, have issued a policy which would apply to such 'bodily injury' or 'personal injury' except for a provision" requiring abuse

The Sexual Abuse Coverage in each of ACE's primary policies provides $1 million "Each Act" limit of insurance. [*Id.* at 2.] The "Limits of Insurance" section defines how this limit works for covered claims. [*Id.* §3, at 3.] It provides:

**3.      LIMITS OF INSURANCE**

a.   All acts or omissions which cause or contribute to "physical abuse" or "sexual misconduct by a single individual for whose conduct any insured is legally responsible shall be considered a single act, subject to the Each Act limit of insurance, regardless of the number of <u>acts or omissions</u>, number of <u>persons injured</u>, number of <u>insureds responsible</u> or number of <u>locations involved</u>.

b.   The Each Act of "Physical Abuse" or "Sexual Misconduct" limit of insurance shown above is the most we will pay in judgments or settlements for a single act of "physical abuse" or "sexual misconduct," or both. If this policy provides a General Aggregate limit, the "Physical Abuse" or "Sexual Misconduct" Aggregate limit shall be part of and not in addition to the General Aggregate limit. The most we will pay in total judgments or settlements during any policy period is the "Physical Abuse" or "Sexual Misconduct" Aggregate limit to the extent there is coverage available in any applicable General Aggregate limit.

c.   If this coverage form and any other coverage form or policy for the same policy period issued by us or any company affiliated with us apply, the maximum applicable limits of insurance available under all coverage forms or policies shall not exceed the highest applicable limits of insurance under any one coverage form or policy.

[*Id.* (emphasis added).]

Clause 3.a (the "deemer clause") is the main language at issue here. USAG agrees that this language limits ACE's liability to $1 million (the "Each Act" limit) for each primary policy, even though Nassar may have committed multiple acts of abuse against multiple persons in

---

to be "first committed" during that future policy's the policy period. [Dkt. 175-1, §1.b(3)(b), at 2 (emphasis added).] That is, if a survivor is first abused during the Year 2 Primary Policy and the abuse continues into the Year 3 Primary Policy, the Year 2 Primary Policy will cover the damages from the abuse that occurred during both policy periods.

multiple locations during a <u>single</u> policy year. The "Each Act" limit simply caps that policy's liability for all those claims at $1 million. [*Id.*] Clause 3.a says nothing about the time period over which the "Each Act" limit applies. [*Id.*]

Clause 3.b, however, states that the aggregate limit of the Sexual Abuse Coverage ($5 million) is the most ACE will pay "in total judgments or settlements during any policy period." [*Id.*, §3.b, at 3.] Clause 3.c then prevents USAG from "stacking" each year's Sexual Abuse Coverage's limits on top of <u>other</u> coverages sold by ACE or its affiliates during the same policy period. Appendix 1 to this Objection provides a visual representation of how this policy language applies to a hypothetical claims pattern.

### 2.    *The Excess Policies*

Each of the excess policies sits above the respective ACE primary policies and promises coverage for "injury or damage covered by the [underlying primary policy], and that takes place during our policy period." [Dkt. 175-2, §I.A, at 2;[6] Dkt. 217-5, at 8 (1998–99 excess policy); Dkt. 217-6, at 7 (1999–2000 excess policy); Dkt. 217-7, at 9 (2000–01 excess policy).] More specifically, each promises to "pay on [USAG's] behalf the 'ULTIMATE NET LOSS' in excess of the applicable limits of the [underlying primary policy] . . . whether such insurance is collectible or not . . . ." [Dkt. 175-2, §I.A, at 2.]

The excess policies generally incorporate or "follow form" to the terms of the primary policies, but with significant exceptions. They expressly state that they do <u>not</u> "follow form" to primary-policy terms that "<u>relate to</u> premium, subrogation, any obligation to defend, the payment

---

[6] Again, the relevant language in the excess policies is identical over all three years. USAG generally cites to Dkt. 175-2 (the operative coverage form) for the Court's convenience.

of expenses, <u>limits of insurance</u>, cancellation or any renewal agreement" or are "<u>inconsistent with</u> provisions of this policy." [*Id.* (emphasis added).]

The limits sections of the three excess policies state that "[i]f the UNDERLYING INSURANCE limit has been reduced or exhausted solely by reason of losses paid thereunder . . . which take place during OUR policy period," then the excess policy will pay the remainder. [*Id.*, §I.B, at 2.] The excess policies also state: "If the UNDERLYING INSURANCE does not pay a loss for reasons other than exhaustion of an aggregate limit of insurance, then WE shall not pay such loss. [*Id.*] This section also states that "[t]he Limit of Insurance stated in the Declarations . . . shall be the total limit of our liability for all covered damages" and "[t]he Limit of Insurance stated in the Declarations as the aggregate shall be the total limit of [ACE's] liability for all covered damages sustained during each annual period of the of this policy. . . ." [*Id.*] The Declarations page in each excess policy specifies that its limit is $10 million per occurrence and in the aggregate. [Dkt. 217-5, at 2; Dkt. 217-6, at 2; Dkt. 217-7, at 3.]

## IV.    LEGAL STANDARDS

### A.    Standard of Review

Upon submission of a bankruptcy court's proposed findings of fact and conclusions of law, a district court "shall make a de novo review upon the record or, after additional evidence, of any portion of the bankruptcy judge's findings of fact or conclusions of law to which specific written objection has been made in accordance with this rule." FED. R. BANKR. P. 9033(d). This requires the district court to give "fresh consideration" of issues to which a party has objected, and "consider the record which has been developed . . . and make [its] own determination on the basis of that record, without being bound to adopt the findings and conclusions of the magistrate." *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quotations omitted). "The district judge may accept, reject, or modify the proposed findings of fact or conclusions of law,

receive further evidence, or recommit the matter to the bankruptcy judge with instructions." FED. R. BANKR. P. 9033(d).

