**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| USA GYMNASTICS, | ) | Case No. 18-09108-RLM-11 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| USA GYMNASTICS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. Case No. 19-50012 |
| | ) | |
| ACE AMERICAN INSURANCE | ) | |
| COMPANY f/k/a CIGNA INSURANCE | ) | |
| COMPANY, GREAT AMERICAN | ) | |
| ASSURANCE COMPANY, LIBERTY | ) | |
| INSURANCE UNDERWRITERS INC., | ) | |
| NATIONAL CASUALTY COMPANY, | ) | |
| RSUI INDEMNITY COMPANY, TIG | ) | |
| INSURANCE COMPANY, VIRGINIA | ) | |
| SURETY COMPANY, INC. f/k/a | ) | |
| COMBINED SPECIALTY INSURANCE | ) | |
| COMPANY, WESTERN WORLD | ) | |
| INSURANCE COMPANY, ENDURANCE | ) | |
| AMERICAN INSURANCE COMPANY, | ) | |
| AMERICAN INTERNATIONAL GROUP, | ) | |
| INC., AMERICAN HOME ASSURANCE | ) | |
| COMPANY, AND DOE INSURERS, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**ACE AMERICAN INSURANCE COMPANY'S RESPONSES TO USA GYMNASTICS'
OBJECTIONS TO THE BANKRUPTCY COURT'S PROPOSED ORDER RE: USA
GYMNASTICS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND ACE
AMERICAN INSURANCE COMPANY'S CROSS-MOTION FOR PARTIAL
SUMMARY JUDGMENT**

## I.    INTRODUCTION AND SUMMARY

Defendant ACE American Insurance Company, f/k/a Cigna Insurance Company ("ACE")[1] submits these Responses to Plaintiff and Debtor USA Gymnastics' ("USAG") Objections to the Bankruptcy Court's Proposed Order Re: USA Gymnastics' Motion for Partial Summary Judgment and ACE American Insurance Company's Cross-Motion for Partial Summary Judgment [Dkt. 294] (the "Objection").

The Objection pertains to the "Bankruptcy Court's Proposed Findings and Conclusions With Respect To USAG's Motion[] for Partial Summary Judgment and ACE's Cross-Motion[] for Summary Judgment" [Dkt. 275] (the "Proposed Order"). The Proposed Order addressed the narrow dispute presented initially by USAG's Motion for Partial Summary Judgment. Dkt. 174. That dispute concerned the total limits applicable under ACE's policies issued to USAG in 1998-2001 for settlements or judgments arising from abuse by a single perpetrator. No argument or evidence was presented regarding particular claims of abuse by Larry Nassar or anyone else, nor did either party seek any ruling on which particular claims initially triggered the ACE policies for defense purposes (if any). With respect to the narrow issue presented to it, the Proposed Order adopted ACE's straightforward application of the "Deemer Clause," which reads as follows:

> All acts or omissions which cause or contribute to "physical abuse" or "sexual misconduct" by a single individual for whose conduct any insured is legally responsible shall be considered a single act, subject to the Each Act limit of insurance, regardless of the number of acts or omissions,

---

[1] Cigna Insurance Company ("Cigna") changed its name to ACE American Insurance Company in late 1999, while the second of the three successive policies that ACE issued to USAG was in effect. Thus, Cigna and ACE are one and the same entity, as correctly alleged in USAG's Adversary Complaint (which alleged that ACE was "formerly known as" Cigna). Dkt. 1, p. 1. The parties have at various times used "Chubb" as an informal shorthand for ACE, due to ACE's current affiliation with Chubb Limited. The Proposed Order used the name "ACE", and so does this Response.

number of persons injured, number of insureds responsible or number of locations involved.

Dkt. 217-2, p. 13; Dkt. 217-3, p. 196; Dkt. 217-4, p. 254.[2]

Finding the Deemer Clause unambiguous, the Bankruptcy Court held that the ACE policies cap all liability arising from abuse by a single perpetrator at $1 million (the "Each Act" limit) under the first applicable Primary Policy (as defined herein), and $10 million from the corresponding Excess Policy (as defined herein) in that year, for a total of $11 million. Dkt. 275, pp. 7, 12. The Bankruptcy Court reasoned:

> The "trigger" found in the insuring agreement is "bodily injury" or "personal injury" caused by *an act* of "physical abuse" or "sexual misconduct" committed in the coverage territory during the policy period. Whether the triggering event ultimately establishes coverage depends on the policy language. The insuring agreement provided that "the amount we will pay for damages is limited as described in 3. LIMITS OF INSURANCE." The deemer clause contained in those limits provides that the acts committed by a single perpetrator would be considered a "single act" subject to the Each Act coverage limit. It does not provide for any or all acts "committed within the policy period". The latter part of the clause demonstrates the expansiveness of "all". "All" is "regardless" of the number of acts, persons injured, insureds responsible or locations involved. "All acts or omissions" is not modified nor limited by a time frame and the other expressly stated benchmarks regarding number of acts, persons injured, insureds responsible and locations are not temporally limited either. The term "all acts or omissions" is not ambiguous. The absence of a temporal limit does not give rise to the inference that it must mean acts committed only within the policy period. There is no limiting language in this deemer clause. The Court will not rewrite this clause to impute a time limitation and expand coverage beyond that provided for in the contract. *Sell v. United Farm Bureau Life Ins. Co.*, 647 N.E.2d 1129, 1131-32 (Ind. Ct. App. 1995).

Dkt. 275, pp. 8-9.

