**September 29, 2020**



**Robyn L. Moberly**
**United States Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| USA GYMNASTICS,[1] | Case No. 18-9108-RLM-11 |
|         Debtor. | |

| | |
|---|---|
| USA GYMNASTICS, | Adv. Pro. No. 19-50012 |
|     Plaintiff, | in 18-09108-RLM-11 |
| v. | |
| ACE AMERICAN INSURANCE COMPANY f/k/a CIGNA INSURANCE COMPANY, GREAT AMERICAN ASSURANCE COMPANY, LIBERTY INSURANCE UNDERWRITERS INC., NATIONAL CASUALTY COMPANY, RSUI INDEMNITY COMPANY, TIG INSURANCE COMPANY, VIRGINIA SURETY COMPANY, INC. f/k/a COMBINED SPECIALTY INSURANCE COMPANY, WESTERN WORLD INSURANCE COMPANY, | |

---

[1] The last four digits of the Debtor's federal tax identification number are 7871. The location of the Debtor's principal office is 130 E. Washington Street, Suite 700, Indianapolis, Indiana 46204.

ENDURANCE AMERICAN
INSURANCE COMPANY, AMERICAN
HOME ASSURANCE COMPANY, and
DOE INSURERS,

    Defendants.

## BANKRUPTCY COURT'S PROPOSED FINDINGS AND CONCLUSIONS WITH RESPECT TO USAG'S MOTION TO ENTER MONEY JUDGMENT AND TO ENFORCE ORDER

In accordance with 28 U.S.C. 157(c)(1), the Bankruptcy Court now tenders its proposed findings and conclusions [2] :

This matter came before the Court upon the *Motion to Enter Money Judgment and to Enforce Order* ("the Motion"), filed by Plaintiff USA Gymnastics "USAG").  The Motion seeks to enforce the District Court's January 13, 2020 order granting partial summary judgment to USAG on the duty to defend and ordering LIU to pay specifically enumerated past defense costs of USAG. LIU opposes the Motion.  The parties have filed their respective briefs in support of their positions as well as their proposed orders as directed by the Court at the conclusion of the August 10, 2020 hearing.  The Motion is now ripe for decision.

## I. UNDERLYING MOTION FOR PARTIAL SUMMARY JUDGMENT AND DISTRICT COURT ORDER

USAG was named as a defendant in hundreds of lawsuits involving sexual abuse perpetrated upon gymnasts by Dr. Larry Nassar, a USAG volunteer, and

---

[2] The Motion is corollary to this Court's proposed findings and conclusions issued on October 24, 2019 with respect to the parties' underlying summary judgment motions.  As with those motions, LIU does not consent to entry of final order or judgment by the Bankruptcy Court with respect to this Motion.  This Court must submit proposed findings of fact and conclusions of law, which the district court must review *de novo* before entering final judgment.  See. *Wellness Intern. Network, Ltd. v. Sharif*, 135 S.Ct. 1932, 1947 (2015).  This Court therefore makes its proposed findings and conclusions for *de novo* review by the District Court. *See* 28 U.S.C. § 157(c)(2); *Wellness*, 135 S. Ct. at 1951-52.

others.  USAG filed its voluntary chapter 11 case on December 5, 2018 to provide a single forum in which to equitably and completely resolve all sexual abuse claims. USAG filed this adversary proceeding on February 1, 2019 against several of its insurers seeking coverage for (1) Nassar-related lawsuits including the "Revocation Lawsuits" brought by two sets of coaches and gyms for losses arising out of Nassar's sexual misconduct (Bankr. AP ECF #131, p. 5);[3] (2) investigations by committees in both houses of Congress, the Indiana Attorney General ("IAG"), and the U.S. Olympic Committee ("USOC") which employed the law firm of Ropes & Gray to prepare a report on the investigation, as well as USOC's commencement of decertification proceedings which sought to revoke USAG's status as the national governing body for gymnastics; and (3) various other civil and criminal defense matters involving USAG personnel for matters precipitated by Nassar's sexual misconduct.

On October 24, 2019 this Court issued its proposed findings and conclusions, with recommendation to the District Court that a substantial portion of USAG's motion for partial summary judgment seeking defense coverage be granted. [Bankr. AP ECF #260.]  The Court recommended that LIU be required to defend (1) the Nassar Athlete Lawsuits, (2) the Revocation Lawsuits, (3) the IAG Investigation, (4) the Congressional Investigations, and (5) the USOC Investigation, including the USOC decertification proceeding.  [Bankr. AP ECF #260, p. 32][4] On January 13, 2020, the district court agreed, accepted all of this Court's proposed findings, declared that LIU has a duty to defend the above matters, and issued two orders:

(1) "The court . . . **ORDERS** LIU to provide a complete defense to USAG

---

[3] The Court will refer to documents filed and appearing on a case docket as "Bankr. AP ECF ___" ( documents in this proceeding, Adversary Proceeding 19-50012); "Bankr. ECF ___" (documents in USAG's chapter 11 case, No. 18-9108-RLM-11) and "Dist. Ct. ECF ___" (documents in Dist Ct. case no. 1:18-cv-1306-RLY-MPB).

[4] This Court also recommended that LIU's defense coverage included the "White deposition matter". USAG has informed this Court that another insurer has paid the costs associated with this matter and thus, USAG no longer seeks damages on this claim

and its former employees as to those matters;" and

(2) "The court . . . **ORDERS** LIU to reimburse USAG its defense costs,

plus prejudgment interest (8% simple interest) . . . ."

[Dist. Ct. ECF #146 at 5.]  LIU sought stays of the January 13 order pending appeal in the district court and the Seventh Circuit.  Its requests were denied. [Dist. Ct. ECF #200, 202.].

USAG in its motion for partial summary judgment alleged that, at that point, it had incurred $1,427,624.90 in out of pocket costs for attorney and legal research fees.  [Bankr. AP ECF #26 at 3.] Neither this Court nor the district court expressly addressed the issue of damages and neither this Court's proposed judgment nor the district court's judgment specified a sum certain.  [Bankr. AP ECF #260 at 32; Dist Ct. ECF#146 at 5.]  LIU has paid nothing since entry of the district court's January 13, 2020 order other than the small percentage of the litigation bills it had been paying all along in coordination with other insurance carriers. As a result, USAG brought the Motion which now brings the issue of a sum certain squarely before the Court. [5]

## II. GOVERNING LAW AND LEGAL STANDARD

This court has previously found, and the district court has agreed, that substantive Indiana law applies here. [*See generally* Bankr AP ECF #260.] As a federal court exercising diversity jurisdiction, this Court is required to follow the law as articulated by the Indiana Supreme Court. See *Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1090 (7th Cir. 1999). If that Court has not spoken to the issue, a federal court must predict how the Indiana Supreme Court would decide the question. *Id.* . "[I]n the absence of prevailing authority from the state's highest court, federal courts ought to give great weight to the holdings of the state's intermediate appellate courts." *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 637

---

[5] The Motion was initially brought pursuant to Rules 58 and 70 of the Federal Rules of Civil Procedure. The Court has converted the Motion into a proceeding under FED. R. BANKR. P. 9014 (governing contested matters). [Bankr. AP  ECF #363, 396.]

4

(7th Cir. 2002).

In an insurance dispute, whether fees are reasonable and necessary is a matter of state law, because it involves the application of state insurance law and state law governing what attorneys may charge for their services. *Thomson v. Ins. Co. of N. Am.*, 11 N.E.3d 982, 1023–26, 1032 (Ind. Ct. App. 2014), *trans. denied*. However, "even in a diversity suit the requirements of proof are governed by federal rather than state law." *Taco Bell Corp. v. Cont'l Cas. Co.*, 388 F.3d 1069, 1076 (7th Cir. 2004) (addressing the reasonableness and necessity of fees sought from a breaching insurer). Thus, <u>what</u> must be proven is a matter of state law, but the <u>manner</u> and <u>quantum</u> of the proof required is procedural and is governed by federal law. *Id.*; *see also Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 767 (7th Cir. 2013) ("Whether an issue is relevant to a case is a question of state substantive law; whether the specific evidence offered is relevant to resolving that issue is a procedural question governed by [federal law].")

### III. THE MOTION TO ENFORCE

The Motion was filed on March 13, 2020 and seeks payment of legal fees incurred by the following law firms: Barnes & Thornburg, LLP; Miller Johnson Snell & Cummisky, PLC ("Miller Johnson"); Gibson, Dunn & Crutcher, LLP ("Gibson Dunn"); Faegre Baker Daniels LLP (now known as Faegre Drinker Biddle & Reath LLP) ("Faegre"); Hilder & Associates, P.C. ("Hilder"); and Jenner & Block, LLP ("Jenner"). The Motion also seeks to compel LIU to pay an unpaid balance of fees owed to Epiq eDiscovery Solutions, Inc. ("Epiq"). Along with the Motion, USAG filed under seal the fee invoices of the law firms (Bankr. AP ECF#341-346, 376, 377) and Epiq's invoices (Bankr.AP ECF # 381-1).

LIU filed its opposition to the Motion on April 10, 2020 wherein it designated an expert report supporting its contention that an indeterminate amount of USAG's fees were unreasonable or unnecessary and requested further discovery. USAG disputed the need for additional discovery and moved to exclude LIU's expert witness and designated a rebuttal expert. USAG filed its reply to LIU's opposition

on May 8, 2020 and the Court scheduled a hearing on the Motion for May 21, 2020. The Court denied LIU's request to file a surreply, since the issues had been fully briefed by both parties and the matter was set for an evidentiary hearing. The Court reasoned that this adversary proceeding which sought determination of LIU's duty to defend had been pending over a year and that USAG's explicit intent had been to recover defense costs from LIU. The Court was perplexed as to why LIU had done absolutely nothing "to prepare for the inevitable request for an award of an actual dollar amount." (Bankr. AP ECF #396). The Court did grant LIU's request to continue the May 21st hearing out of "an overabundance of sensitivity to the concerns raised by LIU." [*Id.* at 3.] .

Hearing on the Motion and related filings in support and in opposition was held over the course of three days in July and August. Three witnesses testified: Mr. Schneider (USAG's outside Chief Legal Officer), Mr. Schoon (USAG's expert), and Mr. Cooper (LIU's expert).[6] The Court overruled USAG's objection to Mr. Cooper's qualifications to serve as an expert in this matter, noting that the challenge would go to the weight and not the admissibility of his testimony.

USAG's papers claim a total of $3,365,131.96 in various fees. For reasons that are not disputed, the total claim has changed slightly to $3,384,983.11. Of that amount, $1,950,429.56 relates to "Reimbursement Claims," meaning that USAG paid or incurred fees to various law firms and seeks reimbursement from LIU. With one small exception, USAG has either paid or owes these fees. The balance of $1,434,553.55 relates to fees charged by USAG's eDiscovery vendor and its primary litigation defense firm, Miller Johnson. These amounts are typically paid directly to USAG's vendors by the insurers. USAG requests that LIU pay 5% of these costs and LIU contends that it agreed to pay only 4%. Because a dispute has arisen over how much LIU must pay, and because USAG has an obvious interest in having its defense vendors paid, USAG asks the Court to order LIU to pay those amounts

---

[6] The parties also designated portions of the 30(b)(6) depositions of USAG and Epiq, the e-discovery vendor utilized in the underlying matters.

directly to the vendors.

