**January 19, 2021**

**Robyn L. Moberly**
**United States Bankruptcy Judge**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| In re:<br><br>USA GYMNASTICS,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 18-9108-RLM-11 |
| USA GYMNASTICS,<br><br>Plaintiff,<br><br>v. | Adv. Pro. No. 19-50012<br>in 18-09108-RLM-11 |

[1] The last four digits of the Debtor's federal tax identification number are 7871. The location of the Debtor's principal office is 130 E. Washington Street, Suite 700, Indianapolis, Indiana 46204.

ACE AMERICAN INSURANCE COMPANY f/k/a CIGNA INSURANCE COMPANY, GREAT AMERICAN ASSURANCE COMPANY, LIBERTY INSURANCE UNDERWRITERS INC., NATIONAL CASUALTY COMPANY, TIG INSURANCE COMPANY, VIRGINIA SURETY COMPANY, INC. f/k/a COMBINED SPECIALTY INSURANCE COMPANY, AMERICAN HOME ASSURANCE COMPANY, and DOE INSURERS,

Defendants.

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON USAG'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON BANKRUTPCY COSTS**

Pursuant to 28 U.S.C. §157(c)(1), the Court now tenders its proposed findings and conclusions for de novo review by the district court. *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1947 (2015).

This matter came before the Court on USAG's motion for partial summary judgment ("the Motion") against its five General Liability ("GL") insurers and one of its Directors & Officers ("D&O") insurers (collectively, the "Insurers").[2] The Motion seeks an order compelling the Insurers to pay, as part of their duties to defend, the costs USAG has incurred in this bankruptcy case.

The Court provided the Insurers with an opportunity to take discovery, and the parties completed briefing. The Court heard oral argument on November 18, 2020. The Motion is ripe for decision. For the reasons stated below, the Court recommends that the district court DENY the Motion.

[2] The GL insurers are TIG Insurance Company ("TIG"), ACE American Insurance Company, f/k/a CIGNA Insurance Company ("ACE"), Combined Specialty Insurance Company, n/k/a Virginia Surety Insurance Company ("Combined Specialty"), Great American Insurance Company ("Great American"), and National Casualty Company ("National Casualty"). Liberty Insurance Underwriters, Inc. ("LIU") is the D&O insurer.

## I. BACKGROUND

USA Gymnastics ("USAG") is the national governing body ("NGB") for gymnastics in the United States. As such, USAG is licensed to conduct certain events, including Olympic trials, and to use certain intellectual property, including the Olympic logo, in conjunction with those events. Beginning in 2017, hundreds of former and current athletes sued USAG for sexual abuse and acts of sexual misconduct perpetrated by Larry Nassar, a USAG volunteer. USAG provided notice to the GL Insurers, who agreed to defend under a reservation of rights. The GL Insurers agreed to USAG's choice of the law firm of Miller, Johnson, Snell & Cummiskey, PLC ("Miller Johnson") to defend the sexual abuse lawsuits. Miller Johnson's role was later expanded to that of coordinating USAG's defense on a national basis as the number of sexual abuse lawsuits grew. The GL Insurers have paid the fees of Miller Johnson incurred in defending USAG, as well as the fees of other defense counsel retained by USAG.

The United States Olympic and Paralympic Committee ("USOPC") is the federal statutorily created body that certifies NGB's for Olympic sports. The negative fallout from the sexual abuse lawsuits put USAG's NGB status in jeopardy. USAG replaced members of its Board of Directors and modified other internal operations in an attempt to restore the public's and USOPC's trust in USAG. USAG participated in four mediation sessions which did not result in settlement of the sexual abuse lawsuits. The USOPC filed a decertification complaint on November 5, 2018. USAG filed its chapter 11 case on December 5, 2018.

The prosecutions of the sexual abuse lawsuits have been stayed. A Tort Claimants' Committee comprised of the sexual abuse survivors was formed and is an active participant in this chapter 11. At USAG's request, the Court appointed mediators and a Future Claimants' Representative. After a stalemate was declared in the first extensive round of mediations, the court appointed another mediator and

mediation continues. USAG also obtained a third party litigation stay where the survivors agreed to stay their lawsuits against USOPC and others. USAG moved the Court to establish a claims bar date and devised a comprehensive, detailed proof of claim form tailored to obtain information unique to sexual abuse claims. It has objected to a claim on the basis that it was procedurally improperly filed as a class claim and has objected to certain late-filed claims. USAG has filed its plan of reorganization which offers the sexual abuse survivors a choice between a "litigation option" and a "settlement option". USAG sought, and obtained, the input of the both the Tort Claimants Committee and the Insurers on several of these matters. The majority of the work in this case, however, has involved insurance coverage issues.

