# EXHIBIT 1



## LIBERTY INSURANCE UNDERWRITERS INC.

## NONPROFIT EXECUTIVE ADVANTAGE POLICY

In Witness Whereof, we have caused this policy to be signed by its President and Secretary.

PRESIDENT
Christopher L. Peirce

VICE PRESIDENT and SECRETARY
Mark C. Touhey



## Nonprofit Executive Advantage Policy

# LIBERTY INSURANCE UNDERWRITERS INC.

(A Stock Insurance Company, hereinafter the "Insurer")
55 Water Street, 23rd Fl, New York, NY  10041
Toll-Free number: 1-800-677-9163

## NONPROFIT EXECUTIVE ADVANTAGE POLICY

## DECLARATIONS

---

**NOTICE:  THIS IS A CLAIMS-MADE POLICY.  THIS POLICY COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR DISCOVERY PERIOD, IF APPLICABLE, AND REPORTED TO THE INSURER AS SOON AS PRACTICABLE BUT IN NO EVENT LATER THAN 90 DAYS AFTER THE END OF THE POLICY PERIOD.  PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.**

**UNLESS AMENDED BY ENDORSEMENT, AMOUNTS INCURRED AS DEFENSE COSTS SHALL BE IN ADDITION TO THE LIMIT OF LIABILITY AND SHALL NOT BE APPLIED AGAINST THE APPLICABLE RETENTION.**

**THE INSURER HAS THE DUTY TO DEFEND.**

---

**POLICY NUMBER:** DOCHAA5JSQ002          **PRODUCER:** US Pro Insurance Services
                                                          27475 FERRY ROAD, SUITE 131
                                                          WARRENVILLE, IL  60555

**RENEWAL OF:**      DOCHAA5JSQ001

**ITEM I.     NAME AND ADDRESS OF PARENT ORGANIZATION:**
              USA GYMNASTICS
              132 E WASHINGTON ST, STE 700
              INDIANAPOLIS
              INDIANA
              46204

**ITEM II.    POLICY PERIOD:**          Inception Date: May 16, 2016     Expiration Date: May 16, 2017
                                        (12:01 A.M. at the address set forth in Item I)

**ITEM III.   LIMIT OF LIABILITY:**     $5,000,000 in the aggregate for the **Policy Year**

**ITEM IV.    RETENTION:**              $25,000 in the aggregate each **Claim**

**ITEM V.     PRIOR LITIGATION DATES:** 5/16/2009

**ITEM VI.    PREMIUM:**                $19,057

              TRIA Premium             $0
              Surcharges and Taxes     NA

**ITEM VII.   ENDORSEMENTS FORMING PART OF THIS POLICY AT ISSUANCE:**
              See Attached Schedule

| 1 | 2 |
|---|---|

LIUI00DO030010507



## Nonprofit Executive Advantage Policy

This Declarations page, together with the **Application**, the attached Nonprofit Executive Advantage Policy Form, and all endorsements thereto, shall constitute the contract between the Insurer and the **Insureds**. This Policy is valid only if signed below by a duly authorized representative of the Insurer.

PRESIDENT                                    VICE PRESIDENT and SECRETARY
Christopher L. Peirce                              Mark C. Touhey

LIUI00DO030010507



## Nonprofit Executive Advantage Policy

# LIBERTY INSURANCE UNDERWRITERS INC.

(A Stock Insurance Company, hereinafter the "Insurer")
55 Water Street, 23rd Fl, New York, NY  10041
Toll-Free number: 1-800-677-9163

### NONPROFIT EXECUTIVE ADVANTAGE POLICY

(Words and phrases printed in **bold**, other than
in the headings, are defined in Section 23 below.)

In reliance upon the truthfulness and accuracy of the statements made in the **Application**, in consideration of, and subject to, the payment of premium when due, and subject to the terms, conditions, and exclusions of this Policy, the Insurer and the **Insureds** agree as follows:

**1.**  **Insuring Agreement:** The Insurer shall pay on behalf of the **Insureds** all **Loss** which they shall become legally obligated to pay as a result of a **Claim** first made during the **Policy Period** or **Discovery Period**, if applicable, against the **Insureds** for a **Wrongful Act** which takes place before or during the **Policy Period**.

**2.**  **Defense Costs and Settlements:**

    **2.1**  It shall be the right and duty of the Insurer to defend any **Claim**.  The Insurer may investigate, as it deems appropriate, any **Claim**, circumstance, or **Wrongful Act** involving the **Insureds**.

    **2.2**  The **Insureds** shall not incur any **Defense Costs**, admit any liability, assume any obligation, agree to any settlement, or make any settlement offer with respect to any **Claim** without the Insurer's prior written consent, which shall not be unreasonably withheld.  The Insurer shall not be liable for any **Defense Costs** incurred or any admissions, obligations, agreements, or settlements made by the **Insureds** without the Insurer's prior written consent.

    **2.3**  The Insurer has the right to negotiate the settlement of any **Claims** it deems expedient, but only with the **Insured's** consent.  If the **Insureds** withhold consent to such settlement, the Insurer's liability for such **Claim** is limited to the amount in excess of the Retention which the Insurer would have contributed to the settlement had the **Insured** consented to the settlement, and 70 percent (70%) of any additional covered **Loss,** including **Defense Costs**, incurred subsequent to such refusal to settle.

**3.**  **Cooperation**: As a condition precedent to the **Insureds'** rights under this Policy, they shall give to the Insurer all information and cooperation as the Insurer reasonably may require and shall do nothing that may prejudice the Insurer's position or its rights of recovery.

**4.**  **Claim Exclusions:** This Policy does not apply to any **Claim** made against any **Insured**:

    **4.1**  for:

        **(a)**  bodily injury, sickness, disease, death; or

        **(b)**  emotional distress, mental anguish, false arrest or imprisonment, abuse of process, malicious prosecution, violation or invasion of any right of privacy or private occupancy, trespass, nuisance or wrongful entry or eviction; or

        **(c)**  libel, slander, defamation; or

        **(d)**  damage to, destruction of, or loss of use of any tangible property;

    provided that parts (b) and (c) of this exclusion shall not apply to any **Claim** brought by or on behalf of any **Third Person,** or any past, present or prospective **Insured Person** for an **Employment Practices Wrongful Act**; also provided that part (c) of this exclusion shall not apply to any **Claim** for any other **Wrongful Act** other than an **Employment Practices Wrongful Act**. However, coverage

LIUI00DO010010507

**Nonprofit Executive Advantage Policy** 

afforded for libel, slander or defamation for **Wrongful Acts** other than **Employment Practices Wrongful Acts** shall be excess of any coverage afforded by the **Insured's** general liability policy;

**4.2**   for any error, misstatement, misleading statement, act, omission, neglect or breach of duty by **Insured Persons** of any **Subsidiary** in such capacity or by the **Subsidiary** itself if such error, misstatement, misleading statement, act, omission, neglect or breach of duty actually or allegedly occurred, in whole or in part, when such entity was not a **Subsidiary**;

**4.3**   based upon, arising from, or in any way related to any error, misstatement, misleading statement, act, omission, neglect or breach of duty which has been reported or has been the subject of any notice under any insurance policy of which this Policy is a renewal or replacement or under any other policy which it may succeed in time;

**4.4**   for any actual or alleged violation of the Employee Retirement Income Security Act of 1974, amendments thereto or similar federal, state, local or common law;