**B.      Special Rules of Interpretation applicable to Insurance Policies.**

The parties agree that Indiana law governs this coverage dispute. As a federal court exercising diversity jurisdiction, this Court must follow the law as it is articulated by the Indiana Supreme Court. *See Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1090 (7th Cir. 1999). If that court has not addressed the issue, a federal court must predict how the Indiana Supreme Court would decide the question. *Id.*

"The first principle of insurance law is captured by the maxim contra proferentem, which directs that ambiguities in a [policy] be interpreted 'against the drafter,' who is almost always the insurer." Kenneth S. Abraham, *A Theory of Insurance Policy Interpretation*, 95 MICH. L. REV. 531, 531 (1996). This is also the "first principle" of Indiana insurance law, as it has been for over a century. *Glens Falls Ins. Co. v. Michael*, 74 N.E. 964, 965 (Ind. 1905); *Masonic Acc. Ins. Co. v. Jackson*, 164 N.E. 628, 631–32 (Ind. 1929) ("An insurance policy should be so construed as to effectuate indemnification . . . rather than to defeat it."). The reason for this strict scrutiny is simple: "[T]he insurer drafts the policy and foists its terms upon the customer. The insurance companies write the policies; we buy their forms or we do not buy insurance." *Am. States Ins. Co. v. Kiger*, 662 N.E.2d 945, 947 (Ind. 1996); *Visteon Corp. v. Nat'l Union Fire Ins. Co.*, 2013 U.S. Dist. LEXIS 111109 at *16–17 (S.D. Ind. 2013) (Young, J.).

"Where there is ambiguity, insurance policies are to be construed strictly against the insurer and the policy language is viewed from the standpoint of the insured." *Allstate Ins. Co. v. Dana Corp.*, 759 N.E.2d 1049, 1056 (Ind. 2001) (quotations omitted). If there is more than one reasonable construction of a term, then it is ambiguous, and the policy must be construed in favor of the policyholder and in favor of coverage. *Eli Lilly & Co. v. Home Ins. Co.*, 482 N.E.2d 467,

470–71 (Ind. 1985); *Carter v. State Farm Fire & Cas. Co.*, 2019 U.S. Dist. LEXIS 175696, at *7 (S.D. Ind. 2019) (insurer's coverage-restricting position must be the "only reasonable interpretation" of the policy to prevail).

"Insurers are free to limit the coverage of their policies, but such limitations must be clearly expressed to be enforceable." *State Auto. Mut. Ins. Co. v. Flexdar, Inc.*, 964 N.E.2d 845, 848 (Ind. 2012). For this reason, exclusions or limitations on coverage in insurance policies are subject to the strictest scrutiny. *Kiger*, 662 N.E.2d at 947, 949; *Asbury v. Ind. Union Mut. Ins. Co.*, 441 N.E.2d 232, 242 (Ind. Ct. App. 1982). They bar or limit coverage only when their terms "clearly and unmistakably" apply. *Asbury*, 441 N.E.2d at 242; *Kiger*, 662 N.E.2d at 947, 949; *Meridian Mut. Ins. Co. v. Auto-Owners Ins. Co.*, 698 N.E.2d 770, 773 (Ind. 1998) ("Where provisions limiting coverage are not clearly and plainly expressed, the policy will be construed most favorably to the insured, to further the policy's basic purpose of indemnity."). ACE bears the burden of showing that an exclusion or limitation applies. *FLM, LLC v. Cincinnati Ins. Co.*, 27 N.E.3d 1141, 1143 (Ind. Ct. App. 2015).

## V.    ARGUMENT

### A.    ACE conceded below that all three policies are triggered—because that is what the policies say—and the Bankruptcy Court incorrectly held otherwise.

The "first step in any coverage analysis is determining what event must occur for potential coverage to commence under the terms of the insurance policy." [Dkt. 275, at 8 (Bankruptcy Court's proposed order).] This event is referred to as the "trigger" of coverage. [*Id.* (citing *In re Future Realty Litigation*, 468 F. Supp. 2d 1287, 1294 (E.D. Wash. 2006)); *see also Eli Lilly & Co.*, 482 N.E.2d at 470 (trigger is focused on "what must happen during a particular policy period to trigger coverage for that period").] The analysis of what is required to "trigger" coverage under an insurance policy is governed exclusively by the language of the policy's

insuring agreement. [Dkt. 275, at 8]; *see also Amerisure, Inc. v. Wurster Constr. Co., Inc.*, 818 N.E.2d 998, 1005 (Ind. Ct. App. 2004). Only after the "trigger" of coverage has been determined by reference to the policy's insuring agreement may a court look to "additional factors" to determine whether the claim is actually covered, and if so how much the insurer must pay. *Id.*

Here, the insuring agreements in each primary policy only provide coverage for injuries "sustained during the policy period" and that are "caused by" abuse "first committed during the policy period." [Dkt. 175-1, §1.b(2)–(3), at 2.] Each Year 1 Claimant alleges injury "sustained during" and "caused by" abuse "first committed" against them while the Year 1 Primary Policy was in effect. Similarly, each Year 2 Claimant alleges injury "sustained during" and "caused by" abuse "first committed" against <u>them</u> while the Year 2 Primary Policy was in effect. Finally, each Year 3 Claimant alleges injury "sustained during" and "caused by" abuse "first committed" against <u>them</u> while the Year 3 Primary Policy was in effect. Year 2 and Year 3 Claimants neither allege injury "sustained during" the Year 1 Primary Policy, nor do they allege that the abuse was "first committed" against them during the Year 1 Primary Policy.

For these reasons, some claims fall within the insuring agreements of each year's policies, "triggering" each primary policy. ACE agrees that this was how the policy should be interpreted. [*See* Ex. A, at 63:18–64:12 ("[F]or trigger purposes . . . . [a]s long as . . . the abuse of the claimant was first committed during the policy period, during one of our three periods[,] it triggers . . . coverage" under that specific policy).]

Despite this concession and the Insuring Agreements' language, the Bankruptcy Court held that the Year 2 and Year 3 Primary Policies "are not triggered because the triggering event is the first act of abuse by a single perpetrator, not when a victim is first abused by a single perpetrator who has committed acts of sexual abuse in prior policy years." [Dkt. 275, at 12.]

11

Stated differently, the Bankruptcy Court held that because Nassar began abusing athletes before the Year 2 and Year 3 policies incepted, those latter policies could not be triggered, not even by athletes who were first abused by Nassar during those policy periods—and who experienced no abuse before then.

To comport with Indiana law, the Bankruptcy Court's coverage-limiting result may stand only if it is the "only reasonable interpretation" of the policy. *Carter*, 2019 U.S. Dist. LEXIS 175696, at *7; *American Economy Ins. Co. v. Liggett*, 426 N.E.2d 136, 144 (Ind. Ct. App. 1981) ("Where any reasonable construction can be placed on a policy that will prevent the defeat of the insured's indemnification for loss covered by general language, that construction will be given."). Considering that even ACE repudiated the Bankruptcy Court's theory, it cannot be the only reasonable interpretation of the policy. *Kiger*, 662 N.E.2d at 947–48.