USAG's Objection attempts to muddy the waters by exploring various hypothetical scenarios and categories of Nassar claimants and semantics associated with words that are not in

---

[2] Page number references are to the Bankruptcy Court's ECF pagination.

the policies. The Bankruptcy Court correctly found that the Deemer Clause deems all abuse by a single perpetrator to be a "single act", such that ACE's indemnity obligation (*i.e.*, the "amount we will pay for damages") is capped at one "Each Act" limit, payable under the policy in effect when that perpetrator's "act" was "first committed." ACE's briefing made substantively the same argument. *See* Dkt. 217, pp. 12-13; Dkt. 239, p. 8. The difference between the Bankruptcy Court's formulation and ACE's formulation was purely semantic. The Bankruptcy Court found that since ACE's indemnity obligation with respect to a "single act" is limited to the policy in effect when the act was "first committed," only that policy was "triggered" with respect to the indemnity obligation. Instead of using the word "trigger," ACE's briefing stated that the subsequent policies do not "pay the loss." *See, e.g.*, Dkt. 239, pp. 10-11.

At oral argument, ACE's counsel used the word "trigger" in a narrower sense. The Bankruptcy Court asked ACE's counsel questions regarding which particular claims have been treated as "triggering" coverage as a threshold matter. Dkt. 294-1, pp. 62-63. ACE's counsel responded that, as each claim has come in, ACE has accepted defense of that claim so long as it alleges abuse commencing during the three-year period of the ACE policies, even if other claims allege earlier abuse. *Id.*, p. 63. Simultaneously, however, ACE's counsel distinguished that threshold issue from the issue of "determining how much we pay." *Id.*, pp. 63-64. The issue of "how much we will pay"—*i.e.*, the scope of ACE's indemnity obligation—was the only one presented by the cross-motions, and the only one ruled upon by the Bankruptcy Court. On the issue of "the amount we will pay for damages," the Deemer Clause is clear and unambiguous: it deems all abuse by a single perpetrator—without temporal limitation—to be a single "act," subject to one "Each Act" limit, payable under the policy in effect when that singular "act" was "first committed."

USAG's Objection as to the Excess Policies is similarly founded on attempted semantic confusion rather than substance. The Excess Policies are "follow form" policies, meaning they "'incorporate[] by reference the terms of the underlying policy and [are] designed to match the coverage provided by the underlying policy.'" *PSI Energy, Inc. v. Home Ins. Co.*, 801 N.E.2d 705, 722 n.16 (Ind. Ct. App. 2004) (quoting Eric Holmes, 23 Appleman on Insurance 2d § 145.1 at 6 (2003)). They extend the same coverage up into an additional, larger layer, once the followed Primary Policy is exhausted. Since ACE's liability at the primary level arising from a single perpetrator is limited to one "Each Act" limit under the first applicable policy, only the excess policy from that year is implicated. USAG argues that even assuming *arguendo* that ACE's indemnity obligation with respect to a single perpetrator is limited to one "Each Act" limit under a single Primary Policy, *all three* Excess Policy limits apply. The Bankruptcy Court properly rejected this argument, as the Excess Policies expressly provide: "If the UNDERLYING INSURANCE *does not pay* a loss for reasons other than the exhaustion of an aggregate limit of insurance, then *WE shall not pay* such loss." (emphasis added). Dkt. 217-6, p. 7; Dkt. 275, p. 12. The Bankruptcy Court agreed with ACE that if the Primary Policies' indemnity obligation is confined to the first policy's "Each Act" limit—as that was when the perpetrator's "act" was "first committed" relative to ACE's policies—then the subsequent policies "pay" nothing (with respect to that perpetrator). Dkt. 275, p. 12. Therefore, the Excess Policies in those latter years do not apply to that perpetrator.

USAG again attempts to undermine the Proposed Order through semantic manipulation of the word "trigger," a word found nowhere in any of the policies. USAG argues that the subsequent policies still "pay" the loss because they are "triggered" by particular claims of abuse commencing in those years, even if the policies pay no actual money toward settlements or

judgments. But this argument misses the point. The Bankruptcy Court merely held that the subsequent policies are not "triggered" at the indemnity stage in the sense that they pay no indemnity. Meanwhile, actual "payment" of the primary limit is a clear and unambiguous prerequisite to coverage under the follow-form excess policy. Regardless of whether the subsequent Primary Policies could be described as "triggered" as a matter of insurance jargon, USAG does not dispute (*arguendo*) that they "pay" no money toward settlements or judgments, which is what the Excess Policy language requires. The District Court should adopt the Bankruptcy Court's Proposed Order.

## II.  ARGUMENT

### A.  The ACE Policies.

ACE insured USAG under Commercial General Liability Policy No. G19421752, which was in effect for three annual periods: August 1, 1998 to August 1, 1999; August 1, 1999 to August 1, 2000; and August 1, 2000 to August 1, 2001 (collectively, the "Primary Policies"). Dkt. 217-2 (1998-1999 Primary Policy); Dkt. 217-3 (1999-2000 Primary Policy); Dkt. 217-4 (2000-2001 Primary Policy). The Primary Policies each contain an identical endorsement titled "Physical Abuse or Sexual Misconduct Liability Coverage." The relevant sections of that endorsement provide as follows:

> Except to the extent coverage is provided by this endorsement, this insurance does not apply to any claim or "suit" which seeks damages arising out of or in any way related, in whole or in part, to the actual, alleged or threatened "physical abuse" or "sexual molestation" by any one of any person at any time.

**Limits of Insurance**

| | |
|---|---|
| Each Act of "Physical Abuse" or "Sexual Misconduct" | 1,000,000 |
| "Physical Abuse" or "Sexual Misconduct" Aggregate | 5,000,000 |

Unless modified by this endorsement, all other provisions in the policy to which it is attached remain in effect.

## 1. INSURING AGREEMENT

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "personal injury" to which this insurance applies arising out of "physical abuse" or "sexual misconduct" against any person while in the care, custody, or control of any insured.

We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "personal injury" to which this insurance does not apply. We may, at our discretion, investigate any act of "physical abuse" or "sexual misconduct" and settle any claim or "suit" that may result.

The amount we will pay for damages is limited as described in 3. LIMITS OF INSURANCE.