The charts below show the amounts, by firm, that (1) USAG claims and its
expert found reasonable and necessary (labelled "Claimed") and (2) LIU's expert
found to be the maximum fees that are reasonable and necessary, subject to further
unspecified reduction.

| Reimbursement Claims<br><br>Firm | Claimed | LIU's Maximum [7] |
|---|---|---|
| Miller Johnson (Inv.) | $238,741.29 | $203,379.00 [8] |
| Miller Johnson (Westlaw) | $55,076.00 | No Opinion |
| Gibson Dunn | $453,097.01 | $379,541.00 |
| Faegre Baker Daniels | $111,193.50 | $62,994.00 |
| Barnes & Thornburg | $789,049.76 | $706,577.00 |
| Hilder & Assocs. | $83,961.99 | $78,315.00 |
| Jenner & Block | $219,310.01 | $0 |
| Totals | $1,950,429.56 | $1,430,806.00 Threshold amount before application of further deductions |

| Non-Reimbursement Claims<br><br>Firm | Claimed | LIU's Maximum |
|---|---|---|
| Miller Johnson Defense Costs | $43,348.97 | Limited to 4% |
| Epiq eDiscovery | $1,391,204.58 | Limited to 4% |
| Totals | $1,434,553.55 | |

[7] These are the amounts contained in LIU's proposed findings and conclusions submitted to the Court on August 28, 2020. LIU asserts that these are the maximum amounts and that the actual amount of reasonable and necessary fees is "substantially less" after applying further deductions it deems necessary.

[8] It is not clear whether this amount includes the Miller Johnson Westlaw charges.

| Total Requested Reimbursement and Non Reimbursement Claims : $3,384,983.11 |
| --- |

## IV.  ANALYSIS

### A.  The Presumption of Reasonableness under *Thomson* and *Taco Bell*

Indiana adheres to the rule that "when an insurer has breached the duty to defend, and the policyholder has secured, supervised and paid for a defense without any expectation of payment, those costs are 'market tested' and are presumed to be 'reasonable and necessary.' " *Thomson,* 11 N.E.3d  at 1023-24; *Taco Bell ,*388 F.3d at 1076.  *Taco Bell* and *Thomson* involved insurers who could have, but did not, defend their policyholders. *Taco Bell*, 388 F.3d at 1076; *Thomson*, 11 N.E.3d at 1023. In *Taco Bell*, the Seventh Circuit concluded that the insurer was "gambling that it would be exonerated from its duty to defend—with the result that Taco Bell selected the lawyers." *Taco Bell*, 388 F.3d at 1076. That gamble did not pay off, as the Seventh Circuit held that the insurer had breached its duty to defend. *Id.* at 1075. After being found in breach, the *Taco Bell* insurer challenged the policyholder's legal fees, submitting "an affidavit from a firm that hires itself out to review lawyers' bills and that opined that Taco Bell had overpaid the lawyers who represented it in the [underlying] litigation." *Id.*  Ruling against the insurer, the Court determined that the market-tested nature of the defense costs made them presumptively reliable, reasoning:

> When Taco Bell hired its lawyers, and indeed at all times since, [the insurer] was vigorously denying that it had any duty to defend. . . . Because of the resulting uncertainty about reimbursement, Taco Bell had an incentive to minimize its legal expenses (for it might not be able to shift them); <u>and where there are market incentives to economize, there is no occasion for painstaking judicial review.</u>

*Id.* at 1075–76 (emphasis added).

The Court stated "the duty to defend would be significantly undermined if an

insurance company could, by the facile expedient of hiring an audit firm to pick apart a law firm's billing, obtain an evidentiary hearing on how much of the insured's defense costs it had to reimburse." *Id.* at 1077.

In *Thomson,* there was no dispute "that the defense costs were incurred [and] paid" and that the insurer "ha[d] not paid any defense costs," even after it was ordered to defend. *Thomson,* 11 N.E.3d at 1023–24. Following *Taco Bell*, the Indiana Court of Appeals adopted the market-tested rule as a substantive presumption under state law, finding "[t]he rationale for the 'market tested' analysis is compelling." *Thomson*, 11 N.E.3d at 1023–26, 1032 (citing *Taco Bell*, 388 F.3d at 1075 and *Metavante Corp. v. Emigrant Savings Bank*, 619 F.3d 748, 772–76 (7th Cir. 2010)).

The Court in *Thomson* determined that the presumption of reasonableness of fees rests on two principles:

> First, the policyholder, which is defending itself without an assurance it will be reimbursed, provides a market-based check on the amounts spent, a better check than any court can provide after-the-fact. Second, it is unfair to let a breaching insurer nit-pick costs later when it could have – had it honored its duty to defend—initially directed the defense in any reasonable way it wished.

*Thomson*, 11 N.E.3d at 1024.

If the presumption applies, USAG's defense costs are presumed to be reasonable and necessary, and LIU is limited in the evidence it can present to rebut this strong presumption. *Taco Bell*, 388 F.3d at 1076; *Thomson*, 11 N.E.3d at 1025. LIU argues that, to the extent the *Thomson* presumption applies, LIU has sufficiently rebutted it. LIU claims that the *Thomson* presumption of reasonableness does not apply for two reasons: (1) unlike the policyholder in *Thomson*, USAG has no inside general counsel scrutinizing the bills, relying instead on its outside Chief Legal Officer (C.J. Schneider), who is a Member at Miller Johnson, one of the firms defending USAG; and (2) USAG has not actually paid all

of the fees it seeks in the Motion.

### 1. Inadequate Internal Review of Fees

LIU contends that USAG's review of the legal bills was not sufficiently "independent." C. J. Schneider, USAG's outside Chief Legal Officer, began to serve as USAG's Chief Legal Officer in August 2018 and continues to serve in that capacity. Mr. Schneider is a member of the Miller Johnson law firm. Mr. Schneider is not an employee of USAG, and USAG does not pay him a salary. Instead, USAG pays for Mr. Schneider's time at his regular hourly rate as part of Miller Johnson's invoices. As USAG's Chief Legal Officer, Mr. Schneider is responsible for retaining, supervising, and coordinating with outside counsel representing USAG and regularly reviews the legal invoices submitted to USAG for payment. He also participates in the organization's formal budgeting process and works to keep the legal fees within the budget.

USAG does not provide its legal counsel with billing guidelines. When Mr. Schneider receives invoices, he first looks at the total amount charged in the invoice. He reviews this number to determine whether, in his view, this amount is consistent with the work the firm was asked to do in the relevant period. Mr. Schneider, as outside Chief Legal Officer of USAG, assigns the work to each law firm representing USAG. Once he completes this review, he sends the invoices submitted to him to Li Leung, the CEO of USAG. Occasionally, he will include comments summarizing the invoices when he sends them to Ms. Leung. Mr. Schneider has contacted outside firms to discuss prospective workflow and work allocation but has not asked any of them to reduce or write-off any of their charges.

Bernadette Barron, USAG's CFO, oversees payment of invoices. Both Ms. Leung and Ms. Barron review the invoices submitted by USAG's law firms. Ms. Leung reviews the summaries provided by Mr. Schneider and flips through the invoices, looking at them at a high level. Mr. Schneider had general discussions with Ms. Barron about the invoices but he did not recall her having any questions about particular invoices. Neither Ms. Leung nor Ms. Barron have asked Mr. Schneider to ask a law firm to reduce or write off any invoice.

LIU argues that Mr. Schneider's roles as both the Chief Legal Officer of USAG and a member of Miller Johnson is a conflict of interest which prevents meaningful review of Miller Johnson invoices. After Mr. Schneider became USAG's Chief Legal Officer, Miller Johnson did revise its engagement letter to advise USAG that someone else besides Mr. Schneider should review and approve payment of invoices. It appears that, like invoices submitted by other firms, Mr. Schneider reviews the Miller Johnson invoices and provides an e-mail summary to Ms. Leung. Both Ms. Leung and Ms. Barron review the Miller Johnson invoices. LIU argues that USAG in its responses to interrogatories has identified various individuals who purportedly had responsibility for supervising, reviewing, or approving invoices submitted by USAG's law firms prior to the involvement of Mr. Schneider, Ms. Leung, and Ms. Barron, but none of these individuals told Mr. Schneider what they did to review invoices . LIU contends that USAG has presented no evidence of the invoice review protocol prior to USAG's involvement with Mr. Schneider, Ms. Leung, and Ms. Barron.

This point is of no moment because neither *Taco Bell* nor *Thomson* relied on the presence of a specific internal-review process of fees. *Taco Bell* rested its holding on the fact that, because the insurer refused to defend, "the resulting uncertainty about reimbursement" gave the policyholder "an incentive to minimize its legal expenses (for it might not be able to shift them)." *Taco Bell*, 388 F.3d at 1075–76. It pointed <u>generally</u> to "market incentives to economize" as obviating the need for "painstaking judicial review," rather than to any <u>specific</u> processes the policyholder followed in that case. *Id.*

*Thomson* did note the policyholder's internal-review process, but that process was not an essential component of the decision as the court there followed the *Taco Bell* analysis, which did not concern itself with the details of any internal review. What was critical to the Court of Appeals in *Thomson* was evidence of an incentive for the policyholder to economize; the in-house review by its General Counsel was simply evidence that it had such an incentive. *Thomson,* 11 N.E.3d at 1025. Indeed,

11

earlier this year, a federal court in South Bend, Indiana extended *Thomson* and *Taco Bell* to an insurer who was defending under a reservation of rights. *Liberty Mut. Ins. Co. v. Dometic Corp.*, 2020 U.S. Dist. LEXIS 25597, *3–4 (N.D. Ind., Feb. 13, 2020). The Court reasoned that the incentive to economize existed because "[a]s long as Liberty Mutual had a chance of prevailing on its position that there was no duty to defend, which it did until the Court's March 2019 ruling, Dometic had to proceed as though it could be stuck with the bills." *Id.* Thus, while an internal review process is further evidence of a policyholder's incentive to manage fees, neither *Thomson* nor *Taco Bell* suggests that such a process is required for the presumption of reasonableness to apply. There is no language in either *Thompson* nor *Taco Bell* that proscribes a depth of legal knowledge or expertise of the insured to review legal bills in order to manage its expenses.

If an internal review process is required, USAG's practice fit the bill. Invoices were reviewed at three different levels which included review by the Chief Financial Officer responsible for overseeing and authorizing payment of USAG's expenses. Furthermore, USAG is a nonprofit and is motivated to manage legal fees as its sources of funds for legal warfare are limited. It already has spent over $1.2 million on defense of the matters at issue here. It is in bankruptcy; its funds are limited and needed for many purposes. It has every incentive to minimize legal expense. Its liability insurer refused to defend it from certain investigations and proceedings and forced it to initiate lengthy and costly coverage litigation in order to secure a defense. At no point in this process was USAG ever guaranteed that it would win. Had this Court ruled against it, USAG would have eventually been required to pay the vast majority of the legal fees it now seeks from LIU. These are the types of incentives that underlie *Taco Bell* and *Thomson*, not whether the policyholder had a formal general-counsel review protocol or billing guidelines. Thus, the Court finds that there is evidence that USAG had ample incentives to economize on its legal bills, it is sufficient to support the market-tested presumption. As *Taco Bell* observes, if the insurer wanted to impose its billing insights on the fees charged by

the lawyers, then it should have defended the policyholder in the first place, or certainly after the district court ordered LIU to defend its insured. *Taco Bell*, 388 F.3d at 1076.

### 2. Actual Payment of Fees

LIU's second argument is that USAG has failed to satisfy another prerequisite for applying the *Thomson* presumption: actual payment of the legal fees at-issue. *See Thomson*, 11 N.E.3d at 1023-24. LIU argues that, in applying the presumption, the Seventh Circuit Court of Appeals "places great weight on the fact that the prevailing party paid the bills without assurance of repayment." *Metavante*, 619 F.3d at 775 n.22. LIU contends that liability for payment of legal bills is insufficient. LIU argues USAG is not incentivized to hold down fees and thus fees have not been "market tested" if they have not been paid by USAG and fees that have not been "market tested" are not entitled to the presumption of reasonableness.