USAG has incurred substantial costs in this bankruptcy and has asked the GL Insurers to pay for those costs that have been incurred as well as bankruptcy costs going forward as part of their defense obligation under the policies. The GL Insurers have declined. Thus, USAG seeks a declaration that USAG's costs in maintaining this bankruptcy are covered defense costs under the GL Insurers' policies in a precise dollar amount, including fees incurred by USAG's bankruptcy counsel, the law firm of Jenner & Block ("Jenner"), as well as counsel fees for the Future Claimants' Representative and the Tort Claimants Committee.

## II. SUMMARY JUDGMENT

A party is entitled to summary judgment where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. The moving party bears the burden of proving the absence of a genuine issue of material fact and the non-moving party must affirmatively demonstrate the existence of a genuine issue of material fact requiring trial. Fed.R.Civ.P. (56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *In Re Clark,* 550 B.R. 429, 431 (Bankr. N.D. Ind. 2016). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris,* 550 U.S. 372, 378 (2007); *Perdomo v. Browner*, 67 F.3d 140, 144 (7th

Cir. 1995) (reversing grant of summary judgment after "viewing the record and all reasonable inferences drawn from the record in the light most favorable to . . . the non-moving party."). Drawing all reasonable factual inferences in favor of the Insurers, the Court must determine whether they have presented "evidence of a genuine factual dispute" warranting a trial. *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir. 1995). The factual dispute must be material, one that "might affect the outcome of the suit under the governing law." *Freese v. Honda Mfg. of Ind.*, 1:18-cv-4016-JMS-MPB, 2020 WL 3473450 at *1 (S.D. Ind., June 25, 2020) (citing *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). Factual disputes that are irrelevant to the legal question at issue will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Contract interpretation is a subject particularly suited to disposition by summary judgment" because the construction of a written contract is a question of law. *Grun v. Pneumo Abex Corp.*, 163 F.3d 411, 419-20 (7th Cir. 1998); *Celadon Trucking Services, Inc. v. Worth*, 70 N.E.3d 833, 842 (Ind. Ct. App. 2017); *Von Hor v. Doe*, 867 N.E.2d 276, 278 (Ind. Ct. App. 2007).

## III. GOVERNING LAW AND THE POLICIES

### A. Interpretation of Insurance Policies

The parties agree that Indiana substantive law governs the interpretation of the GL Policies for purposes of this Motion. USAG bears the burden to prove that the bankruptcy expenses it seeks to recover by this Motion fall within the scope of the GL Policies' insuring agreements. *PSI Energy, Inc. v. Home Ins. Co.*, 801 N.E.2d 705, 726-27 (Ind. Ct. App. 2004). Accordingly, USAG must show that all of the costs that it seeks constitute covered "defense costs" within the terms of the GL Policies.

As a federal court exercising diversity jurisdiction, this Court is required to follow the law as it is articulated by the Indiana Supreme Court. *See Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1090 (7th Cir. 1999). If that Court has not spoken to the issue, the Court must predict how the Indiana Supreme Court would

decide the question. *Id.* "[I]n the absence of prevailing authority from the state's highest court, federal courts ought to give great weight to the holdings of the state's intermediate appellate courts." *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 637 (7th Cir. 2002). Federal courts "ought to deviate from those holdings only when there are persuasive indications that the highest court of the state would decide the case differently." *Id.*

Under Indiana law, "[a]n insurer's duty to defend claims against the insured is contractual, *i.e.*, as specified in the contract of insurance." *Drake Ins. Co. of N.Y. v. Carroll County Sheriff's Dept.*, 427 N.E.2d 1153, 1155 (Ind. Ct. App. 1981); *All-Star Ins. Corp. v. Steel Bar, Inc.*, 324 F. Supp. 160, 163 (N.D. Ind. 1971) ("The nature of the insurer's duty to defend is purely contractual. There is no common law duty to which the courts are free to devise rules. The obligation on the court is merely to interpret the language of the insurance contract."); *TIG Ins. v. City of Elkhart*, 122 F.Supp. 3d 795, 804 (N.D. Ind. 2015)("[w]hat really matters in deciding coverage questions is what the individual insurance policy at issue actually says. In other words, it is the language of the insurance contract that governs coverage, not some blanket judge-made rule").