**4.5**   based upon, arising from, or in any way related to:

(a)   any demand, suit, or other proceeding against any **Insured** which has been made, which existed, or was pending prior to the applicable Prior Litigation Date set forth in Item V of the Declarations; or

(b)   the same or substantially the same facts, circumstances or allegations involved in such demand, suit, or other proceeding;

**4.6**   brought or maintained by or on behalf of the **Insured Organization**;

**4.7**   based upon, arising from, or in any way related to the actual, alleged, or threatened discharge, dispersal, release or escape of **Pollutants, Fungi** or **Microbes**, or any direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify, or neutralize **Pollutants, Fungi** or **Microbes**;

**4.8**   based upon, arising from, or in any way related to an **Insured Person** serving as a director, officer, trustee, regent, governor, volunteer, employee, or similar position of any entity other than the **Insured Organization;** or

**4.9**   based upon, arising from, or in any way related to:

(a)   any **Insureds** gaining in fact any personal profit, remuneration or advantage to which they were not legally entitled; or

(b)   any deliberately dishonest, malicious or fraudulent act or omission or any willful violation of law by any **Insured;**

provided, however, this exclusion shall only apply if it is finally adjudicated that such conduct in fact occurred.

For purposes of determining the applicability of Section 4.9, the **Wrongful Act** of any **Insured Person** shall not be imputed to any other **Insured Person.**

**5.**   **Loss Exclusions:** The Insurer shall not be liable to pay any **Loss** in connection with any **Claim**:

**5.1**   for any obligation of the **Insured Organization** to modify any building or property in order to affect compliance with the Americans With Disabilities Act and any amendments thereto or any similar federal, state or local statute, regulation, or common laws; or

LIUI00DO010010507



## Nonprofit Executive Advantage Policy

5.2     for any actual or alleged liability of any **Insured** under any contract or agreement, express or implied, written or oral, except for employment related obligations which would have attached absent such contract or agreement.

Provided, however, that these exclusions shall not apply to the Insurer's duty to defend and to pay **Defense Costs**.

6.     **Application Representations and Severability:**

6.1     The **Insureds** represent that the statements and representations contained in the **Application** are true and shall be deemed material to the acceptance of the risk or the hazard assumed by the Insurer under this Policy. This Policy is issued in reliance upon the truth of such statements and representations.

6.2     The **Insureds** agree that if the **Application** contains any statements or representations that are untrue, this Policy shall be void as to the **Insured Organization** and any **Insured Person** who knew the facts that were not truthfully disclosed, provided that such knowledge shall not be imputed to any other **Insured Person**.

7.     **Reporting Requirements:**

7.1     The **Insureds**, as a condition precedent to their rights under this Policy, shall report every **Claim** to the Insurer as soon as practicable from the date any **Executive Officer** has knowledge of the **Claim**, and in no event later than ninety (90) days after the end of the **Policy Period**.

7.2     Notice of any **Claim**, circumstance, or **Wrongful Act** shall be forwarded to **Liberty International Underwriters, 55 Water Street, 18th Floor, New York, NY 10041 Attention: Specialty Casualty Claims**.

7.3     All notices under this Policy shall be sent in writing by mail, prepaid express courier, or facsimile and shall be effective upon receipt thereof by the addressee.

8.     **Notice of Circumstance or Wrongful Act:** If during the **Policy Period** or the **Discovery Period** the **Insureds** become aware of any circumstance or **Wrongful Act** that reasonably may be expected to give rise to a **Claim**, and if such circumstance or **Wrongful Act** is reported to the Insurer during the **Policy Period** in writing with details as to the nature and date of such circumstance or **Wrongful Act**, the identity of any potential claimant, the identity of any **Insured Person** involved in such circumstance or **Wrongful Act**, and the manner in which the **Insureds** first became aware of such circumstance or **Wrongful Act**, then any **Claim** subsequently arising from such circumstance or **Wrongful Act** shall be deemed under this Policy to be a **Claim** made during the **Policy Period** in which the circumstance or **Wrongful Act** was first duly reported to the Insurer.

9.     **Limit of Liability:**

9.1     The Insurer's maximum aggregate Limit of Liability for all **Loss** under this Policy shall be the amount set forth in Item III of the Declarations. Amounts incurred as **Defense Costs** shall be in addition to the Limit of Liability.

9.2     All **Claims** arising from the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed one **Claim** and subject to a single limit of liability. Such **Claim** shall be deemed first made on the date the earliest of such **Claims** is first made, regardless of whether such date is before or during the **Policy Period**.

9.3     With respect to all **Claims** deemed to have been made in a **Policy Year**, should the Limit of Liability be exhausted by payment of **Loss** resulting from one or more of such **Claims**, the Insurer's duty to defend shall cease and any and all obligations of the Insurer hereunder shall be deemed to be completely fulfilled and extinguished and the Insurer shall have no further obligations hereunder of any kind or nature.

LIUI00DO010010507



## Nonprofit Executive Advantage Policy

**10.**   **Retentions:**  The Insurer shall be liable to pay only the amount of covered **Loss** in excess of the applicable Retention amount set forth in Item IV of the Declarations.  Such Retention shall not be applicable to **Defense Costs** except in the instance noted in Section 2.3 in which the **Insureds** withhold consent to settlement.  Such applicable Retention shall be uninsured and shall be borne by the **Insured Organization.**  However, if an **Insured Person** is not indemnified for **Loss** solely by reason of the **Insured Organization's** financial insolvency or because indemnification is not legally permissible, an **Insured Person's** Retention shall be $0.  This change in Retention shall not affect any other terms or conditions of this Policy.

**11.**   **Allocation**:  If a **Claim** gives rise to **Loss** covered under this Policy and loss not covered under this Policy, either because a **Claim** includes both covered and uncovered matters or both covered and uncovered parties, the **Insureds** and the Insurer shall allocate such amount between covered **Loss** and uncovered loss.

**12.**   **Other Insurance**:  If any **Loss** arising from any **Claim** is insured by other valid and collectible insurance, then this Policy shall apply only in excess of the amount of any deductibles, retentions and limits of liability under such other policy or policies, whether such other policy or policies are stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written specifically excess of this Policy by reference in such other policy to this Policy's Policy Number.

**13.**   **Discovery Period**:

   **13.1**   If the Insurer or the **Parent Organization** fails or refuses to renew this Policy or if the **Parent Organization** cancels this Policy, any **Insured** shall have the right to an extension of the coverage granted by this Policy following the effective date of such cancellation or non-renewal.  Such extension of coverage shall apply solely with respect to **Wrongful Acts** taking place before the effective date of such cancellation or non-renewal.

   **13.2**   If the Insurer refuses to renew this Policy the **Discovery Period** shall be the period of ninety (90) days from the end of the **Policy Period**, and there shall be no charge for this **Automatic Discovery Period** of ninety (90) days.  If prior to the end of the **Automatic Discovery Period** the **Parent Organization** pays the Insurer an additional amount equal to thirty-five percent (35%) of the annual premium of this Policy, the term of the **Discovery Period** shall be extended for an additional twelve (12) months from the end of the **Automatic Discovery Period**.  Such Discovery Period Premium shall be deemed fully earned as of such date.  This extension shall not apply if this Policy is terminated by the Insurer for failure to pay any premium when due.