The Insuring Agreements do not bar coverage simply because the same perpetrator abused <u>someone else</u> before the policy incepted. Indeed, the only "per-perpetrator" limitation contained in the primary policies is in their "Limits of Insurance" section. The Limits of Insurance section does not govern the trigger analysis, but only how much the insurer must pay for claims that are covered. ACE made this very point during the hearing:

> This clause which aggregates all acts, collapses it all into one act per perpetrator, applies at the indemnity stage, at the stage of when we're determining how much we pay. And that's an important point actually . . . [W]e've conceded that this clause applies at the stage of determining how much we pay. . . . . Now, for trigger purposes . . . . [a]s long as . . . the abuse of the claimant was first committed during the policy period, during one of our three periods[,] it triggers . . . coverage.

[Ex. A, at 63:18–64:12.]

Moreover, the Bankruptcy Court's analysis rests on a logical flaw that even ACE recognized and avoided. The Bankruptcy Court held that the "triggering event is the first act of abuse by a single perpetrator," and then concluded that only the Year 1 Primary Policy was

triggered by the Nassar abuse. [Dkt. 275, at 12.] But if Nassar's first act of abuse was the triggering event, then none of the ACE policies would provide coverage for the Nassar abuse. Nassar allegedly began abusing gymnasts at least as early as 1992—long before the Year 1 Primary Policy incepted in 1998. The Bankruptcy Court's reasoning is thus absurd in light of the conclusion it actually reached. ACE even conceded that it was not taking this position or advocating for this result. [Ex. A, at 63:18–64:12.] If neither party advocated for a reading of the policy, then it cannot be the "only reasonable interpretation" required to destroy coverage under Indiana law. *Carter*, 2019 U.S. Dist. LEXIS 175696, at *7.

Ruling against a policyholder on an issue it presented using a reading that the insurer never argued—and that the insurer expressly repudiated—is reason enough to reject the proposed findings and recommit the issue to the Bankruptcy Court. "[T]he premise of the adversarial system is that [courts] do not sit as self-directed boards of inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them." *United States v. Pryce*, 938 F.2d 1343, 1352–53 (D.C. Cir. 1991) (quotations omitted). ACE agrees with USAG that all three policies are triggered, because that is what the policies require. [Ex. A, at 63:18–64:12.] ACE concedes that the policies provide coverage for the Nassar abuse and do not treat all Nassar claims as a single "act" committed before ACE's policies incepted. [*Id.* at 63:18–64:12.] USAG agrees on these points. The Bankruptcy Court should not have resolved this trigger issue contrary to the agreement between both the policyholder and the insurer. This is especially true in a civil, insurance-coverage case: If both the insurer and the policyholder agree a construction of the policy, that reading must be at least a reasonable interpretation, which the Court should have adopted. *Carter*, 2019 U.S. Dist. LEXIS 175696, at *7.

Finally, ACE's policies support neither the approach advocated by ACE nor the argument adopted by the Bankruptcy Court. ACE's policies do not state that all abuse committed by a single person against anyone during any ACE policy period shall be deemed to have been "first committed" during ACE's <u>initial</u> policy period (ACE's argument). The policies contain no such language, and the Court cannot read that language into the policy just because ACE wants it there. Neither do ACE's policies state that there is no coverage for a claimant, who first suffered abuse during the policy period, if the same perpetrator abused someone else before the policy period (the Bankruptcy Court's argument). Other carriers have attempted to include such limiting language, but ACE did not. *TIG Ins. Co. v. Smart Sch.*, 401 F. Supp. 2d 1334, 1339 (S.D. Fla. 2005). These clauses specifically state in their insuring agreements that a series of acts taking place over any period of time will be deemed to have "taken place on the date of the first of such series of acts" and confirm that "[n]o coverage is afforded under this policy if the first act of 'sexual abuse occurrence' took place outside the policy period." *Id.*

Limitations like the ones invented by ACE and the Bankruptcy Court must be clearly put in the text of the policy. *State Auto. Mut. Ins. Co. v. Flexdar, Inc.*, 964 N.E.2d 845, 848–52 (Ind. 2012) (strictly construing policy language against an insurer is justified because "[a]fter all, the insurance companies write the policies; we buy their forms or we do not buy insurance." (citations and internal quotations omitted)).[7] ACE did not do so. The Court cannot construe the

---

[7] In *Flexdar*, the insurer argued that the chemical trichloroethylene (TCE) came within the scope of a pollution exclusion applicable to any "solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." *Id.* at 850. Rejecting the insurer's argument, the Supreme Court recognized that under "basic contract principles, our decisions have consistently held that the insurer can (and should) specify what falls within [an] exclusion." *Id.* at 851. It ruled, further, that other pollution exclusions specifically included TCE as an excluded chemical, demonstrating that the insurer could have been more specific. *Id.* Accordingly, since the "insurer's failure to be more specific render[ed] its policy ambiguous, [the Court] construe[d] the policy in favor of coverage." *Id.*

policies as though ACE had placed such requirements into their insuring agreements, when in fact ACE chose to write the policy differently. *Id.*

USAG and ACE agreed that all three policies are triggered. No one argued otherwise. ACE's cross-motion was based on the argument that the "Limits of Insurance" provision in each of the primary policies should be interpreted to limit coverage to $1 million for Nassar claims across all three years—not, as the Bankruptcy Court found, that only the first policy was triggered. As a matter of law, then, the Bankruptcy Court should have held that all three policies were triggered and analyzed only the limits issues briefed by the parties. This Court should, at least, reject the findings, hold that all of the policies are triggered, and recommit the issue to the Bankruptcy Court in light of that finding.

**B.    The $1 million per-perpetrator limit is reasonably construed as applying on an annual basis to claims triggering each separate policy.**

There is no dispute between the parties that all three years of primary policies are "triggered" under the terms of the three insuring agreements. Nor is there any dispute about whether the "Limits of Insurance" section in each primary policy imposes a "per-perpetrator" cap of $1 million. Rather, as ACE informed the Bankruptcy Court, "the only dispute before this Court, is when you look at a single perpetrator[,] how much limits are available" under the ACE policies. [Ex. A, at 71:10–14.] Specifically, the dispute is whether the primary policies' $1 million "per-perpetrator" cap applies separately on a policy-by-policy basis (affording $1 million under each primary policy ($3 million total) for Nassar claims, as USAG contends), or instead imposes a single $1 million indemnity limit governing the three separate ACE primary policies (as ACE contends).