We will have no further obligation to pay any claim or judgment or defend any "suit" after the Limits of Insurance under this coverage form have been used up by the payment of judgments or settlements.

b. This insurance applies to "bodily injury" or "personal injury" only:

(1) if the "bodily injury" or "personal injury" is caused by an act of "physical abuse" or "sexual misconduct" committed in the "coverage territory"; and

(2) if the "bodily injury" or "personal injury" is caused by an act of "physical abuse" or "sexual misconduct" first committed during the policy period; and

(3) so long as the "bodily injury" or "personal injury" is sustained:

(a)     during the policy period; or

(b)     during any subsequent period in which we, or any company affiliated with us, have issued a policy which would apply to such "bodily injury" or "personal injury" except for a provision that such "bodily injury" or "personal injury" be caused by an act of "physical abuse" or "sexual misconduct" first committed during its policy period.

\* \* \*

### 3. LIMITS OF INSURANCE

    a.  All acts or omissions which cause or contribute to "physical abuse" or "sexual misconduct" by a single individual for whose conduct any insured is legally responsible shall be considered a single act, subject to the Each Act limit of insurance, regardless of the number of acts or omissions, number of persons injured, number of insured responsible or number of locations involved.

    b.  The Each Act of "Physical Abuse" or "Sexual Misconduct" limit of insurance shown above is the most we will pay in judgments or settlements for a single act of "physical abuse" or "sexual misconduct", or both. If this policy provides a General Aggregate limit, the "Physical Abuse" or "Sexual Misconduct" Aggregate limit shall be part of and not in addition to the General Aggregate limit. The most we will pay in total judgments or settlements during any policy period is the "Physical Abuse" or "Sexual Misconduct" Aggregate limit to the extent there is coverage available in any applicable General Aggregate limit.

    c.  If this coverage form and any other coverage form or policy for the same policy period issued by us or any company affiliated with us apply, the maximum applicable limits of insurance available under all coverage forms or policies shall not exceed the highest applicable limits of insurance under any one coverage form or policy.

### 4. DEFINITIONS

With respect to the coverage provided by this endorsement, the definition of "bodily injury" includes mental anguish resulting from "physical abuse" or "sexual misconduct" of the person injured while in the care, custody or control of any insured.

"Physical abuse" means actual, alleged, or threatened physical maltreatment.

"Sexual misconduct" means any conduct, whether actual, alleged, or threatened, of a sexual nature.

Dkt. 217-2, pp. 12-13; Dkt. 217-3, pp. 195-96; Dkt. 217-4, pp. 253-54.

       ACE also issued Excess Liability Policy No. XCP G19493805 for the period of August 1,

1998 to August 1, 1999; No. XCP G20086427 for the period of August 1, 1999 to August 1,

2000; and No. XCP G20125858 for the period of August 1, 2000 to August 1, 2001 (collectively,

the "Excess Policies"; together with the Primary Policies, the "Policies"). Dkt. 217-5 (1998-1999

Excess Policy); Dkt. 217-6 (1999-2000 Excess Policy); Dkt. 217-7 (2000-2001 Excess Policy).

The Excess Policies are each subject to a limit of liability of $10 million per occurrence and in

the aggregate. Dkt. 217-5, p. 2; Dkt. 217-6, p. 2; Dkt. 217-7, p. 3. The Excess Policies each

provide as follows under Section I, INSURING AGREEMENTS:

A.  COVERAGE

This insurance only applies to injury or damage covered by the
UNDERLYING INSURANCE, and that takes place during OUR policy
period. WE will pay on YOUR behalf the ULTIMATE NET LOSS in
excess of the applicable limits of the UNDERLYING INSURANCE listed
in the attached Schedule of UNDERLYING INSURANCE (whether such
insurance is collectible or not). If the UNDERLYING INSURANCE does
not pay a loss for reasons other than the exhaustion of an aggregate limit
of insurance, then WE shall not pay such loss.

The Definitions, Terms, Conditions, Limitations, and Exclusions of the
UNDERLYING INSURANCE, in effect at the inception date of this
policy, apply to this coverage unless they are inconsistent with provisions
of this policy, or relate to premium, subrogation, any obligation to defend,
the payment of expenses, limits of insurance, cancellation or any renewal
agreement.

B.  LIMITS OF INSURANCE

The Limit of Insurance stated in the Declarations as applicable to "each
OCCURRENCE" shall be the total limit of OUR liability for all covered
damages sustained as the result of any one OCCURRENCE.

The Limit of Insurance stated in the Declarations as "aggregate" shall be
the total limit of OUR liability for all covered damages sustained during
each annual period of this policy; and for which any UNDERLYING
INSURANCE provides coverage that is subject to an aggregate limit. If
the UNDERLYING INSURANCE limit has been reduced or exhausted
solely by reason of losses paid thereunder arising out of OCCURRENCES
which take place during OUR policy period, then this policy shall:

1.  In the event of reduction, pay the excess of the reduced underlying
    limit;

8

2. In the event of exhaustion, continue in force as UNDERLYING INSURANCE.

The aggregate limit of this policy shall apply separately to (i) the products-completed operations hazard as defined in the UNDERLYING INSURANCE and (ii) any other coverage in which the UNDERLYING INSURANCE provide(s) an aggregate limit. If the UNDERLYING INSURANCE does not provide an aggregate limit for coverage(s), OUR liability for ULTIMATE NET LOSS (except for the products-completed operations hazard as referred to in "i" above) is likewise not subject to an aggregate limit for such coverage(s).

Dkt. 217-5, p. 8; Dkt. 217-6, p. 7; Dkt. 217-7, p. 9.