LIU maintains that USAG has not paid 78.35% of the fees related to its Motion. However, the amounts for the reimbursement claims and the non-reimbursement claims must be separated to give a true picture of what USAG has paid. LIU concedes that USAG has paid $1,352,732.76 of the $1,950,429.56 in reimbursement claim fees, leaving a balance of $597,696.80 This means that USAG has paid a little over 69% of the fees related to the reimbursement claims, the claims for which it has been billed directly. USAG has paid nothing on the non-reimbursement claims of Epiq and Miller Johnson defense costs because, by agreement of insurers, those fees are to be paid by third party vendors and insurers directly on USAG's behalf. Those non-reimbursement claims for which USAG seeks payment total $1,434,553.55 or approximately 43% of all of the amounts sought in the Motion.

LIU cites no authority supporting the proposition that *Taco Bell* only applies when the client has actually paid all of the fees sought. None exists. The market-test cases only hold that payment is good evidence of market-tested reasonableness.

13

*Balcor Real Estate Holdings, Inc. v. Walentas-Phoenix Corp.*, 73 F.3d 150, 153 (7th Cir. 1996); *Metavante*, 619 F.3d at 773; *Medcom Holding Co. v. Baxter Travenol Labs., Inc.*, 200 F.3d 518, 520 (7th Cir. 1999). Like the authority on review by in-house counsel, these cases say that payment is <u>sufficient</u> to trigger the market-tested presumption. They do not hold that payment is <u>necessary</u> or that no other proof of market incentive is permissible.

*Taco Bell* illustrates this point. Nowhere in *Taco Bell* did the court limit its analysis to fees that were already paid or otherwise say that payment was critical for the presumption to arise. 388 F.3d at 1075–76. In fact, the only times the Court mentioned payment at all was to observe that the <u>insurer</u> could have hired and paid the lawyers had it agreed to defend. *Id.* at 1075. As to the policyholder, it only stated that "Taco Bell has <u>incurred</u> defense costs of some $5.8 million," and the opinion is silent about when, or whether, those costs were all previously paid by the policyholder. *Id.* Instead, the court said that the market-tested presumption arises from the "uncertainty about reimbursement" generated by the insurer's refusal to defend. *Id.* at 1076. USAG remains the responsible party to pay any reimbursement claims not paid by LIU.

Nor does *Thomson* require prior payment of all costs incurred. There, the Indiana Court of Appeals viewed *Taco Bell*'s rationale—which focused on breach, unfairness, and damage to the duty to defend, not payment—as persuasive. *Id.* Nothing in the *Thomson* opinion suggests that the Court was adopting a stricter version of the *Taco Bell* test, one that requires prior payment in full.

Nonetheless, a majority of the fees for the reimbursement claims *have* been paid and Seventh Circuit precedent says that where the fees have been paid without guarantee of reimbursement, the inquiry is over. "Courts award fees at the market rate, and the best evidence of the market value of legal services is what people pay for it. Indeed, this is not evidence of market value; <u>it is market value.</u>" *Balcor*, 73 F.3d at 153 (emphasis added). "Although courts interpolate the word

14

'reasonable' into [fee-shifting clauses], the best guarantee of reasonableness is willingness to pay." *Id.* So, too, in *Medcom*:

> If attorneys submit bills that meet market standards of detail, their omission of information to which courts resort in the absence of agreement is of no moment. If the bills were paid, this strongly implies that they meet market standards. The fees in dispute here are not pie-in-the-sky numbers that one litigant seeks to collect from a stranger but would never dream of paying itself. These are bills that MHC <u>actually paid</u> in the ordinary course of its business. The indemnity requires Baxter to make MHC whole, which means reimbursement for commercially-reasonable fees no matter how the bills are stated.

*Medcom*, 200 F.3d at 520.

Another reason to reject the "payment in full" prerequisite is that such a requirement would have perverse and unfair effects. A wealthy policyholder that has a war chest sufficient to pay all its legal bills would gain the presumption, but a less wealthy not-for-profit with limited cash would not. Insurers would be encouraged to impose really big breaches on less wealthy policyholders in order to avoid the presumption. Under LIU's "rule," for-profit policyholders who could fund their own defense while fighting a recalcitrant insurer would be entitled to the presumption, while nonprofit or cash-poor policyholders—like churches, charities, and most individuals—would not. That makes no sense, as it would simply encourage insurers to defend the rich and abandon the poor, regardless of the merits. LIU's full payment requirement therefore does not promote the policy goals of the presumption. Even if payment were a prerequisite to proof of "market tested" fees, USAG has paid over two-thirds of fees that have been directly billed to it. The Court finds LIU's "payment of fees" argument unpersuasive.

### 3. Other "Special Circumstances"

LIU contends that "special circumstances" exist that demonstrate that USAG was not incentivized to hold down fees and thus the presumption of reasonableness

15

does not apply. First, it argues the Gibson Dunn fee arrangement [9] that provides it will agree to accept only those sums paid by the insurers gives USAG no incentive to minimize its fees. Second, LIU argues that USAG has paid fees with funds received from third parties. USAG has accepted at least $7.73 million of dollars from the National Gymnastics Foundation ("NGF"), a separate foundation with a separate board and counsel, (and possibly other third parties) between March 2019 and April 2019 to pay its legal fees. USAG also received grants from the NGF in 2020 which were used to pay professional fees. LIU surmises that, to the extent USAG is receiving fees and grants from the NGF or other third parties to pay its legal fees, rather than using its own resources, that pipeline of third-party funds removes the incentive for USAG to minimize its fees. Third, LIU argues that, if it is determined that LIU does not have a duty to defend, it will be USAG's creditors, and not USAG, that will bear the cost of its legal expenses through a reduction in the amount available to pay their claims. It argues that USAG's incentives concerning fees differ materially from a commercial entity with an uninhibited "incentive to minimize legal costs." *Thomson*, 11 N.E.3d at 1025.

The Court finds all of these arguments specious. The fact that Gibson Dunn agreed to limit its fees has no effect upon LIU's duty to defend. And, the Court finds it disingenuous on one hand for LIU to argue that actual payment of fees is required for them to be "market tested" and *Thomson*-presumed, and on the other hand argue that USAG's acceptance of funds from third parties for the very purpose of paying fees when it had insufficient resources itself is a "special circumstance" that negates the *Thomson* presumption. The source of funds with which USAG has paid fees, again, has no effect upon LIU's duty to defend, as that duty is not contingent upon what fees have or have not been paid, and from what source of funds.

---

[9] After paying some of Gibson Dunn's bills, USAG was able to obtain an agreement with Gibson Dunn to limit its fees to what USAG's insurers would pay, which establishes that USAG actively attempted to reduce its defense costs and succeeded. Market forces continue to minimize the fees under this agreement. When Gibson Dunn made this agreement and performed the work, Gibson Dunn had no assurances it would be paid any more.

As to the argument that USAG's creditors will bear the brunt of the fees if LIU is found to have no duty to defend, the Court notes that in the bankruptcy case it has authorized the employment of four of the six firms for whom fees are sought in the Motion.[10]    Three of the four firms have filed interim fee applications seeking interim court approval of the amounts drawn down and other fees incurred but not included in the draw down notices.  Those interim fee applications were served via the Court's EFC system on all counsel of record and the United States Trustee ("UST").  The UST reviewed those applications and suggested modifications which the Court approved.[11]  The draw down and interim fee application procedures used in the bankruptcy case provide an additional level of review – and a heightened "market test"-- that does not exist in regular civil cases.

The fact remains that LIU has completely breached its duty to defend. USAG has paid most of the fees, and so it meets both *Thomson* rationales here. Not only have the fees here been "market tested" but most have been subjected to a heightened standard of review by the United States Trustee, USAG's largest

---

[10] The Court has authorized the employment of (1) Barnes & Thornburg (Bankr. ECF #298; (2) Miller Johnson (Bankr. ECF #189); (3) Jenner (Bankr. ECF #188); and (4) Hilder (Bankr. ECF #192). Neither Faegre nor Gibson Dunn rendered legal services to USAG post petition and thus USAG did not file employment applications for them.  Each of these firms whose employment has been authorized by the Court utilizes the  "draw down" procedures provided  for L.R. B-2016-1(b)(4) wherein professionals may apply for fees on a periodic basis by filing a "notice of draw down" which specifies the amount of fees and expenses sought and for what period.  That notice of draw down is served on, at a minimum, counsel of record and the United States Trustee, who may object to the fees sought in the draw down notice.  If no objection is filed, counsel is  authorized to be paid 80% of the fees and 100 of the expenses sought in the draw down notice. Of course, lack of objection to the draw down amounts does not mean that the Court has approved those amounts as the professional still must file the appropriate payment application which is subject to notice, review and court approval. But, the draw down procedure allows professionals to continue uninterrupted work on a case by getting compensated at regular intervals with minimum court involvement.

[11] The Court approved the interim fee applications of  B & T (Bankr. ECF #1167);Miller Johnson (Bankr. ECF #1165); and  Jenner (Bankr. ECF #1168).  An award of interim fees by the bankruptcy court under § 331 is not final, *Brouwer v. Ancel & Dunlap (In re Firstmark Corp.)*, 46 F.3d 653, 657–59 (7th Cir. 1995), and is subject to later review by the court, *In re Taxman Clothing Co.*, 49 F.3d 310, 312, 314 (7th Cir. 1995).  All of the post-petition fees were incurred with the expectation that the U.S. Trustee would object to an unreasonable or unnecessary fee. 11 U.S.C. §330(a)(1)(A)–(B), (a)(2). The mere underline expectation that the Trustee would audit the fees independent of the policyholder is a strong economic incentive for any law firm to take care in billing the Debtor.

17

creditors, and this Court through the bankruptcy process.  Regardless, it is "unfair to let a breaching insurer nit-pick costs later when it could have—had it honored its duty to defend—initially directed the defense in any reasonable way it wished." *Thomson*, 11 N.E.2d at 1024; *see Taco Bell*, 388 F.3d at 1075–76 (focusing on the market incentives created by the "uncertainty surrounding reimbursement"). Here, there is <u>still</u> uncertainty about whether those fees will ever be paid or reimbursed by an insurer. USAG has "had to proceed as if it would be stuck with the bill." *Dometic*, 2020 U.S. Dist. LEXIS 25597, *3–4. It possessed the incentive to minimize fees which is enough  to "market test" the fees and apply the presumption of reasonableness.

### B.  The Parties' Experts

### 1.    Rule 1.5 and the "Total Value"  Approach

USAG's expert Gene Schoon and LIU's expert, Brand Cooper took vastly different approaches in determining whether USAG's defense costs were reasonable and necessary.  Both agreed that Rule 1.5 of the Indiana Rules of Professional Conduct is "the standard for what is reasonable" under Indiana law. *Id.* ("Our courts have expressly adopted Rule 1.5 as the standard for what is reasonable") *Thomson*, 11 N.E.3d at 1025, (citing *Terry Gerstbauer v. Styers*, 898 N.E.2d 369, 381 (Ind. Ct. App. 2008)).  Rule 1.5 "mandates a multi-factor total value approach." *Id.*  Under this rule, "[t]he analysis is case specific. What matters is what is reasonable and necessary to defend the particular case at issue." *Id.* In addition to time spent, "the Court is to consider such factors as novelty, difficulty, skill, experience, reputation, and ability." *Id.*

In applying Rule 1.5, the policyholder in *Thomson* took a "total value" approach, which the Court found to be "more sound and more consistent with Indiana law" than the insurer's approach, which focused on billing practices that the insurer claimed resulted in overbilling. *Id.* The court noted that one problem with the insurers' nitpicking approach is that it is "biased downward" because in

seeking only to find instances of alleged "overbilling" it ignores tasks done exceptionally well or efficiently, which is inconsistent with Rule 1.5. *Id.* at 1024.