The GL Policies "are subject to the same rules of construction as other contracts." *Burkett v. American Family Ins. Group*, 737 N.E.2d 447, 452 (Ind. Ct. App. 2000); *Colonial Penn Ins. Co. v. Guzorek*, 690 N.E.2d 664, 667 (Ind. 1997). It is the function of a court to "interpret an insurance policy with the goal of ascertaining and enforcing the parties' intent as revealed by the insurance contact." *Wright v. Am. States Ins. Co.*, 765 N.E.2d 690, 692 (Ind. Ct. App. 2002). "Clear and unambiguous language in insurance policy contracts, like other contracts, should be given its plain and ordinary meaning." *Cinergy Corp v. Associated Elec. & Gas Ins. Servs., Ltd.*, 865 N.E.2d 571, 574 (Ind. 2007); *Eli Lilly and Co. v. Home Ins. Co.*, 482 N.E.2d 467, 470 (Ind. 1985). Courts "must construe the insurance policy as a whole, rather than considering individual words, phrases or paragraphs," *Wright*, 765 N.E.2d at 692-93, and "must accept an interpretation of the contract language that

harmonizes the provisions, rather than one that supports conflicting versions of the provisions." *Thomson Inc. v. Ins. Co. of N. Am.*, 11 N.E.3d 982, 994 (Ind. Ct. App. 2014). Nothing in Indiana law permits the Court to rewrite the insurance contracts or "extend insurance coverage beyond that provided by the unambiguous language in the contract." *See Sheehan Const. Co., Inc. v. Continental Cas. Co.*, 935 N.E.2d 160, 169 (Ind. 2010); *Gillespie v. GEICO Gen. Ins. Co.*, 850 N.E.2d 913, 917 (Ind. Ct. App. 2006). Courts "may not extend coverage beyond that provided in the contract," and "may not interpret the policy to mean something that it clearly does not or was not intended to mean," even if doing so "limits the insurer's liability." *Rice v. Meridian Ins. Co.*, 751 N.E.2d 685, 689 (Ind. Ct. App. 2001).

## B. THE GL POLICIES

The GL Insurers issued commercial general liability primary policies to USAG over roughly a thirty year period from 1986 to 2018 ("GL Policies"). The GL Policies contain substantially similar material terms, including their insuring agreements, supplementary and voluntary payments provisions that delineate the GL Insurers' right and duty to defend suits against USAG:[3]

> 1. INSURING AGREEMENT
>
> a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" … to which this insurance applies. **We will have the right and duty to defend the insured against any "suit" seeking those damages**. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" … to which this insurance does not apply.
>
> b. This insurance applies to "bodily injury" only if:
>
> (1) The "bodily injury" is caused by an "occurrence" that takes place in the "coverage territory"; and
>
> (2) The "bodily injury" occurs during the policy period. [Bolding added.]

[3] A policy containing the language at issue here can be found at Adv. Dkt 19-50012 #2-9, p.609 of 1011.

The GL Policies define the term "suit" to mean a "civil proceeding in which damages because of 'bodily injury' … to which this insurance applies are alleged." The GL Policies' "supplementary payments" provision states:

> 1. We will pay, with respect to any claim we investigate or settle, **or any "suit" against an insured we defend**:
>
> a. All expenses **we incur**.
>
> * * *
>
> d. All reasonable expenses incurred by the insured **at our request** to assist us in the investigation or defense of the claim or "suit". [Bolding added.]

The GL Policies' "no voluntary payments" provision states:

> d. No insured will, except at the insured's own cost, **voluntarily** make a payment, assume any obligation or incur any expense, other than for first aid, **without our consent**. [Bolding added.]

Finally, the GL Policies' "bankruptcy conditions" provision states:

> 1. Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

## C. The LIU Policy

LIU issued a D & O policy covering the period from May 16, 2016 to May 16, 2017. [4] The Insuring Agreement provided that LIU:

> shall pay on behalf of the **Insureds** all **Loss** which they shall become legally obligated to pay as a result of a **Claim** first made during the **Policy Period** or **Discovery Period**, if applicable, against the **Insureds** for a **Wrongful Act** which takes place before or during the **Policy Period**."