   **13.3**   If the **Parent Organization** fails or refuses to renew or cancels this Policy the **Parent Organization** may purchase a **Discovery Period** of twelve (12) month from the end of the **Policy Period**, provided that the **Parent Organization** pays the Insurer an additional amount equal to thirty-five percent (35%) of the annual premium of this Policy within thirty (30) days of the end of the **Policy Period**.  Such Discovery Period Premium shall be deemed fully earned as of such date.

   **13.4**   The extension of coverage for the **Discovery Period** shall not in any way increase the Limit of Liability set forth in Item III of the Declarations.  For purposes of the Limit of Liability, the **Discovery Period** is considered to be part of and not in addition to the last **Policy Year**.

   **13.5**   If the **Parent Organization** shall cancel or non-renew this Policy for any reason other than being sold, acquired or bankrupt, each director or officer that was an **Insured**, but did not serve as a director or officer at the time of cancellation or non-renewal, shall be provided an unlimited extension of coverage granted by this Policy to report any **Claim(s)** first made against the director or officer after the date of such cancellation or non-renewal.  However, this extension of coverage shall only be afforded in the event that the **Wrongful Act** was committed before the date of cancellation or non-renewal, and no Directors and Officers Liability policy, or policy providing essentially the same type of coverage, or extension period, is in effect at the time the **Claim** is made.

**14.**   **Conversion to Automatic Run-off:**

LIUI00DO010010507

**Nonprofit Executive Advantage Policy** 

    **14.1**    In the event of a **Change in Control** during the **Policy Period**, coverage under this Policy shall continue until the end of the **Policy Period**, but only with respect to **Claims** for **Wrongful Acts** taking place prior to the effective date of such **Change in Control**. The entire premium for this Policy shall be deemed fully earned as of the effective date of such **Change in Control**.

    **14.2**    The **Parent Organization** shall give written notice of such **Change in Control** to the Insurer as soon as practicable, together with such information as the Insurer may reasonably require.

**15.**    **Subrogation**:  If the Insurer pays any **Loss** under this Policy, the Insurer shall be subrogated to the extent of such payment to all rights of recovery thereof.  The **Insureds** shall execute all papers required and shall do everything that may be necessary to secure and preserve such rights, including the execution of such documents necessary to enable the Insurer effectively to bring suit in the name of the **Insureds**.  The obligations of the **Insureds** pursuant to this Section 15 survive the termination of the **Policy Period**.

**16.**    **Parent Organization as Authorized Representative**: The **Insureds** agree that the **Parent Organization** shall act on their behalf with respect to all matters under this Policy, including without limitation the giving and receiving of notices hereunder, the payment or return of premiums, and the negotiation and acceptance of endorsements.

**17.**    **Amendment, Assignment and Headings:**

    **17.1**    Any amendment to this Policy or assignment of an interest in this Policy, in whole or in part, shall be effective only if made by endorsement to this Policy signed by an authorized representative of the Insurer.

    **17.2**    The headings to the provisions in this Policy, including those found in any endorsements attached hereto, are provided for convenience only and do not affect the construction hereof.

**18.**    **Territory**:  This Policy applies to **Wrongful Acts** occurring anywhere in the world, provided that a **Claim** is brought against the **Insured** within the United States of America, its territories or possessions or Canada.

**19.**    **Spousal Benefit**:  If a **Claim** against an **Insured Person** for a **Wrongful Act** otherwise covered under this Policy includes a claim against his/her legal spouse where the claimant asserts such claim by reason of spousal status or seeks to obtain recovery against property in which such spouse has an interest, the amount which such spouse becomes legally obligated to pay in respect of such **Claim** (including defense costs) shall be deemed the **Loss** and **Defense Costs** of such **Insured Person**, and subject to this Policy's terms, conditions, and exclusions. In any event, this extension shall not cover any conduct or wrongful act committed by such legal spouse.

**20.**    **Estates and Legal Representatives**:  In the event of the death, incapacity, or bankruptcy of an **Insured Person**, any **Claim** made against the estate, legal representatives, heirs, or the assigns of such **Insured Person** for a **Wrongful Act** by such **Insured Person** shall be deemed to be a **Claim** against such **Insured Person**.

**21.**    **Termination:**

    **21.1**    The Insurer may not cancel this Policy except for non-payment of premium when due.  Such cancellation shall be effective as of the inception date of the **Policy Period**.

    **21.2**    The **Parent Organization** may cancel this Policy by sending notice of cancellation to the Insurer.  Such cancellation shall be effective on the date the Insurer receives such notice. The **Parent Organization** may not cancel this Policy in anticipation of or after the effective date of a **Change in Control**.  In the event the **Parent Organization** cancels this Policy, the Insurer shall retain the customary short rate premium.  Payment of any unearned premium by the Insurer shall not be a condition precedent to the effectiveness of cancellation but such payment shall be made as soon as practicable.

    **21.3**    If the Insurer elects not to renew this Policy, the Insurer shall provide the **Parent Organization** with not less than sixty (60) days advance notice thereof.

LIUI00DO010010507



## Nonprofit Executive Advantage Policy

**22.    Action Against Insurer:**

**22.1**    No action shall be taken against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this Policy, or the amount of the **Insureds'** obligation to pay shall have been finally determined either by judgment against the **Insureds** after actual trial, or by written agreement of the **Insureds**, the claimant and the Insurer.

**22.2**    No person or organization shall have the right under this Policy to join the Insurer as a party to any action against the **Insureds**, nor shall the Insurer be impleaded by the **Insureds** or their legal representatives.

**23.    Definitions:**

**23.1**    **"Application"** means all signed applications, including attachments and materials submitted therewith or as a part thereof, or incorporated therein, for this Policy and for any policy in an uninterrupted series of policies issued by the Insurer of which this Policy is a direct or indirect renewal or replacement. All such applications, attachments, and materials are deemed attached to and incorporated into this Policy.

**23.2**    **"Change in Control"** means:

**(a)**    the acquisition by another entity of voting rights resulting in voting control by such other entity of more than 50% of the outstanding voting rights representing the present right to vote for election of directors or equivalent positions of the **Parent Organization**;

**(b)**    the merger of the **Parent Organization** into another entity such that the **Parent Organization** is not the surviving entity, or the consolidation of the **Parent Organization** with another entity; or

**(c)**    the loss of the **Parent Organization's** not-for-profit tax status.

**23.3**    **"Claim"** means:

**(a)**    a written demand for monetary or non-monetary relief against an **Insured**;

**(b)**    the commencement of a civil or criminal judicial proceeding or arbitration against an **Insured**; or

**(c)**    the commencement of a formal criminal, administrative or regulatory proceeding or investigation against an **Insured,** including any brought before the Equal Employment Opportunity Commission or any similar state, local or territorial governmental agency ;

including any appeal therefrom.  A **Claim** will be deemed first made on the date an **Insured** receives a written demand, complaint, indictment, notice of charges, or order of formal investigation.

**23.4**    **"Defense Costs"** means reasonable and necessary fees (including attorneys' fees and experts' fees) and expenses incurred in the defense of a **Claim** and cost of attachment or similar bonds, but shall not include the wages, salaries, benefits or expenses of any directors, officers or employees of the **Insured Organization**.