To prevail on this argument, ACE must show that it has the "only reasonable interpretation" of the policy language. *Carter*, 2019 U.S. Dist. LEXIS 175696, at *7. If it is

reasonable to construe the "per-perpetrator" payment cap as being limited to the annual period of each policy, then the Court must find in favor of USAG. *Id.*; *Liggett*, 426 N.E.2d at 144. ACE cannot meet this burden. For the reasons set forth below, it is reasonable to conclude that <u>each</u> primary policy provides $1 million in limits for Nassar-related claims that trigger that respective policy.

No principle of insurance law prevents multiple policies from providing coverage for the same or related losses. As the Indiana Supreme Court has observed, "when more than one policy is applicable to a loss[,] . . . the insured [may] recover under all policies applicable to the loss (i.e., stack the policies) up to the total damages," unless the policy language precludes such "stacking." *Wagner v. Yates*, 912 N.E.2d 805, 812 (Ind. 2009). Such "anti-stacking" clauses, whatever their form, are subject to the same strict scrutiny as other coverage limitations. *Id.* at 811–12 (observing that policy language is "construed strictly against the insurer and the policy language is viewed from the standpoint of the insured" because "the insurer drafts the policy and foists its terms upon the consumer") (quotations omitted).

 "Anti-stacking" language is effective only when two criteria are met. First, the policy must "clearly refer[] to insurance <u>other</u> than that" under which coverage is sought, *Wagner*, 912 N.E.2d at 813 (emphasis added). Second, the policy must explain in clear and unambiguous terms either (a) that a payment under one policy will be limited by recoveries under a different policy, or (b) that no more than one limit can apply to a loss or series of related losses. *Id.*

Here, ACE's annual "per-perpetrator" payment cap makes no "reference to other insurance policies . . . to indicate [that USAG's] maximum recovery" under one policy will be reduced by coverage provided under others. *Wagner*, 912 N.E.2d at 813. Instead, the "per perpetrator" cap only says that "[a]ll acts or omissions . . . shall be considered a single act" for

16

purposes of calculating ACE's limits of insurance and that "the most we will pay" is $1 million per perpetrator. [Dkt. 175-1, §3.a–b, at 3.] These terms do not say that the amount payable under one policy will be reduced if coverage is available for other, related claims under a different policy. To the contrary, the "Limits of Insurance" language in each primary policy "appears to refer only to itself." *Wagner*, 912 N.E.2d at 813. Other insurers have used more straightforward language to address this issue. *Phila. Indem. Ins. Co. v. Chi. Tr. Co.*, 930 F.3d 910, 914 (7th Cir. 2019).[8] ACE did not. Accordingly, this language cannot be afforded any "anti-stacking" effect under Indiana law, which means that ACE must "pay up to" each primary policy's separate $1 million limit for claims triggering that policy. *Id.*

Notably, the ACE primary policies contain an actual "anti-stacking" clause, but that is not at issue here. It applies exclusively to other coverages "within the same policy period."[9] [Dkt. 175-1, §3.c, at 3.] The presence of another "anti-stacking" clause in the policies is nonetheless relevant: it demonstrates that ACE knew how to write "anti-stacking" clauses but chose not to include a clause that applies in this context—the stacking of <u>successive</u> policy limits. This, alone, prohibits the reading that ACE advances here. *Flexdar*, 964 N.E.2d at 848

---

[8] In *Philadelphia Indemnity Co.*, the anti-stacking provision read as follows:

> The limit of insurance shown in the Declarations for each "abusive conduct" is the most we will pay for all "damages" incurred as the result of any claim of "abusive conduct". <u>Two or more claims</u> for "damages" because of the same incident or interrelated incidents of "abusive conduct" shall be: a. Considered a single claim[;] and b. Such claims, whenever made, <u>shall be assigned to only one policy (whether issued by this or any [o]ther insurer) and if that is this policy, only one limit of insurance shall apply.</u>

930 F.3d at 914.

[9] This section provides: "If this coverage form and any other coverage form or policy for the same policy period . . .apply, the maximum applicable limits . . . shall not exceed the highest applicable limits . . . under any one coverage form or policy." [Dkt. 175-1, §3.c, at 3.]

17

(the insurer's ability to draft language that would have specifically applied to the dispute precludes construing the policy as if it had that language).

ACE nevertheless argues that using "all" in the annual "per-perpetrator" limit converts it into an implicit "anti-stacking" clause. [Dkt. 239, at 8.] Not so. For limits purposes, the "per-perpetrator" term treats all acts of abuse as a "single act . . . regardless of the number of acts or omissions, number of persons injured, number of insureds responsible, or number of locations involved" [Dkt. 175-1, §3.a, at 3.] If anything, this language communicated that ACE did <u>not</u> intend to impose a single $1 million limit regardless of whether the claims triggered different policy periods or "regardless of the period of time" over which the abuse occurred.

ACE's arguments to the contrary are meritless. At the Bankruptcy Court's hearing, ACE argued that its underwriters only felt it necessary to "clarify" what "all" meant with regard to issues or "questions that policyholders might have." [Ex. A, at 65:13.] But ACE's underwriters must have been aware that abuse often occurs across successive policy periods—claims involving multi-year abuse by a single perpetrator generated landmark appellate decisions on coverage law years before ACE sold these policies. *E.g.*, *Soc'y of the Roman Catholic Church of the Diocese of Lafayette & Lake Charles*, 26 F.3d 1359, 1366 (5th Cir. 1994). Indeed, ACE's underwriters <u>were</u> aware of this problem, because they limited ACE's aggregate exposure—though not its "Each Act" exposure—across multiple policy periods. [Dkt. 175-1, § 3.b, at 3 ("The most we will pay in total judgment or settlements <u>during any policy period</u> is the 'Physical Abuse' or 'Sexual Misconduct' Aggregate limit.") (emphasis added)];

Some policies issued during the late 1990s, when the first ACE policy was issued, specifically addressed this concern. *E.g.*, *TIG Ins. Co. v. San Antonio YMCA*, 172 S.W.3d 652, 657 (2005) (addressing a 1999 policy which specified that acts would be aggregated "regardless

of . . . the period of time during which the acts of sexual molestation or abuse took place" and that "[n]o coverage is afforded under this policy if the first [aggregated] act . . . took place outside this policy period"). ACE cannot rewrite the policy now when it could have, "[b]y more careful drafting . . . resolve[d] any question of ambiguity." *Flexdar*, 964 N.E.2d at 852.