### B.  Indiana Canons of Contract Interpretation Apply.

Under Indiana law, "[a]n insurance policy is a contract, and in reviewing the policy, we construe it as we would any other contract—to give effect to the parties' intentions at the time the contract was made." *Founders Ins. Co. v. May*, 44 N.E.3d 56, 61 (Ind. Ct. App. 2015). "The freedom to contract is 'a bedrock principle of Indiana law,' and the 'freedom of the parties to exclude risks from an insurance contract is well established[.]'" *Id.* (internal citations omitted). Therefore, "[p]rovisions of insurance contracts are subject to the same rules of construction as other contracts[.]" *Progressive Se. Ins. Co. v. Smith*, 113 N.E.3d 229, 233 (Ind. Ct. App. 2018). Importantly for this dispute, these rules include the following: courts "construe the insurance policy as a whole, rather than considering individual words, phrases or paragraphs" (*id.*); a court "should construe the language of a contract so as not to render any words, phrases, or terms ineffective or meaningless" (*Mahan v. Am. Standard Ins. Co.*, 862 N.E.2d 669, 676 (Ind. Ct. App. 2007)); and Indiana courts "will not give insurance policies an unreasonable construction to provide added coverage" (*Adkins v. Vigilant Ins. Co.*, 927 N.E.2d 385, 389 (Ind. Ct. App. 2010)). While ambiguous policy terms are construed against the insurer that drafted them, the Bankruptcy Court correctly held that the relevant terms here are unambiguous, which means they must be enforced and cannot be re-written. "When confronted with a dispute over the meaning of

insurance policy terms, Indiana courts afford clear and unambiguous policy language its plain, ordinary meaning. By contrast, courts may construe—or ascribe meaning to—ambiguous policy terms only." *Erie Indem. Co. for Subscribers at Erie Ins. Exch. v. Estate of Harris by Harris*, 99 N.E.3d 625, 630 (Ind. 2018) (citing *Holiday Hospitality Franchising, Inc. v. AMCO Ins. Co.*, 983 N.E.2d 574, 577 (Ind. 2013)). An ambiguity exists where a policy provision is susceptible to more than one interpretation and reasonable persons would differ as to its meaning. *Briles v. Wausau Ins. Cos.*, 858 N.E.2d 208, 213 (Ind. Ct. App. 2006). "However, an ambiguity does not exist merely because the parties proffer differing interpretations of the policy language." *Id.* As the Indiana Supreme Court explained in *Estate of Harris*:

> [W]e caution that parties to an insurance contract may not invite judicial construction by creating ambiguity. They may not make a term ambiguous by simply offering different policy interpretations. Cf. *Puryear v. Progressive N. Ins. Co.*, 790 N.E.2d 138, 141 (Ind. Ct. App. 2003). In other words, ambiguity does not arise from mere disagreement over a policy term's meaning—that is, where "one party asserts an interpretation contrary to that asserted by the opposing party." [*Wagner v. Yates*, 912 N.E.2d 805, 810 (Ind. 2009)]. Rather, insurance policy provisions are ambiguous only if they are "susceptible to more than one **reasonable** interpretation." *Holiday Hosp. Franchising, Inc.*, 983 N.E.2d at 578 (emphasis added).

> When evaluating alleged ambiguities—whether there exist two reasonable interpretations for one policy term—courts read insurance policies "from the perspective of . . . ordinary policyholder[s] of average intelligence." *Allgood v. Meridian Sec. Ins. Co.*, 836 N.E.2d 243, 246-47 (Ind. 2005). If reasonably intelligent policyholders would honestly disagree on the policy language's meaning, then we will find the term ambiguous and subject to judicial construction. *Id.* at 247. Conversely, if reasonably intelligent policyholders could not legitimately disagree as to what the policy language means, we deem the term unambiguous and apply its plain ordinary meaning.

99 N.E.3d at 630.

## C.  **The Bankruptcy Court's Proposed Order Only Addressed ACE's Applicable Limits, Not Which Claims are Covered.**

The first section of USAG's Argument in its Objection attempts to create confusion around the Proposed Order by erecting a strawman. USAG argues that the ACE Policies "do not bar coverage" for all claims by all Nassar victims "simply because the same perpetrator abused *someone else* before the policy incepted." Dkt. 294, p. 12. USAG asserts that the Deemer Clause only governs "how much the insurer must pay for claims that are covered." *Id.* ACE agrees and the Proposed Order did not rule otherwise.

Neither party raised, and the Bankruptcy Court did not rule on, which claims "trigger" the ACE Policies as a threshold matter, as USAG uses that term. The Policies apply to "an *act* of 'physical abuse' or 'sexual misconduct' *first committed* during the policy period . . . ." Dkt. 217-2, p. 12 (emphasis added). The Deemer Clause, which addresses the scope of ACE's indemnity obligation—the only issue presented by the parties' cross-motions—deems all abuse by the same perpetrator to be a "single act." *Id.*, p. 13. Neither the Bankruptcy Court nor ACE's counsel stated that the Deemer Clause removes all Nassar abuse out of coverage. Since the Deemer Clause is contained within the section dictating "the amount we will pay for damages[,]" ACE has applied it only at that stage—as did the Bankruptcy Court. The Deemer Clause is clear and unambiguous as to the amount ACE will pay—it collapses all abuse by a single perpetrator, not a single victim or claimant, into a "single act."

USAG's self-created confusion apparently stems from the Bankruptcy Court's use of the word "trigger" in the Proposed Order. The Proposed Order's discussion of policy "trigger", when placed in context, relates to "the amount we will pay for damages" and how the "Each Act" limit applies to those damages. *See* Dkt. 275, p. 8 ("Whether the triggering event ultimately establishes coverage depends on the policy language. The insuring agreement provided that 'the

amount we will pay for damages is limited as described in 3. LIMITS OF INSURANCE.' The deemer clause contained in those limits provides that the acts committed by a single perpetrator would be considered a 'single act' subject to the Each Act coverage limit.").