When the *Thomson* presumption applies, the policyholder is relieved of its initial burden to establish a prima facie case under the "total value" approach. *Id.* Where the presumption does not apply, on the other hand, the policyholder should use Rule 1.5 to establish the "total value" of the defense, and the insurer must rebut the policyholder's evidence. *See id.* In order to do this, the insurer must provide competent expert testimony using Rule 1.5 to show that the "total value" of the defense is outside the range of reasonableness, after accounting for all of the circumstances. *Id.* at 1024, 1032.

As stated earlier, Mr. Schneider could not recall where either he or Ms. Leung or Ms. Barron requested a reduction in fees.  LIU argues this renders the invoices facially unreasonable and in violation of Rule 1.5.  The fact that firms were not asked to reduce their fees does not render the fees unreasonable. There is no basis to claim that a fee is unreasonable simply because the client never asked the lawyer to write off or write down her time. Mr. Cooper's analysis presumes all lawyers exploit their clients when they block bill a time entry.  A client may decide not to demand a reduction for a number of reasons, the most obvious reason being that the fees are <u>already</u> reasonable because the lawyer followed her or his obligations under Rule 1.5 of Indiana's Rules of Professional Conduct. The client may also decide not to demand a reduction for other reasons, including that (1) the lawyer has done exceptional work: (2) the lawyer has voluntarily written off time, (3) the client wants to preserve the relationship with the lawyer, or (4) the lawyer has agreed to a discounted rate. Those are all permissible factors to consider when examining the reasonableness of an attorneys' fee. *See* Ind. R. Prof'l Cond. 1.5(a)(1), (4), (6).

2.    **Qualifications**

a.  **USAG's Expert Gene Schoon**

USAG's expert, Gene Schoon, worked at Sidley Austin for approximately 37 years and during most of that time, he focused on nationwide complex mass tort and products liability  litigation.  This work included personal injury class actions, multi-district litigation, and ancillary administrative proceedings. He spent many years as both a trial lawyer and national coordinating counsel.   As national coordinating counsel, clients hired him to supervise and coordinate multiple firms to obtain all necessary expertise, creating what he calls a "virtual law firm"- a group of law firms, each with its own area of expertise, retained as a single organization to represent the client in a particular multi-faceted matter.  He oversaw the billing of local counsel retained by his clients but it was not unusual for his clients to have in-house counsel who also reviewed bills.  His experience also included representation in government investigations, primarily as support for the attorneys working on them and providing those attorneys documents or other background information.

While Mr. Schoon has not had specific experience with sexual abuse cases, he has defended mass tort litigation comparable to this case. His experience includes cases posing an existential threat to the client, involving simultaneous government and Congressional investigations, including those instituted by Attorneys General, the U.S. Department of Justice, local U.S. Attorneys Offices, and numerous federal agencies.  He has directed and supported attorneys with specialized roles in such investigations to make the most efficient use of everyone's time.  Mr. Schoon also testified as to his experience as billing partner, with law-firm billing and budgeting, and particular experience with insurer disputes concerning reasonable and necessary defense costs.

In order to formulate his expert opinion, Mr. Schoon got an overview of the litigation, identified the key participants, and learned about the different law firms

and what roles they played. He clarified with USAG some details in order to become oriented to the issues before reviewing the bills. He reviewed applications for approval of counsels' employment filed in the bankruptcy case and the declaration of C. J. Schneider, USAG's Chief Legal Officer, to understand what the various firms were doing. He also reviewed the biographies of each of the key lawyers in order to understand staffing in the cases. He also interviewed the lawyers to confirm and test his assumptions.

Mr. Schoon reviewed certain pleadings for this adversary proceeding and the proceedings in the District Court. He also reviewed some of the work product from the representation of USAG, including two pleadings from the Nassar Athlete Lawsuits, some unidentified pleadings he pulled from the internet, and excerpts of Kerry Perry's testimony before Congress. Most importantly, Mr. Schoon reviewed the invoices supporting the amounts USAG claims in the Motion. He did not think it was necessary for him to review every page of the invoices in order to provide an opinion about whether the fees were reasonable and necessary. Mr. Schoon then reviewed Mr. Cooper's original declaration filed in opposition to the Motion.

Mr. Schoon reviewed and considered the *Thomson* case as well as the Indiana Rule 1.5 factors, taking into account the enormous challenges involved in the case, and the skill of the lawyers discharging the various tasks. Using the "total value" approach, it was his opinion that after taking into account all of the bills and the work that was done, the applicable standards and his own personal experience as an attorney for 40 years, all of USAG's defense costs were reasonable and necessary.

### b.    LIU's Expert Brand Cooper

Mr. Cooper is a licensed attorney with over thirty years of experience as an expert assessing bills and invoices submitted to insurance companies for payment. He has offered testimony on the reasonableness of fees in multi-forum actions, class actions, mass tort cases, and cases involving sexual abuse. Mr. Cooper has analyzed and offered opinions about the reasonableness and necessity of fees for e-discovery services in litigation. In formulating his expert opinion, Mr. Cooper reviewed the

Motion and related pleadings.  Mr. Cooper reviewed Mr. Schoon's declaration in support of the Motion.  He was not permitted by USAG to interview the lawyers whose fees are sought in the Motion.

Mr. Cooper's review of the invoices included use of a proprietary software as part of his fee analysis.  The proprietary software appears to be a sorting program by various fields, not injecting any qualitative analysis.  Mr. Cooper first input the invoices into his system, which unscrambled them and sorted time entries by biller or chronologically. He then categorized and quantified the time billed by task.  The software separated out into individual tasks the entries that were block-billed.  Mr. Cooper and his staff then manually estimated and reapportioned time increments to the particular task.  Mr. Cooper's software enabled him to run keyword searches on the unscrambled and unblocked time entries to identify all the work done on particular tasks.

Mr. Cooper agreed that the factors set forth in Rule 1.5 are to be considered in determining whether fees are reasonable but, unlike Mr. Schoon, did not employ the "total fee" approach as was evident from his use of his proprietary software and estimations that resulted in almost a "line by line" review of the invoices.  He considered the "total fee" approach to be nebulous and opined that it resulted in a "rubber stamping" of fees.  He instead took a "task-based" approach and relied primarily on two Rule 1.5 factors  -- time and labor required and the fee customarily charged, more in line with the  "lodestar" method.[12]  Mr. Cooper testified that he primarily looked at the number of hours and the number of people involved. He either gave little weight to or discounted the other Rule 1.5 factors.  He made no assessment of the attorneys' hourly rates.  He surmised that while a fee arrangement between client and counsel may satisfy the requirements of Rule 1.5, that does not necessarily mean that the fees are reasonable and necessary.

---

[12] The lodestar calculation is derived by multiplying the "number of hours reasonably expended on the litigation . . . by a reasonably hourly rate" and then making some adjustments if necessary. *Walton v. First Merchant's Bank*, — F. App'x —, 2020 U.S. App. LEXIS 21032, at *13–14 (7th Cir. 2020) (citations omitted).

Mr. Cooper adjusted downward each firm's fees because (1) some of the time entries were so vague, it prevented one from determining what the attorney was doing and whether the fee for that work was reasonable and necessary; (2) some of the entries were "block-billed" wherein it made it difficult for someone reviewing the invoice containing block-billed entries to determine how much time the attorney spent on each task; or (3) there was excessive duplication within law firms among lawyers doing the same work. After taking these adjustments into account, his opinion as to the reasonable and necessary amount of fees for each firm, *before further unquantified reductions* was:

Faegre: $62,944

Miller Johnson: $203,379

Barnes & Thornburg, LLP: $706,577

Gibson Dunn: $379,541

Hilder: $78,315

Jenner & Block: $0

Mr. Cooper opined that further reductions, which he did not quantify, should be applied to these threshold amounts because (1) there was overlap in getting the receiving law firm up to speed on the matter when responsibility for a particular matter was transferred to it from another firm; (2) duplicative work was done not only among lawyers in the same firm but also among law firms that had responsibility for the same matter; (3) billing should have been in tenth of an hour increments and not in quarter-hour increments and (4) he was not able to interview lawyers representing USAG, review Miller Johnson's WestLaw contract and bills, or review details concerning Epiq's work and bills.

### c. The Amount of Fees the Court Finds Reasonable and Necessary Regarding the Reimbursement Claims

Activity on varied legal fronts – the sexual abuse lawsuits, governmental investigations and decertification proceedings—demands that USAG maintain a scope and level of legal representation not seen in most cases. Indeed, the threat of

23

decertification alone is the sort of "bet the company" existential threat which USAG faces. Coordination between counsel that represent USAG on all fronts is essential.

While Mr. Schoon has not had specific experience with sexual abuse cases, he has defended mass tort litigation and multi-forum cases comparable to this case. His experience includes cases posing an existential threat to the client, involving simultaneous government and Congressional investigations, including those instituted by Attorneys General, the U.S. Department of Justice, local U.S. Attorneys Offices, and numerous federal agencies. He has served as national coordinating counsel and has supervised "virtual law firms". His experience also included representation in government investigations, primarily as support for the attorneys working on them and providing those attorneys documents or other background information.

Mr. Cooper has no such similar experience. He has never litigated a mass-tort or sex abuse case. He has not litigated in multiple forums and has not litigated cases with both civil and criminal components, coinciding governmental investigations, or a large associated bankruptcy. He has not served as national coordinating counsel. In short, Mr. Cooper's approach was geared solely towards reducing fees.[13]

The Court finds Mr. Schoon to be the more credible and reliable expert witness. He has done the type of work that is involved in this case. Like the policyholder's expert in *Thomson,* his "expertise in similar cases is the probative expertise." *Thomson,* 11 N.E.3d at 1024. He has the requisite experience and applied the "total value" approach adopted in *Thomson* and laid out in Rule 1.5.

---

[13] In reviewing Mr. Cooper's methodology and criticisms, Mr. Schoon testified that Mr. Cooper's "methodology is geared toward reduction of those fees and reduction of time entries. He characterizes them as vague, unnecessary, he criticizes block billing and so on. But at the end of the day while he says that the fees should [not ]be allowed, what he seems to really be saying is, I just need more information before I can really assess whether they're reasonable or not." [Transcript of August 4th hearing, Bankr. AP ECF #477 at 59:15–21.]

24

As a backdrop to the discussion that follows with respect to each firm, the Court first notes that, while Mr. Cooper expressed an opinion on the maximum amount of fees that should be determined to be reasonable, that opinion was subject to further reductions for which he gave no specific dollar amounts. Mr. Cooper's opinions were simply his opinions. There are no empirical studies or data from which his conclusions were drawn and some of his conclusions were those of his assistants who considered what they deemed reasonable for work performed. Furthermore, his general objections as to block billing and vagueness were criticized in *Thomson* and such criticisms bear repeating here.