The policy defined "claim": as

> **(a)** a written demand for monetary or non-monetary relief *against an **Insured***;
> **(b)** the commencement of a civil or criminal judicial proceeding or arbitration *against an **Insured***; [or]
> **(c)** the commencement of a formal criminal, administrative or regulatory proceeding or formal investigation *against an **Insured**….*"

[4] The LIU Policy can be found at Adv. Dkt. 19-50012 #501-2, page 3 of 29.

"Wrongful Act" was defined as "any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty…committed or attempted…by the **Insured Organization**." The LIU Policy defined "**"Defense Costs"**" to mean "reasonable and necessary fees (including attorneys' fees and experts' fees) and expenses incurred *in the defense of a **Claim*** and cost of attachment or similar bonds, but shall not include the wages, salaries, benefits or expenses of any directors, officers or employees of the **Insured Organization**." Further, the LIU Policy provides that "[t]he **Insureds** shall not incur any **Defense Costs**…with respect to any **Claim** without the Insurer's prior written consent, which shall not be unreasonably withheld," and LIU "shall not be liable for any **Defense Costs** incurred…without the Insurer's prior written consent."

The LIU Policy also provides:

> If any **Loss** arising from any **Claim** is insured by other valid and collectible insurance, then this Policy shall apply only in excess of the amount of any deductibles, retentions and limits of liability under such other policy or policies, whether such other policy or policies are stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written specifically excess of this Policy by reference in such other policy to this Policy's Policy Number.

The GL Policies define "suit" as "a civil proceeding in which damages because of 'bodily injury' . . . to which this insurance applies are alleged." The LIU Policy uses the term "Claim," which is broadly defined to even cover "a written demand for monetary relief" but such demand must be "against the Insured". No one disputes that the sexual-abuse lawsuits against USAG are "claims" or "suits" *under the relevant policies,* but is the chapter 11 bankruptcy itself a "claim" or a "suit" under the policies?

## IV. ANALYSIS

### A. MOTIVE FOR FILING BANKRUPTCY IRRELEVANT

The parties give a fair amount of discussion to USAG's motive in filing the chapter 11. The Insurers note that defense of the sexual abuse lawsuits by Miller Johnson and other defense counsel was operating smoothly and it was not until the USOPC filed its decertification action that USAG decided to file a chapter 11 case. USAG argues that the purpose of the filing was to resolve the claims related to the sexual abuse lawsuits in one convenient forum. This Court, in the course of various hearings, has commented that this case is "about" resolution of the sexual abuse claims. USAG further argues that it had already proposed to the USOPC the possibility of filing a chapter 11 case before the decertification complaint was filed.

Most chapter 11 reorganization cases have reputation rehabilitation as a goal. Without post-bankruptcy support from customers, members, or clients, most businesses would ultimately fail; USAG is no exception. Restructuring the leadership of USAG and developing Safe Sport[5] policies are analogous to actions taken by other for-profit and not-for-profit debtors to improve their chances for a successful exit from bankruptcy. Likewise, restructuring the leadership and developing Safe Sport policies are consistent with actions done in a civil settlement to satisfy constituents and enhance settlement possibilities.

USAG's motive for filing was multi-faceted and the chapter 11 most likely was filed for all the reasons mentioned above. The overwhelming number of pleadings, issues, efforts, and time in this case has been related to resolution of insurance coverage issues (both in pleadings and court rulings as well as in mediations) and resolution of the survivors' claims. Staying decertification was considered by USAG but has not been an issue or even addressed in this case. USOPC has not requested the stay be lifted and has not indicated any intent to proceed with decertification. There has been no pleading nor ruling by the Court, other than the statutory automatic stay, entered in this case. In fact, USOPC is a

---

[5] Protecting Young Victims From Sexual Abuse and Safe Sport Authorization Act of 2017 (the "Safe Sport Act") Pub. L. No. 115-126, 132 Stat 318 (Feb 14, 2018).

co-defendant in some or most of the pending sex abuse lawsuits and it is logical that USOPC is similarly situated with USAG in the arena of public opinion and may be aligned with USAG in its filing. Determination of coverage is controlled by the policy language and motive for filing is irrelevant to the issue of insurance coverage for this bankruptcy, just as it is in any coverage matter. Therefore, the court puts no weight in the debtor's motivations or concerns about its reputation.