**23.5**    **"Discovery Period"** means the period of time set forth in Section 13.

**23.6**    **"Employment Practices Wrongful Act"** means:

**(a)**    wrongful dismissal or discharge or termination of employment, whether actual or constructive;

**(b)**    discrimination, whether based upon race, sex, age, national origin, religion, sexual orientation or disability;

**(c)**    sexual or other harassment in the workplace;

LIUI00DO010010507



## Nonprofit Executive Advantage Policy

    **(d)**      employment related misrepresentation;

    **(e)**      violation of employment laws;

    **(f)**      wrongful failure to employ, promote or grant tenure;

    **(g)**      wrongful discipline;

    **(h)**      negligent evaluation;

    **(i)**      retaliation; and/or

    **(j)**      failure to provide adequate workplace or employment policies or procedures.

Solely with respect to any **Claim** brought by or on behalf of any **Third Party**, **Employment Practices Wrongful Act** means any actual or alleged, discrimination, sexual harassment or violation of such **Third Party's** civil rights in relation to such discrimination or sexual harassment, whether direct, indirect, or unintentional, committed by an **Insured Person** in his/her capacity as an **Insured Person** or by the **Insured Organization**.

**23.7**   **"Executive Officer"** means the president, chief executive officer, chief operating officer, chief financial officer, managing director, any executive vice president and any equivalent executive position of the **Insured Organization**.

**23.8**   **"Fungi"** means any form of fungus, including but not limited to yeast, mold, mildew, rust, smut or mushroom, and any spores, mycotoxins, odors or any other substances, products, or by products produced by, released by, or arising out of the current or past presence of fungi.

**23.9**   **"Insolvency"** means the status of the **Insured Organization** as a result of the appointment of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to control, supervise, manage, or liquidate the **Insured Organization**, or the **Insured Organization** becoming an insolvent debtor-in-possession.

**23.10**   **"Insured(s)"** means the **Insured Persons** and the **Insured Organization**.

**23.11**   **"Insured Organization"** means any entity named in Item I of the Declarations and any **Subsidiary**, including any such entity operating as a debtor-in-possession.

**23.12**   **"Insured Person(s)"** means one or more natural persons who were, now are, or shall hereafter be duly elected or appointed directors, trustees, officers, employees, committee members or volunteers of the **Insured Organization,** or, with respect to a **Subsidiary** operating outside the United States, their functional equivalent, regardless of title.

**23.13**   **"Interrelated Wrongful Acts"** means **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions, or causes.

**23.14**   **"Loss"** means:

    **(a)**      sums which the **Insureds** are legally obligated to pay solely as a result of any **Claim** insured by this Policy, including damages, judgments, settlement amounts, legal fees and costs awarded pursuant to judgments, punitive or exemplary damages, and the multiple portion of any multiplied damage award; and

    **(b)**      any excise tax equal to ten percent (10%) of an excess benefit which has been assessed by the Internal Revenue Service against any **Insured Person** pursuant to Section 4658 of the Internal Revenue Code for participation of an organization manager in an excess benefit transaction.



## Nonprofit Executive Advantage Policy

**Loss** shall not include any other taxes, fines, penalties, or matters uninsurable pursuant to any applicable law.

23.15 **"Microbes"** means any non-fungal microorganisms or non-fungal colony-form organisms that causes infection or disease including but not limited to any spores, mycotoxins, odors or any other substances, products, or by products produced by, released by, or arising out of the current or past presence of microbes.

23.16 **"Parent Organization"** means the **Insured Organization** first named in Item I of the Declarations.

23.17 **"Policy Period"** means the period from the inception date set forth in Item II of the Declarations to the expiration date set forth in Item II of the Declarations, or its earlier termination pursuant to Section 21.

23.18 **"Policy Year"** means the period of one year following the effective date and hour of this Policy or the period of one year following any anniversary date thereof falling within the **Policy Period**; or if the time between the effective date or any anniversary date and the termination of this Policy is less than one year, such lesser period.

23.19 **"Pollutants"** means any substance exhibiting hazardous characteristics as is or may be identified on any list of hazardous substances issued by the United States Environmental Protection Agency, or any state, local, or foreign counterpart. This definition shall include, without limitation, any solid, liquid, gaseous or thermal irritant, or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, odors, noise, lead, oil or oil products, radiation, asbestos or asbestos-containing products, waste (including material to be recycled, reconditioned or reclaimed), and any electric, magnetic or electromagnetic field of any frequency, as well as any air emission, waste water, infectious medical waste, nuclear materials, or nuclear waste.

23.20 **"Subsidiary"** means any entity which qualifies as a not-for-profit organization under the Internal Revenue Code and for which the **Parent Organization** has or controls the right to elect or appoint more than fifty percent (50%) of the Board of Directors or other governing body of such entity if such right exists:

**(a)** prior to inception date of the **Policy Period**;

**(b)** after the inception date of the **Policy Period** and the assets of such entity do not exceed thirty-five percent (35%) of the total consolidated assets of the **Insured Organization** as reflected in the **Parent Organization's** most recent audited consolidated financial statement; or

**(c)** after the inception date of the **Policy Period** and the assets of such entity exceed thirty-five percent (35%) of the total consolidated assets of the **Insured Organization** as reflected in the **Parent Organization's** most recent audited consolidated financial statement but only upon the condition that the **Parent Organization**:

**(i)** give written notice of such transaction to the Insurer within 90 days after the effective date of such transaction;

**(ii)** provide the Insurer with such information as the Insurer may require; and

**(iii)** pay any additional premium required by the Insurer.

23.21 **"Third Party"** means any natural person who is an active or current customer, supplier, vendor, applicant, business invitee or other client of the **Insured Organization**.

23.22 **"Wrongful Act"** means:

LIUI00DO010010507



# Nonprofit Executive Advantage Policy

**(a)**  any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty, or **Employment Practices Wrongful Act** committed or attempted by the **Insured Persons** in their capacities as such or by the **Insured Organization**; or

**(b)**  any matter claimed against the **Insured Persons** solely by reason of their status as **Insured Persons**.

**23.23**  **"Outside Entity"** means any not-for-profit organization that qualifies as such under Section 501(c) of the Internal Revenue Code of 1986 (as amended).

**23.24**  **"Outside Position"** means the position of director, officer, trustee, or other equivalent position held by an **Insured Person** in any **Outside Entity**, if service in such position is with the knowledge and express consent or at the express request of the **Insured Organization**.

**24.**  **Outside Position Liability:**

**24.1**  This Policy, subject to its terms, conditions, and exclusions, covers any **Insured Person** serving in an **Outside Position.**  Such coverage shall be specifically excess of any: (i) indemnification provided by the **Outside Entity** in which the **Insured Person** serves in such **Outside Position**; and (ii) insurance available from or provided by such **Outside Entity**, regardless of whether or not such other insurance policy is written specifically excess of this Policy or refers to this Policy's policy number.

**24.2**  Payment by the Insurer or any member company of the Liberty Mutual Group under another insurance policy as a result of a **Claim** against an **Insured Person** in an **Outside Position** shall reduce, by the amount of such payment, the Insurer's Limit of Liability under this Policy.

**24.3**  Coverage under this Section 2 shall not apply to any **Claim** that is brought or maintained with the solicitation, assistance or participation of the **Outside Entity** in which an **Insured Person** serves in an **Outside Position** or any director, officer, trustee, regent, governor or employee of such **Outside Entity**.