ACE also argues that the word "all" should be presumed to apply indefinitely, no matter how many policies ACE sells, unless there is express language limiting the term to the policy period. [Dkt. 239, at 3.] ACE has this backwards. The policies are written on an annual basis, and each policy's terms apply only to that policy period unless otherwise expressly stated. RESTATEMENT OF THE LAW OF LIABILITY INSURANCE, §40, Cmt. b (each individual policy is "independently and concurrently liable" under its own terms "unless there is a term in the insurance policy that provides to the contrary"). ACE failed to state that each primary policy's "per perpetrator cap" applies across all three policies, creating a single three-year "uber policy" limit. The fact that ACE used a "belt and suspenders" approach to clarify that certain other policy provisions clause do apply only on an annual basis (*e.g.*, the aggregate cap and "anti-stacking" clause) [Dkt. 175-1, §3.b-c, at 3] does not create a presumption that other provisions do not. ACE wrote the policy; Indiana law requires <u>it</u> to speak "clearly and unmistakably" if it wants to limit the coverage granted by its insuring agreement. *Asbury*, 441 N.E.2d at 242; *Kiger*, 662 N.E.2d at 947.

The policies' annual "per-perpetrator" cap is not an "anti-stacking" provision under the stringent requirements set forth by the Indiana Supreme Court. Thus, ACE cannot impose a single, three-year "uber-policy" limit across all of its primary policies. Instead, each primary policy affords a separate $1 million "per perpetrator" limit.

**C.      All three excess policies provide coverage even if the "Limits of Insurance" language caps ACE's obligations under the primary policies.**

Each of the excess policies promises coverage for "injury or damage covered by the [the underlying primary policy], and that takes place during our policy period." [Dkt. 175-2, §I.A, at 2.] Each promises to pay "in excess of the applicable limits of the [underlying primary policy] (whether such insurance is collectible or not)." [*Id.*] Each excess policy also states that $10 million "shall be the total limit of [ACE's] liability for all covered damages sustained during each annual period of the of this policy. . . ." [*Id.* §I.B, at 2.] Accordingly, if this Court agrees that each primary policy provides $1 million for the Nassar claims (for a total of $3 million), it follows that the three excess policies each provide another $10 million in coverage.

The analysis below only becomes necessary if the Court agrees with ACE and concludes that the "per-perpetrator cap" in the primary policies "Limits of Insurance" sections create a single "uber-policy" limit of $1 million.

**1.      Even if ACE's primary policies create a single, three-year "uber-policy" limit, all of them still "pay," which causes all three excess policies to attach.**

The Bankruptcy Court found that the Year 2 and Year 3 excess policies do not attach because the underlying primary policies "are not triggered" and therefore pay "nothing." [Dkt. 275, at 12.] As explained above, this premise (that the primary policies pay nothing) is incorrect, was argued by no one, and was repudiated by ACE during oral argument. *Supra*, §V.A. This Court should similarly reject it.

ACE argues, instead, that even though all three of its primary policies are triggered, the second and third excess policies do not attach because of the $1 million "uber policy" limit. [Ex. A, at 65:18–23, 64:7–13.] Nothing in any of the six policies supports this claim. Indeed, ACE's conclusion defies logic. If all three primary policies are subject to a single $1 million limit (as ACE contends), then limits applicable to <u>all three</u> primary policies would be exhausted by

payment of claims once that $1 million limit is exhausted.[10] Black letter insurance law—and the text of the excess policies' insuring agreement—says that the excess policies attach at this point. *Allstate Ins. Co. v. Dana Corp.*, 759 N.E.2d 1049, 1063 n.10 (Ind. 2001); *Kaiser Cement & Gypsum Corp. v. Ins. Co. of Pa.*, 155 Cal. Rptr. 3d 283, 304–05 (Cal. Ct. App. 2013). Accordingly, by paying that single $1 million "Each Act" limit, all three primary policies would be exhausted for the Nassar claims. This would, in turn, satisfy the attachment language of the second and third excess policies.[11]

ACE's attempts to read further requirements into the "attachment" language are unavailing. ACE admits that paying the $1 million "Each Act" limit on behalf of the <u>three</u> "triggered" primary policies (the one "uber-policy") satisfies the "attachment" language of the first excess policy. [Ex. A, at 67:5–17.] But there is no principled reason why that same payment would not also satisfy the "attachment" language in the second and third excess policies for abuse by the same perpetrator. Indeed, when "anti-stacking" language prevents an insured from "stacking" the limits of multiple "triggered" policies, which this section of the brief assumes is the case here, <u>all</u> of those "triggered" policies are deemed exhausted for excess-insurance purposes by the payment of a single limit. *See, e.g.*, *Kaiser*, 155 Cal. Rptr. 3d at 304–05.

Moreover, Indiana law does not permit excess insurers to avoid payment for <u>liability</u> that clearly reaches their limit merely because the primary insurer did not <u>pay</u> the stated limits of its policy. *Dana Corp.*, 759 N.E.2d at 1063 n.10. In *Dana*, the Indiana Supreme Court ruled that

---

[10] Moreover, it is perfectly possible that a single "Each Act" limit of $1 million would be divided between the three "triggered" policies—whether in equal thirds, "pro rata" based on the number of claimants or amount of damages falling into each period, "first come first serve," or any of the other myriad ways losses get allocated across multiple, successive policies.

[11] The "attachment" language in the excess policies provides that ACE will pay "in excess of the applicable limits of the [primary policy] (whether such insurance is collectible or not)." [Dkt. 175-2, §I.A, at 2.]

even when an excess policy conditions its "attachment" on the underlying insurer's payment of its policy limits, the excess "coverage attaches as soon as liabilities are incurred in the amount of the underlying [primary policy] limits for the applicable coverages." *Id.* (explaining that a determination of whether the primary insurer's settlement was "actually paid . . . is unnecessary," and it is "also irrelevant" whether the payment "exhausted the underlying limits"). Here, to the extent USAG's liability for the Year 2 and Year 3 Claimants exceeds the limits of liability under the Year 2 and Year 3 primary policies, *Dana* makes it clear that the second and third excess policies "attach" to the loss regardless of whether the primary policies pay.

### 2.   Even if ACE's primary policies create a single, three-year "uber-policy" limit, the excess policies disregard any terms that "relate to" the primary policies' limits of insurance.