Relative to the ACE Policies, for purposes of determining the total amount ACE will pay, the "act" of abuse was "first committed" during the first policy year when the perpetrator first committed the abuse. Therefore, ACE's liability with respect to that perpetrator is capped at one "Each Act" limit for that "single act," payable under the first policy implicated (or "triggered", as the Bankruptcy Court put it) by that "single act." The result is that subsequent ACE policies pay no indemnity—or, as the Bankruptcy Court put it, they are not "triggered"—for purposes of determining the maximum amount ACE will pay arising from the singular "act" of abuse. The Bankruptcy Court held that ACE's liability with respect to abuse by Nassar (or any other single perpetrator) is capped at $11 million—*not* that the Nassar claims are excluded from coverage entirely (and the Bankruptcy Court was well aware that Nassar's acts began prior to 1998).

USAG's Objection argues that threshold timing requirements on the one hand should not be confused with provisions limiting the insurer's indemnity obligation on the other, citing *TIG Ins. Co. v. Smart Schl.*, 401 F. Supp. 2d 1334 (S.D. Fla. 2005) (which involved a policy with deemer clauses as to both). Dkt. 294, p. 14. But USAG is the party confusing these issues in its Objection. The parties' cross-motions and the Proposed Order concerned only the latter issue, not the former. The distinction between these two issues is precisely the reason why ACE has *not* disclaimed coverage for the Nassar claims altogether. On the issue actually presented to the Bankruptcy Court—the maximum amount ACE must pay for settlements or judgments arising from abuse by a single perpetrator—the result is clear and unambiguous, as the Bankruptcy Court properly concluded.

### D. **The Bankruptcy Court Properly Declined to Insert Additional Limitations Into the Deemer Clause.**

USAG argues that the Deemer Clause cannot apply to other policy periods unless the clause itself explicitly references other policy periods. Dkt. 294, p. 16. The Bankruptcy Court properly rejected this argument, for at least two reasons.

#### 1. **"All" means all.**

First, the Deemer Clause *does* reach *all* injury, inside and outside the policy period, by using the word "all." Dkt. 217-2, p. 13. Under Indiana law, the word "all"—rather than (for example) "those," and without a qualifying phrase such as "during the policy period"— encompasses injury both inside and outside the policy period. *See Thomson Inc. v. Ins. Co. of N. Am.*, 11 N.E.3d 982, 1020 (Ind. Ct. App. 2014) (distinguishing policies applying to "all sums," without qualification, as referring to injury both inside and outside the policy period, from policies providing coverage for "those sums" and expressly limiting itself to the policy period); *see also Holiday Hospitality Franchising, Inc.*, 983 N.E.2d at 581 (explaining that "any insured" means any insured thereby barring insurance coverage under abuse or molestation exclusion). The Deemer Clause also expressly applies "regardless of the number of acts or omissions, number of persons injured, number of insureds responsible or number of locations involved[,]" parameters which necessarily include an extended period of time. *See* Dkt. 217-2, p. 13; Dkt. 275, pp. 8-9. The fact that ACE's Deemer Clause does not contain a redundant reference to other policy periods does not allow USAG to insert a one-year limitation into the clause. Dkt. 275, p. 9; *see also DeMeo v. State Farm Mut. Auto. Ins. Co*., 639 F.3d 413, 416 (8th Cir. 2011) ("[T]he absence of a redundant clarifier does not create an ambiguity where none exists."). The Deemer Clause cannot be rewritten to include such a limitation any more than it can be rewritten to include limitation as to gender, days of the week, or any other unspecified distinction. *See id.*

Applying the Deemer Clause only to one policy period requires inserting words into the clause, which Indiana law does not permit. *See Sell*, 647 N.E.2d at 1131-32 ("When construing an insurance policy, we may not extend insurance coverage beyond that provided in the contract, nor may we rewrite the clear and unambiguous language of the insurance contract.").

USAG cites cases involving other deemer clauses *which were enforced* to argue that they contain "more straightforward" language, which ACE could have used here. Dkt. 294, p. 17. This argument suffers from the basic fallacy of confusing a necessary condition with a sufficient one. The cited cases merely establish that the policy language was *sufficient* to achieve the result in those cases, not that it was *necessary*. The fact that different language in another case was deemed unambiguous does not make the language here ambiguous. Under Indiana law, "insurance policy provisions are ambiguous only if they are 'susceptible to more than one **reasonable** interpretation[,]'" and failure to define a term does not render it ambiguous. *Estate of Harris*, 99 N.E.3d at 630 (quoting *Holiday Hospitality Franchising, Inc.*, 983 N.E.2d at 578). As the Bankruptcy Court correctly found, "Ace's reading of the deemer clause is the only reading that comports with the insuring agreement." Dkt. 275, p. 9.

Furthermore, courts have enforced deemer clauses *without* explicit reference to other policies, contrary to the requirement invented by USAG. *See Church Mut. Ins. Co. v. First United Pentecostal Church of Parma*, Case No. 1:11CV2201, 2012 WL 3619812, at *5 (N.D. Ohio Aug. 21, 2012); *TIG Ins. Co. v. Merryland Childcare & Dev. Ctr., Inc*., Case No. 04-2666 B, 2007 WL 316571, at *4 (W.D. Tenn. Jan. 31, 2007); *TIG Ins. Co. v. San Antonio YMCA*, 172 S.W.3d 652, 661 (Tex. App. 2005). In previous briefing, USAG attempted to distinguish these cases on the basis that the policy language at issue contained the phrase "period of time." Dkt. 231, pp. 14-15. USAG mischaracterized that phrase as "explicitly extend[ing] the deemer beyond

the policy period." *Id.*, p. 14. In reality, the phrase "period of time" does not refer explicitly to other policy periods any more than ACE's policy language does, and the holdings in those cases did not emphasize or hinge on that phrase. If USAG's "policy reference" requirement were correct, the phrase would have been read to refer to any period of time within the policy period, even several months apart. But that was not the result in the above-cited cases.