First, *Thomson* and *Taco Bell* bar an insurer from "nitpicking" a policyholder's legal expenses after the insurer has breached its duty to defend. This is because it is "unfair" to allow an insurer to do this after its breach, when it could have supervised the defense if it had honored the duty and imposed any reasonable cost control measures. *Thomson*, 11 N.E.3d at 1022. And Judge Posner warned in *Taco Bell* that "the duty to defend would be significantly undermined" if insurers are allowed to "pick apart" a policyholder's bills after the fact using an auditor (like Mr. Cooper) to try to reduce their defense bills. *Taco Bell*, 388 F.3d at 1075. LIU has breached its duty and under Thomson it no longer has any right to second guess its policyholder. See also, *Charter Oak Fire Ins. Co. v. Hedeen & Cos.*, 280 F.3d 730, 738–39 (7th Cir. 2002) (when an insurer breaches its duty to defend, "it should not be allowed to second guess [the policyholder's] payment arrangements . . . ."); *Fleet & Farm of Green Bay, Inc. v. United Fire & Cas. Co*, 2015 U.S. Dist. LEXIS 136991 at *2–5 (E.D. Wis., Oct. 7, 2015) ("[S]econd guessing an insured's tactical decisions within the defensive sphere is generally precluded, and uncertainties in the nature and extent of an insured's legal representation are to be resolved against the breaching insurer."); *La. Generating LLC v. Ill. Union Ins. Co.*, 2014 U.S. Dist. LEXIS 40617 at *30–31 (M.D. La., Mar. 27, 2014) ("[B]ecause Charter Oak declined to defend, it should not be allowed to second guess the [policyholder]'s payment arrangements . . . ."); *Shore Chan Bragalore Depumpo LLP v. Greenwich Ins. Co.*, 904 F. Supp. 2d 592, 602–03 (N.D. Tex. 2012) ("[A]n insurer who abdicates its duty

to defend is also barred from directly challenging the reasonableness and necessity of the insured's attorney's fees. This is especially so because an insurer gives up the right to control the defense once it abandons the insured . . . .").

*Thomson* expressly rejects the position that "block billing" is inappropriate or could be used to reduce fees, observing that Indiana law permits the practice. *Thomson* 11 N.E.3d at 1024. The Indiana Court of Appeals in *Thomson* noted that "logically, there is no basis to conclude that block billing results in inflated time; it could as easily lead to lost time." *Id.* USAG's expert, Gene Schoon, whom the Court finds to be the more credible witness, testified that he has block billed on occasion and sometimes, his clients preferred it. While it was not in general a "best practice", it could be in certain circumstances. Besides, the applicable standard here is whether the fees are reasonable and necessary and not whether the law firm followed "best practices". Mr. Schoon found the fees reasonable because the block billed entries here were complete and informative. Like the court in *Thomson*, he found nothing that would suggest block billing inherently inflated the time billed. He acknowledged that some clients who issued billing guidelines to its counsel prohibited block billing, but that was not the case here.

*Thomson* also rejected the insurer's general complaints that "certain entries were too vague." *Id.* at 1026. This holding was not based only on the market test, though that test supports the result. The court pointed out that the insurer's argument "ignores two critical facts." *Id.* It ignored the policyholder's regular scrutiny of the bills with the incentive to economize, but it also ignored that "if the insurers wanted more detail, they could have gotten it had they timely honored their duty to defend." *Id.*

Given *Thomson's* directive, the Court will not rummage through the invoices, line by line, and question whether each specific charge is vague, duplicative, excessive, block billed, or fails some other criteria Mr. Cooper thinks is appropriate to impose on defense lawyers. As *Medcom* holds: "Instead of doing a detailed hour-

26

by-hour review after the fashion of fee-shifting statute . . . the district judge should have undertaken an overview of [the policyholder's] aggregate costs to ensure that they were reasonable in relation to the stakes of the case and . . . litigation strategy . . . ." 200 F.3d at 521.

### 1. Barnes & Thornburg LLC

USAG seeks payment of $789,049.76  in fees for Barnes & Thornburg. Mr. Cooper opined that the threshold of reasonable and necessary fees amounted to $706,577 before further unquantified reductions.

Barnes & Thornburg has represented USAG in the Congressional investigations, the IAG investigation, and the USOC investigation conducted by Ropes & Gray.  USAG later transferred responsibility for the USOC Investigation from Barnes & Thornburg to Miller Johnson.  Mr. Cooper noted a substantial amount of overlap of work between Barnes & Thornburg and (1) three other firms – Faegre, Gibson Dunn, and Miller Johnson – with respect to work on the USOC investigation; and (2) Miller Johnson and Jenner & Block on the IAG investigation. He noted that Barnes & Thornburg continued to bill USAG for work involved in the transition to Miller Johnson of the USOC investigation.  He points to instances where both Barnes & Thornburg and Miller Johnson responded to requests and billed for communicating between themselves.  He also maintains that Barnes & Thornburg and Jenner & Block duplicated work regarding document review related to the IAG investigation. He criticized the amount of fees Barnes & Thornburg billed in "getting up to speed" on certain USAG matter in which Faegre had withdrawn its representation in May 2018.  It appears that Mr. Cooper's own personal judgment was the only measurement applied to the time it took to transition work and to maintain communication with other firms.  There was no peer reviewed treatise or authority presented other than Mr. Cooper's opinion.

The Court rejects Mr. Cooper's opinion that time is not "reasonable" or "necessary" because it was done to "get up to speed" after the client's previous lawyers withdrew.  In his opinion, it was unfair to put these costs on to the insurer,

but the Court has been asked to determine the reasonableness of the fee and not whether it is "fair" to pass on to the insurer. *Thomson*, 11 N.E.3d at 1025–26. It is entirely reasonable and necessary for the new firm to "get up to speed" on matters essential to adequately represent the client—indeed, Barnes & Thornburg would have flirted with malpractice by doing otherwise. Moreover, Mr. Cooper does not make any allowance for the need to coordinate efforts for the firm handling the investigation to understand the significance of discovery in that matter to the underlying tort litigation.[14] It was reasonable and necessary for these lawyers to do such work, and LIU must pay for it.

All of Barnes & Thornburg's invoices were either paid by USAG or were incurred under the bankruptcy court's supervision and thus meet the "market tested" rationale under *Thomson*.    LIU has not rebutted the presumption. Regardless, the Court finds Mr. Schoon's testimony on the reasonableness and necessity of these costs to be more credible. The Court will require LIU to pay all of Barnes & Thornburg's fees as requested.

### 2. Faegre Baker Daniels LLP

USAG seeks reimbursement for $111,193.50 it paid to Faegre Baker Daniels ("Faegre"). Mr. Cooper opined that the threshold of reasonable and necessary fees amounted to $62,944 before further unquantified reductions.

Faegre had a long standing relationship with USAG and had been its coordinating counsel on Nassar related mass tort litigation before it withdrew that representation in 2018 due to a conflict of interest. Faegre also represented USAG in the Congressional investigations which included substantial fees incurred in

---

[14] Mr. Schoon testified:

> His criticism on duplication is hard to understand given Mr. Cooper's kind of approach to this. It's as if he would expect these various law firms to operate only within their silos of expertise and not—and that there would not be some communication among them. In fact, it's critical when there are multiple things going on at once, bankruptcy, Attorney General, Congress, criminal investigations all happening at the same time that the people in those different areas, fields of expertise, have the benefit of perspective, of knowledge, of potential impacts on their own litigation. So I do not agree with that criticism.[8/4 Tr. Bankr AP ECF #477 at 68:21–69:6.]

28

preparing Kerry Perry, former CEO of USAG, to testify before Congressional committees and gathering documents and information requested by them.

With respect to the time spent preparing Ms. Perry for the Congressional committee hearings, Mr. Cooper opined that Faegre's work was either duplicative with that of Gibson Dunn, or that Faegre overstaffed certain tasks.  For example, Mr. Cooper objected to Faegre using eight lawyers on behalf of USAG, sometimes sending as many as six experienced lawyers to attend meetings. Mr. Cooper opined that four of these attorneys did very little on the case other than having conferences with each other but nonetheless billed approximately $21,000.  Mr. Cooper's opinion shows that he did not understand the breadth or significance of the testimony Kerry Perry was expected to provide in the way that Mr. Schoon did.[15]  This was an extraordinarily important investigation in which Congress was investigating serious, high-profile, and high-stakes issues involving abuse of the nation's athletes. The services that Faegre performed for USAG were real and valuable.  Those hearings occurred in the midst of the tort litigation, and anything provided to Congress, any misstep, would assist the plaintiffs suing USAG and could possibly lead to Congress pressing decertification.

Mr. Cooper was also very critical of Congresswoman Mary Bono's vague time entries such as "emails, reading, media reports", and the like.  Ms. Bono is not an attorney but was a consultant who assisted with preparation of witnesses before the Congressional committees. Mr. Schoon opined that the same level of detail normally provided by an attorney would not be expected of a consultant as Ms. Bono.  Mr. Schoon did not find these time entries unduly vague or the fees associated with them unreasonable.

---

[15] Mr. Cooper incorrectly linked Ms. Perry's preparation to the short time she had been at USAG, stating, "She did ncot have a history with the organization that one would have to prepare for going back two or three years where all kinds of things could come out in the testimony." [8/4 Tr. at 179:3–180:16.] Mr. Schoon testified about the importance and ramifications of Congressional hearings, that Ms. Perry's testimony was not confined to her own personal knowledge of USAG, and that Congressional hearings have "virtually no bound." [*Id.* at 64:5–65:24.]

Mr. Cooper's other objections as to vague time entries and block billing has been addressed above. The Court notes that all of these invoices have been paid in full. LIU has failed to rebut the presumption of reasonableness. The Court will require LIU to pay all of Faegre 's fees.

### 3. Gibson, Dunn & Crutcher LLP

USAG claims $453,097.01 in fees charged by Gibson, Dunn & Crutcher LLP ("Gibson Dunn"). This involves reimbursement for $162,656.73 that USAG has paid, and $290,440.28 outstanding that neither USAG nor any insurer has paid. Mr. Cooper opined that the threshold of reasonable and necessary fees amounted to $379,541 before further unquantified reductions.

Gibson Dunn also represented USAG in the Congressional investigations and took over preparation of then-CEO Kerry Perry to testify before the Congressional committees. Its attorneys conducted several "mock" sessions and educated Ms. Perry on information with which she was not familiar given her short tenure with USAG at the time. Gibson Dunn used numerous staff in its preparation of Kerry Perry to testify before Congress. At one point, six lawyers participated in a single preparation session and some of those who participated had never done anything else on the case.

Mr. Schoon provided his insight in the August 4th hearing with respect to this intense preparation:

> I have to start by saying that I think it's impossible to overstate the importance of having a witness well prepared to appear before Congress. And there is no amount of attention to detail or nuance or just frankly getting the witness comfortable with that setting that would be almost too much. This is – and particularly with a matter like this with so much emotion, so much public attention on it, and with a witness who had very little experience with the organization and no experience testifying before. That this is an intense time consuming process. It must be done properly or the results can be very bad… So the fact that for example Mr. Cooper criticized Gibson Dunn for having six lawyers prepare Ms. Perry in a mock examination is just unfounded. You need people who have experience in this area to throw questions out. Congressional hearings are not necessarily a search for the truth, they're an opportunity to use witnesses as sounding boards, the

witness is not confined to her own personal knowledge, her own experience, but can be asked virtually anything. There are virtually no bounds, they have to be prepared for it in a number of different ways. It takes a lot, a lot of work to be sure that that the witness is able to withstand the pressures... So I find no fault at all with the Gibson Dunn preparation.

(Transcript of August 4th hearing, Bankr AP . ECF #477, p. 64-65)

LIU places undue emphasis on Gibson Dunn's agreement to look only to USAG's insurers, not USAG itself, for payment of its outstanding fees. Gibson Dunn did not expect USAG to pay any of its outstanding fees if the insurers did not. This was discussed previously where the court rejected the argument that this agreement was a "special circumstance" that the fees were not market tested and entitled to the reasonableness presumption. It remains that USAG continued to monitor Gibson Dunn's fees as if it were paying them. Due to their agreement with USAG, the lawyers at Gibson Dunn billed this time fully aware that payment was contingent on the outcome of future litigation. Any time these lawyers billed to USAG was time they could not spend billing other clients. Given the uncertain prospect of reimbursement, the opposite is true. Gibson Dunn had every incentive to bill the minimum amount necessary to adequately represent USAG. It is unfair to punish Gibson Dunn for being willing to assist its client by limiting its recovery to payment by an insurer of covered defense costs. LIU has not rebutted the presumption and the Court will require LIU to pay all of Gibson Dunn's fees.