### B. THE BANKRUPTCY CASE IS NOT A 'SUIT' UNDER THE GL POLICIES

Indiana case law broadly defines "defense costs" as expenses incurred to minimize liability and resolve claims. *Thomson*, 11 N.E.3d at 1026-27. USAG makes three major arguments why the bankruptcy fees are covered under the GL Policies: (1) these costs fit within Indiana's broad concept of defense costs and a policyholder's right to a "complete defense"; (2) the use of a chapter 11 bankruptcy is the way modern mass torts are most efficiently and effectively defended; and (3) insurers have routinely paid these costs or arranged for their payment as part of the resolution of just this kind of chapter 11 mass tort. While these points have merit, it is the policy language that controls.

The GL Policies define a "suit" as a "civil proceeding" that alleges damages for "bodily injury" to which the insurance coverage applies. A bankruptcy case is a "civil proceeding", but for the duty to defend to be triggered, the "suit" has to be a civil proceeding in which damages for bodily injury are alleged. Coverage under the GL Policies, then, necessarily involves costs incurred in defending a claim for bodily injury alleged by another against USAG. This is the plain and commonly understood definition of "suit": B is the insured and A sues B for damages for something B did to A. Indeed, Black's Law Dictionary defines "suit" as "a generic term, of comprehensive signification, referring to any proceeding by one person or persons *against* another or others in a court of law in which the plaintiff pursues the remedy that the law affords for the redress of an injury or the enforcement of a right, whether at law or in equity." (emphasis added). Black's Law Dictionary, 1434 (6th ed. 1990). A "bankruptcy" is

defined as "a statutory procedure by which a …debtor obtains financial relief and undergoes a judicially supervised reorganization or liquidation of the debtor's assets for the benefit of creditors…" Black's Law Dictionary, 180 (11th ed. 2019). These definitions demonstrate the difference between a "suit" involving a plaintiff and specific defendants, and a "bankruptcy" involving a debtor and its collective body of creditors.

### 1. A Bankruptcy Discharge Does Not Minimize or Eliminate Liability, But Merely Bars Collection of the Debt

A civil suit seeking damages against a policyholder, such as a lawsuit alleging sexual abuse, necessarily possesses an adversarial tenor and requires that the parties litigate the defendant's liability and the plaintiff's damages through discovery, motion practice and, if necessary, trial. The purpose of expending defense costs is to minimize those liabilities and damages. The insurer and its policyholder have a shared interest to minimize liability and defense costs to further that common purpose. The very nature of a bankruptcy proceeding alters that shared interest.

The debtor in a chapter 11 reorganization is not concerned with trying to minimize or dismiss tort liabilities, but rather with obtaining a discharge and emerging as an operating entity. The resulting discharge does not eliminate or lessen liability on claims against the debtor; it merely bars collection of that debt from the debtor. *See Matter of Shondel*, 950 F.2d 1301, 1306 (7th Cir. 1991) ("[A] discharge under Section 524 does not prevent the establishment of liability for the purpose of recovery from an insurer."); *In re Coho Resources, Inc.*, 345 F.3d 338, 343 (5th Cir. 2003) ("[C]ourts are in 'near unanimous agreement' that § 524(e) 'permits a creditor to bring, and proceed in, an action nominally directed against a discharged debtor for the sole purpose of proving liability on its part as a prerequisite to recovering from its insurer.'"); *Green v. Welsh*, 956 F.2d 30, 33–34, 36 (2nd Cir. 1992) ("In sum, we find that the discharge injunction under §§ 524(a) and 524(e) permits Green to continue her suit against the Welshes, without requiring her to obtain a modification of the injunction, but only to prove liability as a prerequisite to recovery from the Welshes' liability insurer.").