**24.4**  Nothing in this Section 24 shall be construed to extend coverage under this Policy to the **Outside Entity** in which such **Insured Person** serves in such **Outside Position**, or to the other directors, officers, or employees of such **Outside Entity**.

In Witness Whereof, the Insurer has caused this Policy to be executed and attested, but this Policy shall not be valid unless countersigned on the Declarations Page by a duly authorized agent of the Insurer.

PRESIDENT
Christopher L. Peirce

VICE PRESIDENT and SECRETARY
Mark C. Touhey

**Nonprofit Executive Advantage Policy**



## LIBERTY INSURANCE UNDERWRITERS INC.

(A Stock Insurance Company, hereinafter the "Insurer")

### SCHEDULE OF ENDORSEMENTS

| Endorsement No. | Form Name | Form Number |
|---|---|---|
|  | Declarations | LIUI00DO030010507 |
|  | Nonprofit Executive Advantage Policy | LIUI00DO010010507 |
| 1 | Indiana Amendatory Endorsement | LIUI13DO240010507 |
| 2 | Indiana Endorsement | LIUI13DO240011006 |
| 3 | Indiana Policyholder Notice | LIUI13DO550011006 |
| 4 | Enhancement Endorsement for Nonprofit Risks | LIUI00DO381340914 (Ed. 09/14) |
| 5 | Fiduciary Liability Coverage with Shared Limit of Liability | LIUI00DO380180507 |
| 6 | Sub Limit Endorsement | LIUI00DO380280507 |
| 7 | Sub-Limit Endorsement for Wage & Hour | LIUI00DO380290507: |
| 8 | U.S. Economic and Trade Sanctions Clause | OFAC 08/09 |
| 9 | Cap On Losses From Certified Acts of Terrorism | TRIA-E002-0315 |
| 10 | Disclosure – Terrorism Risk Insurance Act | TRIA N004-0315 |



## Nonprofit Executive Advantage Policy

# LIBERTY INSURANCE UNDERWRITERS INC.

(A Stock Insurance Company, hereinafter the "Insurer")

## ENDORSEMENT NO. 1

| | |
|---|---|
| **Effective Date:** | May 16, 2016 |
| **Policy Number:** | DOCHAA5JSQ002 |
| **Issued To:** | USA GYMNASTICS |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## INDIANA AMENDATORY ENDORSEMENT

This endorsement modifies insurance under the following:

**A.** Irrespective of any other provision of this Policy, notice given by or on behalf of the Parent Organization to any authorized agent of the Insurer within the state of Indiana with particulars sufficient to identify the Parent Organization shall be deemed to be notice to the Insurer.

**B.** Paragraph **23.14 "Loss"** of Section **23. Definitions** is deleted in its entirety and replaced by the following:

23.14 **"Loss"** means:

**(a)** sums which the **Insureds** are legally obligated to pay solely as a result of any **Claim** insured by this Policy, including damages, judgments, settlement amounts, legal fees and costs awarded pursuant to judgments, and the multiple portion of any multiplied damage award; and

**(b)** any excise tax equal to ten percent (10%) of an excess benefit which has been assessed by the Internal Revenue Service against any **Insured Person** pursuant to Section 4658 of the Internal Revenue Code for participation of an organization manager in an excess benefit transaction.

**Loss** shall not include any other taxes, fines, penalties, or matters uninsurable pursuant to any applicable law. **Loss** shall also not include punitive or exemplary damages except for vicarious liability.

All other exclusions, conditions and limitations remain unchanged.

**Nonprofit Executive Advantage Policy**



# LIBERTY INSURANCE UNDERWRITERS INC.

(A Stock Insurance Company, hereinafter the "Insurer")

## ENDORSEMENT NO. 2

| | |
|---|---|
| **Effective Date:** | May 16, 2016 |
| **Policy Number:** | DOCHAA5JSQ002 |
| **Issued To:** | USA GYMNASTICS |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## INDIANA ENDORSEMENT

As used in this Policy endorsement the terms "the Insurer", "we", "our" and "us" refer to Liberty Insurance Underwriters Inc. The term "Named Insured", "you" and "your" refer to the "Parent Organization" or "Named Real Estate Investment Trust" as shown on the Declarations Page of this Policy.

Irrespective of any other term or condition within the Policy, the Policy is hereby amended by the following:

**A.      Cancellation**

We may cancel this Policy only for non-payment of premium by mailing to the Named Insured written notice of cancellation at least 10 days prior to the effective date of the cancellation.

We will mail notices of cancellation to the Named Insured at the mailing address we have on record.

You may cancel this Policy by mailing notice to us stating when the cancellation will be effective.  You may not, however, cancel this Policy in anticipation of, or after the effective date of, a **Change In Control**.

**B.      Non-renewal**

If we decide not to renew this Policy, we will mail you notice of this decision at least 45 days before the Policy expires.

All other exclusions, conditions and limitations remain unchanged.

| 1 | 1 |
|---|---|

LIUI13DO240011006

## Nonprofit Executive Advantage Policy



# LIBERTY INSURANCE UNDERWRITERS INC.

(A Stock Insurance Company, hereinafter the "Insurer")

## ENDORSEMENT NO. 3

| | |
|---|---|
| **Effective Date:** | May 16, 2016 |
| **Policy Number:** | DOCHAA5JSQ002 |
| **Issued To:** | USA GYMNASTICS |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## INDIANA
## POLICYHOLDER NOTICE

**Questions regarding your policy or coverage should be directed to:**

**Liberty Insurance Underwriters Inc.**
**1-800-677-9163**

If you (a) need the assistance of the governmental agency that regulates insurance; or (b) have a complaint you have been unable to resolve with your insurer you may contact the Department of Insurance by mail, telephone or email:

State of Indiana Department of Insurance
Consumer Services Division
311 West Washington St.
Indianapolis, Indiana  46204

Consumer Hotline: (800) 622-4461; (317) 232-2395

Complaints can be filed electronically at www.in.gov/idoi.



**Nonprofit Executive Advantage Policy**

## LIBERTY INSURANCE UNDERWRITERS INC.

(A Stock Insurance Company, hereinafter the "Insurer")

### ENDORSEMENT NO. 4

| | |
|---|---|
| **Effective Date:** | May 16, 2016 |
| **Policy Number:** | DOCHAA5JSQ002 |
| **Issued To:** | USA GYMNASTICS |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### ENHANCEMENT ENDORSEMENT FOR NONPROFIT RISKS

It is agreed that the Policy is hereby amended as follows:

(1.)     Section 4 of the Policy is hereby amended as follows:

The last paragraph of Section 4 is deleted and replaced with the following:

For purposes of determining the applicability of Sections 4.1 through 4.9, the **Wrongful Act** of any **Insured Person** shall not be imputed to any other **Insured Person.**

(2.)     Section 6 is deleted in its entirety and replaced with the following:

**6.      Application Representations and Severability:**

**6.1**     The **Insureds** represent that the statements and representations contained in the **Application** are true and shall be deemed material to the acceptance of the risk or the hazard assumed by the Insurer under this Policy.  This Policy is issued in reliance upon the truth of such statements and representations.

**6.2**     The **Insureds** agree that if the **Application** contains any statements or representations that are untrue, this Policy shall be void as to:

(a)     any **Insured Person** who knew the facts that were not truthfully disclosed, provided that such knowledge shall not be imputed to any other **Insured Person**.  This provision shall also apply to the **Insured Organization** to the extent that it indemnifies such **Insured Person**; and/or

(b)     the **Insured Organization**, if it is established that any director or any executive officer of the **Insured Organization** knew the facts that were not truthfully disclosed;

whether or not such director or executive officer knew of such untruthful disclosure in the Application.