The excess policies' "Limits of Insurance" sections do not contain language aggregating claims or sublimits. Neither do they contain any anti-stacking clauses. Instead, they promise to pay up to $10 million "for all covered damages sustained as the result of any one Occurrence" and "for all covered damages sustained during each annual period of this policy." [Dkt. 175-2, §I.B, at 2.] The excess policies expressly forbid incorporating provisions from the primary policies that "are inconsistent with the provisions of this policy or relate to . . . limits of insurance." [*Id.*]

Despite these terms, the Bankruptcy Court found that the primary policies' "Limits of Insurance" terms apply to the excess policies. [Dkt. 275, at 11–12.] It brushed off the prohibition on incorporating terms that "relate to . . . limits of insurance" by holding that it only applied to the "higher dollar coverage amounts" (i.e., $10 million rather than $1 million). [*Id.*] This is incorrect.

The "per-perpetrator" terms from the primary policies plainly "relate to" those policies' limits of insurance. The primary policies each impose a $1 million "Each Act" limit. That limit is

calculated by reference to the "per-perpetrator" clause that deems all abuse by a single individual to be "a single act, subject to the Each Act limit of insurance." [Dkt. 175-1, §3.a, at 3.] Indeed, ACE placed the "per-perpetrator" limits in a section of the primary policies labeled "Limits of Insurance." [*Id.*] It is at least reasonable to interpret these terms as "relate[d] to" the primary policies' limits of insurance, which is all USAG must show to prevail.

The reasons cited by the Proposed Order do not justify the result. For example, while the difference in capitalization ("limits of insurance" versus "Limits of Insurance") might matter in other contexts, it cannot work a complete forfeiture of coverage. Under Indiana law, policy terms are interpreted "from the perspective of an ordinary policyholder of average intelligence," *Bradshaw v. Chandler*, 916 N.E.2d 163, 166 (Ind. 2009) (citations omitted). Limitations on coverage must "clearly and unmistakably" apply, *Asbury*, 441 N.E.2d at 242; *Kiger*, 662 N.E.2d at 947, 949, so that the "only reasonable interpretation" is the one limiting coverage. *Carter*, 2019 U.S. Dist. LEXIS 175696, at *7; *Liggett*, 426 N.E.2d at 144. A difference in capitalization does not "clearly and unmistakably" convey to a person of average intelligence that they would lose <u>all</u> coverage under a policy.

The Bankruptcy Court also based its conclusion on the fact that the excess policies have their own "Limits of Insurance" section. [Dkt. 275, at 11.] But this actually proves USAG's point, not ACE's. If the excess policies have their own, detailed "Limits of Insurance" section, <u>those</u> provisions should be operative—and those alone—not the different and conflicting rules from the primary policies' "Limits of Insurance" section. Accordingly, when the excess policies state that they do not "follow form" to provisions that "relate to . . . limits of insurance," [12] it is

---

[12] This Court really need not look any further than the language in the excess policies that directly prohibits incorporation of provisions from the primary policy that "relate to . . . limits of

partly because they already have their own "Limits of Insurance" section and do not need another.

Moreover, the "Limits of Insurance" provisions in the primary policy are at least arguably "inconsistent with" the "Limits of Insurance" in the excess policies. The Bankruptcy Court held that the primary policies have "anti-stacking" clauses, but the excess policies provide exactly the opposite. Nothing in the excess policies even arguably alters ACE's promise to pay $10 million "for all covered damages sustained during each annual period." [Dkt. 175-2, §I.B, at 2 (emphasis added).] Given that inconsistency, the excess policies' unqualified promise to pay $10 million per year must be given effect.[13]

The result reached by the Proposed Order is "inconsistent with the provisions" of the excess policies in another way, too. By accepting ACE's argument that only the first "follow form excess policy can pay" when there is "abuse committed during all three years" [Ex. A, at 67:14–17], it contradicts the plain language of the first excess policy, which limits coverage to "bodily injury . . . that takes place during [the] policy period," [Dkt. 175-2, §I.A, at 2 (emphasis

---

insurance." Indeed, ACE conceded that "if the Court wants to say that it relates to limits of insurance, that's fine." [Ex. A, at 70:10–12.]

[13] The cases ACE cites do not support its argument. [Dkt. 239, at 14.] None of the cases involved a situation where, as here, the insurer argued that the "Limits of Insurance" section of a primary policy should supplant or supplement the "Limits of Insurance" section in the excess policy. Moreover, the cases support the rule that courts construe policies against the insurer unless the language clearly and unambiguously requires the opposite. For example, in *Union Carbide Corp. v. Affiliated FM Ins. Co.*, 947 N.E.2d 111, 113 (N.Y. 2011), the court held that since the primary policies provided coverage on an annual basis, the "follow form" excess policies likewise provided annualized limits in the absence of clear language to the contrary, of which there was none. In *Air & Liquid Sys. Corp. v. Allianz Underwriters Ins. Co.*, 2013 WL 5436934, at *25 (W.D. Pa. 2013), the court found that "non-cumulation" clauses were incorporated into the excess policies because they were located in the primary policies' "Conditions" section, to which the excess policies followed form without exception, and not in the "Limits of Insurance" section as is the case here.

added)], and therefore cannot cover abuse "first committed" and "bodily injury" sustained after it expired.

In short, all three of the primary policies pay. How much they pay is the only issue in dispute. Similarly, all three of the excess policies pay regardless of how the Court construes the Limits terms of the primary policies.

## VI.    CONCLUSION

The Bankruptcy Court's proposed order resolved the issue on a ground neither party advanced and which ACE conceded is not at issue. The Court should, at the very least, **REJECT** the proposed findings and **RECOMMIT** the issue to the Bankruptcy Court for reconsideration based on premise that all three primary policies are triggered. In the alternative, because USAG's reading of the policy is reasonable, and because ACE's reading is not the "only reasonable interpretation" of the policy, the Court should **GRANT** USAG's Motion for Partial Summary Judgment and **DENY** ACE's Cross-Motion for Partial Summary Judgment.