USAG's Objection also newly relies on *Wagner v. Yates*, 912 N.E.2d 805, 812 (Ind. 2009) in support of its "policy reference" rule. Dkt. 294, pp. 16-17. But *Wagner* involved the highly regulated area of underinsured motorist ("UIM") coverage and addressed whether certain anti-stacking clauses met the statutory requirements for enforceability of such clauses in UIM policies. 912 N.E.2d at 812. Accordingly, it has no relevance to this dispute.

## 2. In context, the endorsement addresses successive ACE policy periods unless it states otherwise.

Second, USAG's interpretation is unreasonable when viewed in the context of the endorsement as a whole, as required by Indiana law. *See Briles*, 858 N.E.2d at 213 ("We construe the insurance policy as a whole and consider all of the provisions of the contract and not just the individual words, phrases or paragraphs."). The endorsement's Insuring Agreement section expressly addresses injury occurring during successive policy periods. Dkt. 217-2, p. 12, at § 1.b.3.(b). Once successive policy periods are expressly encompassed within the endorsement's scope, and the Deemer Clause applies to "all" acts, there is no reasonable basis for USAG's argument that the Deemer Clause refers only to one policy period. To the contrary: it is when a clause is intended to apply only to one policy period—as with respect to the endorsement's aggregate limit in 3.b. and the anti-stacking provision in 3.c.—that the policy says so explicitly. *Id.*, p. 13, at § 3.b. and 3.c.

15

Section 3.b. is particularly instructive. It states that the "Each Act" limit caps ACE's liability with respect to a "single act," without any temporal limitation. *Id.*, p. 13, at § 3.b. In the very next sentence, section 3.b. states that the *aggregate* limit caps ACE's liability "*during any policy period . . . .*" *Id.* (emphasis added). In other words, the Each Act limit does not apply on an annual basis, but the aggregate limit does. The use of the word "any" (rather than "the") in reference to the "policy period" further shows that the endorsement presumes the existence of multiple policy periods, providing that ACE's aggregate liability for "*any*" one of those multiple periods is capped at the stated amount.

### E. The Bankruptcy Court Correctly Found that USAG's Interpretation of the Excess Policies is Unreasonable.

#### 1. "Pays" means pays.

USAG argues that even if the Primary Policies limit ACE's duty to indemnify with respect to a single perpetrator to one "Each Act" limit under one policy, the full $10 million limit is still available under all three Excess Policies—even though two of those Excess Policies follow form to Primary Policies that *pay nothing at all*. The Bankruptcy Court property rejected this argument because, *inter alia*, it conflicts with the following express requirement of the Excess Policies: "If the UNDERLYING INSURANCE *does not pay* a loss for reasons other than the exhaustion of an aggregate limit of insurance, then *WE shall not pay* such loss." *See* Dkt. 217-6, p. 7, § I.A (emphasis added).

The Excess Policies are "follow form" policies, insofar as they follow the terms of the "UNDERLYING INSURANCE." Dkt. 217-5, p. 8, § I.A. A "follow form" policy "insures the same risks covered by the underlying policy …, but provides coverage to the insured in addition to and in excess of the coverage provided by" the underlying policy. *Hartford Acc. & Indem. Co. v. Chicago Hous. Auth.*, 12 F.3d 92, 95 (7th Cir. 1993). Thus, "interpretation of the extent of

coverage afforded by" the follow-form excess policy "will be dictated by the terms of" the underlying followed policy. *Id.*; *see also PSI Energy, Inc.*, 801 N.E.2d at 722 n.16 ("It is well established in insurance law that 'a follow form excess policy incorporates by reference the terms of the underlying policy and is designed to match the coverage provided by the underlying policy.'") (quoting Eric Holmes, 23 Appleman on Insurance 2d § 145.1 at 6 (2003)). Thus, each Excess Policy issued by ACE provides substantively the same coverage as the underlying Primary Policy; it merely extends the indemnity obligation to an additional, larger excess level, after "the UNDERLYING INSURANCE limit has been reduced or exhausted solely by reason of losses paid thereunder . . . ." Dkt. 217-6, p. 7, § I.B.

As USAG acknowledges, its argument as to the Excess Policies in its Objection is one asserted in the alternative. Dkt. 294, p. 20. It stipulates, for the sake of argument (as the Bankruptcy Court correctly found), that all coverage under the Primary Policies for a single perpetrator is limited to one Each Act limit under one policy. *See id.* In short, USAG's argument *presumes* that the other two Primary Policies pay no indemnity. Yet USAG somehow asserts that the Bankruptcy Court's conclusion that the 1999-2000 and 2000-2001 Primary Policies "pay nothing" was "incorrect, was argued by no one, and was repudiated by ACE during oral argument." *Id.*

This is incorrect. ACE thoroughly explained in its briefing how and why the subsequent policies pay no indemnity, because only one Each Act limit applies under the first policy only. Dkt. 217, pp. 16-18; Dkt. 239, pp. 10-12. USAG's argument again depends on semantic confusion. USAG conflates the express requirement of actual "payment" of settlements or judgments with what it calls the "trigger" analysis. Dkt. 294, p. 20. Again, the former issue was presented to the Bankruptcy Court in the cross-motions and ruled upon; the latter issue was not.

While it did use the word "trigger," the Bankruptcy Court merely found that the subsequent Primary Policies are not "triggered" at the indemnity stage in the sense that they pay no indemnity. Dkt. 275, p. 12. Meanwhile, actual "payment" of the Primary Policy limit is a clear and unambiguous prerequisite to coverage under the follow-form Excess Policy. *Id.* Regardless of whether the subsequent Primary Policies could be described as "triggered" as a matter of insurance jargon, USAG does not dispute (as part of its alternative argument) that they "pay" no money toward settlements or judgments, which is what the policy language requires.