### 4. Hilder & Associates, P.C.

USAG claims $83,961.99 in fees charged by Hilder & Associates, P.C. ("Hilder firm"). Mr. Cooper opined that the threshold of reasonable and necessary fees amounted to $78,315 before further unquantified reductions.

Hilder is primarily a criminal defense firm and has represented USAG in one of the Revocation Lawsuits. Mr. Cooper generally complained that the Hilder invoices were redacted, that the firm bills in quarter-hour rather than tenth-hour increments, and that the firm spent too much time (approximately 170 hours, or

31

$50,000) on a motion to compel arbitration. He stated he could not judge how much was actually reasonable because he had not reviewed the motion as it apparently was never provided to him.

The redaction argument is easily rejected—none of the Hilder invoices filed with the Court and admitted into evidence have redactions that obscure the entry on amounts claimed by USAG.

Mr. Cooper 's opinion as to the quarter-hour billing increments is likewise rejected.   While billing in .10 increments may be a "best practice", Mr. Schoon testified that quarter-hour billing was the default for his Sidley Austin clients the entire time he was at that firm.  He acknowledged that some clients prefer .10 increments but without a client directive, he did not find that quarter hour increments lead to inherently unreasonable fees.

As to the motion to compel arbitration, Mr. Schoon testified that winning the motion undoubtedly saved USAG a lot of time and money as a loss on that motion would have led to adjudication in a very unfriendly forum. He faulted Mr. Cooper for treating it like a "simple discovery motion"  instead of the dispositive motion that it was. If  the reason for this oversight was that Mr. Cooper did not have a copy of the motion, he could have requested its production.  Mr. Schoon found nothing unreasonable about the fees incurred on the motion.

LIU agrees that USAG paid all of Hilder's charges at issue here. LIU has not rebutted the presumption. The Court will require LIU to pay all of Hilder's fees.

### 5. Jenner & Block LLP

USAG claims $219,310.01 in fees charged by Jenner & Block LLP ("Jenner"). Mr. Cooper opined that the threshold of reasonable and necessary fees amounted to $0.   Jenner is USAG's general bankruptcy counsel in its bankruptcy case and has assumed  greater responsibility in the IAG investigation.  USAG is headquartered in Indianapolis, and thus, a successful outcome with respect to the IAG investigation was essential, justifying Jenner's direct participation in that

32

representation. Jenner has also represented USAG in the USOC decertification proceeding.

Mr. Cooper's objection to these invoices was that they are over-redacted, impermissibly vague or involved work on claw back requests that, in Mr. Cooper's judgment, was duplicative or meant that the documents should never have been produced.

Mr. Cooper intimates that he was unable to discern what a reasonable fee was because Jenner's invoices were so heavily redacted. Jenner's invoices were filed on the Court's public docket, with some redaction, starting on February 22, 2019, over a year ago, before USAG even filed its motion for partial summary judgment, and they have been routinely filed since then. [*E.g.*, Bankr.AP ECF #289.] Further, five months ago, USAG filed unredacted copies of these invoices with the Court, under seal, and served them on LIU. [Bankr AP ECF # 346, 377.] At the time, USAG notified the Court and LIU that USAG was not seeking reimbursement for any still-redacted dollar amounts. [Bankr. AP ECF # 337, ¶6.]

Nonetheless, LIU's objection as to the redactions is misplaced as the redactions are almost entirely for costs USAG is not seeking from LIU. There are a few entries on the first invoice (No. 9463969), amounting to $11,760.00, that are partially redacted and do not indicate how the time is split between the redacted and unredacted tasks. On these entries, LIU's objection is well taken, because it is not clear how much of the work is for matters covered by the January 13, 2020 order. The Court will reduce the amount covered in proportion to the redactions.[16]

With respect to the "claw back" issue, Mr. Schoon testified that it was important for bankruptcy counsel to be involved in the document productions as

---

[16] For the charge on 11/19/2018 (2.5 hours, $2,625.00), four of the five lines are redacted. [Ex. 8 at 5.] The Court will therefore allow 20% of this entry, or $525.00. On the next charge, on 11/21/2018 (4.7 hours, $4,935.00), 1.5 of the 4 lines are redacted. [Ex. 8 at 6.] The Court will therefore allow 62% of this entry, or $3,059.70. On 11/29/2018, approximately half of the charge (2.5 hours, $2,625.00) is redacted. [Ex. 8 at 8.] The Court will allow 50% of that entry, or $1,312.50. The same is true for the last entry, on 11/30/18 (1.5 hours, $1,575.00), on which the Court will allow $787.50. This amounts to a net reduction of $6,075.30.

33

part of representing USAG in this chapter 11 proceeding.  The investigations here have involved millions of documents and it is likely—if not inevitable—that in discovery of that scale, privileged documents will accidentally be produced. Working to claw back those documents is part of the legal representation and not unreasonable or unnecessary. To the contrary, such diligence is ordinarily <u>required</u> to avoid a potentially catastrophic privilege waiver. *See* FED. R. EVID. 502(b)(3) (providing that inadvertent disclosure does not waive privilege if the holder "promptly took reasonable steps" to rectify the disclosure). The assertion that the fees are unreasonable because they involve work on claw-back requests is not well taken.

The Court rejects LIU's other objections. All of Jenner's fees were either paid by USAG or were incurred under the supervision of the bankruptcy court. They are presumed to be reasonable and necessary. The Court will require LIU to pay USAG $213,234.71 on these invoices.

### 6. Miller Johnson

USAG seeks reimbursement for $238,741.29 in fees charged by the Miller Johnson firm. Mr. Cooper opined that the threshold of reasonable and necessary fees amounted to $203,379  before further unquantified reductions.  It is not clear whether this amount includes the legal-research invoices, addressed separately below.  This amount does exclude the non-reimbursement claim related to defense litigation invoices billed directly to the insurers.[17]

Miller Johnson initially represented USAG only with regard to Nassar Athlete Lawsuits filed in Michigan, where both Nassar and Miller Johnson's offices were located.  Because the litigation against Nassar  in Michigan progressed more quickly than litigation pending in other jurisdictions, Miller Johnson developed familiarity with the facts of the case early on and was eventually asked by USAG to take over as its national coordinating counsel for all Nassar-Related Matters.  As

---

[17]  Discussion of this non-reimbursement claim is discussed, *infra*, p.37.

such, it coordinated, supported and assisted  attorneys who were primarily responsible for all of the investigations.

With respect to these fees, Mr. Cooper's objection was that some entries are redacted and that the work was duplicative of other firms who worked on the Congressional Investigations, the USOPC investigation, the decertification, and the Indiana Attorney General investigation. On the redaction issue, the Court disagrees with Mr. Cooper's objection. USAG has not sought compensation for any entry that is fully redacted. [Bankr. AP ECF  337, ¶6.] All of the redactions in Exhibit 3 (previously filed as Bankr AP ECF  341) are full redactions, meaning that USAG is not seeking those amounts.

Mr. Cooper's complaint about duplicative work is not well taken.  One would expect, and perhaps require, a reasonable national coordinating counsel to spend time actually working on each important aspect of the case and remain in constant communication with all counsel, as Mr. Schneider testified he and his firm did here. Additionally, the Court expects that some counsel might be assisted by help from the firm which has been involved the longest and which is handling much of the sexual-abuse litigation, given that the investigations are generally about the facts underlying the abuse claims themselves. USAG has shown that this sort of work is reasonable and necessary, in part based on the testimony of someone who has actually served in that role. LIU's general complaints about duplicative work do not rebut these points and therefore are not persuasive.

Once again, the Court notes that except for a few invoices (Nos. 1679281, 1681479, 1684322), all of them were either were paid in full or were incurred under the supervision of the Bankruptcy Court.

USAG also contends that LIU is obligated to pay $55,076 for WestLaw charges incurred by Miller Johnson in connection with Nassar-Related Matters. USAG's insurers have refused to pay any of these charges.  Mr. Cooper objects to the costs as "overhead" and not defense costs. It is incomprehensible how Miller Johnson could defend USAG without using electronic research and Mr. Cooper

makes no cogent argument that the Westlaw charges were not necessary. Even *Thomson* supports the conclusion that some "overhead" costs are reimbursable, so long as they actively assist in the defense.    *Thomson*, 11 N.E.3d at 1026.

Mr. Cooper does allege that the research fees appear excessive and claims that there was no proof that research was done because he was not provided the invoices. He is wrong on this point.  The charges showed up on the invoices, and USAG (whose CLO, Mr. Schneider, was intimately familiar with the work being done) paid most of them. LIU is most concerned that Miller Johnson is marking up its Westlaw charges.  Miller Johnson's initial engagement letter dated March 27, 2017 provides that the client, USAG, will pay for computer legal research as a pass-through charge, without markup and USAG has paid them.  (Bankr. ECF #107, page 3 of 20, Exhibit 39.2).  The revised engagement letter with USAG dated September 20, 2018 states:

> "c. Out-of-Pocket Expense Reimbursement. The Client will reimburse us for reasonable out-of-pocket expenses that we incur in delivering our services. We charge the reimbursement at our actual cost~ without any premium or mark-up. Examples of expenses are overnight mail service, document delivery service, conference call set-up, copies, filing fees, computerized legal and other research, secretarial overtime, and travel. We will bill these costs to the insurers when they are within the scope of the insurers' agreed-upon defense costs. We understand that certain costs, such as computerized legal research (e.g. Westlaw) are not within that scope. (Bankr. ECF #107, page 3, Exhibit 39.2).

In other words, USAG is obligated to pay for computerized legal research but when the insurers begin paying for the legal services and establish a scope of agreed-upon defense costs, computerized legal research will not be reimbursed by the insurers. LIU argues that it should benefit from the last two sentences of paragraph c of the revised engagement letter quoted above, even though it never assumed responsibility for paying Miller Johnson's bills and never established a scope of agreed-upon defense costs.  Mr. Schneider testified that there was no markup as Miller Johnson pays WestLaw a fixed monthly fee for the whole firm and allocates

the total WestLaw fees among clients for whom it uses WestLaw.  The Court will order LIU to pay all of Miller Johnson's invoices, including the computerized legal research costs.

### d. The Amount of Fees the Court Finds Reasonable and Necessary Regarding the Non-Reimbursement Claims

The non-reimbursement claims are those fees that are billed directly to the insurers, which USAG claims LIU is either underpaying or is holding out due to a fight with other insurers. This dispute involves two amounts. First, USAG contends that LIU must pay 5% of Miller Johnson's Nassar litigation bills; LIU argues it only must pay 4%. If USAG is correct, LIU owes $43,348.97 to Miller Johnson.  Second, a total balance of $1,391,204.58 is owed to Epiq, who the parties agree has performed substantial eDiscovery services on USAG's behalf.

### 1.    Miller Johnson Defense Costs

LIU is one of eleven insurers named as defendants in USAG's Complaint filed in this adversary proceeding, six of which have agreed to contribute to USAG's costs for defending the Nassar Athlete Lawsuits, including LIU.  These six insurance carriers agreed to each pay a share of USAG's defense costs for defending the Nassar Athlete Lawsuits based on their respective shares of the total number of policies of insurance that might apply to the Nassar Athlete Lawsuits. Based on this allocation, LIU argues it agreed to pay for 4% of USAG's defense costs for the Nassar Athlete Lawsuits.  USAG has contended that LIU's share of the defense costs for the Nassar Athlete Lawsuits is 5%.