The litigation option under USAG's proposed chapter 11 plan does not calculate, eliminate, or lessen USAG's liability for the sexual abuse claims: it merely bars collecting on that debt from the debtor. That option permits the pre-petition sexual abuse lawsuits to resume, and new sexual abuse claims to be filed. All such lawsuits would be litigated in court, presumably defended by USAG's insurers, and be paid (if at all) only from USAG's insurance. Nor does the settlement option resolve claims. Under this option, a trust would be established and the sexual abuse claims would be channeled to that trust for eventual resolution. The pending proposed plan does not evaluate nor classify the value of survivors' claims by the usual defensive criteria, such as statute of limitations, degree of physical harm both short term and permanent, pain and suffering, pecuniary loss, medical or psychological treatment, or culpability of USAG. Nothing in the proposed plan or pleadings filed by USAG indicate that the bankruptcy case would be used to adjudicate the claims against USAG or attempt to reduce its liability.

**2. USAG's Claims Objections Were Not Filed to Determine USAG's Liability**

A proof of claim filed in a bankruptcy case is deemed allowed unless objected to. *See* 11 U.S.C. § 502(a). A "contested proceeding" arises upon the filing of an objection and at that point, there may be discovery taken and arguments may be made about the validity and amount of the claim. *See IRS v. Taylor (In re Taylor)*, 132 F.3d 256, 260 (5th Cir. 1998) ("An objection to a proof of claim serves to initiate a contested matter."); *In re WorldCom, Inc.*, 372 B.R. 159, 164 (Bankr. S.D.N.Y. 2007) ("the filing of an objection to a proof of claim commences a contested matter"). Because the objection process commences a contested matter bearing many similarities to civil litigation, USAG might have had an argument that it is entitled to recover "defense" costs for pursuing claim objections. But,the claims objections pursued here, combined with the language of the GL Policies, deem otherwise. First, the language of the GL Policies is not broad enough to require a defense for "any claim"; it is limited to a

"suit" in which damages for bodily injury are alleged. *See Amatex Corp. v. Aetna Cas. & Surety Co. (In re Amatex Corp.)*, 107 B.R. 856, 869-70 (Bankr. E.D. Pa. 1989). (where the bankruptcy court held that an insurer was required to defend proof of claim proceedings against the debtor where the policy expressly required a defense for "any claim" against the insured). Second, while the claims may have alleged bodily injury, USAG's objections had nothing to do with disputing its liability for the bodily injury allegedly caused. Out of more than 500 unique sexual abuse claims filed in this case, USAG has objected to only a few claims, most of which were simply duplicate claims, along with one class claim that USAG objected to on procedural grounds. The objections did not contest USAG's liability on the underlying merits of the claim. USAG has not conducted discovery nor raised any defenses with respect to the sexual abuse claims and the objections it filed do not seek to lessen USAG's liability on those claims.

### 3. USAG's Fiduciary Duties Alter the "Unity of Interests" With Its Insurers

A debtor in possession's fiduciary duties further illustrate how a bankruptcy alters the relationship between an insured and its insurer. As the debtor in possession of the bankruptcy estate, the debtor owes a fiduciary obligation to creditors and necessarily cannot act only in its own interest. *See, e.g., In re Scott*, 172 F.3d 959, 967 (7th Cir. 1999) ("[t]he debtor-in-possession owes a fiduciary duty to his creditors"); *In re Mack Industries*, 606 B.R. 313, 320 (Bankr. N.D. Ill. 2019); 11 U.S.C. § 1107(a). This includes, in appropriate circumstances, duties of care and to maximize estate assets and distributions to creditors—the same persons that held opposing interests prior to the petition. *See Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991). A chapter 11 debtor no longer has the same unity of interests with its insurer and, in some cases, has interests that may be diametrically opposed. In a chapter 11 case filed to deal with asbestos personal injury lawsuits, a bankruptcy court likened insurance coverage to a "pie" where the debtor, claimants, and the future claimants' representative in that case had a common

interest (adverse to the insurers) in maximizing the size of the pie, even if they have conflicting interests in how to divide the pie amongst themselves. *In re Leslie Controls, Inc.*, 437 B.R. 493, 500 (Bankr. D. Del. 2010). At a minimum, USAG's focus in the bankruptcy is not to challenge or defeat claimants' allegations but to marshal insurance coverage for the claimant's benefit. The chapter 11 is a procedural vehicle by which USAG can gather, maximize and then divvy up insurance proceeds in resolution of the sexual abuse lawsuits. This objective is far different than the duty to defend objective of minimizing an insured's liability.