Except as set forth above, and solely with respect to **Loss** that is not indemnified due to the **Insured Organization's** financial insolvency or because indemnification is not legally permissible, This Policy shall not be rescinded by the Insurer in whole or in part for any reason, however, such coverage will be subject to all other terms, conditions and exclusions of the Policy.

(3.)     Sections 7.2 and 7.3 are deleted in entirety and replaced with the following:

**7.2**     Notice of any **Claim**, circumstance, or **Wrongful Act** shall be forwarded in writing by mail, prepaid express courier, or facsimile to **Liberty International Underwriters, 55 Water**

| 1 | 4 |
|---|---|

LIUI00DO381340914 (Ed. 09/14)



## Nonprofit Executive Advantage Policy

Street, 23rd Floor, New York, NY 10041 Attention: Specialty Casualty Claims and shall be effective upon receipt thereof by the addressee.

**7.3**   In addition to the postal address set forth in Section 7.2, such notice may also be given in writing to the **Insurer** by email at the following email address:

DandONotice@libertyiu.com

Your email must reference the policy number for this Policy. The date of the **Insurer's** receipt of the emailed notice shall constitute the date of notice.

(4.)   Section 9 of the Policy is hereby amended by the addition of the following:

**9.4**   If **Loss** becomes due and payable, the Insurer shall pay such **Loss** in the following order of priority:

(a)   The Insurer shall first pay such **Loss** on behalf of the **Insured Persons**; and

(b)   whatever amount of the Limit of Liability remains after the payment of such **Loss,** the Insurer then shall pay such **Loss** on behalf of the **Insured Organization**.

(5.)   Sections 13.2 and 13.3 are deleted in their entirety and replaced with the following:

**13.2**   If the Insurer refuses to renew this Policy the **Discovery Period** shall be the period of ninety (90) days from the end of the **Policy Period**, and there shall be no charge for this **Automatic Discovery Period** of ninety (90) days. If prior to the end of the **Automatic Discovery Period** the **Parent Organization** pays the Insurer an additional amount equal to thirty-five percent (35%) of the annual premium of this Policy, the term of the **Discovery Period** shall be extended for an additional twelve (12) months from the end of the **Automatic Discovery Period**. The **Parent Organization** shall also have the option of paying seventy percent (70%) of the annual premium for an additional twenty-four (24) months from the end of the **Automatic Discovery Period** or one hundred percent (100%) of the annual premium for an additional thirty-six (36) months from the end of the **Automatic Discovery Period**. Such Discovery Period Premium shall be deemed fully earned as of such date. This extension shall not apply if this Policy is terminated by the Insurer for failure to pay any premium when due.

**13.3**   If the **Parent Organization** fails or refuses to renew or cancels this Policy the **Parent Organization** may purchase a **Discovery Period** of twelve (12) month from the end of the **Policy Period**, provided that the **Parent Organization** pays the Insurer an additional amount equal to thirty-five percent (35%) of the annual premium of this Policy within thirty (30) days of the end of the **Policy Period**. The **Parent Organization** shall also have the option of paying seventy percent (70%) of the annual premium for an additional twenty-four (24) months from the end of the **Policy Period** or one hundred percent (100%) of the annual premium for an additional thirty-six (36) months from the end of the **Policy Period**. Such Discovery Period Premium shall be deemed fully earned as of such date

(6.)   Section 18 is deleted in its entirety and replaced with the following:

**18.**   **Territory**: This Policy applies to **Wrongful Acts** occurring anywhere in the world.

(7.)   Section 19 is deleted in its entirety and replaced with the following:

**19.**   **Spousal Benefit**: If a **Claim** against an **Insured Person** for a **Wrongful Act** otherwise covered under this Policy includes a claim against his/her legal spouse or domestic partner where the claimant asserts such claim by reason of status as a spouse or domestic partner or seeks to obtain recovery against property in which such spouse or domestic partner has an interest, the amount which such spouse or domestic partner becomes legally obligated to pay in respect of such **Claim** (including defense costs)



## Nonprofit Executive Advantage Policy

shall be deemed the **Loss** and **Defense Costs** of such **Insured Person**, and subject to this Policy's terms, conditions, and exclusions.  In any event, this extension shall not cover any conduct or wrongful act committed by such legal spouse or domestic partner.

(8.)   The definition of **Claim** under Section 23.3 is deleted in its entirety and replaced with the following:

   **23.3   "Claim"** means:

   **(a)**   a written demand for monetary or non-monetary relief against an **Insured**;

   **(b)**   the commencement of a civil or criminal judicial proceeding or arbitration against an **Insured**;

   **(c)**   the commencement of a formal criminal, administrative or regulatory proceeding or formal investigation against an **Insured,** including any brought before the Equal Employment Opportunity Commission or any similar state, local or territorial governmental agency ;

   **(d)**   a written request to any **Insured** by a prospective claimant to toll or waive any statute of limitation;

   including any appeal therefrom.  A **Claim** will be deemed first made on the date an **Insured** receives a written demand, complaint, indictment, notice of charges, or order of formal investigation.

(9.)   The definition of **Employment Practices Wrongful Act(s)** under Section 23.6 is deleted in its entirety and replaced with the following:

   **23.6   "Employment Practices Wrongful Act"** means:

   **(a)**   wrongful dismissal or discharge or termination of employment, whether actual or constructive;

   **(b)**   discrimination, whether based upon race, sex, age, national origin, religion, sexual orientation, marital status, gender identity or expression, disability, health status, military status or other protected status established under federal, state or local law;

   **(c)**   sexual harassment, whether quid pro quo or hostile work environment,  or other unlawful harassment or bullying in the workplace;

   **(d)**   employment related misrepresentation;

   **(e)**   violation of employment laws;

   **(f)**   wrongful deprivation of career opportunity, wrongful demotion, or wrongful failure to employ, promote or grant tenure;

   **(g)**   wrongful discipline;

   **(h)**   wrongful evaluation, supervision, training or retention of employees;

   **(i)**   retaliation; and/or

   **(j)**   failure to provide adequate workplace or employment policies or procedures.

(10.)   The definition of **Loss** under Section 23.14 is amended by the addition of the following:

   Solely with respect to Fiduciary Liability Coverage, if endorsed to this Policy, **Loss** shall also include civil money penalties imposed upon an **Insured** for violation of the privacy provisions of Health Insurance Portability and Accountability act of 1996 (HIPAA Penalties). The maximum limit of the

LIUI00DO381340914 (Ed. 09/14)



## Nonprofit Executive Advantage Policy

**Insurer's** liability for all HIPAA Penalties in the aggregate shall be $25,000 (HIPAA Sub-limit of Liability). The HIPAA Sub-limit of Liability shall be part of, and not in addition to, the Limit of Liability set forth in Item III of the Declarations of this Policy shall in no way serve to increase such Limit of Liability.

(11.)   The definition of **Third Party** under Section 23.21 is deleted in its entirety and replaced with the following:

23.21   **"Third Party"** means any natural person who is not an employee or applicant for employment.

All other terms, conditions, and exclusions of this Policy remain unchanged.