December 13, 2019                              Respectfully Submitted,

                                              /s/ *Christopher E. Kozak*
                                              George M. Plews (#6274-49)
                                              Gregory M. Gotwald (#24911-49)
                                              Tonya J. Bond (#24802-49)
                                              Christopher E. Kozak (#35554-49)
                                              PLEWS SHADLEY RACHER & BRAUN LLP
                                              1346 N. Delaware St.
                                              Indianapolis, IN 46202-2415
                                              (317) 637-0700
                                              gplews@psrb.com
                                              ggotwald@psrb.com
                                              tbond@psrb.com
                                              ckozak@psrb.com

                                              -and-

JENNER & BLOCK LLP
Catherine L. Steege (admitted *pro hac vice*)
Dean N. Panos (admitted *pro hac vice*)
Melissa M. Root (#24230-49)
353 N. Clark Street
Chicago, Illinois 60654
(312) 923-2952
csteege@jenner.com
dpanos@jenner.com
mroot@jenner.com

*Counsel for the Plaintiff USA Gymnastics*

**Appendix 1 – ACE Coverage Chart (hypothetical Nassar claimants)**

Any shading = abuse in policy year | Red shading = no ACE coverage
Green shading = ACE coverage | Dark green shading = abuse triggering ACE coverage

| Claimant | TIG 97-98 "Year -1" | ACE 98-99 "Year 1" | ACE 99-00 "Year 2" | ACE 00-01 "Year 3" | TIG 01-02 "Year 4" |
|---|---|---|---|---|---|
| #1 | | | | | |
| #2 | | Year 1 Claimant | | | |
| #3 | | | Year 2 Claimant | | |
| #4 | | | Year 2 Claimant | | [Not covered by ACE] |
| #5 | | | | Year 3 Claimant | [Not covered by ACE] |
| #6 | | Year 1 Claimant | | | [Not covered by ACE] |
| #7 | | | Year 2 Claimant | | |

## 1. INSURING AGREEMENT

a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "personal injury" to which this insurance applies arising out of "physical abuse or "sexual misconduct" against any person while in the care, custody, or control of the insured.

****

b.  This insurance applies to "bodily injury" or "personal injury" only:

(1)  if the "bodily injury" or "personal injury" is caused by an act of "physical abuse" or "sexual misconduct" committed in the "coverage territory" [not at issue]; and

(2)  if the "bodily injury" or "personal injury" is caused by an act of "physical abuse" or "sexual misconduct" first committed during the policy period; and

(3)  so long as the "bodily injury" or "personal injury" is sustained:

(a)  during the policy period; or

(b)  during any subsequent policy period in which we, or any other company affiliated with us, have issued a policy which would apply to such "bodily injury" or "personal injury" except for a provision that such "bodily injury" or "personal injury" be caused by an act of "physical abuse" or "sexual misconduct" first committed during its policy period.

> Below are applications of this insuring agreement, as interpreted by USAG, to the seven hypothetical claimants represented by the chart above:

| Nassar Claimant #1 | | |
|---|---|---|
| Year 1 | Year 2 | Year 3 |
| *Not triggered, not covered.* Even though injury is "sustained" in Year 1 [Y1, §1.b(3)(a)], it was not caused by abuse "first committed during" Year 1 against Claimant #1 [Y1, §1.b(2).]<br><br>*Note: Injury in "Year -1" is not covered because it is not "sustained" during an ACE policy period [Y1, §1.b(3)(a)] | *Not triggered, not covered.* Even though bodily injury is "sustained" in Year 2 [Y2, §1.b(3)(a)], it was not caused by abuse "first committed during" Year 2 against Claimant #1 [Y2, §1.b(2).] | *Not triggered, not covered.* Even though bodily injury is "sustained" during Year 3 [Y3, §1.b(3)(a)], it was not caused by abuse "first committed during" Year 3 against Claimant #1 [Y3, §1.b(2).] |

| Nassar Claimant #2 | | |
|---|---|---|
| Year 1 | Year 2 | Year 3 |
| **TRIGGERED**. Bodily injury is "sustained" during Year 1 [Y1, §1.b(3)(a)] and is caused by abuse "first committed during" Year 1 against Claimant #2. [Y1, §1.b(2).] | *Not triggered, but covered under Year 1.* Injury is not caused by abuse "first committed" during Year 2 against Claimant #2. [Y2, §1.b(2).] However, since it would be covered absent this Year 2 requirement, Year 1 agrees to pay for injury to Claimant #2 sustained in Year 2. [Y1, §1.b(3)(b).] | *Not triggered, but covered under Year 1.* Injury is not caused by abuse "first committed" during Year 3 against Claimant #2. [Y2, §1.b(2).] However, since it would be covered absent this Year 3 requirement, Year 1 agrees to pay for injury to Claimant #2 sustained in Year 3. [Y1, §1.b(3)(b).] |

| Nassar Claimant #3 | | |
|---|---|---|
| Year 1 | Year 2 | Year 3 |
| *Not triggered, not covered.* Bodily injury is not "sustained" by Claimant #3 during Year 1. [Y1, §1.b(3)(a)] | **TRIGGERED**. Bodily injury is "sustained" during Year 2 [Y2, §1.b(3)(a)] and is caused by abuse "first committed during" Year 2 against Claimant #3 [Y2, §1.b(2).] | *Not triggered, but covered under Year 2.* Injury is not caused by abuse "first committed" during Year 3 against Claimant #3. [Y3, §1.b(2).] However, since it would be covered absent this Year 3 requirement, Year 2 agrees to pay for injury to Claimant #3 sustained in Year 3. [Y2, §1.b(3)(b).] |

2

| Nassar Claimant #4 | | |
|---|---|---|
| Year 1 | Year 2 | Year 3 |
| *Not triggered, not covered.* Bodily injury is not "sustained" by Claimant #4 during Year 1. [Y1, §1.b(3)(a)] | **TRIGGERED**. Bodily injury is "sustained" during Year 2 [Y2, §1.b(3)(a)] and is caused by abuse "first committed during" Year 2 against Claimant #4 [Y2, §1.b(2).] | *Not triggered, but covered under Year 2.* Injury is not caused by abuse "first committed during" Year 3 against Claimant #4. [Y3, §1.b(2).] However, since it would be covered absent this Year 3 requirement, Year 2 agrees to pay for injury to Claimant #4 sustained in Year 3. [Y2, §1.b(3)(b).]<br><br>*Note: Injury in "Year 4" is <u>not covered</u> by the Year 2 extension described above. The Year 4 policy is not "issued" by ACE "or any company affiliated with [ACE]" [Y2, §1.b(3)(b) |

| Nassar Claimant #5 | | |
|---|---|---|
| Year 1 | Year 2 | Year 3 |
| *Not triggered, not covered.* Bodily injury is not "sustained" by Claimant #5 during Year 1. [Y1, §1.b(3)(a)] | *Not triggered, not covered.* Bodily injury is not "sustained" by Claimant #5 during Year 2. [Y2, §1.b(3)(a)] | **TRIGGERED**. Bodily injury is "sustained" during Year 3 [Y3, §1.b(3)(a)] and is caused by abuse "first committed during" Year 3 against Claimant #5 [Y3, §1.b(2).]<br><br>*Note: Injury in "Year 4" is <u>not covered</u> by the Year 3 extension. The Year 4 policy is not "issued" by ACE "or any company affiliated with [ACE]" [Y3, §1.b(3)(b)] |