USAG also invents a rule, based on a footnote in *Allstate Ins. Co. v. Dana Corp.*, 759 N.E.2d 1049, 1063 n.10 (Ind. 2001), that "Indiana law does not permit excess insurers to avoid payment for <u>liability</u> that clearly reaches their limit merely because the primary insurer did not <u>pay</u> the stated limits of its policy." Dkt. 294, p. 21. Indiana law has no such prohibition, and USAG misstates the footnote in *Dana*. Nowhere did *Dana* indicate that the policies in that case required "payment" of underlying limits, and nowhere did the Indiana Supreme Court state any generally applicable rule or prohibition with respect to excess policies generally. The court merely noted that determination of actual payment of the underlying limits was unnecessary *in that case* because *those particular policies* did not require it; they only required liability exceeding the underlying limits. 759 N.E.2d at 1063 n.10.

But the Excess Policies here *do* require it. When excess policies require "payment," courts enforce that requirement. *Citigroup Inc. v. Fed. Ins. Co.*, 649 F.3d 367, 373 (5th Cir. 2011) ("[T]he use of the phrase 'payment of loss' establishes that the underlying insurer must make *actual* payment to the insured in order to exhaust the underlying policy."); *Great Am. Ins. Co. v. Bally Total Fitness Holding Corp.*, No. 06-CV-04554, 2010 WL 2542191, at *5 (N.D. Ill. June 22, 2010) (holding that, where primary insurer had paid only a portion of its limit in

18

exchange for a release, the underlying primary policy had not actually "paid" the full limit, even if the insured's liability exceeded that limit); *Quellos Grp. LLC v. Fed. Ins. Co.*, 177 Wn. App. 620, 638 (2013) (same); *JP Morgan Chase & Co. v. Indian Harbor Ins. Co.*, 947 N.Y.S.2d 17, 21 (N.Y. App. Div. 2012) (same); *Qualcomm, Inc. v. Certain Underwriters at Lloyd's, London*, 161 Cal. App. 4th 184, 197 (2008) (same). Furthermore, the issue here is *not* that the underlying Primary Policy failed to "pay" its liability; rather, the Primary Policy was not liable to make any indemnity payment in the first instance. As a result, "the UNDERLYING INSURANCE does not pay a loss for reasons other than the exhaustion of an aggregate limit of insurance," and thus the Excess Policy "shall not pay such loss." Dkt. 217-6, p. 7, § I.A.

### 2.  The "limits of insurance" exception is irrelevant.

USAG does not dispute that the Excess Policies are "follow-form" policies; *i.e.*, they substantively follow or mimic the coverage provided by underlying Primary Policies, except with larger limits and a higher trigger point. *See Chicago Housing Auth.*, 12 F.3d at 95; *PSI Energy, Inc.*, 801 N.E.2d at 722 n.16 ("It is well established in insurance law that 'a follow form excess policy incorporates by reference the terms of the underlying policy and is designed to match the coverage provided by the underlying policy.'") (internal citation omitted). Indeed, USAG cannot dispute this point, because this is the only reason the Excess Policies here provide any coverage at all for USAG's liability arising from sexual abuse. The Excess Policies make no specific reference to the abuse-related coverage provided by endorsement to the Primary Policies, yet ACE concedes that the general "follow form" clause is sufficient to incorporate that coverage, *where it applies*. At the same time, however, the Excess Policies only incorporate the underlying indemnity obligation when it actually exists *in that underlying Primary Policy*. As discussed in the previous section, the Excess Policies each expressly require that the underlying

Primary Policy actually pay a loss before the Excess Policy will pay a loss (except if the reason for the Primary Policy's non-payment is prior exhaustion of the aggregate limit).

In arguing that the Excess Policy must pay a loss even when the underlying Primary Policy does not, USAG relied on the inclusion of "limits of insurance" within a list of ways that the Excess Policies might differ from the underlying Primary Policies. Dkt. 231, pp. 5-8; Dkt. 294, p. 22. The Excess Policies' follow-form clause reads, in full: "The Definitions, Terms, Conditions, Limitations, and Exclusions of the UNDERLYING INSURANCE, in effect at the inception date of this policy, apply to this coverage unless they are inconsistent with provisions of this policy, or relate to premium, subrogation, any obligation to defend, the payment of expenses, limits of insurance, cancellation or any renewal agreement." Dkt. 217-6, p. 7, § I.A. All of the items in this list are ones that can be different in an excess policy than in a primary policy. In the case of "limits of insurance," excess policies (including the ones here) typically include larger limits of liability than the underlying primary policies, but are triggered only after underlying limits are exhausted. Here, the Excess Policies' limits are $10 million (per occurrence and in the aggregate) in excess of the underlying limits, whereas the Primary Policies are subject to limits of $1 million per occurrence and $5 million in the aggregate. Dkt. 217-2, pp. 6 & 12; Dkt. 217-6, p. 2.

USAG argued that, since "limits of insurance" is included within this list of exceptions, the Excess Policies indemnify losses even when those losses are *not paid at all* under the underlying policies, so long as the reason for non-payment is contained within a section of the underlying policy titled "limits of insurance." Dkt. 231, pp. 8-10; Dkt. 294, p. 22. This interpretation is unreasonable as a matter of law because it violates at least two canons of construction. First, it conflicts with the specific, express requirement that the underlying Primary

Policy actually pay a loss (discussed above). *See Briles*, 858 N.E.2d at 213 ("[A court] must accept an interpretation of the contract language that harmonizes the provisions, rather than one that supports conflicting versions of the provisions."). Second, it leads to an unreasonable result that the parties could not have intended—under which an excess policy must pay up to $10 million for a loss, even though the excess policy's coverage obligation is derived entirely from an underlying primary policy that pays nothing for that loss. *Id.* ("[A court] will not give insurance policies an unreasonable construction to provide additional coverage."); *see also Chicago Housing Auth.*, 12 F.3d at 96 (rejecting an interpretation that "would create a significant difference between the coverage schemes" of the follow-form excess policies and underlying primary policies, which "could not have been intended by any of the parties").