USAG contends that LIU is obligated to pay $72,759.88 relating to Nassar Athlete Lawsuits. The $72,759.88 represents the difference between LIU bearing a 5% or 4% share of those costs. LIU and other insurers have paid most of Miller Johnson's fees relating to the Nassar Athlete Lawsuits including a payment of $29,410.91 LIU made on May 20, 2020, leaving an unpaid balance of $43,348.97. Mr. Cooper did not have an opinion as to the reasonableness of these fees.  LIU does

37

not dispute these amounts are necessary to USAG's defense, only that it never agreed to pay 5% instead of 4%. That does not matter. The Court could order LIU to pay 100% of the fees in that matter going forward, if it were so inclined, based on the district court's order that LIU provide a "complete defense." Because the other insurers appear to be paying their shares, that is not necessary at this point. But LIU has no right to force Miller Johnson to accept less based on LIU's alleged agreement with third parties. Because other insurers already are paying 95% of the defense costs billed by Miller Johnson, the additional 1% is all that is needed to fund the "full defense." The Court orders LIU to make those payments.

### 2.    Epiq eDiscovery

USAG seeks to compel LIU to pay $1,391,204.58 in fees claimed by Epiq. None of these fees have been paid. USAG and its coordinating counsel at Miller Johnson chose to use Epiq as it is a highly regarded litigation support firm that provides global e-discovery services.  USAG has used Epiq's electronic services for document collection, preservation, review, and production. To provide such service, Epiq was called upon to gather electronic data from dozens of computers and personal devices, store that data, and host it on "Relativity", a state of the art platform for document hosting and review.  Epiq also assisted with the paper document production which required review of a very large number of boxes of documents.  The parties were in agreement that Epiq charged far less for its litigation support services than what would be charged by law firms performing the same work.

USAG itself does not have a contract with Epiq.  Rather, USAG requested and ultimately had its insurers enter into a contract with Epiq to provide services for the benefit of USAG.  LIU is among the insurers that are parties to that contract. Because USAG is not a party to the contract, it does not receive Epiq invoices and thus, Mr. Schneider, Ms. Leung and Ms. Barron do not review them. Epiq had informed USAG that it would disable USAG's counsel's access to Epiq's services without prompt payment of the outstanding balance of its fees.  This

38

prompted USAG to demand its insurers to pay the Epiq invoices.  The insurers sought more information about Epiq's work and fees.  LIU contends that the information first requested in late Fall, 2019 was not provided or addressed by USAG or Epiq until June 2020, after the Motion was filed.  It appears that the parties continue to communicate with respect to obtaining the requested information.  Epiq has not stopped providing services to USAG.

LIU does not contend that the amount charged by Epiq is *per se* excessive but rather, in part, that its invoices are too vague to permit LIU to decide whether or not a specific charge is related to a matter falling within LIU's duty to defend.  LIU is a party to the contract, USAG is not, and if it wanted more clarity on the charges, it should have sought it prior to the filing of the Motion.

LIU also complains that it agreed to pay only 4% of Epiq's invoices and it should not have to pay 5% (as apparently requested by Epiq, at some point), much less the full unpaid balance of Epiq's invoices (as now requested by USAG). LIU has submitted no evidence that either USAG or Epiq agreed to limit LIU's liability to 4% or to any other percentage share. Additionally, the Court finds this allocation predicament to be a problem of LIU's own creation. As party to the contract, LIU paid some portion of Epiq's costs without concern about whether those amounts relate to some matter falling outside the scope of its duty to defend. If an allocation by matter was important to LIU, then it should have insisted on that sort of an agreement—with USAG, with Epiq, or with the other insurers—when it entered into the contract with Epiq. And if LIU truly had an issue with the billings, why did it not raise the issue pursuant to the terms of the contract?

LIU has produced no evidence that Epiq was not defending USAG from a lawsuit or investigation covered by the district court's January 13, 2020 order. Its complaints of vagueness and unfair allocation do not overcome the evidence presented by USAG. The Court notes that LIU was given the opportunity to take a Rule 30(b)(6) deposition of Epiq and ask questions about this subject. None of this testimony establishes that any of the costs fall outside LIU's duty to defend. To the

extent later evidence reveals that, for whatever reason, a specific charge relates solely to a matter which LIU has no duty to defend, then LIU may seek appropriate equitable contribution or subrogation from the insurer that is responsible for that matter. Right now, however, LIU has provided no such evidence, and it does not affect USAG's right to have its critical defense vendor paid.

LIU raises a suspect, albeit novel argument.  It alleges that the Epiq agreement requires disputes under the contract to be governed by the substantive laws of the State of Kansas without regard to any conflicts of law principles and that any disputes shall be settled by mandatory, final and binding arbitration in Kansas City, Missouri.  USAG is not bound by the choice of law or arbitration provisions of a contract to which it is not a party.  The district court ordered LIU to provide a complete defense to USAG and that order controls. A "full defense" here requires appropriate eDiscovery services.

With the exception of the $6,075.30 the Court deducted from one Jenner & Block invoice, USAG has supported its claim for reimbursement with evidence that the amounts submitted are reasonable and necessary. It has done so both by showing that the *Thomson/Taco Bell* presumption applies and by designating expert evidence that they are reasonable. LIU has not offered persuasive or competent evidence to rebut either sources of proof.  The Court finds that USAG has proven by a preponderance of the evidence that **$1,944,354.26** of the fees it incurred related to the reimbursement claims are reasonable and necessary. LIU is therefore ordered to pay or reimburse them, as the case may be.

The Court likewise rejects LIU's objections to non-reimbursement claims which are the Miller Johnson defense fees and the Epiq charges.

###    e.    Prejudgment Interest

USAG sought, and the district court ordered, an award of prejudgment interest at 8% for all of USAG's past defense fees. [Bankr AP ECF #310 at 5.] USAG has submitted a calculation of the prejudgment interest it believes is owed. [Bankr AP ECF # 374.] LIU did not respond to this issue in its briefing, but it raised some

questions about the calculations at the hearing, yet presented no calculation of its own. [7/29 Tr. at 17:9–19:25.]

The purpose of prejudgment interest is to compensate the prevailing party for the cost of having to pay money that a third party should have paid on its behalf. *See Ind. Ins. Co. v. Sentry Ins.* Co., 437 N.E.2d 1381, 1391 (Ind. Ct. App. 1982); *Wolf Lake Terminals, Inc. v. Mut. Marine Ins.,* 433 F. Supp. 2d 933, 953–56 (N.D. Ind. 2005). Otherwise the breaching party profits from its breach by retaining the use of money to which it had no legal right. *Id.* That purpose is served most directly by calculating interest from the date of payment. The Court believes, then, that prejudgment interest is appropriate for the amounts USAG has paid. It should also be calculated from the date of payment, rather than the date of the invoice.

Thus, rather than use USAG's calculations, the Court has provided its own (attached as Appendix A). This provides a more appropriate finding, based on Exhibits 3–8 (fees sought by USAG), Exhibit D (fees paid, with date of payment), and the Court's reduction of part of a Jenner & Block invoice. That chart shows prejudgment interest of $186,885.20 through August 10, 2020 (the date of the last hearing) and $290.27 in interest per day thereafter through the entry of judgment.

## V.    PROPOSED RELIEF

USAG has requested the entry of a money judgment for the amounts owed to it, along with an order compelling LIU to pay the judgment within 15 days of entry. It has also asked for an order specifically compelling LIU to pay all future invoices within 30 days of receipt or to show cause why it should not be held in contempt. The Court finds that this relief is appropriate, except that it will order LIU to pay Epiq and Miller Johnson directly on the amounts that were billed directly to the insurers and that USAG has no obligation to pay.

LIU is correct that Fed. R. Civ. P. 62(a) generally provides a 30-day automatic stay on the execution of a judgment. However, the rule states that the

41

stay is automatic "unless the Court orders otherwise." *Id.* Here, the Court finds that good cause exists for ordering otherwise. Further delay reduces the value of the separate duty to defend that LIU has violated. Given LIU's complete failure to make any payments under the order (besides the 4% on the litigation invoices it agreed to pay all along), even in the face of multiple directions from this Court and the District Court, as well as the fact that (1) LIU's arguments lack merit or support in the controlling case law, (2) LIU has refused to even pay amounts its expert agreed are reasonable and necessary, and (3) the district court and the Seventh Circuit have both refused to stay the order in its entirety, the Court finds further delay is unnecessary and inadvisable.

In summary, the Court recommends that the district court **GRANT** USAG's motion to enforce in substantial part and order the following:

(1)    Enter judgment immediately in USAG's favor, and against LIU, for $2,131,239.46, plus additional prejudgment interest equal to $290.27 multiplied by the number of days between August 10, 2020 and the date of the judgment;

(2)    Order, under Fed. R. Civ. P. 62(a), that USAG may enforce the judgment by execution or by any other lawful means after fifteen (15) days have elapsed from the entry of such judgment;

(3)    Order LIU to pay all other invoices on the covered matters within thirty (30) days of receipt (or fifteen (15) days of the order, if LIU already has the invoice in its possession), or show cause why it should not be held in contempt;

(4)    Order LIU to pay, within fifteen (15) days of the order, $1,391,204.58 to Epiq or Epiq's outstanding balance, whatever is less, and to continue paying Epiq's invoices in full within thirty (30) days of receipt or show cause why it should not be held in contempt; and

(5)    Order LIU to pay $43,348.97 to Miller Johnson or the outstanding
portion of LIU's 5% share, whichever is less, within fifteen (15) days of
an order, and to continue paying 5% of Miller Johnson's invoices within
thirty (30) days of receipt or show cause why it should not be held in
contempt.