**4. There is No Legal Precedent That Extends an Insurer's Duty to Defend to Payment of Bankruptcy Costs.**

Neither USAG nor the Insurers have directed this Court to a case where payment of a debtor's bankruptcy costs fell under a duty to defend. USAG puts much stock in the *Thomson* case to support its argument that the bankruptcy costs here fall under the general notion of "defense costs". *Thomson* is neither analogous nor supportive of USAG's arguments.

Thomson was not a debtor in bankruptcy . Rather, the issue there was whether the insurer (which had previously been found to have a duty to defend) was obligated to pay the costs of prosecuting a third-party indemnity claim as a "reasonable" defense cost. The underlying suit against Thomson was brought in Taiwan by plaintiffs and estates of those who allegedly were injured or died due to exposure to organic solvents. Thomson sought a defense and indemnity from its general liability insurers, which asserted various coverage defenses and resulted in coverage litigation. Thomson later moved for summary judgment to recover fees as defense costs, including fees incurred in prosecuting a third party indemnity claim. The insurer's expert testified that the time spent pursuing indemnity claims against third parties should be excluded from the insured's "reasonable and necessary costs." 11 N.E. 3d at 1025-1026. The *Thomson* court rejected this notion

and cited in footnote 26 to an Illinois case which held that a duty to defend extends to "all litigation by the insured which could defeat its liability…." The ruling in *Thomson* simply reflected that the setoff from the indemnity litigation would reduce the policyholder's liability and, as a consequence, the insurer's obligation to pay on account of it. The *Thomson* case may indicate that an insured's claims and actions for indemnity and contribution (which reduce or defeat the insured's liability) fall under an insured's duty to defend, but nothing in *Thomson* analyzed the relevant policy language or the scope of the duty to defend because that issue had already been decided in a prior ruling that was not the subject of the appeal.

USAG aptly points to a number of other bankruptcies where insurers have agreed, in the context of settlements resolving coverage and effecting plan confirmation, to allow insurance proceeds to be used to pay administrative costs. It is likely true that insurance companies have agreed to fund other bankruptcy cases of their insureds for the reasons USAG cites in its papers. In a mass tort context, bankruptcy is an efficient venue to resolve mass tort claims by bringing them together in one venue, mediating all claims in any flexible manner a court should order or the parties agree, banding similar claims together for efficiency and consistency, ending potential future claims, and generally being very cost-effective. These cases reflect that insurers contributed to settlements involving substantial benefits to the insurers, including policy release, injunctive relief and protection against extra contractual claims, as part of a global deal. While the economic, logistical and systemic advantages of the bankruptcy forum may be a reason for insurers to voluntarily fund an insured's bankruptcy, it is not a reason for this Court to stretch or rewrite the contractual coverage obligation. This Court declines to rewrite the policy language, especially in light of other courts that have denied coverage for similar costs. See, *Milwaukee Notions, Inc. v. Erie Ins. Exch. (In re Milwaukee Notions, Inc.)*, Adv. No. 07-2292, 2009 WL 1351101, at *6-7 (Bankr. E.D. Wis. May 11, 2009) (bankruptcy court held that expenses incurred in responding to Rule 2004 examinations which may have aided the debtor's defense in underlying litigation, the

preparation of schedules and the filing of a cash use motion were not covered defense costs).

On the contrary, courts consistently hold that the plain language of insurance contracts similar to those at issue here dictate that the duty to defend does not extend to an insured's affirmative claims for relief or causes of action (*e.g.*, counterclaims or claims asserted in altogether different lawsuit). *See, e.g., Global Caravan Techs., Inc. v. Cincinnati Ins. Co.*, 135 N.E.3d 584 (Ind. Ct. App. 2019) (affirming trial court's summary judgment ruling that insured's voluntary intervention in pending litigation in which no claim for damages was asserted against it was not a "suit" under the language of its insurance contract).

In *Global Caravan*, the named insured intervened in a lawsuit pending against certain other insureds (who were being defended by the insurer). The named insured sought coverage for "defense" of that action from the insurer, which then sought a declaration that it had no such duty to the named insured in that action. The policy's definition of "suit" was identical to the definition of "suit" in the GL Policies here. The trial court granted summary judgment to the insurer on the basis that the named insured's intervention was not a "suit" against the named insured seeking damages, even if the named insured's intervention had the purpose of preventing recovery from its assets. *Id.* at 588. The trial court characterized the insured's argument as an "invitation … to ignore well-settled Indiana law and the … Policy language to impose a duty to defend upon [the insurer] in the absence of a 'suit' against [the named insured]." *Id.* at 590. The trial court declined that invitation. The Court of Appeals affirmed, agreeing that the case was not a "suit" against the named insured seeking damages.