## Nonprofit Executive Advantage Policy

# LIBERTY INSURANCE UNDERWRITERS INC.

(A Stock Insurance Company, hereinafter the "Insurer")

## ENDORSEMENT NO. 5

| | |
|---|---|
| **Effective Date:** | May 16, 2016 |
| **Policy Number:** | DOCHAA5JSQ002 |
| **Issued To:** | USA GYMNASTICS |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## FIDUCIARY LIABILITY COVERAGE WITH SHARED LIMIT OF LIABILITY

It is agreed that this Policy shall be amended as follows:

I.      **Section 1 (Insuring Agreement)** shall be amended to include the following additional Insuring Agreement:

Fiduciary Liability: The Insurer shall pay on behalf of the **Insureds** all **Loss** which they shall become legally obligated to pay as a result of a **Claim** first made during the **Policy Period** or **Discovery Period**, if applicable, against the **Insureds** for a **Fiduciary Wrongful Act** which takes place before or during the **Policy Period**.

II.     **Section 4 (Exclusions of Claims)** is amended to include the following additional exclusions:

for any **Fiduciary Wrongful Act** by any **Insured** with respect to any **Insured Plan** (i) sponsored by a **Subsidiary** if such **Fiduciary Wrongful Act** actually or allegedly occurred at any time when such entity was not a **Subsidiary,** or (ii) when such **Insured Plan** was not sponsored by an **Insured Organization;**

based upon, arising from, or in any way related to liability of others assumed by the **Insured** under any written contract or agreement, except to the extent that the **Insured** would have been liable in the absence of such contract or agreement or unless the liability was assumed in accordance with or under the agreement or declaration of trust pursuant to which the **Insured Plan** was established;

based upon, arising from, or in any way related to the failure of the **Insured** to comply with any law governing workers' compensation, unemployment insurance, or disability benefits; or

based upon, arising from, or in any way related to an **Insured** serving as a fiduciary of any plan, fund or program which is not an **Insured Plan**, even if such service is at the direction or request of an **Insured Organization**.

III.    **Section 5 (Exclusions of Losses)** is amended to include the following additional exclusions:

based upon, arising from, or in any way related to the failure to fund an **Insured Plan** in accordance with **ERISA** or the **Insured Plan's** document or to collect contributions owed to an **Insured Plan:**

for benefits due or to become due under the terms of an **Insured Plan** unless, and to the extent that (i) the **Insured** is a natural person and such benefits are payable by such **Insured** as a personal obligation, and (ii) recovery for the benefits is based upon a covered **Fiduciary Wrongful Act**.

IV.     Solely with respect to Fiduciary Liability coverage granted by this endorsement, Section 4.4 of the Policy is deleted.

V.      The amount set forth in Item III of the declarations shall be the maximum Limit of Liability for all **Loss** under this Policy.  The following amount shall be the maximum aggregate Limit of Liability for the Fiduciary Liability coverage granted under this endorsement: $5,000,000.  Such amount shall be a sub-limit, which is part of, and not in addition to, the Limit of Liability set forth in Item III of the Declarations.

| 1 | 3 |
|---|---|

LIUI00DO380180507



## Nonprofit Executive Advantage Policy

VI.    Solely with respect to Fiduciary Liability coverage granted by this endorsement, Item IV of the Declarations is amended to include the following:

$5,000,000 in the aggregate each **Claim** for a **Fiduciary Wrongful Act**

VII.    Solely with respect to Fiduciary Liability coverage granted by this endorsement, Item V of the Declarations is amended to include the following:

Prior Litigation Date:

VIII.    If during the **Policy Period**: (i) a **Change in Control** occurs, (ii) the responsibilities of the **Insured Organization** with respect to **any Insured Plan** is fully assumed by any other person or entity, or (iii) **the Insured Organization** terminates any **Insured Plan;**

coverage under this endorsement shall continue until termination of this Policy, but only with respect to **Claims** for **Fiduciary Wrongful Acts** committed or allegedly committed prior to the effective date of such **Change in Control**, termination, or assumption of responsibilities.

IX.    Solely with respect to Fiduciary Liability coverage granted by this endorsement, the definitions of the following terms are deleted and replaced with the following:

**23.3**    **"Claim"** means:

    **(a)**    a written demand for monetary or non-monetary relief against an **Insured**;

    **(b)**    the commencement of a civil or criminal judicial proceeding or arbitration against an **Insured**;

    **(c)**    the commencement of a formal criminal, administrative or regulatory proceeding or investigation against an **Insured,** including any brought before the Equal Employment Opportunity Commission or any similar state, local or territorial governmental agency; or

    **(d)**    a fact finding investigation by the Department of Labor, the Pensions Benefit Guaranty Corporation, or similar government agency;

including any appeal therefrom, against an **Insured** for a **Fiduciary Wrongful Act**. A **Claim** will be deemed first made on the date an **Insured** receives a written demand, complaint, indictment, notice of charges, or order of formal investigation.

**23.10**    **"Insured(s)"** means the **Insured Persons,** the **Insured Organization,** the **Insured Plans** or any other organization, plan or natural person listed as an **Insured** on a schedule to this endorsement.

**23.12**    **"Insured Person(s)"** means one or more natural persons who were, now are, or shall hereafter be duly elected or appointed directors, trustees, officers, employees, committee members or volunteers of the **Insured Organization** or of any **Insured Plan** in his or her capacity as a **Fiduciary** or trustee of an **Insured Plan** or as a person performing **Administration** of an **Insured Plan,** or, with respect to a **Subsidiary** operating outside the United States, their functional equivalent, regardless of title.

**23.20**    **"Wrongful Act"** means a **Fiduciary Wrongful Act**.

X.    The following definitions are added to Section 23 (Definitions);

**"Administration"** means:

    (a)    handling records, or giving advice, counsel or interpretation to employees regarding an **Insured Plan**; or

    (b)    affecting enrollment of employees, and termination, or cancellation of benefits under an **Insured Plan.**

**"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended.



## Nonprofit Executive Advantage Policy

**"Fiduciary"** means a fiduciary as defined by **ERISA** of an **Insured Plan**, or a person or entity who exercises discretionary control with respect to the management of an **Insured Plan** or the disposition of its assets.

**"Fiduciary Wrongful Act"** means:

(a)     any breach of the responsibilities, obligations, or duties imposed upon **Fiduciaries** of any **Insured Plan** by **ERISA** or by the common or statutory law of the United States, any state, or other jurisdiction anywhere in the world;

(b)     any other matter claimed against any **Insured** solely by reason of their service as **Fiduciaries** of any **Insured Plan**;

(c)     any negligent act, error, or omission solely in the **Administration** of any **Insured Plan**.

**"Insured Plan(s)"** means:

(a)     any welfare benefit plan as defined in **ERISA** or any similar common or statutory law of the United States or other jurisdiction anywhere in the world, which is sponsored solely by the **Insured Organization** or jointly by the **Insured Organization** and a labor organization solely for the benefit of the employees of the **Insured Organization** located anywhere in the world and which:

   (i)     existed on the Inception Date of this Policy; or

   (ii)     is created or acquired by the **Insured Organization** after the Inception Date of this Policy, provided that if the assets of such created or acquired plan exceed 35% of the total plan assets of all **Insured Plans** as of the Inception Date of this Policy, the **Insured Organization** shall give written notice of such creation or acquisition to the Insurer within ninety (90) days of such creation or acquisition, shall provide such information as the Insurer may require, and shall pay an additional premium required by the Insurer.