3

| Nassar Claimant #6 | | |
|---|---|---|
| Year 1 | Year 2 | Year 3 |
| **TRIGGERED**. Bodily injury is "sustained" during Year 1 [Y1, §1.b(3)(a)] and is caused by abuse "first committed during" Year 1 against Claimant #6. [Y1, §1.b(2).] | *Not triggered, but covered under Year 1*. Injury is not caused by abuse "first committed" against Claimant #6 during Year 2. [Y2, §1.b(2).] However, since it would be covered absent this Year 2 requirement, Year 1 agrees to pay for injury to Claimant #6 sustained in Year 2. [Y1, §1.b(3)(b).] | *Not triggered, but covered under Year 1*. Injury is not caused by abuse "first committed" against Claimant #6 during Year 3. [Y2, §1.b(2).] However, since it would be covered absent this Year 3 requirement, Year 1 agrees to pay for injury Claimant #6 sustained in Year 3. [Y1, §1.b(3)(b).]<br><br>\*Note: Injury in "Year 4" is <u>not covered</u> by the Year 1 extension. The Year 4 policy is not "issued" by ACE "or any company affiliated with [ACE]" [Y1, §1.b(3)(b)] |

| Nassar Claimant #7 | | |
|---|---|---|
| Year 1 | Year 2 | Year 3 |
| *Not triggered, not covered*. Bodily injury is not "sustained" by Claimant #7 during Year 1. [Y1, §1.b(3)(a)] | **TRIGGERED**. Bodily injury is "sustained" during Year 2 [Y2, §1.b(3)(a)] and is caused by abuse "first committed during" Year 2 against Claimant #7 [Y2, §1.b(2).] | *Not triggered, not covered*. Bodily injury is not "sustained" by Claimant #7 during Year 3. [Y3, §1.b(3)(a)] |

4

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on December 13, 2019, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to the following parties through the Court's Electronic Case Filing System.  Parties may access this filing through the Court's system.

| | |
|---|---|
| Scott P. Fisher<br>Drewry Simmons Vornehm, LLP<br>sfisher@DSVlaw.com<br><br>George R. Calhoun V<br>Ifrah PLLC<br>george@ifrahlaw.com<br>*Counsel for TIG Insurance Company* | James P. Moloy<br>Bose McKinney & Evans LLP<br>jmoloy@boselaw.com<br><br>Kevin P. Kamraczewski<br>Law Offices of Kevin P. Kamraczewski<br>kevin@kevinklaw.com<br><br>Robert B. Millner<br>Ronald D. Kent<br>Susan M. Walker<br>Dentons US LLP<br>robert.millner@dentons.com<br>ronald.kent@dentons.com<br>susan.walker@dentons.com<br>*Counsel for Virginia Surety Company Inc.,*<br>*f/k/a Combined Specialty Insurance Company* |
| Jeffrey B. Fecht<br>Riley Bennett Egloff LLP<br>jfecht@rbelaw.com<br><br>Cassandra L. Jones<br>Walker Wilcox Matousek LLP<br>cjones@wwmlawyers.com<br>*Counsel for RSUI Indemnity Company* | Wendy D. Brewer<br>Phillip A. Martin<br>Fultz Maddox Dickens PLC<br>wbrewer@fmdlegal.com<br>pmartin@fmdlegal.com<br><br>Abigail E. Rocap<br>Bates Carey LLP<br>arocap@batescarey.com<br>*Counsel for Endurance American Insurance*<br>*Company* |
| Harley K. Means<br>Stephen J. Peters<br>Kroger Gardis & Regas, LLP<br>hmeans@kgrlaw.com<br>speters@kgrlaw.com<br><br>Eric D. Freed<br>Cozen & O'Connor<br>efreed@cozen.com<br>*Counsel for ACE American Insurance*<br>*Company f/k/a CIGNA Insurance Company* | Bruce L. Kamplain<br>Cynthia E. Lasher<br>Norris Choplin Schroeder LLP<br>bkamplain@ncs-law.com<br>clasher@ncs-law.com<br>*Counsel for Western World Insurance*<br>*Company* |

| | |
|---|---|
| Ginny L. Peterson<br>Casey R. Stafford<br>Kightlinger & Gray, LLP<br>gpeterson@k-glaw.com<br>cstafford@k-glaw.com<br><br>Nancy D. Adams<br>Mathilda S. McGee-Tubb<br>Laura Bange Stephens<br>Mintz Levin Cohn Ferris Glovsky & Popeo, PC<br>nadams@mintz.com<br>msmcgee-tubb@mintz.com<br>lbstephens@mintz.com<br>*Counsel for Liberty Insurance Underwriters, Inc.* | Hans H. J. Pijls<br>Dinsmore & Shohl LLP<br>Hans.pijls@dinsmore.com<br>*Counsel for National Casualty Company* |
| Susan N.K. Gummow<br>Igor Shleypak<br>Foran Glennon Palandech Ponzi & Rudloff PC<br>sgummow@fgppr.com<br>ishleypak@fgppr.com<br>*Counsel for American International Group, Inc. & American Home Assurance Company* | Karen M. Dixon<br>Michael M. Marick<br>Skarzynski Marick & Black LLP<br>kdixon@skarzynski.com<br>mmarick@skarzynski.com<br><br>Joshua D. Weinberg<br>Katherine M. Hance<br>Shipman & Goodwin LLP<br>jweinberg@goodwin.com<br>khance@goodwin.com<br>*Counsel for Great American Assurance Company* |
| U.S. Trustee<br>Office of U.S. Trustee<br>ustpregion10.in.ecf@usdoj.gov | Catherine L. Steege<br>Melissa M. Root<br>Jenner & Block LLP<br>csteege@jenner.com<br>mroot@jenner.com<br>*Counsel for Debtor USA Gymnastics* |

/s/ *Christopher E. Kozak*
Christopher E. Kozak