In addition to these fundamental problems with USAG's position, ACE cited case law further demonstrating that an exception for "limits of liability" within a follow-form clause does not operate in the manner advocated by USAG. Dkt. 217, pp. 17-18. *See Air & Liquid Sys. Corp. v. Allianz Underwriters Ins. Co.*, Civil Action No. 11-247, 2013 WL 5436934, at *25 (W.D. Pa. Sept. 27, 2013) (holding that the excess policy followed form to the underlying policy with respect to the number of years' limits available, even though "limits of liability" were excepted from the follow-form clause); *Union Carbide Corp. v. Affiliated FM Ins. Co*., 947 N.E.2d 111, 113 (N.Y. 2011) (same); *Metro. Life Ins. Co. v. Aetna Cas. & Sur. Co*., No. X04CV 950115305S, 1999 WL 244642, at *3 (Conn. Super. Ct. Apr. 16, 1999) (same). USAG, meanwhile, cited no precedent for a "limits of insurance" exception creating an indemnity obligation under an excess policy that follows form to a primary policy with no indemnity obligation for that same loss.

In the Proposed Order, the Bankruptcy Court agreed with ACE that—when read in context of the underlying "payment" requirement and the Excess Policies' follow-form nature—the "limits of insurance" section "simply means that the excess policy follows form with the primary policy liability limits, unless the excess policy contains higher dollar coverage limits …." Dkt. 275, p. 11. The Bankruptcy Court further observed that the exception clause contained the phrase "limits of insurance" in lower-case (rather than "Limits of Insurance" or "LIMITS OF INSURANCE"). Dkt. 275, pp. 10-11. This lack of capitalization bolstered the point that the phrase refers "generically" to the limits of liability themselves, rather than, as USAG argues, any clause contained within the underlying section titled "LIMITS OF INSURANCE." *Id*.

USAG's Objection takes issue with how much significance the Proposed Order ascribes to the lack of capitalization in the "limits of insurance" exception. Dkt. 294, p. 22. This entire line of argument, however, is a red herring. It is irrelevant whether the Deemer Clause "relates to" limits of liability, or whether the follow-form exception refers to the underlying "LIMITS OF INSURANCE" section. The dispositive issue is not whether the Excess Policies incorporate the Primary Policies' Deemer Clause into the Excess Policies. It is unnecessary to determine anew at the excess level how many "acts" are involved. Rather, what matters is that the Deemer Clause applies to the Primary Policies and restricts the duty to indemnify under the Primary Policies for any single perpetrator to the first applicable policy's "Each Act" limit. As a result, the other Primary Policies do not indemnify any loss with respect to that same perpetrator. Each follow-form Excess Policy, meanwhile, derives its indemnity obligation entirely from the terms of the underlying Primary Policy and merely extends that obligation to an additional, larger excess layer. That is the very nature of a follow-form excess policy. *See PSI Energy*, *supra*. As the Bankruptcy Court correctly held, the Excess Policies cannot be obligated to indemnify a loss in

the first instance if the underlying Primary Policy has no obligation to pay that loss, as expressly provided in each of the Excess Policies. *See* Dkt. 217-6, p. 7, § I.A.

**F.  USAG's Request for Oral Argument.**

ACE does not object to oral argument, but responds here to USAG's arguments in support of its request. Dkt. 294, p. 3. This case involves the straightforward application of unambiguous policy language. The Bankruptcy Court's conclusion in the Proposed Order was dictated by Indiana tenets of contract interpretation. USAG offers no support for its contention that Chubb drafted the abuse endorsement "from scratch." Indeed, there is no evidence in the record regarding the drafting of the endorsement, nor would any such evidence be relevant because the language is clear and unambiguous.

**III.    CONCLUSION**

The Proposed Order correctly applied the unambiguous language of the ACE Policies according to Indiana principles of contract interpretation. Accordingly, the Proposed Order should be adopted; USAG's Motion for Partial Summary Judgment should be denied; and ACE's Cross-Motion for Partial Summary Judgment should be granted.

Respectfully submitted.

Dated:  January 10, 2020

KROGER, GARDIS & REGAS, LLP

By    */s/ Stephen J. Peters*
    Stephen J. Peters, Attorney No. 6345-49
    Harley K. Means, Attorney No. 23068-32
    111 Monument Circle, Suite 900
    Indianapolis, IN 46204-5125
    (317) 692-9000
    speters@kgrlaw.com
    hmeans@kgrlaw.com

    *Counsel for Defendant ACE American*
    *Insurance Company f/k/a CIGNA Insurance*
    *Company*

COZEN O'CONNOR

By___*/s/ Jonathan Toren*_____
    Jonathan Toren, *Admitted Pro Hac Vice*
    Eric Freed, *Admitted Pro Hac Vice*
    999 Third Avenue, Suite 1900
    Seattle, Washington 98104
    (206) 340-1000
    jtoren@cozen.com
    efreed@cozen.com

    *Counsel for Defendant, Defendant, ACE*
    *American Insurance Company f/k/a CIGNA*
    *Insurance Company*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 10, 2020, a copy of the foregoing ***Responses To USA Gymnastics' Objections to the Bankruptcy Court's Proposed Order Re: USA Gymnastics' Motion For Partial Summary Judgment and ACE American Insurance Company's Cross-Motion For Partial Summary Judgment*** was filed electronically. Notice of this filing will be sent to the following parties through the Court's Electronic Case Filing System. Parties may access this filing through the Court's system.

Respectfully submitted.

Dated:  January 10, 2020                              COZEN O'CONNOR

By____*/s/ Jonathan Toren*_____
        Jonathan Toren, *Admitted Pro Hac Vice*
        Eric Freed, *Admitted Pro Hac Vice*
        999 Third Avenue, Suite 1900
        Seattle, Washington 98104
        (206) 340-1000
        (206) 621-8783 (Fax)
        jtoren@cozen.com
        efreed@cozen.com

        *Counsel for Defendant, Defendant, ACE American Insurance Company f/k/a CIGNA Insurance Company*