---

# Appendix A – USAG Prejudgment Interest Calculation

| Firm | Invoice | Inv. Amt. | Inv. Date | USAG Pmt. | Pmt. Date | Interest Thru | Days | $186,885.20 | $290.27 | Amount Due as of 8/10/20 |
|---|---|---|---|---|---|---|---|---|---|---|
| Miller Johnson | 1633284 | $32.00 | 7/31/2017 | $32.00 | 7/31/2017 | 8/10/2020 | 1106 | $7.76 | $0.01 | $40.40 |
| Miller Johnson | 1640999 | $40.00 | 9/27/2017 | $40.00 | 10/10/2017 | 8/10/2020 | 1035 | $9.07 | $0.01 | $49.76 |
| Miller Johnson | 1641823 | $2,111.00 | 10/25/2017 | $2,111.00 | 10/25/2017 | 8/10/2020 | 1020 | $471.94 | $0.46 | $2,617.53 |
| Miller Johnson | 1644653 | $5,031.00 | 11/22/2017 | $5,031.00 | 11/22/2017 | 8/10/2020 | 992 | $1,093.86 | $1.10 | $6,201.46 |
| Miller Johnson | 1647570 | $296.00 | 12/21/2017 | $296.00 | 1/9/2018 | 8/10/2020 | 944 | $61.24 | $0.06 | $361.19 |
| Miller Johnson | 1650320 | $2,942.00 | 1/17/2018 | $2,942.00 | 1/23/2018 | 8/10/2020 | 930 | $599.68 | $0.64 | $3,579.35 |
| Miller Johnson | 1655979 | $1,859.00 | 3/7/2018 | $1,859.00 | 6/12/2018 | 8/10/2020 | 790 | $321.89 | $0.41 | $2,195.94 |
| Miller Johnson | 1658000 | $3,736.00 | 3/21/2018 | $3,736.00 | 4/17/2018 | 8/10/2020 | 846 | $692.75 | $0.82 | $4,465.57 |
| Miller Johnson | 1658907 | $6,574.00 | 3/21/2018 | $6,574.00 | 5/8/2018 | 8/10/2020 | 825 | $1,188.72 | $1.44 | $7,823.06 |
| Miller Johnson | 1661855 | $1,938.00 | 5/24/2018 | $1,938.00 | 6/12/2018 | 8/10/2020 | 790 | $335.57 | $0.42 | $2,289.26 |
| Miller Johnson | 1663964 | $18,972.00 | 5/18/2018 | $18,972.00 | 10/4/2018 | 8/10/2020 | 676 | $2,810.97 | $4.16 | $21,878.41 |
| Miller Johnson | 1664765 | $1,767.00 | 6/28/2018 | $1,767.00 | 7/25/2018 | 8/10/2020 | 747 | $289.30 | $0.39 | $2,068.43 |
| Miller Johnson | 1666968 | $10,343.50 | 6/28/2018 | $10,343.50 | 7/25/2018 | 8/10/2020 | 747 | $1,693.50 | $2.27 | $12,107.98 |
| Miller Johnson | 1667764 | $983.00 | 7/26/2018 | $983.00 | 8/30/2018 | 8/10/2020 | 711 | $153.19 | $0.22 | $1,141.99 |
| Miller Johnson | 1667765 | $18,027.00 | 7/26/2018 | $18,027.00 | 8/30/2018 | 8/10/2020 | 711 | $2,809.25 | $3.95 | $20,942.62 |
| Miller Johnson | 1670682 | $2,962.00 | 8/23/2018 | $2,962.00 | 9/19/2018 | 8/10/2020 | 691 | $448.60 | $0.65 | $3,426.58 |
| Miller Johnson | 1670683 | $12,366.05 | 8/27/2018 | $12,366.05 | 9/27/2018 | 8/10/2020 | 683 | $1,851.18 | $2.71 | $14,281.53 |
| Miller Johnson | 1673527 | $943.00 | 7/27/2018 | $943.00 | 10/25/2018 | 8/10/2020 | 655 | $135.38 | $0.21 | $1,082.66 |
| Miller Johnson | 1673528 | $13,547.04 | 9/27/2018 | $13,547.04 | 10/25/2018 | 8/10/2020 | 655 | $1,944.84 | $2.97 | $15,553.35 |
| Miller Johnson | 1676379 | $8,273.00 | 10/24/2018 | $8,273.00 | 11/20/2018 | 8/10/2020 | 629 | $1,140.54 | $1.81 | $9,446.30 |
| Miller Johnson | 1676380 | $11,068.55 | 10/24/2018 | $11,068.55 | 11/20/2018 | 8/10/2020 | 629 | $1,525.94 | $2.43 | $12,638.32 |
| Miller Johnson | 1679280 | $7,780.00 | 11/21/2018 | $7,780.00 | 11/29/2018 | 8/10/2020 | 620 | $1,057.23 | $1.71 | $8,866.54 |
| Miller Johnson | 1685197 | $1,356.00 | 1/18/2019 | $1,356.00 | 3/12/2019 | 8/10/2020 | 517 | $153.66 | $0.30 | $1,512.18 |
| Miller Johnson | 1690140 | $44,562.85 | 2/14/2019 | $24,082.80 | 3/22/2019 | 8/10/2020 | 507 | $2,676.16 | $5.28 | $26,799.95 |
| Miller Johnson | 1691019 | $21,202.80 | 3/18/2019 | $21,491.90 | 4/24/2019 | 8/10/2020 | 474 | $2,232.80 | $4.71 | $23,750.89 |
| Miller Johnson | 1694036 | $20,531.80 | 4/17/2019 | $17,454.60 | 6/6/2019 | 8/10/2020 | 431 | $1,648.86 | $3.83 | $19,115.14 |
| Miller Johnson | 1696898 | $10,796.75 | 5/21/2019 | $10,796.75 | 6/26/2019 | 8/10/2020 | 411 | $972.59 | $2.37 | $11,774.14 |
| Miller Johnson | 1699810 | $4,467.50 | 6/13/2019 | $4,467.50 | 7/30/2019 | 8/10/2020 | 377 | $369.15 | $0.98 | $4,837.12 |
| Miller Johnson | 1702745 | $5,600.00 | 7/15/2019 | $5,600.00 | 8/26/2019 | 8/10/2020 | 350 | $429.59 | $1.23 | $6,028.90 |
| Miller Johnson | 1705620 | $12,567.50 | 8/20/2019 | $12,567.50 | 9/24/2019 | 8/10/2020 | 321 | $884.20 | $2.75 | $13,447.56 |
| Miller Johnson | 1708523 | $8,426.00 | 9/20/2019 | $6,740.80 | 11/26/2019 | 8/10/2020 | 258 | $381.18 | $1.48 | $7,117.66 |
| Miller Johnson | 1711456 | $4,400.00 | 10/18/2019 | $3,520.00 | 11/26/2019 | 8/10/2020 | 258 | $199.05 | $0.77 | $3,716.79 |
| Jenner & Block | 9463969 | $18,464.21 | 12/5/2018 | $18,464.21 | 12/5/2018 | 8/10/2020 | 614 | $2,484.83 | $4.05 | $21,016.28 |
| Jenner & Block | 9471264 | $13,406.40 | 2/12/2019 | $4,205.70 | 2/12/2019 | 8/10/2020 | 545 | $502.38 | $0.92 | $4,717.86 |

44

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Jenner & Block | 9477465 | $1,300.50 | 3/21/2019 | $1,300.50 | 2/19/2019 | 8/10/2020 | 538 | $153.35 | $0.29 | $1,456.72 |
| Jenner & Block | 9475124 | $20,495.25 | 3/21/2019 | $19,604.25 | 3/21/2019 | 8/10/2020 | 508 | $2,182.79 | $4.30 | $21,820.70 |
| Jenner & Block | 9479260 | $11,781.90 | 4/24/2019 | $1,087.20 | 5/30/2019 | 8/10/2020 | 438 | $104.37 | $0.24 | $1,192.39 |
| Jenner & Block | 9486618 | $3,672.90 | 6/7/2019 | $504.90 | 6/26/2019 | 8/10/2020 | 411 | $45.48 | $0.11 | $550.61 |
| Jenner & Block | 9489904 | $1,028.25 | 6/11/2019 | $1,028.25 | 7/30/2019 | 8/10/2020 | 377 | $84.96 | $0.23 | $1,113.32 |
| Jenner & Block | 9494262 | $168.30 | 8/7/2019 | $168.30 | 8/7/2019 | 8/10/2020 | 369 | $13.61 | $0.04 | $181.92 |
| Jenner & Block | 9497745 | $198.00 | 9/27/2019 | $198.00 | 9/27/2019 | 8/10/2020 | 318 | $13.80 | $0.04 | $211.73 |
| Jenner & Block | 9501292 | $102,109.95 | 10/21/2019 | $102,109.95 | 5/6/2020 | 8/10/2020 | 96 | $2,148.51 | $22.38 | $104,197.90 |
| Jenner & Block | 9504916 | $15,513.30 | 11/19/2019 | $1,402.20 | 5/6/2020 | 8/10/2020 | 96 | $29.50 | $0.31 | $1,430.87 |
| Jenner & Block | 9508599 | $676.35 | 12/2/2019 | $420.75 | 5/6/2020 | 8/10/2020 | 96 | $8.85 | $0.09 | $429.35 |
| Jenner & Block | 9512205 | $24,225.75 | 1/31/2020 | $24,225.75 | 5/6/2020 | 8/10/2020 | 96 | $509.74 | $5.31 | $24,721.12 |
| Jenner & Block | 9515925 | $6,288.95 | 2/24/2020 | $846.00 | 5/6/2020 | 8/10/2020 | 96 | $17.80 | $0.19 | $863.30 |
| Gibson Dunn | 2018-062784 | $165,420.88 | 7/26/2018 | $162,656.73 | 7/26/2018 | 8/10/2020 | 746 | $26,595.49 | $35.65 | $190,363.95 |
| Barnes & Thornburg | 2090001 | $15,473.85 | 3/9/2018 | $15,473.85 | 3/9/2018 | 8/10/2020 | 885 | $3,001.50 | $3.39 | $18,648.31 |
| Barnes & Thornburg | 2100527 | $102,093.53 | 4/16/2018 | $102,093.53 | 5/18/2018 | 8/10/2020 | 815 | $18,236.98 | $22.38 | $121,235.37 |
| Barnes & Thornburg | 2110847 | $118,837.92 | 5/17/2018 | $118,837.92 | 6/5/2018 | 8/10/2020 | 797 | $20,759.19 | $26.05 | $140,584.64 |
| Barnes & Thornburg | 2118684 | $111,130.96 | 6/19/2018 | $111,130.96 | 7/18/2018 | 8/10/2020 | 754 | $18,365.53 | $24.36 | $130,280.77 |
| Barnes & Thornburg | 2128878 | $42,471.98 | 7/13/2018 | $42,471.98 | 8/8/2018 | 8/10/2020 | 733 | $6,823.44 | $9.31 | $49,570.66 |
| Barnes & Thornburg | 2138718 | $47,350.10 | 8/16/2018 | $47,350.10 | 8/16/2018 | 8/10/2020 | 725 | $7,524.13 | $10.38 | $55,170.96 |
| Barnes & Thornburg | 2150115 | $57,545.85 | 9/27/2018 | $57,545.85 | 10/25/2018 | 8/10/2020 | 655 | $8,261.38 | $12.61 | $66,068.38 |
| Barnes & Thornburg | 2157013 | $24,465.40 | 10/12/2018 | $24,465.40 | 11/8/2018 | 8/10/2020 | 641 | $3,437.22 | $5.36 | $28,005.93 |
| Barnes & Thornburg | 2168393 | $20,927.00 | 11/15/2018 | $20,927.00 | 11/29/2018 | 8/10/2020 | 620 | $2,843.78 | $4.59 | $23,849.63 |
| Barnes & Thornburg | 2217622 | $17,391.54 | 4/19/2019 | $15,000.00 | 5/6/2020 | 8/10/2020 | 96 | $315.62 | $3.29 | $15,306.72 |
| Faegre | 31115729 | $99,072.00 | 4/12/2018 | $99,072.00 | 5/1/2018 | 8/10/2020 | 832 | $18,066.39 | $21.71 | $118,069.79 |
| Faegre | 31116342 | $10,841.50 | 4/27/2018 | $10,841.50 | 5/22/2018 | 8/10/2020 | 811 | $1,927.11 | $2.38 | $12,863.35 |
| Faegre | 31117336 | $1,280.00 | 5/15/2018 | $1,280.00 | 7/25/2018 | 8/10/2020 | 747 | $209.57 | $0.28 | $1,498.35 |
| Hilder | 13277 | $4,975.00 | 5/11/2018 | $4,975.00 | 5/11/2018 | 8/10/2020 | 822 | $896.32 | $1.09 | $5,916.50 |
| Hilder | 13303 | $8,884.35 | 6/13/2018 | $8,884.35 | 7/11/2018 | 8/10/2020 | 761 | $1,481.86 | $1.95 | $10,430.66 |
| Hilder | 13329 | $15,855.50 | 7/23/2018 | $11,649.38 | 9/6/2018 | 8/10/2020 | 704 | $1,797.52 | $2.55 | $13,513.55 |
| Hilder | 13367 | $1,654.57 | 9/7/2018 | $1,654.17 | 10/4/2018 | 8/10/2020 | 676 | $245.09 | $0.36 | $1,907.58 |
| Hilder | 13401 | $2,312.50 | 10/8/2018 | $2,312.50 | 11/8/2018 | 8/10/2020 | 641 | $324.89 | $0.51 | $2,647.15 |
| Hilder | 13409 | $48,923.10 | 11/6/2018 | $48,923.10 | 11/29/2018 | 8/10/2020 | 620 | $6,648.18 | $10.72 | $55,755.61 |
| Hilder | 13340 | $1,356.97 | 12/2/2018 | $1,356.97 | 11/29/2018 | 8/10/2020 | 620 | $184.40 | $0.30 | $1,546.48 |
| | | | # | | # | | | # | | |