USAG's further contention that the "policies do not exclude bankruptcy as a defense cost" is of no merit. The fact that the policies do not expressly exclude bankruptcy costs as covered costs is not the standard under which coverage is determined. USAG bears the initial burden of showing that expenses fall within the policies' insuring agreements. *PSI Energy, Inc.*, 801 N.E.2d at 726-27. The

bankruptcy clause in the policy is further unavailing. It provides that bankruptcy of the insured will not relieve the Insurers of their obligations "under this Coverage part", meaning the coverage terms of the policy. This simply means that the GL Insurers' duty to defend and pay the defense costs of Miller Johnson and other approved defense counsel continues even though USAG has filed a bankruptcy case.

**5. The Bankruptcy is not a Defense Strategy**

USAG argues that because the GL Insurers are providing a defense of the Sexual Abuse Lawsuits under a reservation of rights, USAG has the right to control its defense and its chapter 11 case is its defense strategy. The case USAG cites for support—*Armstrong Cleaners Inc. v. Erie Ins. Exch.*, 364 F. Supp. 2d 797, 806-07 (S.D. Ind. 2005) (holding that in this situation, the insurer faces an "insurmountable conflict of interest" and loses the right to control the defense)—provides none. It simply decided whether an insured being defended under a reservation of rights was entitled to select its own counsel to defend it based on the particular facts in that case. Here, USAG has chosen its own defense counsel—Miller Johnson. There is no basis for extrapolating that the rule that an insured is entitled to independent defense counsel in certain circumstances means that the GL Insurers must pay the $6.2 million bill for this bankruptcy.

This chapter 11 case is a means by which USAG can rehabilitate its brand and move forward without the weight of litigating hundreds of sexual abuse claims. By all means, this proposed order does not reach the issue of whether an Insurer would have a contractual obligation to defend contested matters in a bankruptcy context where the debtor was actively denying liability and putting forth a defense to each survivor. But based on what is before the court, the bankruptcy is not a "defense" strategy. It is not a lawsuit brought by one or many persons against the insured. This bankruptcy case was brought by the insured, and not against anyone else. No sexual abuse party in this mass tort bankruptcy can obtain enforcement of their rights; it must be consensual. A bankruptcy forum is typically where agreements can be reached in a mass tort case because the alternative venue,

district and state trial courts where enforcement is achieved, is frequently slower, more expensive, and unpredictable. USAG's aim is to reorganize and discharge its debts and to rehabilitate its tarnished image. The bankruptcy is neither in form nor substance a "suit" against USAG that is "seeking [covered] damages." The supplementary payments and other no voluntary payments policy provisions confirm that the defense obligation provides for the insurer to protect the parties' shared interest in minimizing liability. The bankruptcy is not a "suit" and the GL Insurers are not obligated under the terms of the policies to pay the bankruptcy costs as part of their duty to defend.

### C. THE BANKRUPTCY CASE IS NOT A "CLAIM AGAINST" THE INSURED UNDER THE LIU POLICY

The LIU Policy provides coverage of "claims against the insureds". "Claim" is broadly defined under the policy to include "a written demand for monetary or non-monetary relief against an Insured" and thus is not limited to "suits" as is found in the GL Policies. However, the qualifying language that such written demand must be "against" the insured nonetheless dictates the same result of no duty to defend. This bankruptcy, initiated by USAG, is not a proceeding "against" USAG. The bankruptcy is not a claim for a "wrongful act" which is defined under the policy as "any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty…committed or attempted…by the **Insured Organization**." The discussion above pertaining to no contractual obligation by the GL Insurers to pay bankruptcy costs under their duty to defend applies equally here. LIU's duty to defend does not extend to payment of bankruptcy costs.

The language of the insurance policies is unambiguous. Its plain meaning dictates that the bankruptcy is neither a "suit" nor a "claim" that triggers the Insurers' duty to defend. USAG is not entitled to summary judgment on this issue.

## V. PROPOSED RELIEF

The Court recommends that the district court DENY USAG's Motion for Partial Summary Judgment on Bankruptcy Costs .

# # #