   Coverage for any plan described in subsection (ii) above shall only be afforded with respect to **Fiduciary Wrongful Acts** taking place after the date such plan was created or acquired;

(b)     any non-qualified plan not subject to regulation under Title I of **ERISA** or which does not meet the qualification requirements under Section 401(a) of the Internal Revenue Code of 1986, as amended, but only with respect to conduct described in subsection (c) of the definition of **Fiduciary Wrongful Act**;

(c)     any Employee Pension Benefit Plan as listed by attachment to the Liberty Mutual Group Fiduciary Coverage Application.

All other terms, conditions, and exclusions of this Policy remain unchanged.

LIUI00DO380180507



**Nonprofit Executive Advantage Policy**

# LIBERTY INSURANCE UNDERWRITERS INC.

(A Stock Insurance Company, hereinafter the "Insurer")

**ENDORSEMENT NO. 6**

| | |
|---|---|
| **Effective Date:** | May 16, 2016 |
| **Policy Number:** | DOCHAA5JSQ002 |
| **Issued To:** | USA GYMNASTICS |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**SUB-LIMIT ENDORSEMENT**

It is agreed that Item III of the Declarations Page is hereby amended by the addition of the following:

ITEM III.          LIMIT OF LIABILITY:     $250,000 in the aggregate for the **Policy Year**

It is further agreed that the Limit of Liability provided under this endorsement is part of, and not in addition to, the Limit of Liability provided for in Item III of the Declarations and shall only apply as respects to:

           Third Party EPL

All other terms, conditions, and exclusions of this Policy remain unchanged.

| 1 | 1 |
|---|---|

LIUI00DO380280507



## Nonprofit Executive Advantage Policy

# LIBERTY INSURANCE UNDERWRITERS INC.

(A Stock Insurance Company, hereinafter the "Insurer")

### ENDORSEMENT NO. 7

| | |
|---|---|
| **Effective Date:** | May 16, 2016 |
| **Policy Number:** | DOCHAA5JSQ002 |
| **Issued To:** | USA GYMNASTICS |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

### SUB-LIMIT ENDORSEMENT FOR WAGE & HOUR CLAIMS

It is agreed that Item III of the Declarations Page is hereby amended by the addition of the following:

ITEM III.        SUB-LIMIT OF LIABILITY:        $150,000 in the aggregate for the **Policy Year**

It is further agreed that the Sub-Limit of Liability provided under this endorsement is part of, and not in addition to, the Limit of Liability provided for in Item III of the Declarations and shall only apply as respects to:

**Defense Costs** for **Claims** based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving any federal, state, local or foreign wage and hour laws, including, without limitation, the Fair Labor Standards Act (**FSLA Claims**). Sums that any **Insured** shall become legally obligated to pay as damages (including settlements and judgments) from such **Claims** shall continue to be excluded from the definition of **Loss** except for those resulting from any actual or alleged retaliatory treatment of the claimant by the **Insured** on account of the claimant's exercise of rights pursuant to any such law or amounts owed under the Equal Pay Act of 1963.

It is further agreed that Section 9.1 is deleted and replaced with the following

**9.1**        The Insurer's maximum aggregate Limit of Liability for all **Loss** under this Policy shall be the amount set forth in Item III of the Declarations. Amounts incurred as **Defense Costs** shall be in addition to the Limit of Liability except for those incurred on **FSLA Claims**.

All other terms, conditions, and exclusions of this Policy remain unchanged.

| 1 | 1 |
|---|---|

LIUI00DO380290507:



## Nonprofit Executive Advantage Policy

# LIBERTY INSURANCE UNDERWRITERS INC.

(A Stock Insurance Company, hereinafter the "Insurer")

### ENDORSEMENT NO. 8

| | |
|---|---|
| **Effective Date:** | May 16, 2016 |
| **Policy Number:** | DOCHAA5JSQ002 |
| **Issued To:** | USA GYMNASTICS |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

### U.S. ECONOMIC AND TRADE SANCTIONS CLAUSE

Whenever coverage provided by this policy would be in violation of any U.S. economic or trade sanctions such as, but not limited to, those sanctions administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), such coverage shall be null and void. Similarly, any coverage relating to or referred to in any certificates or other evidences of insurance or any claim that would be in violation of U.S. economic or trade sanctions as described above shall also be null and void.

| 1 | 1 |
|---|---|

OFAC 08/09



## Nonprofit Executive Advantage Policy

# LIBERTY INSURANCE UNDERWRITERS INC.

(A Stock Insurance Company, hereinafter the "Insurer")

### ENDORSEMENT NO. 9

| | |
|---|---|
| **Effective Date:** | May 16, 2016 |
| **Policy Number:** | DOCHAA5JSQ002 |
| **Issued To:** | USA GYMNASTICS |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

### CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the above captioned policy.

**A.  Cap on Certified Act of Terrorism Losses**

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.**  The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.**  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**B.  Application of Exclusions**

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Policy

TRIA-E002-0315                    Includes copyrighted material of Insurance Services Office, Inc., with its permission



## Nonprofit Executive Advantage Policy

# LIBERTY INSURANCE UNDERWRITERS INC.

(A Stock Insurance Company, hereinafter the "Insurer")

## ENDORSEMENT NO. 10

| | |
|---|---|
| **Effective Date:** | May 16, 2016 |
| **Policy Number:** | DOCHAA5JSQ002 |
| **Issued To:** | USA GYMNASTICS |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## DISCLOSURE – TERRORISM RISK INSURANCE ACT

**THIS ENDORSEMENT IS MADE PART OF YOUR POLICY PURSUANT TO THE TERRORISM RISK INSURANCE ACT.**

In accordance with the Terrorism Risk Insurance Act, including all amendments, ("TRIA" or the "Act"), we are required to provide you with a notice of the portion of your premium attributable to coverage for "certified acts of terrorism," the federal share of payment of losses from such acts, and the limitation or "cap" on our liability under the Act.

**Disclosure of Premium**

The Company has made available coverage for "certified acts of terrorism" as defined in the Act. If purchased, the portion of your premium attributable to coverage for "certified acts of terrorism" is shown in the Declarations, Declarations Extension Schedule or elsewhere by endorsement in your policy.

**Federal Participation In Payment Of Terrorism Losses**

If an individual insurer's losses from certified acts of terrorism exceed a deductible amount specified in the Act, the federal government will reimburse the insurer for the Federal Share of losses paid in excess of the deductible, but only if aggregate industry losses from such acts exceed the "Program Trigger".

The Federal Share and Program Trigger by calendar year are:

| Calendar Year | Federal Share | Program Trigger |
|---|---|---|
| 2015 | 85% | $100,000,000 |
| 2016 | 84% | $120,000,000 |
| 2017 | 83% | $140,000,000 |
| 2018 | 82% | $160,000,000 |
| 2019 | 81% | $180,000,000 |
| 2020 | 80% | $200,000,000 |

**Cap On Insurer Participation In Payment Of Terrorism Losses**

If aggregate insured losses attributable to "certified acts of terrorism" exceed $100 billion in a calendar year and we have met our deductible under the Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion. Nor shall Treasury make any payment for any portion of the amount of such losses that exceeds $100 billion. In such case, insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

| 1 | 1 |
|---|---|

TRIA-N004-0315