# EXHIBIT 2

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| In re:<br><br>USA GYMNASTICS,<br><br>          Debtor. | ) ) ) ) ) ) ) ) | Chapter 11<br><br>Case No. 18-09108-RLM-11 |
| USA GYMNASTICS,<br><br>          Plaintiff,<br><br>v.<br><br>ACE AMERICAN INSURANCE COMPANY f/k/a CIGNA INSURANCE COMPANY, GREAT AMERICAN ASSURANCE COMPANY, LIBERTY INSURANCE UNDERWRITERS INC., NATIONAL CASUALTY COMPANY, RSUI INDEMNITY COMPANY, TIG INSURANCE COMPANY, VIRGINIA SURETY COMPANY, INC. f/k/a COMBINED SPECIALTY INSURANCE COMPANY, WESTERN WORLD INSURANCE COMPANY, ENDURANCE AMERICAN INSURANCE COMPANY, AMERICAN INTERNATIONAL GROUP, INC., AMERICAN HOME ASSURANCE COMPANY, AND DOE INSURERS,<br><br>          Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Adv. Case No. 19-50012 |

## DECLARATION OF TODD WEBER IN SUPPORT OF OBJECTIONS OF LIBERTY INSURANCE UNDERWRITERS INC. TO THE BANKRUPTCY COURT'S PROPOSED FINDINGS AND CONCLUSIONS WITH RESPECT TO USAG'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND LIU'S CROSS-MOTION FOR SUMMARY JUDGMENT

I, Todd Weber, do hereby declare and state as follows:

1.     I held the position of Underwriting Manager at Liberty Insurance Underwriters Inc. ("LIU") from approximately June 2010 to approximately September 2017.  During this period, I was the underwriter for the USA Gymnastics ("USAG") account with LIU.  I have personal knowledge of the facts in this declaration.

2.     During the policy period of the LIU policy issued to USAG from May 16, 2012 to May 16, 2013 (the "2012-2013 Policy"), USAG reported a claim against it to LIU which involved sexual allegations made by an athlete ("the 2013 Lawsuit").  The claim was made during the policy period of the 2012-2013 Policy.

3.     The 2012-2013 Policy included Third Party Employment Practices Liability coverage, also known as "Third Party EPL" coverage, which affords coverage for liability claims brought by non-employees against an insured.  The Third Party EPL coverage in the 2012-2013 Policy was not subject to a sublimit.  A copy of the 2012-2013 Policy is attached hereto as Exhibit 1.

4.     At the time of the renewal of the policy in May 2013, I conferred with underwriter Tracy Bernsee regarding the 2013 Lawsuit.  We determined that, because the 2013 Lawsuit involved allegations of sexual misconduct, Third Party EPL coverage should not be included as part of the policy that would be issued to USAG for the following year, from May 16, 2013 to May 16, 2014 (the "2013-2014 Policy").  A copy of my email exchange with Ms. Bernsee from May 6, 2013 to May 13, 2013 is attached hereto as Exhibit 2.

5.     Consistent with this decision, LIU issued the 2013-2014 Policy with an endorsement titled "Deletion of Third Party EPL Coverage."  A copy of the 2013-2014 Policy is attached hereto as Exhibit 3.

6.     At the time of the renewal of the policy in May 2014, USAG's insurance agent, Pat O'Connor, requested that Third Party EPL coverage be added back to the policy for the following year, from May 16, 2014 to May 16, 2015 (the "2014-2015 Policy").  The agent's request was based on an earlier email that had advised the agent of the following:

"As for removing third party coverage, in the early review of the claim,
underwriting noted it alleged sexual assault, and Liberty decided there was too
great a risk for a sexual harassment/assault third party claim (after reviewing this
account/class), so they no longer wanted to offer the third party coverage."

In response to the agent's request that Third Party EPL coverage be added back to the policy, I

determined that Third Party EPL could only be added if such coverage was subject to a $250,000

sublimit of liability. A copy of my email communications with Ms. Bernsee and underwriter

Doug Tobin concerning this issue from May 16, 2014 to May 20, 2014 are attached hereto as

Exhibit 4.

      7.     Consistent with my decision, LIU issued the 2014-2015 Policy with a "Sub-Limit

Endorsement" reflecting a $250,000 sublimit for "any Claim brought by or on behalf of any

Third Party for Employment Practices Wrongful Acts." A copy of the 2014-2015 Policy is

attached hereto as Exhibit 5.

      8.     LIU issued Policy No. DOCHAA5JSQ002 to USAG for the period from May 16,

2016 through May 16, 2017 (the "2016-2017 Policy"). Like the 2014-2015 Policy, I intended for

the 2016-2017 Policy to be issued with a $250,000 sublimit of liability applicable to Third Party

EPL claims.

      9.     I intended that the Third Party EPL coverage would respond to sexual misconduct

claims brought against USAG by athletes. See Exhibits 1-5.

     I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge.

Executed this 12th day of November, 2019.

                                   Todd Weber

93329276

3

# EXHIBIT 1



Administered by:
5★ **Specialty Programs**
A DIVISION OF CRUMP INSURANCE SERVICES, INC.

## LIBERTY INSURANCE UNDERWRITERS INC.

55 Water Street, 18th Floor
New York, New York 10041
**(a member of the Liberty Mutual Group and hereinafter "the Insurer")**
**Liberty Insurance Underwriters Inc.'s toll free number is: 800-677-9163**

# NONPROFIT EXECUTIVE ADVANTAGE POLICY

### DECLARATIONS

---

**NOTICE:  THIS IS A CLAIMS-MADE POLICY.  THIS POLICY COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR DISCOVERY PERIOD, IF APPLICABLE, AND REPORTED TO THE INSURER AS SOON AS PRACTICABLE BUT IN NO EVENT LATER THAN 90 DAYS AFTER THE END OF THE POLICY PERIOD.  PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.**

**UNLESS AMENDED BY ENDORSEMENT, AMOUNTS INCURRED AS DEFENSE COSTS SHALL BE IN ADDITION TO THE LIMIT OF LIABILITY AND SHALL NOT BE APPLIED AGAINST THE APPLICABLE RETENTION.**

**THE INSURER HAS THE DUTY TO DEFEND.**

---

**POLICY NUMBER:** FSS000083-0212          **PRODUCER:** 5Star Specialty Programs a division of Crump
**RENEWAL OF:**      FSS000083-0111                                        Insurance Services, Inc.

**ITEM I. NAME AND ADDRESS OF PARENT ORGANIZATION:**
        USA Gymnastics
        132 E Washington St, Ste 700, Indianapolis, IN 46204

| | | |
|---|---|---|
| **ITEM II.** | **POLICY PERIOD:** | Inception Date: 05/16/2012      Expiration Date: 05/16/2013<br>(12:01 A.M. at the address set forth in Item I) |
| **ITEM III.** | **LIMIT OF LIABILITY:** | $ 5,000,000 in the aggregate for the **Policy Year** |
| **ITEM IV.** | **RETENTION:** | $ 20,000 in the aggregate each **Claim** |
| **ITEM V.** | **PRIOR LITIGATION DATE:** | 05/16/2009 |
| **ITEM VI.** | **PREMIUM:** | $ 14,178.00 |
| **ITEM VII.** | **ENDORSEMENTS FORMING PART OF THIS POLICY AT ISSUANCE:** | See Attached Forms List |

 This Declarations page, together with the **Application**, the attached Nonprofit Executive Advantage Policy Form, and all endorsements thereto, shall constitute the contract between the Insurer and the **Insureds**.  This Policy is valid only if signed below by a duly authorized representative of the Insurer.

*Douglas P. Tobin*          06/27/2012
_____
Authorized Representative

LIUI00DO030010507

# Forms List

| | |
|---|---|
| LIUI00DO03001 | Nonprofit Executive Advantage Policy Declarations |
| Forms List | Forms List |
| LIUI00DO01001 | Nonprofit Executive Advantage Policy |
| LIUI00DO38018 | Fiduciary Liability Coverage with Shared Limit of Liability |
| LIUI00DO38019 | General Professional Services Exclusion (Management Carve-out) |
| LIUI00DO38028 2 | Sub-Limit Endorsement for Wage and Hour Claims |
| LIUI13DO24001 | Indiana Endorsement |
| LIUI13DO24001 | Indiana Amendatory Endorsement |
| LIUI13DO55001 | Indiana Policyholder Notice |
| TRIA-N001 | Policyholder Disclosure- Terrorism Insurance Premium Notice |

# LIBERTY INSURANCE UNDERWRITERS INC.

### (a member of the Liberty Mutual Group
### and hereinafter called "the Insurer")

### NONPROFIT EXECUTIVE ADVANTAGE POLICY

(Words and phrases printed in **bold**, other than
in the headings, are defined in Section 23 below.)

In reliance upon the truthfulness and accuracy of the statements made in the **Application**, in consideration of, and subject to, the payment of premium when due, and subject to the terms, conditions, and exclusions of this Policy, the Insurer and the **Insureds** agree as follows:

**1.**   **Insuring Agreement:** The Insurer shall pay on behalf of the **Insureds** all **Loss** which they shall become legally obligated to pay as a result of a **Claim** first made during the **Policy Period** or **Discovery Period**, if applicable, against the **Insureds** for a **Wrongful Act** which takes place before or during the **Policy Period**.

**2.**   **Defense Costs and Settlements:**

    **2.1**   It shall be the right and duty of the Insurer to defend any **Claim**.   The Insurer may investigate, as it deems appropriate, any **Claim**, circumstance, or **Wrongful Act** involving the **Insureds**.

    **2.2**   The **Insureds** shall not incur any **Defense Costs**, admit any liability, assume any obligation, agree to any settlement, or make any settlement offer with respect to any **Claim** without the Insurer's prior written consent, which shall not be unreasonably withheld.   The Insurer shall not be liable for any **Defense Costs** incurred or any admissions, obligations, agreements, or settlements made by the **Insureds** without the Insurer's prior written consent.

    **2.3**   The Insurer has the right to negotiate the settlement of any **Claims** it deems expedient, but only with the **Insured's** consent.   If the **Insureds** withhold consent to such settlement, the Insurer's liability for such **Claim** is limited to the amount in excess of the Retention which the Insurer would have contributed to the settlement had the **Insured** consented to the settlement, and 70 percent (70%) of any additional covered **Loss,** including **Defense Costs**, incurred subsequent to such refusal to settle.

**3.**   **Cooperation**: As a condition precedent to the **Insureds'** rights under this Policy, they shall give to the Insurer all information and cooperation as the Insurer reasonably may require and shall do nothing that may prejudice the Insurer's position or its rights of recovery.

**4.**   **Claim Exclusions:** This Policy does not apply to any **Claim** made against any **Insured**:

    **4.1**   for:

        **(a)**   bodily injury, sickness, disease, death; or

        **(b)**   emotional distress, mental anguish, false arrest or imprisonment, abuse of process, malicious prosecution, violation or invasion of any right of privacy or private occupancy, trespass, nuisance or wrongful entry or eviction; or

**(c)**     libel, slander, defamation; or

**(d)**     damage to, destruction of, or loss of use of any tangible property;

provided that parts (b) and (c) of this exclusion shall not apply to any **Claim** brought by or on behalf of any **Third Person**, or any past, present or prospective **Insured Person** for an **Employment Practices Wrongful Act**; also provided that part (c) of this exclusion shall not apply to any **Claim** for any other **Wrongful Act** other than an **Employment Practices Wrongful Act**. However, coverage afforded for libel, slander or defamation for **Wrongful Acts** other than **Employment Practices Wrongful Acts** shall be excess of any coverage afforded by the **Insured's** general liability policy;

**4.2**     for any error, misstatement, misleading statement, act, omission, neglect or breach of duty by **Insured Persons** of any **Subsidiary** in such capacity or by the **Subsidiary** itself if such error, misstatement, misleading statement, act, omission, neglect or breach of duty actually or allegedly occurred, in whole or in part, when such entity was not a **Subsidiary**;

**4.3**     based upon, arising from, or in any way related to any error, misstatement, misleading statement, act, omission, neglect or breach of duty which has been reported or has been the subject of any notice under any insurance policy of which this Policy is a renewal or replacement or under any other policy which it may succeed in time;

**4.4**     for any actual or alleged violation of the Employee Retirement Income Security Act of 1974, amendments thereto or similar federal, state, local or common law;

**4.5**     based upon, arising from, or in any way related to:

**(a)**     any demand, suit, or other proceeding against any **Insured** which has been made, which existed, or was pending prior to the applicable Prior Litigation Date set forth in Item V of the Declarations; or

**(b)**     the same or substantially the same facts, circumstances or allegations involved in such demand, suit, or other proceeding;

**4.6**     brought or maintained by or on behalf of the **Insured Organization**;

**4.7**     based upon, arising from, or in any way related to the actual, alleged, or threatened discharge, dispersal, release or escape of **Pollutants, Fungi** or **Microbes**, or any direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify, or neutralize **Pollutants, Fungi** or **Microbes**;

**4.8**     based upon, arising from, or in any way related to an **Insured Person** serving as a director, officer, trustee, regent, governor, volunteer, employee, or similar position of any entity other than the **Insured Organization;** or

**4.9**     based upon, arising from, or in any way related to:

**(a)**     any **Insureds** gaining in fact any personal profit, remuneration or advantage to which they were not legally entitled; or

**(b)** any deliberately dishonest, malicious or fraudulent act or omission or any willful violation of law by any **Insured;**

provided, however, this exclusion shall only apply if it is finally adjudicated that such conduct in fact occurred.

For purposes of determining the applicability of Section 4.9, the **Wrongful Act** of any **Insured Person** shall not be imputed to any other **Insured Person.**

5.     **Loss Exclusions:** The Insurer shall not be liable to pay any **Loss** in connection with any **Claim**:

**5.1**     for any obligation of the **Insured Organization** to modify any building or property in order to affect compliance with the Americans With Disabilities Act and any amendments thereto or any similar federal, state or local statute, regulation, or common laws; or

**5.2**     for any actual or alleged liability of any **Insured** under any contract or agreement, express or implied, written or oral, except for employment related obligations which would have attached absent such contract or agreement.

Provided, however, that these exclusions shall not apply to the Insurer's duty to defend and to pay **Defense Costs**.

6.     **Application Representations and Severability**:

**6.1**     The **Insureds** represent that the statements and representations contained in the **Application** are true and shall be deemed material to the acceptance of the risk or the hazard assumed by the Insurer under this Policy.  This Policy is issued in reliance upon the truth of such statements and representations.

**6.2**     The **Insureds** agree that if the **Application** contains any statements or representations that are untrue, this Policy shall be void as to the **Insured Organization** and any **Insured Person** who knew the facts that were not truthfully disclosed, provided that such knowledge shall not be imputed to any other **Insured Person**.

7.     **Reporting Requirements:**

**7.1**     The **Insureds**, as a condition precedent to their rights under this Policy, shall report every **Claim** to the Insurer as soon as practicable from the date any **Executive Officer** has knowledge of the **Claim**, and in no event later than ninety (90) days after the end of the **Policy Period**.

**7.2**     Notice of any **Claim**, circumstance, or **Wrongful Act** shall be forwarded to **Liberty International Underwriters, 55 Water Street, 18th Floor, New York, NY 10041 Attention: Specialty Casualty Claims**.

**7.3**     All notices under this Policy shall be sent in writing by mail, prepaid express courier, or facsimile and shall be effective upon receipt thereof by the addressee.

8.     **Notice of Circumstance or Wrongful Act:**  If during the **Policy Period** or the **Discovery Period** the **Insureds** become aware of any circumstance or **Wrongful Act** that reasonably may be expected to give rise to a **Claim,** and if such circumstance or **Wrongful Act** is reported to the Insurer

during the **Policy Period** in writing with details as to the nature and date of such circumstance or **Wrongful Act**, the identity of any potential claimant, the identity of any **Insured Person** involved in such circumstance or **Wrongful Act**, and the manner in which the **Insureds** first became aware of such circumstance or **Wrongful Act**, then any **Claim** subsequently arising from such circumstance or **Wrongful Act** shall be deemed under this Policy to be a **Claim** made during the **Policy Period** in which the circumstance or **Wrongful Act** was first duly reported to the Insurer.

9. **Limit of Liability:**

   9.1    The Insurer's maximum aggregate Limit of Liability for all **Loss** under this Policy shall be the amount set forth in Item III of the Declarations. Amounts incurred as **Defense Costs** shall be in addition to the Limit of Liability.

   9.2    All **Claims** arising from the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed one **Claim** and subject to a single limit of liability. Such **Claim** shall be deemed first made on the date the earliest of such **Claims** is first made, regardless of whether such date is before or during the **Policy Period**.

   9.3    With respect to all **Claims** deemed to have been made in a **Policy Year**, should the Limit of Liability be exhausted by payment of **Loss** resulting from one or more of such **Claims**, the Insurer's duty to defend shall cease and any and all obligations of the Insurer hereunder shall be deemed to be completely fulfilled and extinguished and the Insurer shall have no further obligations hereunder of any kind or nature.

10. **Retentions:**  The Insurer shall be liable to pay only the amount of covered **Loss** in excess of the applicable Retention amount set forth in Item IV of the Declarations. Such Retention shall not be applicable to **Defense Costs** except in the instance noted in Section 2.3 in which the **Insureds** withhold consent to settlement. Such applicable Retention shall be uninsured and shall be borne by the **Insured Organization.**  However, if an **Insured Person** is not indemnified for **Loss** solely by reason of the **Insured Organization's** financial insolvency or because indemnification is not legally permissible, an **Insured Person's** Retention shall be $0. This change in Retention shall not affect any other terms or conditions of this Policy.

11. **Allocation**:  If a **Claim** gives rise to **Loss** covered under this Policy and loss not covered under this Policy, either because a **Claim** includes both covered and uncovered matters or both covered and uncovered parties, the **Insureds** and the Insurer shall allocate such amount between covered **Loss** and uncovered loss.

12. **Other Insurance**:  If any **Loss** arising from any **Claim** is insured by other valid and collectible insurance, then this Policy shall apply only in excess of the amount of any deductibles, retentions and limits of liability under such other policy or policies, whether such other policy or policies are stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written specifically excess of this Policy by reference in such other policy to this Policy's Policy Number.

13. **Discovery Period**:

   13.1    If the Insurer or the **Parent Organization** fails or refuses to renew this Policy or if the **Parent Organization** cancels this Policy, any **Insured** shall have the right to an extension of the coverage granted by this Policy following the effective date of such cancellation or

non-renewal. Such extension of coverage shall apply solely with respect to **Wrongful Acts** taking place before the effective date of such cancellation or non-renewal.

13.2    If the Insurer refuses to renew this Policy the **Discovery Period** shall be the period of ninety (90) days from the end of the **Policy Period**, and there shall be no charge for this **Automatic Discovery Period** of ninety (90) days. If prior to the end of the **Automatic Discovery Period** the **Parent Organization** pays the Insurer an additional amount equal to thirty-five percent (35%) of the annual premium of this Policy, the term of the **Discovery Period** shall be extended for an additional twelve (12) months from the end of the **Automatic Discovery Period**. Such Discovery Period Premium shall be deemed fully earned as of such date. This extension shall not apply if this Policy is terminated by the Insurer for failure to pay any premium when due.

13.3    If the **Parent Organization** fails or refuses to renew or cancels this Policy the **Parent Organization** may purchase a **Discovery Period** of twelve (12) month from the end of the **Policy Period**, provided that the **Parent Organization** pays the Insurer an additional amount equal to thirty-five percent (35%) of the annual premium of this Policy within thirty (30) days of the end of the **Policy Period**. Such Discovery Period Premium shall be deemed fully earned as of such date.

13.4    The extension of coverage for the **Discovery Period** shall not in any way increase the Limit of Liability set forth in Item III of the Declarations. For purposes of the Limit of Liability, the **Discovery Period** is considered to be part of and not in addition to the last **Policy Year**.

13.5    If the **Parent Organization** shall cancel or non-renew this Policy for any reason other than being sold, acquired or bankrupt, each director or officer that was an **Insured**, but did not serve as a director or officer at the time of cancellation or non-renewal, shall be provided an unlimited extension of coverage granted by this Policy to report any **Claim(s)** first made against the director or officer after the date of such cancellation or non-renewal. However, this extension of coverage shall only be afforded in the event that the **Wrongful Act** was committed before the date of cancellation or non-renewal, and no Directors and Officers Liability policy, or policy providing essentially the same type of coverage, or extension period, is in effect at the time the **Claim** is made.

14.    **Conversion to Automatic Run-off**:

14.1    In the event of a **Change in Control** during the **Policy Period**, coverage under this Policy shall continue until the end of the **Policy Period**, but only with respect to **Claims** for **Wrongful Acts** taking place prior to the effective date of such **Change in Control**. The entire premium for this Policy shall be deemed fully earned as of the effective date of such **Change in Control**.

14.2    The **Parent Organization** shall give written notice of such **Change in Control** to the Insurer as soon as practicable, together with such information as the Insurer may reasonably require.

15.    **Subrogation**: If the Insurer pays any **Loss** under this Policy, the Insurer shall be subrogated to the extent of such payment to all rights of recovery thereof. The **Insureds** shall execute all papers required and shall do everything that may be necessary to secure and preserve such rights, including the execution of such documents necessary to enable the Insurer effectively to bring suit in

the name of the **Insureds**. The obligations of the **Insureds** pursuant to this Section 15 survive the termination of the **Policy Period**.

16.     **Parent Organization as Authorized Representative**: The **Insureds** agree that the **Parent Organization** shall act on their behalf with respect to all matters under this Policy, including without limitation the giving and receiving of notices hereunder, the payment or return of premiums, and the negotiation and acceptance of endorsements.

17.     **Amendment, Assignment and Headings**:

   17.1     Any amendment to this Policy or assignment of an interest in this Policy, in whole or in part, shall be effective only if made by endorsement to this Policy signed by an authorized representative of the Insurer.

   17.2     The headings to the provisions in this Policy, including those found in any endorsements attached hereto, are provided for convenience only and do not affect the construction hereof.

18.     **Territory**:  This Policy applies to **Wrongful Acts** occurring anywhere in the world, provided that a **Claim** is brought against the **Insured** within the United States of America, its territories or possessions or Canada.

19.     **Spousal Benefit**:  If a **Claim** against an **Insured Person** for a **Wrongful Act** otherwise covered under this Policy includes a claim against his/her legal spouse where the claimant asserts such claim by reason of spousal status or seeks to obtain recovery against property in which such spouse has an interest, the amount which such spouse becomes legally obligated to pay in respect of such **Claim** (including defense costs) shall be deemed the **Loss** and **Defense Costs** of such **Insured Person**, and subject to this Policy's terms, conditions, and exclusions.  In any event, this extension shall not cover any conduct or wrongful act committed by such legal spouse.

20.     **Estates and Legal Representatives**:  In the event of the death, incapacity, or bankruptcy of an **Insured Person**, any **Claim** made against the estate, legal representatives, heirs, or the assigns of such **Insured Person** for a **Wrongful Act** by such **Insured Person** shall be deemed to be a **Claim** against such **Insured Person**.

21.     **Termination**:

   21.1     The Insurer may not cancel this Policy except for non-payment of premium when due.  Such cancellation shall be effective as of the inception date of the **Policy Period**.

   21.2     The **Parent Organization** may cancel this Policy by sending notice of cancellation to the Insurer.  Such cancellation shall be effective on the date the Insurer receives such notice. The **Parent Organization** may not cancel this Policy in anticipation of or after the effective date of a **Change in Control**.  In the event the **Parent Organization** cancels this Policy, the Insurer shall retain the customary short rate premium.  Payment of any unearned premium by the Insurer shall not be a condition precedent to the effectiveness of cancellation but such payment shall be made as soon as practicable.

   21.3     If the Insurer elects not to renew this Policy, the Insurer shall provide the **Parent Organization** with not less than sixty (60) days advance notice thereof.

22.     **Action Against Insurer**:

**22.1**   No action shall be taken against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this Policy, or the amount of the **Insureds'** obligation to pay shall have been finally determined either by judgment against the **Insureds** after actual trial, or by written agreement of the **Insureds**, the claimant and the Insurer.

**22.2**   No person or organization shall have the right under this Policy to join the Insurer as a party to any action against the **Insureds**, nor shall the Insurer be impleaded by the **Insureds** or their legal representatives.

**23.   Definitions:**

**23.1**   "**Application**" means all signed applications, including attachments and materials submitted therewith or as a part thereof, or incorporated therein, for this Policy and for any policy in an uninterrupted series of policies issued by the Insurer of which this Policy is a direct or indirect renewal or replacement.   All such applications, attachments, and materials are deemed attached to and incorporated into this Policy.

**23.2**   "**Change in Control**" means:

**(a)**   the acquisition by another entity of voting rights resulting in voting control by such other entity of more than 50% of the outstanding voting rights representing the present right to vote for election of directors or equivalent positions of the **Parent Organization**;

**(b)**   the merger of the **Parent Organization** into another entity such that the **Parent Organization** is not the surviving entity, or the consolidation of the **Parent Organization** with another entity; or

**(c)**   the loss of the **Parent Organization's** not-for-profit tax status.

**23.3**   "**Claim**" means:

**(a)**   a written demand for monetary or non-monetary relief against an **Insured**;

**(b)**   the commencement of a civil or criminal judicial proceeding or arbitration against an **Insured**; or

**(c)**   the commencement of a formal criminal, administrative or regulatory proceeding or investigation against an **Insured,** including any brought before the Equal Employment Opportunity Commission or any similar state, local or territorial governmental agency ;

including any appeal therefrom.   A **Claim** will be deemed first made on the date an **Insured** receives a written demand, complaint, indictment, notice of charges, or order of formal investigation.

**23.4**   "**Defense Costs**" means reasonable and necessary fees (including attorneys' fees and experts' fees) and expenses incurred in the defense of a **Claim** and cost of attachment or

similar bonds, but shall not include the wages, salaries, benefits or expenses of any directors, officers or employees of the **Insured Organization**.

23.5   **"Discovery Period"** means the period of time set forth in Section 13.

23.6   **"Employment Practices Wrongful Act"** means:

  **(a)**   wrongful dismissal or discharge or termination of employment, whether actual or constructive;

  **(b)**   discrimination, whether based upon race, sex, age, national origin, religion, sexual orientation or disability;

  **(d)**   sexual or other harassment in the workplace;

  **(e)**   employment related misrepresentation;

  **(f)**   violation of employment laws;

  **(g)**   wrongful failure to employ, promote or grant tenure;

  **(h)**   wrongful discipline;

  **(i)**   negligent evaluation;

  **(j)**   retaliation; and/or

  **(k)**   failure to provide adequate workplace or employment policies or procedures.

  Solely with respect to any **Claim** brought by or on behalf of any **Third Party**, **Employment Practices Wrongful Act** means any actual or alleged, discrimination, sexual harassment or violation of such **Third Party's** civil rights in relation to such discrimination or sexual harassment, whether direct, indirect, or unintentional, committed by an **Insured Person** in his/her capacity as an **Insured Person** or by the **Insured Organization**.

23.7   **"Executive Officer"** means the president, chief executive officer, chief operating officer, chief financial officer, managing director, any executive vice president and any equivalent executive position of the **Insured Organization**.

23.8   **"Fungi"** means any form of fungus, including but not limited to yeast, mold, mildew, rust, smut or mushroom, and any spores, mycotoxins, odors or any other substances, products, or by products produced by, released by, or arising out of the current or past presence of fungi.

23.9   **"Insolvency"** means the status of the **Insured Organization** as a result of the appointment of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to control, supervise, manage, or liquidate the **Insured Organization**, or the **Insured Organization** becoming an insolvent debtor-in-possession.

**23.10** **"Insured(s)"** means the **Insured Persons** and the **Insured Organization**.

**23.11** **"Insured Organization"** means any entity named in Item I of the Declarations and any **Subsidiary**, including any such entity operating as a debtor-in-possession.

**23.12** **"Insured Person(s)"** means one or more natural persons who were, now are, or shall hereafter be duly elected or appointed directors, trustees, officers, employees, committee members or volunteers of the **Insured Organization**, or, with respect to a **Subsidiary** operating outside the United States, their functional equivalent, regardless of title.

**23.13** **"Interrelated Wrongful Acts"** means **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions, or causes.

**23.14** **"Loss"** means:

**(a)** sums which the **Insureds** are legally obligated to pay solely as a result of any **Claim** insured by this Policy, including damages, judgments, settlement amounts, legal fees and costs awarded pursuant to judgments, punitive or exemplary damages, and the multiple portion of any multiplied damage award; and

**(b)** any excise tax equal to ten percent (10%) of an excess benefit which has been assessed by the Internal Revenue Service against any **Insured Person** pursuant to Section 4658 of the Internal Revenue Code for participation of an organization manager in an excess benefit transaction.

**Loss** shall not include any other taxes, fines, penalties, or matters uninsurable pursuant to any applicable law.

**23.15** **"Microbes"** means any non-fungal microorganisms or non-fungal colony-form organisms that causes infection or disease including but not limited to any spores, mycotoxins, odors or any other substances, products, or by products produced by, released by, or arising out of the current or past presence of microbes.

**23.16** **"Parent Organization"** means the **Insured Organization** first named in Item I of the Declarations.

**23.17** **"Policy Period"** means the period from the inception date set forth in Item II of the Declarations to the expiration date set forth in Item II of the Declarations, or its earlier termination pursuant to Section 21.

**23.18** **"Policy Year"** means the period of one year following the effective date and hour of this Policy or the period of one year following any anniversary date thereof falling within the **Policy Period**; or if the time between the effective date or any anniversary date and the termination of this Policy is less than one year, such lesser period.

**23.19** **"Pollutants"** means any substance exhibiting hazardous characteristics as is or may be identified on any list of hazardous substances issued by the United States Environmental Protection Agency, or any state, local, or foreign counterpart. This definition shall include, without limitation, any solid, liquid, gaseous or thermal irritant, or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, odors, noise, lead, oil or oil products,

radiation, asbestos or asbestos-containing products, waste (including material to be recycled, reconditioned or reclaimed), and any electric, magnetic or electromagnetic field of any frequency, as well as any air emission, waste water, infectious medical waste, nuclear materials, or nuclear waste.

23.20  **"Subsidiary"** means any entity which qualifies as a not-for-profit organization under the Internal Revenue Code and for which the **Parent Organization** has or controls the right to elect or appoint more than fifty percent (50%) of the Board of Directors or other governing body of such entity if such right exists:

    **(a)**    prior to inception date of the **Policy Period**;

    **(b)**    after  the inception date of the **Policy Period** and the assets of such entity do not exceed thirty-five percent (35%) of the total consolidated assets of the **Insured Organization** as reflected in the **Parent Organization's** most recent audited consolidated financial statement; or

    **(c)**    after the inception date of the **Policy Period** and the assets of such entity exceed thirty-five percent (35%) of the total consolidated assets of the **Insured Organization** as reflected in the **Parent Organization's** most recent audited consolidated financial statement but only upon the condition that the **Parent Organization**:

        **(i)**    give written notice of such transaction to the Insurer within 90 days after the effective date of such transaction;

        **(i)**    provide the Insurer with such information as the Insurer may require; and

        **(ii)**    pay any additional premium required by the Insurer.

23.21  **"Third Party"** means any natural person who is an active or current customer, supplier, vendor, applicant, business invitee or other client of the **Insured Organization**.

23.22  **"Wrongful Act"** means:

    **(a)**    any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty, or **Employment Practices Wrongful Act** committed or attempted by the **Insured Persons** in their capacities as such or by the **Insured Organization**; or

    **(b)**    any matter claimed against the **Insured Persons** solely by reason of their status as **Insured Persons**.

23.23  **"Outside Entity"** means any not-for-profit organization that qualifies as such under Section 501(c) of the Internal Revenue Code of 1986 (as amended).

23.24  **"Outside Position"** means the position of director, officer, trustee, or other equivalent position held by an **Insured Person** in any **Outside Entity**, if service in such position is with the knowledge and express consent or at the express request of the **Insured Organization**.

**24.**    **Outside Position Liability:**

**24.1**    This Policy, subject to its terms, conditions, and exclusions, covers any **Insured Person** serving in an **Outside Position.**  Such coverage shall be specifically excess of any: (i) indemnification provided by the **Outside Entity** in which the **Insured Person** serves in such **Outside Position**; and (ii) insurance available from or provided by such **Outside Entity**, regardless of whether or not such other insurance policy is written specifically excess of this Policy or refers to this Policy's policy number.

**24.2**    Payment by the Insurer or any member company of the Liberty Mutual Group under another insurance policy as a result of a **Claim** against an **Insured Person** in an **Outside Position** shall reduce, by the amount of such payment, the Insurer's Limit of Liability under this Policy.

**24.3**    Coverage under this Section 2 shall not apply to any **Claim** that is brought or maintained with the solicitation, assistance or participation of the **Outside Entity** in which an **Insured Person** serves in an **Outside Position** or any director, officer, trustee, regent, governor or employee of such **Outside Entity**.

**24.4**    Nothing in this Section 24 shall be construed to extend coverage under this Policy to the **Outside Entity** in which such **Insured Person** serves in such **Outside Position**, or to the other directors, officers, or employees of such **Outside Entity**.


In Witness Whereof, the Insurer has caused this Policy to be executed and attested, but this Policy shall not be valid unless countersigned on the Declarations Page by a duly authorized agent of the Insurer.


President                                    Secretary

## LIBERTY INSURANCE UNDERWRITERS INC.

### ENDORSEMENT NO.

This endorsement, effective **05/16/2012**        forms part of

Policy No. **FSS000083-0212**   issued to **USA Gymnastics**
_____

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### Fiduciary Liability Coverage with Shared Limit of Liability

It is agreed that this Policy shall be amended as follows:

I.     **Section 1 (Insuring Agreement)** shall be amended to include the following additional Insuring Agreement:

> Fiduciary Liability: The Insurer shall pay on behalf of the **Insureds** all **Loss** which they shall become legally obligated to pay as a result of a **Claim** first made during the **Policy Period** or **Discovery Period**, if applicable, against the **Insureds** for a **Fiduciary Wrongful Act** which takes place before or during the **Policy Period**.

II.    **Section 4 (Exclusions of Claims)** is amended to include the following additional exclusions:

> for any **Fiduciary Wrongful Act** by any **Insured** with respect to any **Insured Plan** (i) sponsored by a **Subsidiary** if such **Fiduciary Wrongful Act** actually or allegedly occurred at any time when such entity was not a **Subsidiary**, or (ii) when such **Insured Plan** was not sponsored by an **Insured Organization;**

> based upon, arising from, or in any way related to liability of others assumed by the **Insured** under any written contract or agreement, except to the extent that the **Insured** would have been liable in the absence of such contract or agreement or unless the liability was assumed in accordance with or under the agreement or declaration of trust pursuant to which the **Insured Plan** was established;

> based upon, arising from, or in any way related to the failure of the **Insured** to comply with any law governing workers' compensation, unemployment insurance, or disability benefits; or

> based upon, arising from, or in any way related to an **Insured** serving as a fiduciary of any plan, fund or program which is not an **Insured Plan**, even if such service is at the direction or request of an **Insured Organization**.

LIUI00DO380180507

III.     **Section 5 (Exclusions of Losses)** is amended to include the following additional exclusions:

based upon, arising from, or in any way related to the failure to fund an **Insured Plan** in accordance with **ERISA** or the **Insured Plan's** document or to collect contributions owed to an **Insured Plan:**

for benefits due or to become due under the terms of an **Insured Plan** unless, and to the extent that (i) the **Insured** is a natural person and such benefits are payable by such **Insured** as a personal obligation, and (ii) recovery for the benefits is based upon a covered **Fiduciary Wrongful Act**.

IV.      Solely with respect to Fiduciary Liability coverage granted by this endorsement, Section 4.4 of the Policy is deleted.

V.       The amount set forth in Item III of the declarations shall be the maximum Limit of Liability for all **Loss** under this Policy. The following amount shall be the maximum aggregate Limit of Liability for the Fiduciary Liability coverage granted under this endorsement: $1,000,000__.  Such amount shall be a sub-limit, which is part of, and not in addition to, the Limit of Liability set forth in Item III of the Declarations.

VI.      Solely with respect to Fiduciary Liability coverage granted by this endorsement, Item IV of the Declarations is amended to include the following:

$1,000,000__ in the aggregate each **Claim** for a **Fiduciary Wrongful Act**

VII.     Solely with respect to Fiduciary Liability coverage granted by this endorsement, Item V of the Declarations is amended to include the following:

Prior Litigation Date: 05/16/2011

VIII.    If during the **Policy Period**: (i) a **Change in Control** occurs, (ii) the responsibilities of the **Insured Organization** with respect to **any Insured Plan** is fully assumed by any other person or entity, or (iii) **the Insured Organization** terminates any **Insured Plan;**

coverage under this endorsement shall continue until termination of this Policy, but only with respect to **Claims** for **Fiduciary Wrongful Acts** committed or allegedly committed prior to the effective date of such **Change in Control**, termination, or assumption of responsibilities.

IX.      Solely with respect to Fiduciary Liability coverage granted by this endorsement, the definitions of the following terms are deleted and replaced with the following:

**23.3    "Claim"** means:

**(a)**     a written demand for monetary or non-monetary relief against an **Insured**;

**(b)**     the commencement of a civil or criminal judicial proceeding or arbitration against an **Insured**;

**(c)**     the commencement of a formal criminal, administrative or regulatory proceeding or investigation against an **Insured,** including any

LIUI00DO380180507

brought before the Equal Employment Opportunity Commission or any similar state, local or territorial governmental agency; or

(d) a fact finding investigation by the Department of Labor, the Pensions Benefit Guaranty Corporation, or similar government agency;

including any appeal therefrom, against an **Insured** for a **Fiduciary Wrongful Act**. A **Claim** will be deemed first made on the date an **Insured** receives a written demand, complaint, indictment, notice of charges, or order of formal investigation.

**23.10** **"Insured(s)"** means the **Insured Persons,** the **Insured Organization,** the **Insured Plans** or any other organization, plan or natural person listed as an **Insured** on a schedule to this endorsement.

**23.12** **"Insured Person(s)"** means one or more natural persons who were, now are, or shall hereafter be duly elected or appointed directors, trustees, officers, employees, committee members or volunteers of the **Insured Organization** or of any **Insured Plan** in his or her capacity as a **Fiduciary** or trustee of an **Insured Plan** or as a person performing **Administration** of an **Insured Plan,** or, with respect to a **Subsidiary** operating outside the United States, their functional equivalent, regardless of title.

**23.20** **"Wrongful Act"** means a **Fiduciary Wrongful Act**.

X. The following definitions are added to Section 23 (Definitions);

**"Administration"** means:

(a) handling records, or giving advice, counsel or interpretation to employees regarding an **Insured Plan**; or

(b) affecting enrollment of employees, and termination, or cancellation of benefits under an **Insured Plan.**

**"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended.

**"Fiduciary"** means a fiduciary as defined by **ERISA** of an **Insured Plan**, or a person or entity who exercises discretionary control with respect to the management of an **Insured Plan** or the disposition of its assets.

**"Fiduciary Wrongful Act"** means:

(a) any breach of the responsibilities, obligations, or duties imposed upon **Fiduciaries** of any **Insured Plan** by **ERISA** or by the common or statutory law of the United States, any state, or other jurisdiction anywhere in the world;

(b) any other matter claimed against any **Insured** solely by reason of their service as **Fiduciaries** of any **Insured Plan**;

(c) any negligent act, error, or omission solely in the **Administration** of any **Insured Plan**.

**"Insured Plan(s)"** means:

(a)    any welfare benefit plan as defined in **ERISA** or any similar common or statutory law of the United States or other jurisdiction anywhere in the world, which is sponsored solely by the **Insured Organization** or jointly by the **Insured Organization** and a labor organization solely for the benefit of the employees of the **Insured Organization** located anywhere in the world and which:

    (i)    existed on the Inception Date of this Policy; or

    (ii)   is created or acquired by the **Insured Organization** after the Inception Date of this Policy, provided that if the assets of such created or acquired plan exceed 35% of the total plan assets of all **Insured Plans** as of the Inception Date of this Policy, the **Insured Organization** shall give written notice of such creation or acquisition to the Insurer within ninety (90) days of such creation or acquisition, shall provide such information as the Insurer may require, and shall pay an additional premium required by the Insurer.

Coverage for any plan described in subsection (ii) above shall only be afforded with respect to **Fiduciary Wrongful Acts** taking place after the date such plan was created or acquired;

(b)    any non-qualified plan not subject to regulation under Title I of **ERISA** or which does not meet the qualification requirements under Section 401(a) of the Internal Revenue Code of 1986, as amended, but only with respect to conduct described in subsection (c) of the definition of **Fiduciary Wrongful Act**;

(c)    any Employee Pension Benefit Plan as listed by attachment to the Liberty Mutual Group Fiduciary Coverage Application.

All other terms, conditions, and exclusions of this Policy remain unchanged.

_____
Authorized Representative of
Liberty Insurance Underwriters Inc.

6/27/2012_____
Date

LIUI00DO380180507



**LIBERTY INSURANCE UNDERWRITERS INC.**

**ENDORSEMENT NO.**

This endorsement, effective 05/16/2012                forms part of

Policy No. FSS000083-0212    **issued to** USA Gymnastics

_____

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**General Professional Services Exclusion
(Management Carve-out)**

It is agreed that Section __4__ of the Policy is amended by the addition of the following:

4.10_____ based upon, arising from, or in any way related to any **Insured's** performance of or failure to perform professional services for others and caused by an act, error or omission related thereto.

This exclusion shall not apply to any **Claim** brought by or maintained by or on behalf of a security holder(s) of the **Insured Organization** other than an **Insured Person**, whether directly, by class action, or by derivative action, where such **Claim** is based upon the failure of an **Insured Person** to properly supervise or manage such professional services, or based upon improper disclosure or nondisclosure of material information relating to such professional services.

All other terms, conditions, and exclusions of this Policy remain unchanged.

_____
Authorized Representative of
Liberty Insurance Underwriters Inc.

_____
                    6/27/2012
Date

LIUI00DO380190507 (2)

 

Administered by:

**LIBERTY INSURANCE UNDERWRITERS INC.**

**ENDORSEMENT NO.**

This endorsement, effective  05/16/2012           forms part of

Policy No. FSS000083-0212     issued to  USA Gymnastics
_____

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**Sub-Limit Endorsement for Wage & Hour Claims**

It is agreed that Item III of the Declarations Page is hereby amended by the addition of the following:

ITEM III.        SUB-LIMIT OF LIABILITY:    $150,000 in the aggregate for the **Policy Year**

It is further agreed that the Sub-Limit of Liability provided under this endorsement is part of, and not in addition to, the Limit of Liability provided for in Item III of the Declarations and shall only apply as respects to:

**Defense Costs** for **Claims** based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving any federal, state, local or foreign wage and hour laws, including, without limitation, the Fair Labor Standards Act (**FSLA Claims**).  Sums that any **Insured** shall become legally obligated to pay as damages (including settlements and judgments) from such **Claims** shall continue to be excluded from the definition of **Loss** except for those resulting from any actual or alleged retaliatory treatment of the claimant by the **Insured** on account of the claimant's exercise of rights pursuant to any such law or amounts owed under the Equal Pay Act of 1963.

It is further agreed that Section 9.1 is deleted and replaced with the following

**9.1**    The Insurer's maximum aggregate Limit of Liability for all **Loss** under this Policy shall be the amount set forth in Item III of the Declarations.  Amounts incurred as **Defense Costs** shall be in addition to the Limit of Liability except for those incurred on **FLSA Claims**.

All other terms, conditions, and exclusions of this Policy remain unchanged.

_____
Authorized Representative of
Liberty Insurance Underwriters Inc.

_____
06/27/2012
Date

LIUI00DO38028 2 (05/07)



<div align="center">**ENDORSEMENT NO.**</div>

This endorsement, effective 05/16/2012 forms part of

Policy No.: FSS000083-0212        issued to USA Gymnastics

Issued By: 5Star Specialty Programs

<div align="center">**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**INDIANA AMENDATORY ENDORSEMENT**</div>

This endorsement modifies insurance under the following:

**A.** Irrespective of any other provision of this Policy, notice given by or on behalf of the Parent Organization to any authorized agent of the Insurer within the state of Indiana with particulars sufficient to identify the Parent Organization shall be deemed to be notice to the Insurer.

**B.** Paragraph **23.14 "Loss"** of Section **23. Definitions** is deleted in its entirety and replaced by the following:

**23.14 "Loss"** means:

**(a)** sums which the **Insureds** are legally obligated to pay solely as a result of any **Claim** insured by this Policy, including damages, judgments, settlement amounts, legal fees and costs awarded pursuant to judgments, and the multiple portion of any multiplied damage award; and

**(b)** any excise tax equal to ten percent (10%) of an excess benefit which has been assessed by the Internal Revenue Service against any **Insured Person** pursuant to Section 4658 of the Internal Revenue Code for participation of an organization manager in an excess benefit transaction.

**Loss** shall not include any other taxes, fines, penalties, or matters uninsurable pursuant to any applicable law.  **Loss** shall also not include punitive or exemplary damages except for vicarious liability.

All other exclusions, conditions and limitations remain unchanged.



## ENDORSEMENT NO.

This endorsement, effective 05/16/2012 forms part of

Policy No. FSS000083-0212          issued to USA Gymnastics

Issued By: 5Star Specialty Programs

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### INDIANA ENDORSEMENT

As used in this Policy endorsement the terms "the Insurer", "we", "our " and "us" refer to Liberty Insurance Underwriters Inc. The term "Named Insured", "you" and "your" refer to the "Parent Organization" or "Named Real Estate Investment Trust" as shown on the Declarations Page of this Policy.

Irrespective of any other term or condition within the Policy, the Policy is hereby amended by the following:

**A.  Cancellation**

We may cancel this Policy only for non-payment of premium by mailing to the Named Insured written notice of cancellation at least 10 days prior to the effective date of the cancellation.

We will mail notices of cancellation to the Named Insured at the mailing address we have on record.

You may cancel this Policy by mailing notice to us stating when the cancellation will be effective.  You may not, however, cancel this Policy in anticipation of, or after the effective date of, a **Change In Control**.

B.  **Non-renewal**

If we decide not to renew this Policy, we will mail you notice of this decision at least 45 days before the Policy expires.

All other exclusions, conditions and limitations remain unchanged.

**INDIANA**
**POLICYHOLDER NOTICE**

**Questions regarding your policy or coverage should be directed to:**

**Liberty Insurance Underwriters Inc.**
**1-800-677-9163**

If you (a) need the assistance of the governmental agency that regulates insurance; or (b) have a complaint you have been unable to resolve with your insurer you may contact the Department of Insurance by mail, telephone or email:

State of Indiana Department of Insurance
Consumer Services Division
311 West Washington St.
Indianapolis, Indiana   46204

Consumer Hotline: (800) 622-4461; (317) 232-2395

Complaints can be filed electronically at www.in.gov/idoi.

LIUI13DO550011006

05/16/2012

USA Gymnastics
132 E Washington St, Ste 700
Indianapolis, IN 46204

Effective:  05/16/2012

## POLICYHOLDER DISCLOSURE -TERRORISM INSURANCE PREMIUM NOTICE

**This notice contains important information about the Terrorism Risk Insurance Act and its effect on your policy.  Please read it carefully.**

## THE TERRORISM RISK INSURANCE ACT

The Terrorism Risk Insurance Act, including all amendments ("TRIA" or the "Act"), establishes a program to spread the risk of catastrophic losses from certain acts of terrorism between insurers and the federal government.  If an individual insurer's losses from a "certified act of terrorism" exceed a specified deductible amount, the government will reimburse the insurer for 85% of losses paid in excess of the deductible, but only if aggregate industry losses from such an act exceed $100 million. An insurer that has met its insurer deductible is not liable for any portion of losses in excess of $100 billion per year.  Similarly, the federal government is not liable for any losses covered by the Act that exceed this amount.   If aggregate insured losses exceed $100 billion, losses up to that amount may be pro-rated, as determined by the Secretary of the Treasury.

## MANDATORY OFFER OF COVERAGE FOR "CERTIFIED ACTS OF TERRORISM" AND DISCLOSURE OF PREMIUM

TRIA requires insurers to make coverage available for any loss that occurs within the United States (or outside of the U.S. in the case of U.S. missions and certain air carriers and vessels), results from a "certified act of terrorism" AND that is otherwise covered under your policy.

A "certified act of terrorism" means:

[A]ny act that is certified by the Secretary [of the Treasury], in concurrence with the Secretary of State, and the Attorney General of the United States

(i) to be an act of terrorism;
(ii) to be a violent act or an act that is dangerous to –

(I) human life;
(II) property; or
(III) infrastructure;

TRIA-N001-0208

(iii) to have resulted in damage within the United States, or outside of the United States in the case of –

    (I)  an air carrier (as defined in section 40102 of title 49, United States Code) or United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States); or

    (II) the premises of a United States mission; and

(iv) to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

## MANDATORY PREMIUM DISCLOSURE STATEMENT

Your policy does not contain an exclusion for losses resulting from "certified acts of terrorism." Coverage for such losses is still subject to, and may be limited by, all other terms, conditions and exclusions in your policy.

The premium charge for this coverage for the policy period is $0

## YOU NEED NOT DO ANYTHING FURTHER AT THIS TIME.

The summary of the Act and the coverage under your policy contained in this notice is necessarily general in nature. Your policy contains specific terms, definitions, exclusions and conditions. In case of any conflict, your policy language will control the resolution of all coverage questions. Please read your policy.

If you have any questions regarding this notice please contact your sales representative or agent.

TRIA-N001-0208





# APPLICATION FOR
# NONPROFIT EXECUTIVE ADVANTAGE POLICY

THIS IS AN APPLICATION FOR A CLAIMS-MADE POLICY.  THE POLICY FOR WHICH THIS APPLICATION IS MADE COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR DISCOVERY PERIOD, IF APPLICABLE, AND REPORTED TO THE INSURER AS SOON AS PRACTICABLE BUT IN NO EVENT LATER THAN 90 DAYS AFTER THE END OF THE POLICY PERIOD.  PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.

UNLESS AMENDED BY ENDORSEMENT, AMOUNTS INCURRED AS DEFENSE COSTS SHALL BE IN ADDITION TO THE LIMIT OF LIABILITY AND SHALL NOT BE APPLIED TO THE APPLICABLE RETENTION.

THE POLICY PROVIDES THE DUTY ON THE PART OF THE INSURER TO DEFEND.

*Instructions*
- *Please complete all questions.*
- *The term **"Insured Organization"** means the parent organization whose directors and officers are proposed to be insured under the Nonprofit Executive Advantage Policy for which this Application is made, along with any other entities in which such parent organization has or controls the right to elect more than 50% of the Board of Directors  or other governing body of such entity if such right exists.*

1. Name of the **Insured Organization**:
   USA GYMNASTICS

2. Address of the **Insured Organization**: 132 E WASHINGTON ST #700
   City: INDIANAPOLIS   County: MARION   State: IN   Zip Code: 46204

3. Individual at **Insured Organization** designated to receive correspondence and notices from the Insurer:
   JOHN  HEWETT                    CONTROLLER
   (Name)                          (Title)

   Telephone: (317) 237-5050  Fax: (317) 237-5069  E-Mail Address: jhewett@usagym.org

4  **Insured Organization's** nature of operations:
   AMATEUR SPORT NATIONAL GOVERNING BODY

5. a) Tax status:  ☒ Exempt under Section 501(c) 3        o Taxable
   b) Date organized  1964
   c) Number of Employees  54
   d) Annual Salary/Wages Expense 3,006,501  PER W-3
   e) Total Assets  11.5 MILLION

6. a) What was the employee turnover rate in the last 12 months? LESS THAN 10%

   b) Did this exceed the historical average of the prior 3 years? ................................... o Yes ☒ No

7. Have there been any changes in Senior Management for reasons other than death, retirement at normal retirement age or term limitations ................................................................. o Yes ☒ No

303 W. Madison St., Suite 700, Chicago, IL  60606  (866) 879-6565  fax:  (866) 720-5003
www.5starsp.com  |  Submissions: dando@5starsp.com

LIUI00DO110020507

1 of 4



8. Has the **Insured Organization** had in the past 12 months, or does it contemplate within the next 12 months consolidation, merger, sale or divestiture of a portion of its business?........... o Yes ⊠ No
If "Yes", was there, or will there be, a reduction in employees as a result?................. o Yes o No  N/A
If "Yes", what was, or will be, the reduction as a percentage of prior employee count? o Yes o No  N/A

9. Does the **Insured Organization** provide any of the following? :
a) Promote, sponsor or provide any type of insurance to its members?..................... ⊠ Yes o No
b) Provide standard setting, disciplinary or peer review activities?............................ ⊠ Yes o No
c) Engage in any labor negotiations?.................................................................... o Yes ⊠ No
d) Engage in any experimentation, research or product development? ..................... o Yes ⊠ No
e) Provide any other professional services?........................................................ ⊠ Yes o No
f) Engage in any business transactions with **Insured Persons** or businesses they control?  o
⊠Yes o No
If "Yes" for any of the above, please attach full details.

10. Has the **Insured Organization** previously held or does it now have any directors and officers liability insurance or similar insurance?................................................................ ⊠ Yes o No
If "Yes", please provide the following details:

FSS000083-011

| Insurer | Policy Type | Deductible/Retention | Period From/To | Premium |
|---------|-------------|----------------------|----------------|---------|
| Liberty Ins | D & O | 20,000 | 5/16/11 - 5/16/12 | 14,315 |

11. Attach full details of any claim, notice of circumstance, or wrongful act which has been the subject of notice under such insurance in the last 5 years (if none, check the box). ................... o None

12. Has any Insurer declined, cancelled, or refused to renew any directors and officers liability insurance or similar insurance within the past 5 years? ................................................................ o Yes ⊠ No
If "Yes", please attach full details.

**Do not complete questions #13 and #14 if this is a renewal policy with the same limit of liability with a member of the Liberty Mutual Group.**

13. During the last 5 years has the **Insured Organization** or any of its directors, officers, or employees been involved in any litigation that could have a material impact on the **Insured Organization**?
o Yes o No ................................................. If "Yes", please attach full details.

14. Does anyone for whom insurance is sought have any knowledge or information of any act, error, omission, fact, or circumstance which may give rise to a **Claim** which may fall within the scope of the proposed insurance? ...................................................................................... o Yes o No
If "Yes", please attach full details.

---

**IT IS UNDERSTOOD AND AGREED THAT IF ANYONE FOR WHOM THIS INSURANCE IS SOUGHT HAS ANY KNOWLEDGE OF ANY SUCH ACT, ERROR, OMISSION, FACT, OR CIRCUMSTANCE, ANY CLAIM EMANATING THEREFROM SHALL BE EXCLUDED FROM COVERAGE UNDER THE PROPOSED INSURANCE.**

---

303 W. Madison St., Suite 700, Chicago, IL 60606 (866) 879-6565 fax: (866) 720-5003
www.5starsp.com | Submissions: dando@5starsp.com

LIUI00DO110020507

2 of 4



**RENEWAL STATEMENT (Applicable to renewal polices only)** – It is agreed that this Renewal Application is a supplement to the Application(s) attached to the current Policy and said Applications, together with this Renewal Application, constitute the complete Application which shall be the basis of the contract should a Policy be issued and will be attached to and become part of the Policy.

**REQUIRED INFORMATION:** Risks exceeding $300,000 in salaries OR $1,000,000 in assets must submit a financial statement.

Signing this **Application** does not bind the undersigned to purchase or the Insurer to sell any insurance policy. If a policy is issued, this **Application** and its attachments shall be the basis of such policy and shall be deemed attached to and shall form part of such policy.

The undersigned, on behalf of all prospective Insureds, declares that the statements in this **Application** and its attachments are true and accurate. If there are material changes to any statements in this **Application** or its attachments prior to the inception date of the policy, the undersigned shall immediately notify the Insurer of such changes. Upon receipt of such notification, the Insurer shall have the right to modify or withdraw any outstanding terms or proposal.

**NOTICE TO ARKANSAS RESIDENTS:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**NOTICE TO COLORADO RESIDENTS:** It is unlawful to knowingly provide false, incomplete, or misleading facts, or information to an insurance company for the purpose of defrauding or attempting to defraud the company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant with regard to settlement or award payable from insurance proceeds shall be reported to the Colorado division of insurance with the department of regulatory agencies.

**NOTICE TO FLORIDA RESIDENTS:** Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

**NOTICE TO KENTUCKY RESIDENTS:**
Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

**NOTICE TO MAINE RESIDENTS:** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines or a denial of insurance benefits.

**NOTICE TO NEW JERSEY RESIDENTS:** Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties.

**NOTICE TO NEW MEXICO RESIDENTS:** ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL FINES AND CRIMINAL PENALTIES.

**NOTICE TO NEW YORK RESIDENTS:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

303 W. Madison St., Suite 700, Chicago, IL  60606  (866) 879-6565  fax:  (866) 720-5003
www.5starsp.com  |  Submissions: dando@5starsp.com

LIUI00DO110020507

3 of 4



**NOTICE TO OHIO RESIDENTS:** Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

**NOTICE TO OKLAHOMA RESIDENTS:** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

**NOTICE TO OREGON RESIDENTS:** Any person who knowingly, and with intent to defraud or solicit another to defraud an insurer: (1) by submitting an application, or (2) by filing a claim containing a false statement as to any material fact, may be violating state law.

**NOTICE TO PENNSYLVANIA RESIDENTS** Any person who knowingly and with intent to defraud any insurance company or other person files and application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

**NOTICE TO TENNESSEE RESIDENTS:** It is a crime to knowingly provide false, incomplete, or misleading information to an insurance company for the purpose of defrauding the company.  Penalties include imprisonment, fines and denial of insurance benefits

**This Application must be currently dated and signed by the association's insurance agent, broker, property manager or by a member of governing board of the association.**

Signed: _____       Title: _____
    (Signature of President or Executive Director)

Date: _____

**Submitting Producer Name**

_____
Agency Name

_____
Agency Address

_____
License Number (FL Producers Only)

LIUI00DO110020507

Liberty Insurance Underwriters Inc

5 Star Specialty Programs


USA Gymnastics

Nonprofit Executive Advantage Policy


9a  USA Gymnastics requires all coaches, judges and athletes who participate on the floor of sanctioned competitions to be members of USA Gymnastics.  A member benefit is secondary accident medical, as well as catastrophic medical coverage.  In addition, the event host and USA Gymnastics have liability coverage for the event.


9b  When complaints are lodged against athlete and professional members for misconduct or actions contrary to the Code of Ethics   (http://usagym.org/pages/aboutus/pages/code_of_ethics.html), USA Gymnastics investigates those complaints and takes disciplinary action as warranted.  Such adjudication of these matters is authorized and required of us by virtue of the Amateur Sports Act as the National Governing Body for the Sport.  In addition, USA Gymnastics develops the rules and policies for its professional members and standards for the conduct of sanctioned competition and administration of the sport.  http://usagym.org/pages/women/pages/rules_policies.html


9e   USA Gymnastics provides educational opportunities for coaches and judges to enhance their technical capabilities and help provide a safe environment for gymnastics participation.

http://usagym.org/pages/education/pages/index.html

9f.  USA Gymnastics, as the National Governing Body, is involved in most every aspect of the sport domestically, and is responsible for the international participation of our national teams as well.  As such, we sell technical items, such as the educational materials mentioned above, sanction competitions held a member clubs, host educational workshops and conferences, and host and conduct training camps and events.  Participants in these events, and purchasers of the services offered are to a large extent, members for whom insurance is a benefit as described in (a) above.


Supplemental information:   For financial information and tax return, please see the applicable page on our website  http://usagym.org/pages/aboutus/pages/finance.html

# EXHIBIT 2

## Tracy Bernsee

| | |
|---|---|
| **From:** | Bernsee, Tracy |
| **Sent:** | Monday, May 13, 2013 10:46 AM |
| **To:** | 'Weber, Todd (Chicago-LIU)' |
| **Subject:** | USA Gymnastics FSS000083-0212  May 16, 2013) |

How shall I calculate the 30 day extension?  Is it pro-rata plus 10%?  Or just pro-rata?

Regards,
Tracy Bernsee
Underwriter
**5Star Specialty Programs**
(312) 855-2046 Direct
(866) 720-5003 Fax
**Email: tracy.bernsee@5StarSP.com**

**From:** Weber, Todd (Chicago-LIU) [mailto:Todd.Weber@LibertyIU.Com]
**Sent:** Thursday, May 09, 2013 12:33 PM
**To:** Bernsee, Tracy
**Subject:** USA Gymnastics FSS000083-0212 May 16, 2013) - Response from Liberty

Yes.  Can extend current coverage if needed.

**From:** Bernsee, Tracy [mailto:Tracy.Bernsee@5Starsp.com]
**Sent:** Thursday, May 09, 2013 12:12 PM
**To:** Weber, Todd (Chicago-LIU)
**Subject:** RE: USA Gymnastics FSS000083-0212 May 16, 2013) - Response from Liberty

We had not removed Third Party.  So, remove the Third Party via endorsement?

Regards,
Tracy Bernsee
Underwriter
**5Star Specialty Programs**
(312) 855-2046 Direct
(866) 720-5003 Fax
**Email: tracy.bernsee@5StarSP.com**

**From:** Weber, Todd (Chicago-LIU) [mailto:Todd.Weber@LibertyIU.Com]
**Sent:** Thursday, May 09, 2013 10:20 AM
**To:** Bernsee, Tracy
**Subject:** USA Gymnastics FSS000083-0212 May 16, 2013) - Response from Liberty

It's still early on the claim, so there is no reserve set at the moment.  For this year's renewal we do not need to debit but the nature of the claim (sexual allegations) would give me concern about 3rd Party coverage if we have not removed that already.

**From:** Bernsee, Tracy [mailto:Tracy.Bernsee@5Starsp.com]
**Sent:** Wednesday, May 08, 2013 3:03 PM
**To:** Weber, Todd (Chicago-LIU)
**Subject:** USA Gymnastics, FSS000083-012 (May 16, 2013) - Renewal Submission

Todd,

Please find attached renewal submission.  There was a recent claim.   Last year we bound $5m xs. $20,000 SIR @ $14,178 (which included $1mm Fiduciary – Shared) for $12mm Assets & $3mm in Salary.  Due to the claim, I was going to add the Application of Retention to Defense Costs.     Do we need to debit the account any?

This is a May 16th account.

Let me know if you need further information.

Regards,
Tracy Bernsee
Underwriter
**5Star Specialty Programs**
(312) 855-2046 Direct
(866) 720-5003 Fax
**Email: tracy.bernsee@5StarSP.com**

---

**From:** Ben Erdmanis [mailto:berdmanis@usproins.com]
**Sent:** Monday, May 06, 2013 12:51 PM
**To:** Bernsee, Tracy
**Subject:** U S A Gymnastics, FSS000083-012 (May 16, 2013) - Renewal Submission

Hi Tracy,

Please see the attached renewal information for the above insured's 5/16 renewal.  Let me know if you have any questions or if you need anything further.

Thank you!
Benjamin J. Erdmanis
Vice President

# US Pro Insurance Services

27475 Ferry Road, Suite 131
Warrenville, IL  60555
Phone: (630) 864-3032
Fax: (630) 717-4224
E-mail: berdmanis@usproins.com

This message contains information which may be confidential and privileged.
Unless you are the addressee (or authorized to receive for the addressee),you
may not use, copy or disclose to anyone the message or any information
contained in the message. If you have received the message in error or
would like not to receive any further emails from this sender, please
advise the sender by reply email and delete the message.

CA License #: 0G24545

---

The information in this e-mail and in any attachments is confidential and may be privileged. If you are not the intended recipient, please destroy this message and notify the sender immediately. You should not retain, copy or use this e-mail for any purpose, nor disclose all or any part of its contents to any other person or persons.

Any views expressed in this message are those of the individual sender, except where the sender specifically states them to be the views of Liberty International Underwriters.

Liberty International Underwriters may monitor the content of e-mails sent and received via its network for viruses or unauthorized use and for other lawful business purposes.

_____

_____
The information in this e-mail and in any attachments is confidential and may be privileged. If you are not the intended recipient, please destroy this message and notify the sender immediately. You should not retain, copy or use this e-mail for any purpose, nor disclose all or any part of its contents to any other person or persons.

Any views expressed in this message are those of the individual sender, except where the sender specifically states them to be the views of Liberty International Underwriters.

Liberty International Underwriters may monitor the content of e-mails sent and received via its network for viruses or unauthorized use and for other lawful business purposes.

_____

# EXHIBIT 3



Administered by:
**5 Specialty Programs**
A DIVISION OF CRUMP INSURANCE SERVICES, INC.

## LIBERTY INSURANCE UNDERWRITERS INC.

55 Water Street, 18th Floor
New York, New York 10041
**(a member of the Liberty Mutual Group and hereinafter "the Insurer")**
**Liberty Insurance Underwriters Inc.'s toll free number is: 800-677-9163**

# NONPROFIT EXECUTIVE ADVANTAGE POLICY

### DECLARATIONS

> **NOTICE: THIS IS A CLAIMS-MADE POLICY. THIS POLICY COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR DISCOVERY PERIOD, IF APPLICABLE, AND REPORTED TO THE INSURER AS SOON AS PRACTICABLE BUT IN NO EVENT LATER THAN 90 DAYS AFTER THE END OF THE POLICY PERIOD. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.**
>
> **UNLESS AMENDED BY ENDORSEMENT, AMOUNTS INCURRED AS DEFENSE COSTS SHALL BE IN ADDITION TO THE LIMIT OF LIABILITY AND SHALL NOT BE APPLIED AGAINST THE APPLICABLE RETENTION.**
>
> **THE INSURER HAS THE DUTY TO DEFEND.**

**POLICY NUMBER:** FSS000083-0313
**RENEWAL OF:** FSS000083-0212

**PRODUCER:** 5Star Specialty Programs a Division of CRC Insurance Services, Inc.

**ITEM I. NAME AND ADDRESS OF PARENT ORGANIZATION:**
USA Gymnastics
132 E Washington St, Ste 700, Indianapolis, IN 46204

**ITEM II.**  **POLICY PERIOD:**  Inception Date: 05/16/2013  Expiration Date: 05/16/2014
(12:01 A.M. at the address set forth in Item I)

**ITEM III.**  **LIMIT OF LIABILITY:**  $ 5,000,000 in the aggregate for the **Policy Year**

**ITEM IV.**  **RETENTION:**  $ 20,000 in the aggregate each **Claim**

**ITEM V.**  **PRIOR LITIGATION DATE:**  05/16/2009

**ITEM VI.**  **PREMIUM:**  $ 14,302.00

**ITEM VII.**  **ENDORSEMENTS FORMING PART OF THIS POLICY AT ISSUANCE:** See Attached Forms List

This Declarations page, together with the **Application**, the attached Nonprofit Executive Advantage Policy Form, and all endorsements thereto, shall constitute the contract between the Insurer and the **Insureds**. This Policy is valid only if signed below by a duly authorized representative of the Insurer.

*Shawna Reidy*
_____ 06/04/2013
Authorized Representative

LIUI00DO030010507

# Forms List

| | |
|---|---|
| LIUI00DO03001 | Nonprofit Executive Advantage Policy Declarations |
| Forms List | Forms List |
| LIUI00DO01001 | Nonprofit Executive Advantage Policy |
| LIUI13DO24001 | Indiana Amendatory Endorsement |
| LIUI13DO24001 | Indiana Endorsement |
| LIUI13DO55001 | Indiana Policyholder Notice |
| LIUI00DO38013 | Deletion of Third Party EPL Coverage |
| LIUI00DO38018 | Fiduciary Liability Coverage with Shared Limit of Liability |
| LIUI00DO38019 | General Professional Services Exclusion (Management Carve-out) |
| LIUI00DO38028 2 | Sub-Limit Endorsement for Wage and Hour Claims |
| LIUI00DO38129 | Application of Retention to Defense Costs |
| TRIA-N001 | Policyholder Disclosure- Terrorism Insurance Premium Notice |

# LIBERTY INSURANCE UNDERWRITERS INC.

### (a member of the Liberty Mutual Group
### and hereinafter called "the Insurer")

### NONPROFIT EXECUTIVE ADVANTAGE POLICY

(Words and phrases printed in **bold**, other than
in the headings, are defined in Section 23 below.)

In reliance upon the truthfulness and accuracy of the statements made in the **Application**, in consideration of, and subject to, the payment of premium when due, and subject to the terms, conditions, and exclusions of this Policy, the Insurer and the **Insureds** agree as follows:

**1.** **Insuring Agreement:** The Insurer shall pay on behalf of the **Insureds** all **Loss** which they shall become legally obligated to pay as a result of a **Claim** first made during the **Policy Period** or **Discovery Period**, if applicable, against the **Insureds** for a **Wrongful Act** which takes place before or during the **Policy Period**.

**2.** **Defense Costs and Settlements:**

    **2.1** It shall be the right and duty of the Insurer to defend any **Claim**. The Insurer may investigate, as it deems appropriate, any **Claim**, circumstance, or **Wrongful Act** involving the **Insureds**.

    **2.2** The **Insureds** shall not incur any **Defense Costs**, admit any liability, assume any obligation, agree to any settlement, or make any settlement offer with respect to any **Claim** without the Insurer's prior written consent, which shall not be unreasonably withheld. The Insurer shall not be liable for any **Defense Costs** incurred or any admissions, obligations, agreements, or settlements made by the **Insureds** without the Insurer's prior written consent.

    **2.3** The Insurer has the right to negotiate the settlement of any **Claims** it deems expedient, but only with the **Insured's** consent. If the **Insureds** withhold consent to such settlement, the Insurer's liability for such **Claim** is limited to the amount in excess of the Retention which the Insurer would have contributed to the settlement had the **Insured** consented to the settlement, and 70 percent (70%) of any additional covered **Loss,** including **Defense Costs**, incurred subsequent to such refusal to settle.

**3.** **Cooperation**: As a condition precedent to the **Insureds'** rights under this Policy, they shall give to the Insurer all information and cooperation as the Insurer reasonably may require and shall do nothing that may prejudice the Insurer's position or its rights of recovery.

**4.** **Claim Exclusions:** This Policy does not apply to any **Claim** made against any **Insured**:

    **4.1** for:

        **(a)** bodily injury, sickness, disease, death; or

        **(b)** emotional distress, mental anguish, false arrest or imprisonment, abuse of process, malicious prosecution, violation or invasion of any right of privacy or private occupancy, trespass, nuisance or wrongful entry or eviction; or

**(c)**      libel, slander, defamation; or

**(d)**      damage to, destruction of, or loss of use of any tangible property;

provided that parts (b) and (c) of this exclusion shall not apply to any **Claim** brought by or on behalf of any **Third Person,** or any past, present or prospective **Insured Person** for an **Employment Practices Wrongful Act**; also provided that part (c) of this exclusion shall not apply to any **Claim** for any other **Wrongful Act** other than an **Employment Practices Wrongful Act**. However, coverage afforded for libel, slander or defamation for **Wrongful Acts** other than **Employment Practices Wrongful Acts** shall be excess of any coverage afforded by the **Insured's** general liability policy;

**4.2**      for any error, misstatement, misleading statement, act, omission, neglect or breach of duty by **Insured Persons** of any **Subsidiary** in such capacity or by the **Subsidiary** itself if such error, misstatement, misleading statement, act, omission, neglect or breach of duty actually or allegedly occurred, in whole or in part, when such entity was not a **Subsidiary**;

**4.3**      based upon, arising from, or in any way related to any error, misstatement, misleading statement, act, omission, neglect or breach of duty which has been reported or has been the subject of any notice under any insurance policy of which this Policy is a renewal or replacement or under any other policy which it may succeed in time;

**4.4**      for any actual or alleged violation of the Employee Retirement Income Security Act of 1974, amendments thereto or similar federal, state, local or common law;

**4.5**      based upon, arising from, or in any way related to:

**(a)**      any demand, suit, or other proceeding against any **Insured** which has been made, which existed, or was pending prior to the applicable Prior Litigation Date set forth in Item V of the Declarations; or

**(b)**      the same or substantially the same facts, circumstances or allegations involved in such demand, suit, or other proceeding;

**4.6**      brought or maintained by or on behalf of the **Insured Organization**;

**4.7**      based upon, arising from, or in any way related to the actual, alleged, or threatened discharge, dispersal, release or escape of **Pollutants, Fungi** or **Microbes**, or any direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify, or neutralize **Pollutants, Fungi** or **Microbes**;

**4.8**      based upon, arising from, or in any way related to an **Insured Person** serving as a director, officer, trustee, regent, governor, volunteer, employee, or similar position of any entity other than the **Insured Organization;** or

**4.9**      based upon, arising from, or in any way related to:

**(a)**      any **Insureds** gaining in fact any personal profit, remuneration or advantage to which they were not legally entitled; or

**(b)** any deliberately dishonest, malicious or fraudulent act or omission or any willful violation of law by any **Insured;**

provided, however, this exclusion shall only apply if it is finally adjudicated that such conduct in fact occurred.

For purposes of determining the applicability of Section 4.9, the **Wrongful Act** of any **Insured Person** shall not be imputed to any other **Insured Person.**

**5.** **Loss Exclusions:** The Insurer shall not be liable to pay any **Loss** in connection with any **Claim**:

**5.1** for any obligation of the **Insured Organization** to modify any building or property in order to affect compliance with the Americans With Disabilities Act and any amendments thereto or any similar federal, state or local statute, regulation, or common laws; or

**5.2** for any actual or alleged liability of any **Insured** under any contract or agreement, express or implied, written or oral, except for employment related obligations which would have attached absent such contract or agreement.

Provided, however, that these exclusions shall not apply to the Insurer's duty to defend and to pay **Defense Costs**.

**6.** **Application Representations and Severability**:

**6.1** The **Insureds** represent that the statements and representations contained in the **Application** are true and shall be deemed material to the acceptance of the risk or the hazard assumed by the Insurer under this Policy. This Policy is issued in reliance upon the truth of such statements and representations.

**6.2** The **Insureds** agree that if the **Application** contains any statements or representations that are untrue, this Policy shall be void as to the **Insured Organization** and any **Insured Person** who knew the facts that were not truthfully disclosed, provided that such knowledge shall not be imputed to any other **Insured Person**.

**7.** **Reporting Requirements:**

**7.1** The **Insureds**, as a condition precedent to their rights under this Policy, shall report every **Claim** to the Insurer as soon as practicable from the date any **Executive Officer** has knowledge of the **Claim**, and in no event later than ninety (90) days after the end of the **Policy Period**.

**7.2** Notice of any **Claim**, circumstance, or **Wrongful Act** shall be forwarded to **Liberty International Underwriters, 55 Water Street, 18ᵗʰ Floor, New York, NY 10041 Attention: Specialty Casualty Claims**.

**7.3** All notices under this Policy shall be sent in writing by mail, prepaid express courier, or facsimile and shall be effective upon receipt thereof by the addressee.

**8.** **Notice of Circumstance or Wrongful Act:** If during the **Policy Period** or the **Discovery Period** the **Insureds** become aware of any circumstance or **Wrongful Act** that reasonably may be expected to give rise to a **Claim,** and if such circumstance or **Wrongful Act** is reported to the Insurer

during the **Policy Period** in writing with details as to the nature and date of such circumstance or **Wrongful Act**, the identity of any potential claimant, the identity of any **Insured Person** involved in such circumstance or **Wrongful Act**, and the manner in which the **Insureds** first became aware of such circumstance or **Wrongful Act**, then any **Claim** subsequently arising from such circumstance or **Wrongful Act** shall be deemed under this Policy to be a **Claim** made during the **Policy Period** in which the circumstance or **Wrongful Act** was first duly reported to the Insurer.

9. **Limit of Liability:**

   9.1 The Insurer's maximum aggregate Limit of Liability for all **Loss** under this Policy shall be the amount set forth in Item III of the Declarations. Amounts incurred as **Defense Costs** shall be in addition to the Limit of Liability.

   9.2 All **Claims** arising from the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed one **Claim** and subject to a single limit of liability. Such **Claim** shall be deemed first made on the date the earliest of such **Claims** is first made, regardless of whether such date is before or during the **Policy Period**.

   9.3 With respect to all **Claims** deemed to have been made in a **Policy Year**, should the Limit of Liability be exhausted by payment of **Loss** resulting from one or more of such **Claims**, the Insurer's duty to defend shall cease and any and all obligations of the Insurer hereunder shall be deemed to be completely fulfilled and extinguished and the Insurer shall have no further obligations hereunder of any kind or nature.

10. **Retentions:** The Insurer shall be liable to pay only the amount of covered **Loss** in excess of the applicable Retention amount set forth in Item IV of the Declarations. Such Retention shall not be applicable to **Defense Costs** except in the instance noted in Section 2.3 in which the **Insureds** withhold consent to settlement. Such applicable Retention shall be uninsured and shall be borne by the **Insured Organization.** However, if an **Insured Person** is not indemnified for **Loss** solely by reason of the **Insured Organization's** financial insolvency or because indemnification is not legally permissible, an **Insured Person's** Retention shall be $0. This change in Retention shall not affect any other terms or conditions of this Policy.

11. **Allocation**: If a **Claim** gives rise to **Loss** covered under this Policy and loss not covered under this Policy, either because a **Claim** includes both covered and uncovered matters or both covered and uncovered parties, the **Insureds** and the Insurer shall allocate such amount between covered **Loss** and uncovered loss.

12. **Other Insurance**: If any **Loss** arising from any **Claim** is insured by other valid and collectible insurance, then this Policy shall apply only in excess of the amount of any deductibles, retentions and limits of liability under such other policy or policies, whether such other policy or policies are stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written specifically excess of this Policy by reference in such other policy to this Policy's Policy Number.

13. **Discovery Period**:

   13.1 If the Insurer or the **Parent Organization** fails or refuses to renew this Policy or if the **Parent Organization** cancels this Policy, any **Insured** shall have the right to an extension of the coverage granted by this Policy following the effective date of such cancellation or

non-renewal. Such extension of coverage shall apply solely with respect to **Wrongful Acts** taking place before the effective date of such cancellation or non-renewal.

13.2    If the Insurer refuses to renew this Policy the **Discovery Period** shall be the period of ninety (90) days from the end of the **Policy Period**, and there shall be no charge for this **Automatic Discovery Period** of ninety (90) days. If prior to the end of the **Automatic Discovery Period** the **Parent Organization** pays the Insurer an additional amount equal to thirty-five percent (35%) of the annual premium of this Policy, the term of the **Discovery Period** shall be extended for an additional twelve (12) months from the end of the **Automatic Discovery Period**. Such Discovery Period Premium shall be deemed fully earned as of such date. This extension shall not apply if this Policy is terminated by the Insurer for failure to pay any premium when due.

13.3    If the **Parent Organization** fails or refuses to renew or cancels this Policy the **Parent Organization** may purchase a **Discovery Period** of twelve (12) month from the end of the **Policy Period**, provided that the **Parent Organization** pays the Insurer an additional amount equal to thirty-five percent (35%) of the annual premium of this Policy within thirty (30) days of the end of the **Policy Period**. Such Discovery Period Premium shall be deemed fully earned as of such date.

13.4    The extension of coverage for the **Discovery Period** shall not in any way increase the Limit of Liability set forth in Item III of the Declarations. For purposes of the Limit of Liability, the **Discovery Period** is considered to be part of and not in addition to the last **Policy Year**.

13.5    If the **Parent Organization** shall cancel or non-renew this Policy for any reason other than being sold, acquired or bankrupt, each director or officer that was an **Insured**, but did not serve as a director or officer at the time of cancellation or non-renewal, shall be provided an unlimited extension of coverage granted by this Policy to report any **Claim(s)** first made against the director or officer after the date of such cancellation or non-renewal. However, this extension of coverage shall only be afforded in the event that the **Wrongful Act** was committed before the date of cancellation or non-renewal, and no Directors and Officers Liability policy, or policy providing essentially the same type of coverage, or extension period, is in effect at the time the **Claim** is made.

14.    **Conversion to Automatic Run-off**:

14.1    In the event of a **Change in Control** during the **Policy Period**, coverage under this Policy shall continue until the end of the **Policy Period**, but only with respect to **Claims** for **Wrongful Acts** taking place prior to the effective date of such **Change in Control**. The entire premium for this Policy shall be deemed fully earned as of the effective date of such **Change in Control**.

14.2    The **Parent Organization** shall give written notice of such **Change in Control** to the Insurer as soon as practicable, together with such information as the Insurer may reasonably require.

15.    **Subrogation**: If the Insurer pays any **Loss** under this Policy, the Insurer shall be subrogated to the extent of such payment to all rights of recovery thereof. The **Insureds** shall execute all papers required and shall do everything that may be necessary to secure and preserve such rights, including the execution of such documents necessary to enable the Insurer effectively to bring suit in

the name of the **Insureds**. The obligations of the **Insureds** pursuant to this Section 15 survive the termination of the **Policy Period**.

16. **Parent Organization as Authorized Representative**: The **Insureds** agree that the **Parent Organization** shall act on their behalf with respect to all matters under this Policy, including without limitation the giving and receiving of notices hereunder, the payment or return of premiums, and the negotiation and acceptance of endorsements.

17. **Amendment, Assignment and Headings**:

   17.1 Any amendment to this Policy or assignment of an interest in this Policy, in whole or in part, shall be effective only if made by endorsement to this Policy signed by an authorized representative of the Insurer.

   17.2 The headings to the provisions in this Policy, including those found in any endorsements attached hereto, are provided for convenience only and do not affect the construction hereof.

18. **Territory**: This Policy applies to **Wrongful Acts** occurring anywhere in the world, provided that a **Claim** is brought against the **Insured** within the United States of America, its territories or possessions or Canada.

19. **Spousal Benefit**: If a **Claim** against an **Insured Person** for a **Wrongful Act** otherwise covered under this Policy includes a claim against his/her legal spouse where the claimant asserts such claim by reason of spousal status or seeks to obtain recovery against property in which such spouse has an interest, the amount which such spouse becomes legally obligated to pay in respect of such **Claim** (including defense costs) shall be deemed the **Loss** and **Defense Costs** of such **Insured Person**, and subject to this Policy's terms, conditions, and exclusions. In any event, this extension shall not cover any conduct or wrongful act committed by such legal spouse.

20. **Estates and Legal Representatives**: In the event of the death, incapacity, or bankruptcy of an **Insured Person**, any **Claim** made against the estate, legal representatives, heirs, or the assigns of such **Insured Person** for a **Wrongful Act** by such **Insured Person** shall be deemed to be a **Claim** against such **Insured Person**.

21. **Termination**:

   21.1 The Insurer may not cancel this Policy except for non-payment of premium when due. Such cancellation shall be effective as of the inception date of the **Policy Period**.

   21.2 The **Parent Organization** may cancel this Policy by sending notice of cancellation to the Insurer. Such cancellation shall be effective on the date the Insurer receives such notice. The **Parent Organization** may not cancel this Policy in anticipation of or after the effective date of a **Change in Control**. In the event the **Parent Organization** cancels this Policy, the Insurer shall retain the customary short rate premium. Payment of any unearned premium by the Insurer shall not be a condition precedent to the effectiveness of cancellation but such payment shall be made as soon as practicable.

   21.3 If the Insurer elects not to renew this Policy, the Insurer shall provide the **Parent Organization** with not less than sixty (60) days advance notice thereof.

22. **Action Against Insurer**:

**22.1**   No action shall be taken against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this Policy, or the amount of the **Insureds'** obligation to pay shall have been finally determined either by judgment against the **Insureds** after actual trial, or by written agreement of the **Insureds**, the claimant and the Insurer.

**22.2**   No person or organization shall have the right under this Policy to join the Insurer as a party to any action against the **Insureds**, nor shall the Insurer be impleaded by the **Insureds** or their legal representatives.

## 23.   Definitions:

**23.1**   "**Application**" means all signed applications, including attachments and materials submitted therewith or as a part thereof, or incorporated therein, for this Policy and for any policy in an uninterrupted series of policies issued by the Insurer of which this Policy is a direct or indirect renewal or replacement.   All such applications, attachments, and materials are deemed attached to and incorporated into this Policy.

**23.2**   "**Change in Control**" means:

**(a)**   the acquisition by another entity of voting rights resulting in voting control by such other entity of more than 50% of the outstanding voting rights representing the present right to vote for election of directors or equivalent positions of the **Parent Organization**;

**(b)**   the merger of the **Parent Organization** into another entity such that the **Parent Organization** is not the surviving entity, or the consolidation of the **Parent Organization** with another entity; or

**(c)**   the loss of the **Parent Organization's** not-for-profit tax status.

**23.3**   "**Claim**" means:

**(a)**   a written demand for monetary or non-monetary relief against an **Insured**;

**(b)**   the commencement of a civil or criminal judicial proceeding or arbitration against an **Insured**; or

**(c)**   the commencement of a formal criminal, administrative or regulatory proceeding or investigation against an **Insured,** including any brought before the Equal Employment Opportunity Commission or any similar state, local or territorial governmental agency ;

including any appeal therefrom.   A **Claim** will be deemed first made on the date an **Insured** receives a written demand, complaint, indictment, notice of charges, or order of formal investigation.

**23.4**   "**Defense Costs**" means reasonable and necessary fees (including attorneys' fees and experts' fees) and expenses incurred in the defense of a **Claim** and cost of attachment or

similar bonds, but shall not include the wages, salaries, benefits or expenses of any directors, officers or employees of the **Insured Organization**.

**23.5** **"Discovery Period"** means the period of time set forth in Section 13.

**23.6** **"Employment Practices Wrongful Act"** means:

**(a)** wrongful dismissal or discharge or termination of employment, whether actual or constructive;

**(b)** discrimination, whether based upon race, sex, age, national origin, religion, sexual orientation or disability;

**(d)** sexual or other harassment in the workplace;

**(e)** employment related misrepresentation;

**(f)** violation of employment laws;

**(g)** wrongful failure to employ, promote or grant tenure;

**(h)** wrongful discipline;

**(i)** negligent evaluation;

**(j)** retaliation; and/or

**(k)** failure to provide adequate workplace or employment policies or procedures.

Solely with respect to any **Claim** brought by or on behalf of any **Third Party**, **Employment Practices Wrongful Act** means any actual or alleged, discrimination, sexual harassment or violation of such **Third Party's** civil rights in relation to such discrimination or sexual harassment, whether direct, indirect, or unintentional, committed by an **Insured Person** in his/her capacity as an **Insured Person** or by the **Insured Organization**.

**23.7** **"Executive Officer"** means the president, chief executive officer, chief operating officer, chief financial officer, managing director, any executive vice president and any equivalent executive position of the **Insured Organization**.

**23.8** **"Fungi"** means any form of fungus, including but not limited to yeast, mold, mildew, rust, smut or mushroom, and any spores, mycotoxins, odors or any other substances, products, or by products produced by, released by, or arising out of the current or past presence of fungi.

**23.9** **"Insolvency"** means the status of the **Insured Organization** as a result of the appointment of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to control, supervise, manage, or liquidate the **Insured Organization**, or the **Insured Organization** becoming an insolvent debtor-in-possession.

**23.10**   **"Insured(s)"**   means the **Insured Persons** and the **Insured Organization**.

**23.11**   **"Insured Organization"** means any entity named in Item I of the Declarations and any **Subsidiary**, including any such entity operating as a debtor-in-possession.

**23.12**   **"Insured Person(s)"** means one or more natural persons who were, now are, or shall hereafter be duly elected or appointed directors, trustees, officers, employees, committee members or volunteers of the **Insured Organization**, or, with respect to a **Subsidiary** operating outside the United States, their functional equivalent, regardless of title.

**23.13**   **"Interrelated Wrongful Acts"** means **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions, or causes.

**23.14**   **"Loss"** means:

    **(a)**   sums which the **Insureds** are legally obligated to pay solely as a result of any **Claim** insured by this Policy, including damages, judgments, settlement amounts, legal fees and costs awarded pursuant to judgments, punitive or exemplary damages, and the multiple portion of any multiplied damage award; and

    **(b)**   any excise tax equal to ten percent (10%) of an excess benefit which has been assessed by the Internal Revenue Service against any **Insured Person** pursuant to Section 4658 of the Internal Revenue Code for participation of an organization manager in an excess benefit transaction.

    **Loss** shall not include any other taxes, fines, penalties, or matters uninsurable pursuant to any applicable law.

**23.15**   **"Microbes"** means any non-fungal microorganisms or non-fungal colony-form organisms that causes infection or disease including but not limited to any spores, mycotoxins, odors or any other substances, products, or by products produced by, released by, or arising out of the current or past presence of microbes.

**23.16**   **"Parent Organization"** means the **Insured Organization** first named in Item I of the Declarations.

**23.17**   **"Policy Period"** means the period from the inception date set forth in Item II of the Declarations to the expiration date set forth in Item II of the Declarations, or its earlier termination pursuant to Section 21.

**23.18**   **"Policy Year"** means the period of one year following the effective date and hour of this Policy or the period of one year following any anniversary date thereof falling within the **Policy Period**; or if the time between the effective date or any anniversary date and the termination of this Policy is less than one year, such lesser period.

**23.19**   **"Pollutants"** means any substance exhibiting hazardous characteristics as is or may be identified on any list of hazardous substances issued by the United States Environmental Protection Agency, or any state, local, or foreign counterpart. This definition shall include, without limitation, any solid, liquid, gaseous or thermal irritant, or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, odors, noise, lead, oil or oil products,

radiation, asbestos or asbestos-containing products, waste (including material to be recycled, reconditioned or reclaimed), and any electric, magnetic or electromagnetic field of any frequency, as well as any air emission, waste water, infectious medical waste, nuclear materials, or nuclear waste.

23.20  **"Subsidiary"** means any entity which qualifies as a not-for-profit organization under the Internal Revenue Code and for which the **Parent Organization** has or controls the right to elect or appoint more than fifty percent (50%) of the Board of Directors or other governing body of such entity if such right exists:

    **(a)**    prior to inception date of the **Policy Period**;

    **(b)**    after  the inception date of the **Policy Period** and the assets of such entity do not exceed thirty-five percent (35%) of the total consolidated assets of the **Insured Organization** as reflected in the **Parent Organization's** most recent audited consolidated financial statement; or

    **(c)**    after the inception date of the **Policy Period** and the assets of such entity exceed thirty-five percent (35%) of the total consolidated assets of the **Insured Organization** as reflected in the **Parent Organization's** most recent audited consolidated financial statement but only upon the condition that the **Parent Organization**:

        **(i)**    give written notice of such transaction to the Insurer within 90 days after the effective date of such transaction;

        **(i)**    provide the Insurer with such information as the Insurer may require; and

        **(ii)**    pay any additional premium required by the Insurer.

23.21  **"Third Party"** means any natural person who is an active or current customer, supplier, vendor, applicant, business invitee or other client of the **Insured Organization**.

23.22  **"Wrongful Act"** means:

    **(a)**    any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty, or **Employment Practices Wrongful Act** committed or attempted by the **Insured Persons** in their capacities as such or by the **Insured Organization**; or

    **(b)**    any matter claimed against the **Insured Persons** solely by reason of their status as **Insured Persons**.

23.23  **"Outside Entity"** means any not-for-profit organization that qualifies as such under Section 501(c) of the Internal Revenue Code of 1986 (as amended).

23.24  **"Outside Position"** means the position of director, officer, trustee, or other equivalent position held by an **Insured Person** in any **Outside Entity**, if service in such position is with the knowledge and express consent or at the express request of the **Insured Organization**.

**24.**    **Outside Position Liability:**

**24.1**   This Policy, subject to its terms, conditions, and exclusions, covers any **Insured Person** serving in an **Outside Position.**   Such coverage shall be specifically excess of any: (i) indemnification provided by the **Outside Entity** in which the **Insured Person** serves in such **Outside Position**; and (ii) insurance available from or provided by such **Outside Entity**, regardless of whether or not such other insurance policy is written specifically excess of this Policy or refers to this Policy's policy number.

**24.2**   Payment by the Insurer or any member company of the Liberty Mutual Group under another insurance policy as a result of a **Claim** against an **Insured Person** in an **Outside Position** shall reduce, by the amount of such payment, the Insurer's Limit of Liability under this Policy.

**24.3**   Coverage under this Section 2 shall not apply to any **Claim** that is brought or maintained with the solicitation, assistance or participation of the **Outside Entity** in which an **Insured Person** serves in an **Outside Position** or any director, officer, trustee, regent, governor or employee of such **Outside Entity**.

**24.4**   Nothing in this Section 24 shall be construed to extend coverage under this Policy to the **Outside Entity** in which such **Insured Person** serves in such **Outside Position**, or to the other directors, officers, or employees of such **Outside Entity**.

In Witness Whereof, the Insurer has caused this Policy to be executed and attested, but this Policy shall not be valid unless countersigned on the Declarations Page by a duly authorized agent of the Insurer.

President                                   Secretary



**ENDORSEMENT NO.**

This endorsement, effective 05/16/2013 forms part of

Policy No.: FSS000083-0313      issued to USA Gymnastics

Issued By: 5Star Specialty Programs

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## INDIANA AMENDATORY ENDORSEMENT

This endorsement modifies insurance under the following:

**A.** Irrespective of any other provision of this Policy, notice given by or on behalf of the Parent Organization to any authorized agent of the Insurer within the state of Indiana with particulars sufficient to identify the Parent Organization shall be deemed to be notice to the Insurer.

**B.** Paragraph **23.14 "Loss"** of Section **23. Definitions** is deleted in its entirety and replaced by the following:

     **23.14 "Loss"** means:

         **(a)** sums which the **Insureds** are legally obligated to pay solely as a result of any **Claim** insured by this Policy, including damages, judgments, settlement amounts, legal fees and costs awarded pursuant to judgments, and the multiple portion of any multiplied damage award; and

         **(b)** any excise tax equal to ten percent (10%) of an excess benefit which has been assessed by the Internal Revenue Service against any **Insured Person** pursuant to Section 4658 of the Internal Revenue Code for participation of an organization manager in an excess benefit transaction.

     **Loss** shall not include any other taxes, fines, penalties, or matters uninsurable pursuant to any applicable law.  **Loss** shall also not include punitive or exemplary damages except for vicarious liability.

     All other exclusions, conditions and limitations remain unchanged.



**ENDORSEMENT NO.**

This endorsement, effective 05/16/2013 forms part of

Policy No. FSS000083-0313        issued to  USA Gymnastics

Issued By: 5Star Specialty Programs

---

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**INDIANA ENDORSEMENT**

As used in this Policy endorsement the terms "the Insurer", "we", "our " and "us" refer to Liberty Insurance Underwriters Inc. The term "Named Insured", "you" and "your" refer to the "Parent Organization" or "Named Real Estate Investment Trust" as shown on the Declarations Page of this Policy.

Irrespective of any other term or condition within the Policy, the Policy is hereby amended by the following:

**A.  Cancellation**

We may cancel this Policy only for non-payment of premium by mailing to the Named Insured written notice of cancellation at least 10 days prior to the effective date of the cancellation.

We will mail notices of cancellation to the Named Insured at the mailing address we have on record.

You may cancel this Policy by mailing notice to us stating when the cancellation will be effective.  You may not, however, cancel this Policy in anticipation of, or after the effective date of, a **Change In Control**.

**B.  Non-renewal**

If we decide not to renew this Policy, we will mail you notice of this decision at least 45 days before the Policy expires.

All other exclusions, conditions and limitations remain unchanged.

**LIBERTY INSURANCE UNDERWRITERS INC.**

**ENDORSEMENT NO.**

This endorsement, effective  05/16/2013              forms part of

Policy No. FSS000083-0313   issued to USA Gymnastics
_____

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**Deletion of Third Party EPL Coverage**

It is agreed that Exclusion 4.1 of the Policy is hereby deleted and replaced by the following:

**4.1**     for:

> **(a)**     bodily injury, sickness, disease, death; or

> **(b)**     emotional distress, mental anguish, false arrest or imprisonment, abuse of process, malicious prosecution, violation or invasion of any right of privacy or private occupancy, trespass, nuisance or wrongful entry or eviction; or

> **(c)**     libel, slander, defamation; or

> **(d)**     damage to, destruction of, or loss of use of any tangible property;

> provided that parts (b) and (c) of this exclusion shall not apply to any **Claim** brought by or on behalf of any past, present or prospective **Insured Person** for an **Employment Practices Wrongful Act**; also provided that part (c) of this exclusion shall not apply to any **Claim** for any other **Wrongful Act** other than an **Employment Practices Wrongful Act**. However, coverage afforded for libel, slander or defamation for **Wrongful Acts** other than **Employment Practices Wrongful Acts** shall be excess of any coverage afforded by the **Insured's** general liability policy;

It is further agreed that Section 23.6 is hereby deleted and replaced with the following:

**23.6**   **"Employment Practices Wrongful Act"** means any of the following alleged by a past, present or prospective employee:

> **(a)**     wrongful dismissal or discharge or termination of employment, whether actual or constructive;

LIUI00DO380130507

      **(b)**    discrimination, whether based upon race, sex, age, national origin, religion, sexual orientation or disability;

      **(a)**    sexual or other harassment in the workplace;

      **(b)**    employment related misrepresentation;

      **(c)**    violation of employment laws;

      **(d)**    wrongful failure to employ, promote or grant tenure;

      **(e)**    wrongful discipline;

      **(f)**    negligent evaluation;

      **(g)**    retaliation; and/or

      **(h)**    failure to provide adequate workplace or employment policies or procedures.

It is further agreed that Section 23.21 is hereby deleted in its entirety.

All other terms, conditions, and exclusions of this Policy remain unchanged.

*Shawna Reidy*

_____
Authorized Representative of
Liberty Insurance Underwriters Inc.

6/4/2013
_____
Date

LIUI00DO380130507

**INDIANA**
**POLICYHOLDER NOTICE**

**Questions regarding your policy or coverage should be directed to:**

**Liberty Insurance Underwriters Inc.**
**1-800-677-9163**

If you (a) need the assistance of the governmental agency that regulates insurance; or (b) have a complaint you have been unable to resolve with your insurer you may contact the Department of Insurance by mail, telephone or email:

State of Indiana Department of Insurance
Consumer Services Division
311 West Washington St.
Indianapolis, Indiana   46204

Consumer Hotline: (800) 622-4461; (317) 232-2395

Complaints can be filed electronically at www.in.gov/idoi.

LIUI13DO550011006

# LIBERTY INSURANCE UNDERWRITERS INC.

## ENDORSEMENT NO.

This endorsement, effective **05/16/2013**          forms part of

Policy No. **FSS000083-0313**   issued to **USA Gymnastics**
_____

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### Fiduciary Liability Coverage with Shared Limit of Liability

It is agreed that this Policy shall be amended as follows:

I.   **Section 1 (Insuring Agreement)** shall be amended to include the following additional Insuring Agreement:

> Fiduciary Liability: The Insurer shall pay on behalf of the **Insureds** all **Loss** which they shall become legally obligated to pay as a result of a **Claim** first made during the **Policy Period** or **Discovery Period**, if applicable, against the **Insureds** for a **Fiduciary Wrongful Act** which takes place before or during the **Policy Period**.

II.   **Section 4 (Exclusions of Claims)** is amended to include the following additional exclusions:

> for any **Fiduciary Wrongful Act** by any **Insured** with respect to any **Insured Plan** (i) sponsored by a **Subsidiary** if such **Fiduciary Wrongful Act** actually or allegedly occurred at any time when such entity was not a **Subsidiary,** or (ii) when such **Insured Plan** was not sponsored by an **Insured Organization;**

> based upon, arising from, or in any way related to liability of others assumed by the **Insured** under any written contract or agreement, except to the extent that the **Insured** would have been liable in the absence of such contract or agreement or unless the liability was assumed in accordance with or under the agreement or declaration of trust pursuant to which the **Insured Plan** was established;

> based upon, arising from, or in any way related to the failure of the **Insured** to comply with any law governing workers' compensation, unemployment insurance, or disability benefits; or

> based upon, arising from, or in any way related to an **Insured** serving as a fiduciary of any plan, fund or program which is not an **Insured Plan**, even if such service is at the direction or request of an **Insured Organization**.

LIUI00DO380180507

III.     **Section 5 (Exclusions of Losses)** is amended to include the following additional exclusions:

based upon, arising from, or in any way related to the failure to fund an **Insured Plan** in accordance with **ERISA** or the **Insured Plan's** document or to collect contributions owed to an **Insured Plan:**

for benefits due or to become due under the terms of an **Insured Plan** unless, and to the extent that (i) the **Insured** is a natural person and such benefits are payable by such **Insured** as a personal obligation, and (ii) recovery for the benefits is based upon a covered **Fiduciary Wrongful Act**.

IV.      Solely with respect to Fiduciary Liability coverage granted by this endorsement, Section 4.4 of the Policy is deleted.

V.       The amount set forth in Item III of the declarations shall be the maximum Limit of Liability for all **Loss** under this Policy. The following amount shall be the maximum aggregate Limit of Liability for the Fiduciary Liability coverage granted under this endorsement: $ 1,000,000___.   Such amount shall be a sub-limit, which is part of, and not in addition to, the Limit of Liability set forth in Item III of the Declarations.

VI.      Solely with respect to Fiduciary Liability coverage granted by this endorsement, Item IV of the Declarations is amended to include the following:

$ 1,000,000___ in the aggregate each **Claim** for a **Fiduciary Wrongful Act**

VII.     Solely with respect to Fiduciary Liability coverage granted by this endorsement, Item V of the Declarations is amended to include the following:

Prior Litigation Date:  5/16/2011

VIII.    If during the **Policy Period**: (i) a **Change in Control** occurs, (ii) the responsibilities of the **Insured Organization** with respect to **any Insured Plan** is fully assumed by any other person or entity, or (iii) **the Insured Organization** terminates any **Insured Plan;**

coverage under this endorsement shall continue until termination of this Policy, but only with respect to **Claims** for **Fiduciary Wrongful Acts** committed or allegedly committed prior to the effective date of such **Change in Control**, termination, or assumption of responsibilities.

IX.      Solely with respect to Fiduciary Liability coverage granted by this endorsement, the definitions of the following terms are deleted and replaced with the following:

**23.3    "Claim"** means:

**(a)**     a written demand for monetary or non-monetary relief against an **Insured**;

**(b)**     the commencement of a civil or criminal judicial proceeding or arbitration against an **Insured**;

**(c)**     the commencement of a formal criminal, administrative or regulatory proceeding or investigation against an **Insured,** including any

LIUI00DO380180507

brought before the Equal Employment Opportunity Commission or any similar state, local or territorial governmental agency; or

(d)     a fact finding investigation by the Department of Labor, the Pensions Benefit Guaranty Corporation, or similar government agency;

including any appeal therefrom, against an **Insured** for a **Fiduciary Wrongful Act**.  A **Claim** will be deemed first made on the date an **Insured** receives a written demand, complaint, indictment, notice of charges, or order of formal investigation.

23.10   **"Insured(s)"**  means the **Insured Persons,** the **Insured Organization,** the **Insured Plans** or any other organization, plan or natural person listed as an **Insured** on a schedule to this endorsement.

23.12   **"Insured Person(s)"** means one or more natural persons who were, now are, or shall hereafter be duly elected or appointed directors, trustees, officers, employees, committee members or volunteers of the **Insured Organization** or of any **Insured Plan** in his or her capacity as a **Fiduciary** or trustee of an **Insured Plan** or as a person performing **Administration** of an **Insured Plan,** or, with respect to a **Subsidiary** operating outside the United States, their functional equivalent, regardless of title.

23.20   **"Wrongful Act"** means a **Fiduciary Wrongful Act**.

X.     The following definitions are added to Section 23 (Definitions);

**"Administration"** means:

(a)     handling records, or giving advice, counsel or interpretation to employees regarding an **Insured Plan**; or

(b)     affecting enrollment of employees, and termination, or cancellation of benefits under an **Insured Plan.**

**"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended.

**"Fiduciary"** means a fiduciary as defined by **ERISA** of an **Insured Plan**, or a person or entity who exercises discretionary control with respect to the management of an **Insured Plan** or the disposition of its assets.

**"Fiduciary Wrongful Act"** means:

(a)     any breach of the responsibilities, obligations, or duties imposed upon **Fiduciaries** of any **Insured Plan** by **ERISA** or by the common or statutory law of the United States, any state, or other jurisdiction anywhere in the world;

(b)     any other matter claimed against any **Insured** solely by reason of their service as **Fiduciaries** of any **Insured Plan**;

(c)     any negligent act, error, or omission solely in the **Administration** of any **Insured Plan**.

LIUI00DO380180507

**"Insured Plan(s)"** means:

(a)     any welfare benefit plan as defined in **ERISA** or any similar common or statutory law of the United States or other jurisdiction anywhere in the world, which is sponsored solely by the **Insured Organization** or jointly by the **Insured Organization** and a labor organization solely for the benefit of the employees of the **Insured Organization** located anywhere in the world and which:

       (i)     existed on the Inception Date of this Policy; or

       (ii)    is created or acquired by the **Insured Organization** after the Inception Date of this Policy, provided that if the assets of such created or acquired plan exceed 35% of the total plan assets of all **Insured Plans** as of the Inception Date of this Policy, the **Insured Organization** shall give written notice of such creation or acquisition to the Insurer within ninety (90) days of such creation or acquisition, shall provide such information as the Insurer may require, and shall pay an additional premium required by the Insurer.

Coverage for any plan described in subsection (ii) above shall only be afforded with respect to **Fiduciary Wrongful Acts** taking place after the date such plan was created or acquired;

(b)     any non-qualified plan not subject to regulation under Title I of **ERISA** or which does not meet the qualification requirements under Section 401(a) of the Internal Revenue Code of 1986, as amended, but only with respect to conduct described in subsection (c) of the definition of **Fiduciary Wrongful Act**;

(c)     any Employee Pension Benefit Plan as listed by attachment to the Liberty Mutual Group Fiduciary Coverage Application.

All other terms, conditions, and exclusions of this Policy remain unchanged.

_Shawna Reidy_

_____

Authorized Representative of
Liberty Insurance Underwriters Inc.

6/4/2013
_____

Date



## LIBERTY INSURANCE UNDERWRITERS INC.

### ENDORSEMENT NO.

This endorsement, effective 05/16/2013          forms part of

Policy No. FSS000083-0313      issued to USA Gymnastics

_____

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### General Professional Services Exclusion
### (Management Carve-out)

It is agreed that Section __4__ of the Policy is amended by the addition of the following:

4.10_____   based upon, arising from, or in any way related to any **Insured's** performance of or failure to perform professional services for others and caused by an act, error or omission related thereto.

This exclusion shall not apply to any **Claim** brought by or maintained by or on behalf of a security holder(s) of the **Insured Organization** other than an **Insured Person**, whether directly, by class action, or by derivative action, where such **Claim** is based upon the failure of an **Insured Person** to properly supervise or manage such professional services, or based upon improper disclosure or nondisclosure of material information relating to such professional services.

All other terms, conditions, and exclusions of this Policy remain unchanged.

_Shawna Reidy_
_____
Authorized Representative of
Liberty Insurance Underwriters Inc.

6/4/2013
_____
Date

LIUI00DO380190507 (2)



Administered by:


**LIBERTY INSURANCE UNDERWRITERS INC.**

**ENDORSEMENT NO.**

This endorsement, effective 05/16/2013       forms part of

Policy No. FSS000083-0313     issued to USA Gymnastics

_____

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**Sub-Limit Endorsement for Wage & Hour Claims**

It is agreed that Item III of the Declarations Page is hereby amended by the addition of the following:

ITEM III.      SUB-LIMIT OF LIABILITY:    $150,000 in the aggregate for the **Policy Year**

It is further agreed that the Sub-Limit of Liability provided under this endorsement is part of, and not in addition to, the Limit of Liability provided for in Item III of the Declarations and shall only apply as respects to:

**Defense Costs** for **Claims** based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving any federal, state, local or foreign wage and hour laws, including, without limitation, the Fair Labor Standards Act (**FSLA Claims**).  Sums that any **Insured** shall become legally obligated to pay as damages (including settlements and judgments) from such **Claims** shall continue to be excluded from the definition of **Loss** except for those resulting from any actual or alleged retaliatory treatment of the claimant by the **Insured** on account of the claimant's exercise of rights pursuant to any such law or amounts owed under the Equal Pay Act of 1963.

It is further agreed that Section 9.1 is deleted and replaced with the following

**9.1**     The Insurer's maximum aggregate Limit of Liability for all **Loss** under this Policy shall be the amount set forth in Item III of the Declarations.  Amounts incurred as **Defense Costs** shall be in addition to the Limit of Liability except for those incurred on **FLSA Claims**.

All other terms, conditions, and exclusions of this Policy remain unchanged.

*Shawna Reidy*

_____
Authorized Representative of
Liberty Insurance Underwriters Inc.

_____
06/04/2013

Date

LIUI00DO38028 2 (05/07)




Administered by:

# LIBERTY INSURANCE UNDERWRITERS INC.

## ENDORSEMENT NO.

This endorsement, effective 05/16/2013          forms part of

Policy No. FSS000083-0313      issued to   USA Gymnastics
_____

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### Application of Retention to Defense Costs

It is agreed that Section 23.14 (a) of the Policy is deleted and replaced as follows:

**23.14 (a)**    sums which the **Insureds** are legally obligated to pay solely as a result of any **Claim** insured by this Policy, including **Defense Costs,** damages, judgments, settlement amounts, legal fees and costs awarded pursuant to judgments, punitive or exemplary damages, and the multiple portion of any multiplied damage award; and

It is further agreed that for such **Claims**, Section 10 is deleted and replaced with the following:

**10.**    **Retention:**  The Insurer shall be liable to pay only the amount of covered **Loss** in excess of the applicable Retention amount set forth in Item IV of the Declarations.  Such applicable Retention shall be uninsured, shall be applicable to **Defense Costs** and shall be borne by the **Insured Organization.**  However, if an **Insured Person** is not indemnified for **Loss** solely by reason of the **Insured Organization's** financial insolvency or because indemnification is not legally permissible, an **Insured Person's** Retention shall be $0.  This change in Retention shall not affect any other terms or conditions of this Policy.

All other terms, conditions, and exclusions of this Policy remain unchanged.

*Shawna Reidy*

6/4/2013

LIUI00DO381290207

05/16/2013
USA Gymnastics

132 E Washington St, Ste 700
Indianapolis, IN 46204

Effective:   05/16/2013

## POLICYHOLDER DISCLOSURE -TERRORISM INSURANCE PREMIUM NOTICE

**This notice contains important information about the Terrorism Risk Insurance Act and its effect on your policy.  Please read it carefully.**

## THE TERRORISM RISK INSURANCE ACT

The Terrorism Risk Insurance Act, including all amendments ("TRIA" or the "Act"), establishes a program to spread the risk of catastrophic losses from certain acts of terrorism between insurers and the federal government.  If an individual insurer's losses from a "certified act of terrorism" exceed a specified deductible amount, the government will reimburse the insurer for 85% of losses paid in excess of the deductible, but only if aggregate industry losses from such an act exceed $100 million. An insurer that has met its insurer deductible is not liable for any portion of losses in excess of $100 billion per year.  Similarly, the federal government is not liable for any losses covered by the Act that exceed this amount.   If aggregate insured losses exceed $100 billion, losses up to that amount may be pro-rated, as determined by the Secretary of the Treasury.

## MANDATORY OFFER OF COVERAGE FOR "CERTIFIED ACTS OF TERRORISM" AND DISCLOSURE OF PREMIUM

TRIA requires insurers to make coverage available for any loss that occurs within the United States (or outside of the U.S. in the case of U.S. missions and certain air carriers and vessels), results from a "certified act of terrorism" AND that is otherwise covered under your policy.

A "certified act of terrorism" means:

   [A]ny act that is certified by the Secretary [of the Treasury], in concurrence with the Secretary of State, and the Attorney General of the United States

   (i) to be an act of terrorism;
   (ii) to be a violent act or an act that is dangerous to –

      (I) human life;
      (II) property; or
      (III) infrastructure;

TRIA-N001-0208

(iii) to have resulted in damage within the United States, or outside of the United States in the case of –

    (I) an air carrier (as defined in section 40102 of title 49, United States Code) or United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States); or

    (II) the premises of a United States mission; and

(iv) to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

## MANDATORY PREMIUM DISCLOSURE STATEMENT

Your policy does not contain an exclusion for losses resulting from "certified acts of terrorism." Coverage for such losses is still subject to, and may be limited by, all other terms, conditions and exclusions in your policy.

The premium charge for this coverage for the policy period is $0

**YOU NEED NOT DO ANYTHING FURTHER AT THIS TIME.**

The summary of the Act and the coverage under your policy contained in this notice is necessarily general in nature. Your policy contains specific terms, definitions, exclusions and conditions. In case of any conflict, your policy language will control the resolution of all coverage questions. Please read your policy.

If you have any questions regarding this notice please contact your sales representative or agent.

TRIA-N001-0208

Liberty Insurance Underwriters Inc.

# FIDUCIARY COVERAGE APPLICATION FOR NONPROFIT EXECUTIVE ADVANTAGE POLICY

*Instructions*

- *Please complete all questions.*
- *The term **"Insured Organization"** means the parent organization whose directors and officers are proposed to be insured under the Nonprofit Executive Advantage Policy for which this Application is made, along with any other entities in which such parent organization has or controls the right to elect more than 50% of the Board of Directors or other governing body of such entity if such right exists.*

1. Name of the **Insured Organization**: USA GYMNASTICS
2. Does each Pension Plan use an outside Investment Manager? ............ X Yes o No
3. Does each Plan subject to ERISA comply with all applicable requirements of ERISA and the Internal Revenue Code of 1982 (the Code), as amended, including eligibility, participation, vesting, fiduciary responsibility and funding standards? ............ X Yes o No
   If "No" please attach details.
4. In the past two (2) years has there been or is there now under consideration any material changes to a Plan or termination or consolidation of a Plan? ............ o Yes X No
   If "Yes" please attach details.
5. Has there been or is there now pending any claim(s) against any proposed Insured arising out of any Plan? ............ o Yes X No
   If "Yes" please attach details.
6. Does any proposed Insured have any knowledge or information of any act, error or omission which might give rise to a claim under the proposed Fiduciary Liability Coverage? ............ o Yes X No
   If "Yes" please attach details.

**IT IS UNDERSTOOD AND AGREED THAT IF ANYONE FOR WHOM THIS INSURANCE IS SOUGHT HAS ANY KNOWLEDGE OF ANY SUCH ACT, ERROR, OMISSION, FACT, OR CIRCUMSTANCE, ANY CLAIM EMANATING THEREFROM SHALL BE EXCLUDED FROM COVERAGE UNDER THE PROPOSED INSURANCE.**

**REQUIRED INFORMATION:**

- List of all Pension Plans
- Financial statement for all Pension Plans.

Signing this **Application** does not bind the undersigned to purchase or the Insurer to sell any insurance policy. If a policy is issued, this **Application** and its attachments shall be the basis of such policy and shall be deemed attached to and shall form part of such policy.

The undersigned, on behalf of all prospective Insureds, declares that the statements in this **Application** and its attachments are true and accurate. If there are material changes to any statements in this **Application** or its attachments prior to the inception date of the policy, the undersigned shall immediately notify the Insurer of such changes. Upon receipt of such notification, the Insurer shall have the right to modify or withdraw any outstanding terms of proposal.

Signed: [signature] Title: President / CEO
(Signature of President or Executive Director)

Date: June 3, 2013

LIUI00DO110010507

## Your Notifications ?

| Unread Notifications from: | Past 1 Day | Your Notification Settings |
| --- | --- | --- |

| Notification Type | Unread | Flagged as ⚑ Important |
| --- | --- | --- |
| ✉ Data Management | 0 | 0 |
| ✉ Service Requests | 0 | 0 |
| ✉ Reporting | 0 | 0 |
| ✉ Team Workspace | 0 | 0 |
| ✉ Bank Setup & Suspense Accounts | 0 | 0 |
| ✉ User Maintenance | 0 | 0 |

View All Notifications                    ↻ Refresh

### View Participants ?

Enter a Name (Last, First)     [ Search ]

◯ SSN     ⊙ Name

Participant Overview ▾

Defined Contribution Filters (Optional)

## Benefits Dashboard

### Defined Contribution Plan Balances ?
as of May 30, 2013

| Plan | Balance |
| --- | --- |
| Your Defined Contributions Qualified Plans | $4,073,582.08 |

### PSW MESSAGES

**New Participant Overview page**
The Participant Landing Pages have a new look-and-feel! Pertinent participant data has been moved to the forefront of the Participant Overview landing page for your convenience and ease of use. Click Here to view an example of the new page.

**Enhanced File Management Screen**
The File Management screens have received an upgrade to make you more efficient in your daily job! The new screen allows you to control how many files you want to see and manage on one page. Navigate to the Manage Data tab today to personalize your File management experience.

**Employer-provided E-mails**
Learn how Fidelity has expanded the use of Safe Harbor E-mails for legally required communications. Click Here.

**FIIOC Fee**
A Service Request for payment of Fidelity Invoices can be submitted via PSW. The Fidelity Investments Institutional Operations Company (FIIOC) Fees Service Request can be accessed via the Service Request Landing Page. Click here for additional information.

**Fidelity Forum**
Visit our one-step Web site, the Fidelity Forum, to find information, guidance, and resources you need to help keep your benefits on course. Whether change is mandated or you are taking a proactive step in managing your benefits, the Fidelity Forum can help inform your decisions and support successful action.

**Thank you for your feedback**

# Plan Balances

Help/Service Requests

Select a new report topic

By Fund Type    **By Fund**    By Source

About Plan Balances

**Plan**

USA GYMNASTICS - 79629

**Time Period**
⊙ Snapshot
Apr 2013

○ Trend   ○ Compare
Apr 2013    To   Apr 2013

[ Update Chart ]



**Additional Options**   Select Options
Plan:
USA GYMNASTICS - 79629

**Save File**
PDF          [ Save File ]



**Plan Balances by Fund**
April 30, 2013

- ■ Fa Freedom 2020 A – 12%
- ▨ Fa Freedom 2035 A – 9%
- ☐ Fa Strat Income A – 9%
- ☐ Fa Freedom 2010 A – 8%
- ☐ Fa Freedom 2030 A – 7%
- ▨ Fa Freedom 2040 A – 7%
- ■ Fa High Inc Adv A – 5%
- ☐ Fa Freedom 2015 A – 5%
- ▨ Opphmr Global Opp A – 5%
- ☐ Other Funds – 35%

Click on a fund, either in the chart above or in the data table below, to view plans within that fund.

**Plan Balances by Fund - April 30, 2013**

| Fund | Balance▾ | % of Total |
|------|---------:|-----------:|
| Fa Freedom 2020 A | $463,274.70 | 12% |
| Fa Freedom 2035 A | $369,471.19 | 9% |
| Fa Strat Income A | $361,624.50 | 9% |
| Fa Freedom 2010 A | $306,349.96 | 8% |
| Fa Freedom 2030 A | $278,483.26 | 7% |
| Fa Freedom 2040 A | $263,034.55 | 7% |
| Fa High Inc Adv A | $193,948.81 | 5% |
| Fa Freedom 2015 A | $192,829.70 | 5% |
| Opphmr Global Opp A | $181,506.21 | 5% |
| Other Funds | $1,390,819.10 | 35% |
| **Totals:** | **$4,001,341.98** | **100%** |

PSW® provided by
Fidelity
INVESTMENTS

© 1996-2013 FMR LLC.
All rights reserved.

Terms of Use



Nationwide®
On Your Side®

JOHN HEWETT
C/O USA GYMNASTICS
USA GYMNASTICS
JOHN HEWETT
132 E. WASHINGTON ST #700
INDIANAPOLIS IN 46204-3674

SSN:                XXX-XX-9764
Date of Entry:        01/06/2010

## USA GYMNASTICS
### 363 – 60338

### YOUR TOTAL ACCOUNT VALUE IS:
### $74,563.31 AS OF 03/31/2013

## YOUR RETIREMENT PORTFOLIO FROM 01/01/2013 TO 03/31/2013

### Your Account At A Glance

| | |
|---|---|
| Opening Value on 01/01/2013 | $71,058.17 |
| Contributions | $0.00 |
| Investment Gain/(Loss) | $3,505.14 |
| Total Account Value on 03/31/2013 | $74,563.31 |

### Your Recent Retirement Account History*



| Jun 30, 2012 | Sep 30, 2012 | Dec 31, 2012 | Mar 31, 2013 |
|---|---|---|---|
| $51,652 | $53,392 | $71,058 | $74,563 |

*Corrections made after the close of past periods are not reflected in this representation.

| Asset Class | % of Total | Total Fund Balance | Unit Value |
|---|---|---|---|
| Balanced Nw Inv Dest Mod R2 | 100.00% | $74,563.31 | 1.140222 |
| Total Account Value | 100% | $74,563.31 | |

Due to rounding, Total Account Value percentage may not equal 100%. Your actual balance may be different if you are not yet fully vested with your employer. Please contact your employer for details.



Balanced

 

# APPLICATION FOR
# NONPROFIT EXECUTIVE ADVANTAGE POLICY

THIS IS AN APPLICATION FOR A CLAIMS-MADE POLICY. THE POLICY FOR WHICH THIS APPLICATION IS MADE COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR DISCOVERY PERIOD, IF APPLICABLE, AND REPORTED TO THE INSURER AS SOON AS PRACTICABLE BUT IN NO EVENT LATER THAN 90 DAYS AFTER THE END OF THE POLICY PERIOD. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.

UNLESS AMENDED BY ENDORSEMENT, AMOUNTS INCURRED AS DEFENSE COSTS SHALL BE IN ADDITION TO THE LIMIT OF LIABILITY AND SHALL NOT BE APPLIED TO THE APPLICABLE RETENTION.

THE POLICY PROVIDES THE DUTY ON THE PART OF THE INSURER TO DEFEND.

*Instructions*
- *Please complete all questions.*
- *The term **"Insured Organization"** means the parent organization whose directors and officers are proposed to be insured under the Nonprofit Executive Advantage Policy for which this Application is made, along with any other entities in which such parent organization has or controls the right to elect more than 50% of the Board of Directors or other governing body of such entity if such right exists.*

1. Name of the **Insured Organization**:
   USA GYMNASTICS

2. Address of the **Insured Organization**: 132 E WASHINGTON ST #700
   City: INDIANAPOLIS   County: MARION   State: IN   Zip Code: 46204

3. Individual at **Insured Organization** designated to receive correspondence and notices from the Insurer:
   JOHN P HEWETT          CONTROLLER
   (Name)                 (Title)

   Telephone: (317) 829 - 5658   Fax: (317) 237 - 5069   E-Mail Address: jhewette usagym.org

4. **Insured Organization's** nature of operations:
   OLYMPIC SPORT NATIONAL GOVERNING BODY

5. a) Tax status: X Exempt under Section 501(c) 3       o Taxable
   b) Date organized  1962
   c) Number of Employees  51
   d) Annual Salary/Wages Expense 3,583,000
   e) Total Assets 18,274,475
            See notes
6. a) What was the employee turnover rate in the last 12 months? 21 %

   b) Did this exceed the historical average of the prior 3 years? .................................. X Yes  o No

7. Have there been any changes in Senior Management for reasons other than death, retirement at
   normal retirement age or term limitations ................................................................. o Yes  X No

303 W. Madison St., Suite 700, Chicago, IL 60606 (866) 879-6565 fax: (866) 720-5003
www.5starsp.com | Submissions: dando@5starsp.com

LIUI00DO110020507                                                                1 of 4



**Specialty Programs**
A DIVISION OF 5 STAR INSURANCE SERVICES, INC.

8. Has the **Insured Organization** had in the past 12 months, or does it contemplate within the next 12 months consolidation, merger, sale or divestiture of a portion of its business? .......... o Yes ☒ No
   If "Yes", was there, or will there be, a reduction in employees as a result? ................. o Yes o No
   If "Yes", what was, or will be, the reduction as a percentage of prior employee count? o Yes o No

9. Does the **Insured Organization** provide any of the following? :
   a) Promote, sponsor or provide any type of insurance to its members? ..................... ☒ Yes o No
   b) Provide standard setting, disciplinary or peer review activities? ............................ ☒ Yes o No
   c) Engage in any labor negotiations? ........................................................................ o Yes ☒ No
   d) Engage in any experimentation, research or product development? ..................... o Yes ☒ No
   e) Provide any other professional services? ............................................................ ☒ Yes o No
   f) Engage in any business transactions with **Insured Persons** or businesses they control?          o
   ☒ Yes o No
   If "Yes" for any of the above, please attach full details.

10. Has the **Insured Organization** previously held or does it now have any directors and officers liability insurance or similar insurance? .............................................................. ☒ Yes o No
    If "Yes", please provide the following details:

| Insurer | Policy Type | Deductible/Retention | Period From/To | Premium |
|---------|-------------|----------------------|----------------|---------|
| Liberty Intl | D&O | 20,000 | 5/16/12-5/15/13 | 14,178 |

11. Attach full details of any claim, notice of circumstance, or wrongful act which has been the subject of notice under such insurance in the last 5 years (if none, check the box). .................. o None

12. Has any Insurer declined, cancelled, or refused to renew any directors and officers liability insurance or similar insurance within the past 5 years? .................................................................. o Yes ☒ No
    If "Yes", please attach full details.

**Do not complete questions #13 and #14 if this is a renewal policy with the same limit of liability with a member of the Liberty Mutual Group.**

13. During the last 5 years has the **Insured Organization** or any of its directors, officers, or employees been involved in any litigation that could have a material impact on the **Insured Organization**?
    o Yes o No ...............................................If "Yes", please attach full details.

14. Does anyone for whom insurance is sought have any knowledge or information of any act, error, omission, fact, or circumstance which may give rise to a **Claim** which may fall within the scope of the proposed insurance? ........................................................................................ o Yes o No
    If "Yes", please attach full details.

| IT IS UNDERSTOOD AND AGREED THAT IF ANYONE FOR WHOM THIS INSURANCE IS SOUGHT HAS ANY KNOWLEDGE OF ANY SUCH ACT, ERROR, OMISSION, FACT, OR CIRCUMSTANCE, ANY CLAIM EMANATING THEREFROM SHALL BE EXCLUDED FROM COVERAGE UNDER THE PROPOSED INSURANCE. |
|---|

303 W. Madison St., Suite 700, Chicago, IL 60606 (866) 879-6565 fax: (866) 720-5003
www.5starsp.com | Submissions: dando@5starsp.com

LIUI00DO110020507

2 of 4



**RENEWAL STATEMENT (Applicable to renewal polices only)** – It is agreed that this Renewal Application is a supplement to the Application(s) attached to the current Policy and said Applications, together with this Renewal Application, constitute the complete Application which shall be the basis of the contract should a Policy be issued and will be attached to and become part of the Policy.

**REQUIRED INFORMATION:** Risks exceeding $300,000 in salaries OR $1,000,000 in assets must submit a financial statement.

Signing this **Application** does not bind the undersigned to purchase or the Insurer to sell any insurance policy. If a policy is issued, this **Application** and its attachments shall be the basis of such policy and shall be deemed attached to and shall form part of such policy.

The undersigned, on behalf of all prospective Insureds, declares that the statements in this **Application** and its attachments are true and accurate. If there are material changes to any statements in this **Application** or its attachments prior to the inception date of the policy, the undersigned shall immediately notify the Insurer of such changes. Upon receipt of such notification, the Insurer shall have the right to modify or withdraw any outstanding terms or proposal.

**NOTICE TO ARKANSAS RESIDENTS:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**NOTICE TO COLORADO RESIDENTS:** It is unlawful to knowingly provide false, incomplete, or misleading facts, or information to an insurance company for the purpose of defrauding or attempting to defraud the company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant with regard to settlement or award payable from insurance proceeds shall be reported to the Colorado division of insurance with the department of regulatory agencies.

**NOTICE TO FLORIDA RESIDENTS:** Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

**NOTICE TO KENTUCKY RESIDENTS:**
Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

**NOTICE TO MAINE RESIDENTS:** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines or a denial of insurance benefits.

**NOTICE TO NEW JERSEY RESIDENTS:** Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties.

**NOTICE TO NEW MEXICO RESIDENTS:** ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL FINES AND CRIMINAL PENALTIES.

**NOTICE TO NEW YORK RESIDENTS:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

303 W. Madison St., Suite 700, Chicago, IL 60606  (866) 879-6565  fax:  (866) 720-5003
www.5starsp.com  |  Submissions: dando@5starsp.com

The top shows overlapping stamp-like text (court filing header).



**NOTICE TO OHIO RESIDENTS:** Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

**NOTICE TO OKLAHOMA RESIDENTS:** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

**NOTICE TO OREGON RESIDENTS:** Any person who knowingly, and with intent to defraud or solicit another to defraud an insurer: (1) by submitting an application, or (2) by filing a claim containing a false statement as to any material fact, may be violating state law.

**NOTICE TO PENNSYLVANIA RESIDENTS** Any person who knowingly and with intent to defraud any insurance company or other person files and application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

**NOTICE TO TENNESSEE RESIDENTS:** It is a crime to knowingly provide false, incomplete, or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits

**This Application must be currently dated and signed by the association's insurance agent, broker, property manager or by a member of governing board of the association.**

Signed: _____  Title: _P_R_E_S_I_D_E_N_T_____
(Signature of President or Executive Director)

Date: _May 3, 2013_

**Submitting Producer Name**

_____
Agency Name

_____
Agency Address

_____
License Number (FL Producers Only)

303 W. Madison St., Suite 700, Chicago, IL 60606 (866) 879-6565 fax: (866) 720-5003
www.5starsp.com | Submissions: dando@5starsp.com

LIUI00DO110020507

4 of 4

Liberty Insurance Underwriters

Application for Executive Advantage Policy

5e.  Asset amount provided as of last completed audited financial statement of 12/31/11.  Financial statements and tax returns available on our website at usagym.org under About Us.  Amounts are on a consolidated basis.

6b.  Typical post Olympic turnover, plus one retirement.

9a.  USA Gymnastics provides secondary medical and catastrophic medical coverage to its participant members (approx 120,000) in sanctioned events (approx 3,500).

9b.  In order to become a professional member of USA Gymnastics, which allows one on the floor of sanctioned competitions, the professional member must become safety certified, which results from passing a test based on a curriculum that has been developed and updated over the last 30 years by industry members, legal counsel and insurance industry insight.  In addition, USA Gymnastics has a code of ethics, and has a system in place to deal with members, including placing lifetime bans on them from participation in USA Gymnastics activities

9e.  USA Gymnastics and its committees develop skill progression routines, whereby gymnasts at all ages and skill levels can develop the skills necessary to safely develop and demonstrate their proficiency at the different levels of competition.

9f.  As the National Governing Body for the sport, USA Gymnastics enters into any number of business transactions with insured persons, provided that definition includes USA Gymnastics members.  Members, who receive insurance and other benefits described in 9a above, participated in clinics, symposiums, competitions, and other assorted activities, for which they make payment to USA Gymnastics.  In addition, USA Gymnastics has control over the board of directors of the National Gymnastics Foundation, from whom they receive annual grants and on occasion make grants to the Foundation.

# EXHIBIT 4

**Tracy Bernsee**

---

| | |
|---|---|
| **From:** | Weber, Todd <Todd.Weber@LibertyIU.com> |
| **Sent:** | Tuesday, May 20, 2014 3:19 PM |
| **To:** | Bernsee, Tracy |
| **Subject:** | USA Gymnastics FSS000083-0313  3rd Party Sublimit Endorsement |

I would replace 3rd Party EPL Cover with "any **Claim** brought by or on behalf of any **Third Party** for **Employment Practices Wrongful Acts."**

> **From:** Bernsee, Tracy [mailto:tbernsee@TargetProIns.com]
> **Sent:** Tuesday, May 20, 2014 2:45 PM
> **To:** Weber, Todd
> **Subject:** USA Gymnastics FSS000083-0313
>
> Todd,
>
> Is this satisfactory for the endorsement?
>
> Tracy Bernsee
> Underwriter
> **Target Professional Programs**
> (312) 855-2046 Direct
> (866) 720-5003 Fax
> **Email: tbernsee@TargetProIns.com**
>
> **5Star Professional Programs has joined the Target brand.**
> **Our new name is Target Professional Programs.**
> **For details, please visit us at www.TargetProIns.com**
>
> **From:** Weber, Todd [mailto:Todd.Weber@LibertyIU.com]
> **Sent:** Monday, May 19, 2014 10:17 AM
> **To:** Tobin, Doug
> **Cc:** Bernsee, Tracy
> **Subject:** USA Gymnastics FSS000083-0313 Response on 3rd Party
>
> > I think it would be okay to provide 3rd party with $250,000 sub-limit.
> >
> > **From:** Tobin, Doug [mailto:Dtobin@TargetProIns.com]
> > **Sent:** Friday, May 16, 2014 2:44 PM
> > **To:** Weber, Todd
> > **Subject:** FW: USA Gymnastics FSS000083-0313 Renewal Terms May 16, 2013 2014
> >
> > Fyi
> >
> > **Thank you. DT**
> >
> > **Doug Tobin** | Vice President / Underwriting Manager | ☎: 312.855.2040 | 🖷: 866.720.5003 | ✉: dtobin@targetproins.com
> > 1230 East Diehl Road, Suite 350 | Naperville, IL 60563 |
> > **5Star Professional Programs has joined the Target brand.**
> > **Our new name is Target Professional Programs.**
> > **For details, please visit us at www.TargetProIns.com**



**From:** Ben Erdmanis [mailto:berdmanis@usproins.com]
**Sent:** Friday, May 16, 2014 2:26 PM
**To:** Tobin, Doug
**Cc:** Bernsee, Tracy
**Subject:** RE: USA Gymnastics FSS000083-0313 Renewal Terms May 16, 2013 2014

Hi Doug,

My agent has requested that we bind coverage:

"assuming LIU will revise terms to include EPL third party, please bind insurance as quoted (other than this issue)"

Just wanted you to know.

Benjamin J. Erdmanis

# US Pro Insurance Services

27475 Ferry Road, Suite 131
Warrenville, IL 60555
Phone: (630) 864-3032
E-mail: berdmanis@usproins.com

**From:** Tobin, Doug [mailto:Dtobin@TargetProIns.com]
**Sent:** Friday, May 16, 2014 2:00 PM
**To:** 'Ben Erdmanis'
**Cc:** Bernsee, Tracy
**Subject:** RE: USA Gymnastics FSS000083-0313 Renewal Terms May 16, 2013 2014

Yes, so long as Liberty gets back in tough with me today. They made the request at noon today so maybe they should have asked sooner. . .:)

Will do our best but might be Monday.

**Thank you. DT**

**Doug Tobin** | Vice President / Underwriting Manager | ☎: 312.855.2040 | 🖶 866.720.5003 | ✉: **dtobin@targetproins.com**
1230 East Diehl Road, Suite 350 | Naperville, IL 60563 |
**5Star Professional Programs has joined the Target brand.**
**Our new name is Target Professional Programs.**
**For details, please visit us at www.TargetProIns.com**

**From:** Ben Erdmanis [mailto:berdmanis@usproins.com]
**Sent:** Friday, May 16, 2014 1:28 PM
**To:** Tobin, Doug
**Cc:** Bernsee, Tracy
**Subject:** RE: USA Gymnastics FSS000083-0313 Renewal Terms May 16, 2013 2014

Hi Doug,

Thanks for your help!!  I hope we can wrap this up today as it is a 5/16 though!

Benjamin J. Erdmanis

# US Pro Insurance Services
27475 Ferry Road, Suite 131
Warrenville, IL  60555
Phone: (630) 864-3032
E-mail: berdmanis@usproins.com

**From:** Tobin, Doug [mailto:Dtobin@TargetProIns.com]
**Sent:** Friday, May 16, 2014 1:27 PM
**To:** 'Ben Erdmanis'
**Cc:** Bernsee, Tracy
**Subject:** RE: USA Gymnastics FSS000083-0313 Renewal Terms May 16, 2013 2014

Got it.  I will check with Liberty but this is based more on class of business/nature than the claim.  I am out next week but Tracy will advise if we don't hear back today, ok?

**Thank you. DT**

**Doug Tobin** | Vice President / Underwriting Manager | ☎: 312.855.2040 | 🖷 866.720.5003 | ✉: dtobin@targetproins.com
1230 East Diehl Road, Suite 350 | Naperville, IL 60563 |
**5Star Professional Programs has joined the Target brand.**
**Our new name is Target Professional Programs.**
**For details, please visit us at www.TargetProIns.com**



**From:** Ben Erdmanis [mailto:berdmanis@usproins.com]
**Sent:** Friday, May 16, 2014 1:23 PM
**To:** Tobin, Doug
**Cc:** Bernsee, Tracy
**Subject:** RE: USA Gymnastics FSS000083-0313 Renewal Terms May 16, 2013 2014

Hi Doug,

I apologize as this guys e-mails are not always well worded and/or formatted.  He is asking for third party coverage and was apparently referring to an e-mail last year:

"First dollar defense was removed since a claim was filed.  That is part of the standard underwriting process when it comes to Liberty.

As for removing third party coverage, in the early review of the claim, underwriting noted it alleged sexual assault, and Liberty decided there was too great a risk for a sexual harassment/assault third party claim (after reviewing this account/class) , so they no longer wanted to offer the third party coverage."

So he is asking if we can have that coverage added back into their policy based on the argument he provided below.  Sorry for the confusion!

Benjamin J. Erdmanis

# US Pro Insurance Services

27475 Ferry Road, Suite 131
Warrenville, IL 60555
Phone: (630) 864-3032
E-mail: berdmanis@usproins.com

**From:** Tobin, Doug [mailto:Dtobin@TargetProIns.com]
**Sent:** Friday, May 16, 2014 1:06 PM
**To:** Ben Erdmanis (berdmanis@usproins.com)
**Cc:** Bernsee, Tracy
**Subject:** FW: USA Gymnastics FSS000083-0313 Renewal Terms May 16, 2013 2014
**Importance:** High

HI Ben,

What are they asking us to remove?? I don't see any specific entity exclusions? What "inapplicable exclusion" are they referring to?

**Thank you. DT**

**Doug Tobin** | Vice President / Underwriting Manager | ☎: 312.855.2040 | ✉ 866.720.5003 | ✉: **dtobin@targetproins.com**
1230 East Diehl Road, Suite 350 | Naperville, IL 60563 |

**5Star Professional Programs has joined the Target brand.**
**Our new name is Target Professional Programs.**
**For details, please visit us at www.TargetProIns.com**



**From:** Ben Erdmanis [mailto:berdmanis@usproins.com]
**Sent:** Friday, May 16, 2014 12:49 PM
**To:** Bernsee, Tracy
**Subject:** FW: USA Gymnastics DO - Renewal Terms May 16, 2013 2014
**Importance:** High

Hi Tracy,

Please see my agent's e-mail below. Can we comply with his request?

Benjamin J. Erdmanis

# US Pro Insurance Services

27475 Ferry Road, Suite 131
Warrenville, IL 60555
Phone: (630) 864-3032
E-mail: berdmanis@usproins.com

**From:** Pat O'Connor
**Sent:** Friday, May 16, 2014 12:16 PM
**To:** Ben Erdmanis (berdmanis@usproins.com)
**Subject:** USA Gymnastics DO - Renewal Terms May 16, 2013 2014
**Importance:** High

Ben, as highlighted below and explained last year,

1) as the "Doe" "claim" denial was REVISED/REVERSED TO "RESERVATION" FROM REJECTION, which was explained and proven to LIU  that they were WRONG and NOTHING involved USAG employees nor others internally nor directly, strictly outside parties only, with no appropriate nor applicable allegation nor adjudication, AND

2) USAG and City Securities Insurance,
   a. request/require removal of this inapplicable exclusion, for which there has never been such a claim, not even a insinuation of such, over the thirty (30) years with which we have worked together in risk and insurance management, AND
   b. again, we need answer today, for final conclusion/decision today,

sincerely, thanks, Pat


directly by
Patrick J. O'Connor
Executive Vice President
City Securities Corporation

**EXHIBIT 5**



# LIBERTY INSURANCE UNDERWRITERS INC.

This endorsement, effective 05/16/2014 forms part of

Policy No.  FSS000083-0414  issued to  USA Gymnastics

---

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### Sub-Limit Endorsement

It is agreed that Item III of the Declarations Page is hereby amended by the addition of the following:

ITEM III.      LIMIT OF LIABILITY:      $  250,000   in the aggregate for the **Policy Year**

It is further agreed that the Limit of Liability provided under this endorsement is part of, and not in addition to, the Limit of Liability provided for in Item III of the Declarations and shall only apply as respects to:

any **Claim** brought by or on behalf of any **Third Party** for **Employment Practices Wrongful Acts**.

All other terms, conditions, and exclusions of this Policy remain unchanged.

_Douglas P. Tobin_

_____
Authorized Representative of
Liberty Insurance Underwriters Inc.

 05/21/2014 _____
Date

LIUI00DO380280507



# LIBERTY INSURANCE UNDERWRITERS INC.

55 Water Street, 18th Floor
New York, New York 10041
**(a member of the Liberty Mutual Group and hereinafter "the Insurer")**
**Liberty Insurance Underwriters Inc.'s toll free number is: 800-677-9163**

# NONPROFIT EXECUTIVE ADVANTAGE POLICY

## DECLARATIONS

NOTICE:  THIS IS A CLAIMS-MADE POLICY.  THIS POLICY COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR DISCOVERY PERIOD, IF APPLICABLE, AND REPORTED TO THE INSURER AS SOON AS PRACTICABLE BUT IN NO EVENT LATER THAN 90 DAYS AFTER THE END OF THE POLICY PERIOD.  PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.

UNLESS AMENDED BY ENDORSEMENT, AMOUNTS INCURRED AS DEFENSE COSTS SHALL BE IN ADDITION TO THE LIMIT OF LIABILITY AND SHALL NOT BE APPLIED AGAINST THE APPLICABLE RETENTION.

THE INSURER HAS THE DUTY TO DEFEND.

**POLICY NUMBER:** FSS000083-0414
**RENEWAL OF:** FSS000083-0313

**PRODUCER:** 5Star Specialty Programs a Division of CRC Insurance Services, Inc.

**ITEM I. NAME AND ADDRESS OF PARENT ORGANIZATION:**
USA Gymnastics
132 E Washington St, Ste 700, Indianapolis, IN 46204

**ITEM II.** **POLICY PERIOD:** Inception Date: 05/16/2014    Expiration Date: 05/16/2015
(12:01 A.M. at the address set forth in Item I)

**ITEM III.** **LIMIT OF LIABILITY:** $  5,000,000  in the aggregate for the **Policy Year**

**ITEM IV.** **RETENTION:** $  20,000  in the aggregate each **Claim**

**ITEM V.** **PRIOR LITIGATION DATE:** 05/16/2009

**ITEM VI.** **PREMIUM:** $  14,822.00

**ITEM VII.** **ENDORSEMENTS FORMING PART OF THIS POLICY AT ISSUANCE:**  See Attached Forms List

This Declarations page, together with the **Application**, the attached Nonprofit Executive Advantage Policy Form, and all endorsements thereto, shall constitute the contract between the Insurer and the **Insureds**.  This Policy is valid only if signed below by a duly authorized representative of the Insurer.

_Douglas P. Tolson_    06/17/2014
Authorized Representative

LIUI00DO030010507

FSS000083-0414
USA Gymnastics

# Forms List

| | |
|---|---|
| LIUI00DO03001 | Nonprofit Executive Advantage Policy Declarations |
| Forms List | Forms List |
| LIUI00DO01001 | Nonprofit Executive Advantage Policy |
| LIUI13DO24001 | Indiana Endorsement |
| LIUI13DO24001 | Indiana Amendatory Endorsement |
| LIUI13DO55001 | Indiana Policyholder Notice |
| LIUI00DO38018 | Fiduciary Liability Coverage with Shared Limit of Liability |
| LIUI00DO38019 | General Professional Services Exclusion (Management Carve-out) |
| LIUI00DO38028 2 | Sub-Limit Endorsement for Wage and Hour Claims |
| LIUI00DO38129 | Application of Retention to Defense Costs |
| TRIA-N001 | Policyholder Disclosure- Terrorism Insurance Premium Notice |
| LIUI00DO38029 | Sub-Limit Endorsement |

# LIBERTY INSURANCE UNDERWRITERS INC.

### (a member of the Liberty Mutual Group
### and hereinafter called "the Insurer")

### NONPROFIT EXECUTIVE ADVANTAGE POLICY

(Words and phrases printed in **bold**, other than
in the headings, are defined in Section 23 below.)

In reliance upon the truthfulness and accuracy of the statements made in the **Application**, in consideration of, and subject to, the payment of premium when due, and subject to the terms, conditions, and exclusions of this Policy, the Insurer and the **Insureds** agree as follows:

**1.** **Insuring Agreement:** The Insurer shall pay on behalf of the **Insureds** all **Loss** which they shall become legally obligated to pay as a result of a **Claim** first made during the **Policy Period** or **Discovery Period**, if applicable, against the **Insureds** for a **Wrongful Act** which takes place before or during the **Policy Period**.

**2.** **Defense Costs and Settlements:**

    **2.1** It shall be the right and duty of the Insurer to defend any **Claim**. The Insurer may investigate, as it deems appropriate, any **Claim**, circumstance, or **Wrongful Act** involving the **Insureds**.

    **2.2** The **Insureds** shall not incur any **Defense Costs**, admit any liability, assume any obligation, agree to any settlement, or make any settlement offer with respect to any **Claim** without the Insurer's prior written consent, which shall not be unreasonably withheld. The Insurer shall not be liable for any **Defense Costs** incurred or any admissions, obligations, agreements, or settlements made by the **Insureds** without the Insurer's prior written consent.

    **2.3** The Insurer has the right to negotiate the settlement of any **Claims** it deems expedient, but only with the **Insured's** consent. If the **Insureds** withhold consent to such settlement, the Insurer's liability for such **Claim** is limited to the amount in excess of the Retention which the Insurer would have contributed to the settlement had the **Insured** consented to the settlement, and 70 percent (70%) of any additional covered **Loss,** including **Defense Costs**, incurred subsequent to such refusal to settle.

**3.** **Cooperation**: As a condition precedent to the **Insureds'** rights under this Policy, they shall give to the Insurer all information and cooperation as the Insurer reasonably may require and shall do nothing that may prejudice the Insurer's position or its rights of recovery.

**4.** **Claim Exclusions:** This Policy does not apply to any **Claim** made against any **Insured**:

    **4.1** for:

        **(a)** bodily injury, sickness, disease, death; or

        **(b)** emotional distress, mental anguish, false arrest or imprisonment, abuse of process, malicious prosecution, violation or invasion of any right of privacy or private occupancy, trespass, nuisance or wrongful entry or eviction; or

**(c)**    libel, slander, defamation; or

**(d)**    damage to, destruction of, or loss of use of any tangible property;

provided that parts (b) and (c) of this exclusion shall not apply to any **Claim** brought by or on behalf of any **Third Person**, or any past, present or prospective **Insured Person** for an **Employment Practices Wrongful Act**; also provided that part (c) of this exclusion shall not apply to any **Claim** for any other **Wrongful Act** other than an **Employment Practices Wrongful Act**. However, coverage afforded for libel, slander or defamation for **Wrongful Acts** other than **Employment Practices Wrongful Acts** shall be excess of any coverage afforded by the **Insured's** general liability policy;

**4.2**    for any error, misstatement, misleading statement, act, omission, neglect or breach of duty by **Insured Persons** of any **Subsidiary** in such capacity or by the **Subsidiary** itself if such error, misstatement, misleading statement, act, omission, neglect or breach of duty actually or allegedly occurred, in whole or in part, when such entity was not a **Subsidiary**;

**4.3**    based upon, arising from, or in any way related to any error, misstatement, misleading statement, act, omission, neglect or breach of duty which has been reported or has been the subject of any notice under any insurance policy of which this Policy is a renewal or replacement or under any other policy which it may succeed in time;

**4.4**    for any actual or alleged violation of the Employee Retirement Income Security Act of 1974, amendments thereto or similar federal, state, local or common law;

**4.5**    based upon, arising from, or in any way related to:

**(a)**    any demand, suit, or other proceeding against any **Insured** which has been made, which existed, or was pending prior to the applicable Prior Litigation Date set forth in Item V of the Declarations; or

**(b)**    the same or substantially the same facts, circumstances or allegations involved in such demand, suit, or other proceeding;

**4.6**    brought or maintained by or on behalf of the **Insured Organization**;

**4.7**    based upon, arising from, or in any way related to the actual, alleged, or threatened discharge, dispersal, release or escape of **Pollutants, Fungi** or **Microbes**, or any direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify, or neutralize **Pollutants, Fungi** or **Microbes**;

**4.8**    based upon, arising from, or in any way related to an **Insured Person** serving as a director, officer, trustee, regent, governor, volunteer, employee, or similar position of any entity other than the **Insured Organization;** or

**4.9**    based upon, arising from, or in any way related to:

**(a)**    any **Insureds** gaining in fact any personal profit, remuneration or advantage to which they were not legally entitled; or

**(b)**     any deliberately dishonest, malicious or fraudulent act or omission or any willful violation of law by any **Insured;**

provided, however, this exclusion shall only apply if it is finally adjudicated that such conduct in fact occurred.

For purposes of determining the applicability of Section 4.9, the **Wrongful Act** of any **Insured Person** shall not be imputed to any other **Insured Person.**

**5.     Loss Exclusions:** The Insurer shall not be liable to pay any **Loss** in connection with any **Claim**:

**5.1**     for any obligation of the **Insured Organization** to modify any building or property in order to affect compliance with the Americans With Disabilities Act and any amendments thereto or any similar federal, state or local statute, regulation, or common laws; or

**5.2**     for any actual or alleged liability of any **Insured** under any contract or agreement, express or implied, written or oral, except for employment related obligations which would have attached absent such contract or agreement.

Provided, however, that these exclusions shall not apply to the Insurer's duty to defend and to pay **Defense Costs**.

**6.     Application Representations and Severability**:

**6.1**     The **Insureds** represent that the statements and representations contained in the **Application** are true and shall be deemed material to the acceptance of the risk or the hazard assumed by the Insurer under this Policy. This Policy is issued in reliance upon the truth of such statements and representations.

**6.2**     The **Insureds** agree that if the **Application** contains any statements or representations that are untrue, this Policy shall be void as to the **Insured Organization** and any **Insured Person** who knew the facts that were not truthfully disclosed, provided that such knowledge shall not be imputed to any other **Insured Person**.

**7.     Reporting Requirements:**

**7.1**     The **Insureds**, as a condition precedent to their rights under this Policy, shall report every **Claim** to the Insurer as soon as practicable from the date any **Executive Officer** has knowledge of the **Claim**, and in no event later than ninety (90) days after the end of the **Policy Period**.

**7.2**     Notice of any **Claim**, circumstance, or **Wrongful Act** shall be forwarded to **Liberty International Underwriters, 55 Water Street, 18ᵗʰ Floor, New York, NY 10041 Attention: Specialty Casualty Claims**.

**7.3**     All notices under this Policy shall be sent in writing by mail, prepaid express courier, or facsimile and shall be effective upon receipt thereof by the addressee.

**8.     Notice of Circumstance or Wrongful Act:** If during the **Policy Period** or the **Discovery Period** the **Insureds** become aware of any circumstance or **Wrongful Act** that reasonably may be expected to give rise to a **Claim,** and if such circumstance or **Wrongful Act** is reported to the Insurer

during the **Policy Period** in writing with details as to the nature and date of such circumstance or **Wrongful Act**, the identity of any potential claimant, the identity of any **Insured Person** involved in such circumstance or **Wrongful Act**, and the manner in which the **Insureds** first became aware of such circumstance or **Wrongful Act**, then any **Claim** subsequently arising from such circumstance or **Wrongful Act** shall be deemed under this Policy to be a **Claim** made during the **Policy Period** in which the circumstance or **Wrongful Act** was first duly reported to the Insurer.

**9.      Limit of Liability:**

9.1      The Insurer's maximum aggregate Limit of Liability for all **Loss** under this Policy shall be the amount set forth in Item III of the Declarations.  Amounts incurred as **Defense Costs** shall be in addition to the Limit of Liability.

9.2      All **Claims** arising from the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed one **Claim** and subject to a single limit of liability.  Such **Claim** shall be deemed first made on the date the earliest of such **Claims** is first made, regardless of whether such date is before or during the **Policy Period**.

9.3      With respect to all **Claims** deemed to have been made in a **Policy Year**, should the Limit of Liability be exhausted by payment of **Loss** resulting from one or more of such **Claims**, the Insurer's duty to defend shall cease and any and all obligations of the Insurer hereunder shall be deemed to be completely fulfilled and extinguished and the Insurer shall have no further obligations hereunder of any kind or nature.

**10.     Retentions:**  The Insurer shall be liable to pay only the amount of covered **Loss** in excess of the applicable Retention amount set forth in Item IV of the Declarations.  Such Retention shall not be applicable to **Defense Costs** except in the instance noted in Section 2.3 in which the **Insureds** withhold consent to settlement.  Such applicable Retention shall be uninsured and shall be borne by the **Insured Organization.**  However, if an **Insured Person** is not indemnified for **Loss** solely by reason of the **Insured Organization's** financial insolvency or because indemnification is not legally permissible, an **Insured Person's** Retention shall be $0.  This change in Retention shall not affect any other terms or conditions of this Policy.

**11.     Allocation**:  If a **Claim** gives rise to **Loss** covered under this Policy and loss not covered under this Policy, either because a **Claim** includes both covered and uncovered matters or both covered and uncovered parties, the **Insureds** and the Insurer shall allocate such amount between covered **Loss** and uncovered loss.

**12.     Other Insurance**:  If any **Loss** arising from any **Claim** is insured by other valid and collectible insurance, then this Policy shall apply only in excess of the amount of any deductibles, retentions and limits of liability under such other policy or policies, whether such other policy or policies are stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written specifically excess of this Policy by reference in such other policy to this Policy's Policy Number.

**13.     Discovery Period**:

13.1     If the Insurer or the **Parent Organization** fails or refuses to renew this Policy or if the **Parent Organization** cancels this Policy, any **Insured** shall have the right to an extension of the coverage granted by this Policy following the effective date of such cancellation or

non-renewal. Such extension of coverage shall apply solely with respect to **Wrongful Acts** taking place before the effective date of such cancellation or non-renewal.

**13.2** If the Insurer refuses to renew this Policy the **Discovery Period** shall be the period of ninety (90) days from the end of the **Policy Period**, and there shall be no charge for this **Automatic Discovery Period** of ninety (90) days. If prior to the end of the **Automatic Discovery Period** the **Parent Organization** pays the Insurer an additional amount equal to thirty-five percent (35%) of the annual premium of this Policy, the term of the **Discovery Period** shall be extended for an additional twelve (12) months from the end of the **Automatic Discovery Period**. Such Discovery Period Premium shall be deemed fully earned as of such date. This extension shall not apply if this Policy is terminated by the Insurer for failure to pay any premium when due.

**13.3** If the **Parent Organization** fails or refuses to renew or cancels this Policy the **Parent Organization** may purchase a **Discovery Period** of twelve (12) month from the end of the **Policy Period**, provided that the **Parent Organization** pays the Insurer an additional amount equal to thirty-five percent (35%) of the annual premium of this Policy within thirty (30) days of the end of the **Policy Period**. Such Discovery Period Premium shall be deemed fully earned as of such date.

**13.4** The extension of coverage for the **Discovery Period** shall not in any way increase the Limit of Liability set forth in Item III of the Declarations. For purposes of the Limit of Liability, the **Discovery Period** is considered to be part of and not in addition to the last **Policy Year**.

**13.5** If the **Parent Organization** shall cancel or non-renew this Policy for any reason other than being sold, acquired or bankrupt, each director or officer that was an **Insured**, but did not serve as a director or officer at the time of cancellation or non-renewal, shall be provided an unlimited extension of coverage granted by this Policy to report any **Claim(s)** first made against the director or officer after the date of such cancellation or non-renewal. However, this extension of coverage shall only be afforded in the event that the **Wrongful Act** was committed before the date of cancellation or non-renewal, and no Directors and Officers Liability policy, or policy providing essentially the same type of coverage, or extension period, is in effect at the time the **Claim** is made.

**14.    Conversion to Automatic Run-off**:

**14.1** In the event of a **Change in Control** during the **Policy Period**, coverage under this Policy shall continue until the end of the **Policy Period**, but only with respect to **Claims** for **Wrongful Acts** taking place prior to the effective date of such **Change in Control**. The entire premium for this Policy shall be deemed fully earned as of the effective date of such **Change in Control**.

**14.2** The **Parent Organization** shall give written notice of such **Change in Control** to the Insurer as soon as practicable, together with such information as the Insurer may reasonably require.

**15.    Subrogation**: If the Insurer pays any **Loss** under this Policy, the Insurer shall be subrogated to the extent of such payment to all rights of recovery thereof. The **Insureds** shall execute all papers required and shall do everything that may be necessary to secure and preserve such rights, including the execution of such documents necessary to enable the Insurer effectively to bring suit in

the name of the **Insureds**.  The obligations of the **Insureds** pursuant to this Section 15 survive the termination of the **Policy Period**.

16.    **Parent Organization as Authorized Representative**: The **Insureds** agree that the **Parent Organization** shall act on their behalf with respect to all matters under this Policy, including without limitation the giving and receiving of notices hereunder, the payment or return of premiums, and the negotiation and acceptance of endorsements.

17.    **Amendment, Assignment and Headings**:

17.1    Any amendment to this Policy or assignment of an interest in this Policy, in whole or in part, shall be effective only if made by endorsement to this Policy signed by an authorized representative of the Insurer.

17.2    The headings to the provisions in this Policy, including those found in any endorsements attached hereto, are provided for convenience only and do not affect the construction hereof.

18.    **Territory**:  This Policy applies to **Wrongful Acts** occurring anywhere in the world, provided that a **Claim** is brought against the **Insured** within the United States of America, its territories or possessions or Canada.

19.    **Spousal Benefit**:  If a **Claim** against an **Insured Person** for a **Wrongful Act** otherwise covered under this Policy includes a claim against his/her legal spouse where the claimant asserts such claim by reason of spousal status or seeks to obtain recovery against property in which such spouse has an interest, the amount which such spouse becomes legally obligated to pay in respect of such **Claim** (including defense costs) shall be deemed the **Loss** and **Defense Costs** of such **Insured Person**, and subject to this Policy's terms, conditions, and exclusions.  In any event, this extension shall not cover any conduct or wrongful act committed by such legal spouse.

20.    **Estates and Legal Representatives**:  In the event of the death, incapacity, or bankruptcy of an **Insured Person**, any **Claim** made against the estate, legal representatives, heirs, or the assigns of such **Insured Person** for a **Wrongful Act** by such **Insured Person** shall be deemed to be a **Claim** against such **Insured Person**.

21.    **Termination**:

21.1    The Insurer may not cancel this Policy except for non-payment of premium when due.  Such cancellation shall be effective as of the inception date of the **Policy Period**.

21.2    The **Parent Organization** may cancel this Policy by sending notice of cancellation to the Insurer.  Such cancellation shall be effective on the date the Insurer receives such notice. The **Parent Organization** may not cancel this Policy in anticipation of or after the effective date of a **Change in Control**.  In the event the **Parent Organization** cancels this Policy, the Insurer shall retain the customary short rate premium.  Payment of any unearned premium by the Insurer shall not be a condition precedent to the effectiveness of cancellation but such payment shall be made as soon as practicable.

21.3    If the Insurer elects not to renew this Policy, the Insurer shall provide the **Parent Organization** with not less than sixty (60) days advance notice thereof.

22.    **Action Against Insurer**:

LIUI00DO010010507                                    6 of 11

**22.1**   No action shall be taken against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this Policy, or the amount of the **Insureds'** obligation to pay shall have been finally determined either by judgment against the **Insureds** after actual trial, or by written agreement of the **Insureds**, the claimant and the Insurer.

**22.2**   No person or organization shall have the right under this Policy to join the Insurer as a party to any action against the **Insureds**, nor shall the Insurer be impleaded by the **Insureds** or their legal representatives.

**23.   Definitions:**

**23.1**   "**Application**" means all signed applications, including attachments and materials submitted therewith or as a part thereof, or incorporated therein, for this Policy and for any policy in an uninterrupted series of policies issued by the Insurer of which this Policy is a direct or indirect renewal or replacement.   All such applications, attachments, and materials are deemed attached to and incorporated into this Policy.

**23.2**   "**Change in Control**" means:

**(a)**   the acquisition by another entity of voting rights resulting in voting control by such other entity of more than 50% of the outstanding voting rights representing the present right to vote for election of directors or equivalent positions of the **Parent Organization**;

**(b)**   the merger of the **Parent Organization** into another entity such that the **Parent Organization** is not the surviving entity, or the consolidation of the **Parent Organization** with another entity; or

**(c)**   the loss of the **Parent Organization's** not-for-profit tax status.

**23.3**   "**Claim**" means:

**(a)**   a written demand for monetary or non-monetary relief against an **Insured**;

**(b)**   the commencement of a civil or criminal judicial proceeding or arbitration against an **Insured**; or

**(c)**   the commencement of a formal criminal, administrative or regulatory proceeding or investigation against an **Insured,** including any brought before the Equal Employment Opportunity Commission or any similar state, local or territorial governmental agency ;

including any appeal therefrom.   A **Claim** will be deemed first made on the date an **Insured** receives a written demand, complaint, indictment, notice of charges, or order of formal investigation.

**23.4**   "**Defense Costs**" means reasonable and necessary fees (including attorneys' fees and experts' fees) and expenses incurred in the defense of a **Claim** and cost of attachment or

similar bonds, but shall not include the wages, salaries, benefits or expenses of any directors, officers or employees of the **Insured Organization**.

23.5 **"Discovery Period"** means the period of time set forth in Section 13.

23.6 **"Employment Practices Wrongful Act"** means:

(a) wrongful dismissal or discharge or termination of employment, whether actual or constructive;

(b) discrimination, whether based upon race, sex, age, national origin, religion, sexual orientation or disability;

(d) sexual or other harassment in the workplace;

(e) employment related misrepresentation;

(f) violation of employment laws;

(g) wrongful failure to employ, promote or grant tenure;

(h) wrongful discipline;

(i) negligent evaluation;

(j) retaliation; and/or

(k) failure to provide adequate workplace or employment policies or procedures.

Solely with respect to any **Claim** brought by or on behalf of any **Third Party**, **Employment Practices Wrongful Act** means any actual or alleged, discrimination, sexual harassment or violation of such **Third Party's** civil rights in relation to such discrimination or sexual harassment, whether direct, indirect, or unintentional, committed by an **Insured Person** in his/her capacity as an **Insured Person** or by the **Insured Organization**.

23.7 **"Executive Officer"** means the president, chief executive officer, chief operating officer, chief financial officer, managing director, any executive vice president and any equivalent executive position of the **Insured Organization**.

23.8 **"Fungi"** means any form of fungus, including but not limited to yeast, mold, mildew, rust, smut or mushroom, and any spores, mycotoxins, odors or any other substances, products, or by products produced by, released by, or arising out of the current or past presence of fungi.

23.9 **"Insolvency"** means the status of the **Insured Organization** as a result of the appointment of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to control, supervise, manage, or liquidate the **Insured Organization**, or the **Insured Organization** becoming an insolvent debtor-in-possession.

**23.10**  **"Insured(s)"**  means the **Insured Persons** and the **Insured Organization**.

**23.11**  **"Insured Organization"** means any entity named in Item I of the Declarations and any **Subsidiary**, including any such entity operating as a debtor-in-possession.

**23.12**  **"Insured Person(s)"** means one or more natural persons who were, now are, or shall hereafter be duly elected or appointed directors, trustees, officers, employees, committee members or volunteers of the **Insured Organization**, or, with respect to a **Subsidiary** operating outside the United States, their functional equivalent, regardless of title.

**23.13**  **"Interrelated Wrongful Acts"** means **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions, or causes.

**23.14**  **"Loss"** means:

**(a)**  sums which the **Insureds** are legally obligated to pay solely as a result of any **Claim** insured by this Policy, including damages, judgments, settlement amounts, legal fees and costs awarded pursuant to judgments, punitive or exemplary damages, and the multiple portion of any multiplied damage award; and

**(b)**  any excise tax equal to ten percent (10%) of an excess benefit which has been assessed by the Internal Revenue Service against any **Insured Person** pursuant to Section 4658 of the Internal Revenue Code for participation of an organization manager in an excess benefit transaction.

**Loss** shall not include any other taxes, fines, penalties, or matters uninsurable pursuant to any applicable law.

**23.15**  **"Microbes"** means any non-fungal microorganisms or non-fungal colony-form organisms that causes infection or disease including but not limited to any spores, mycotoxins, odors or any other substances, products, or by products produced by, released by, or arising out of the current or past presence of microbes.

**23.16**  **"Parent Organization"** means the **Insured Organization** first named in Item I of the Declarations.

**23.17**  **"Policy Period"** means the period from the inception date set forth in Item II of the Declarations to the expiration date set forth in Item II of the Declarations, or its earlier termination pursuant to Section 21.

**23.18**  **"Policy Year"** means the period of one year following the effective date and hour of this Policy or the period of one year following any anniversary date thereof falling within the **Policy Period**; or if the time between the effective date or any anniversary date and the termination of this Policy is less than one year, such lesser period.

**23.19**  **"Pollutants"** means any substance exhibiting hazardous characteristics as is or may be identified on any list of hazardous substances issued by the United States Environmental Protection Agency, or any state, local, or foreign counterpart.  This definition shall include, without limitation, any solid, liquid, gaseous or thermal irritant, or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, odors, noise, lead, oil or oil products,

radiation, asbestos or asbestos-containing products, waste (including material to be recycled, reconditioned or reclaimed), and any electric, magnetic or electromagnetic field of any frequency, as well as any air emission, waste water, infectious medical waste, nuclear materials, or nuclear waste.

23.20 **"Subsidiary"** means any entity which qualifies as a not-for-profit organization under the Internal Revenue Code and for which the **Parent Organization** has or controls the right to elect or appoint more than fifty percent (50%) of the Board of Directors or other governing body of such entity if such right exists:

   **(a)**     prior to inception date of the **Policy Period**;

   **(b)**     after  the inception date of the **Policy Period** and the assets of such entity do not exceed thirty-five percent (35%) of the total consolidated assets of the **Insured Organization** as reflected in the **Parent Organization's** most recent audited consolidated financial statement; or

   **(c)**     after the inception date of the **Policy Period** and the assets of such entity exceed thirty-five percent (35%) of the total consolidated assets of the **Insured Organization** as reflected in the **Parent Organization's** most recent audited consolidated financial statement but only upon the condition that the **Parent Organization**:

   **(i)**     give written notice of such transaction to the Insurer within 90 days after the effective date of such transaction;

   **(i)**     provide the Insurer with such information as the Insurer may require; and

   **(ii)**    pay any additional premium required by the Insurer.

23.21 **"Third Party"** means any natural person who is an active or current customer, supplier, vendor, applicant, business invitee or other client of the **Insured Organization**.

23.22 **"Wrongful Act"** means:

   **(a)**     any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty, or **Employment Practices Wrongful Act** committed or attempted by the **Insured Persons** in their capacities as such or by the **Insured Organization**; or

   **(b)**     any matter claimed against the **Insured Persons** solely by reason of their status as **Insured Persons**.

23.23 **"Outside Entity"** means any not-for-profit organization that qualifies as such under Section 501(c) of the Internal Revenue Code of 1986 (as amended).

23.24 **"Outside Position"** means the position of director, officer, trustee, or other equivalent position held by an **Insured Person** in any **Outside Entity**, if service in such position is with the knowledge and express consent or at the express request of the **Insured Organization**.

## 24.    Outside Position Liability:

**24.1**  This Policy, subject to its terms, conditions, and exclusions, covers any **Insured Person** serving in an **Outside Position.**  Such coverage shall be specifically excess of any: (i) indemnification provided by the **Outside Entity** in which the **Insured Person** serves in such **Outside Position**; and (ii) insurance available from or provided by such **Outside Entity**, regardless of whether or not such other insurance policy is written specifically excess of this Policy or refers to this Policy's policy number.

**24.2**  Payment by the Insurer or any member company of the Liberty Mutual Group under another insurance policy as a result of a **Claim** against an **Insured Person** in an **Outside Position** shall reduce, by the amount of such payment, the Insurer's Limit of Liability under this Policy.

**24.3**  Coverage under this Section 2 shall not apply to any **Claim** that is brought or maintained with the solicitation, assistance or participation of the **Outside Entity** in which an **Insured Person** serves in an **Outside Position** or any director, officer, trustee, regent, governor or employee of such **Outside Entity**.

**24.4**  Nothing in this Section 24 shall be construed to extend coverage under this Policy to the **Outside Entity** in which such **Insured Person** serves in such **Outside Position**, or to the other directors, officers, or employees of such **Outside Entity**.

In Witness Whereof, the Insurer has caused this Policy to be executed and attested, but this Policy shall not be valid unless countersigned on the Declarations Page by a duly authorized agent of the Insurer.

President                              Secretary



This endorsement, effective 05/16/2014 forms part of

Policy No. FSS000083-0414        issued to  USA Gymnastics

Issued By: Target Professional Programs

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**INDIANA ENDORSEMENT**

As used in this Policy endorsement the terms "the Insurer", "we", "our " and "us" refer to Liberty Insurance Underwriters Inc. The term "Named Insured", "you" and "your" refer to the "Parent Organization" or "Named Real Estate Investment Trust" as shown on the Declarations Page of this Policy.

Irrespective of any other term or condition within the Policy, the Policy is hereby amended by the following:

**A.  Cancellation**

> We may cancel this Policy only for non-payment of premium by mailing to the Named Insured written notice of cancellation at least 10 days prior to the effective date of the cancellation.

> We will mail notices of cancellation to the Named Insured at the mailing address we have on record.

> You may cancel this Policy by mailing notice to us stating when the cancellation will be effective.  You may not, however, cancel this Policy in anticipation of, or after the effective date of, a **Change In Control**.

**B.  Non-renewal**

> If we decide not to renew this Policy, we will mail you notice of this decision at least 45 days before the Policy expires.

All other exclusions, conditions and limitations remain unchanged.



ENDORSEMENT NO.

This endorsement, effective 05/16/2014 forms part of

Policy No.: FSS000083-0414          issued to USA Gymnastics

Issued By: Target Professional Programs

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**INDIANA AMENDATORY ENDORSEMENT**

This endorsement modifies insurance under the following:

**A.** Irrespective of any other provision of this Policy, notice given by or on behalf of the Parent Organization to any authorized agent of the Insurer within the state of Indiana with particulars sufficient to identify the Parent Organization shall be deemed to be notice to the Insurer.

**B.** Paragraph **23.14 "Loss"** of Section **23. Definitions** is deleted in its entirety and replaced by the following:

**23.14 "Loss"** means:

**(a)** sums which the **Insureds** are legally obligated to pay solely as a result of any **Claim** insured by this Policy, including damages, judgments, settlement amounts, legal fees and costs awarded pursuant to judgments, and the multiple portion of any multiplied damage award; and

**(b)** any excise tax equal to ten percent (10%) of an excess benefit which has been assessed by the Internal Revenue Service against any **Insured Person** pursuant to Section 4658 of the Internal Revenue Code for participation of an organization manager in an excess benefit transaction.

**Loss** shall not include any other taxes, fines, penalties, or matters uninsurable pursuant to any applicable law. **Loss** shall also not include punitive or exemplary damages except for vicarious liability.

All other exclusions, conditions and limitations remain unchanged.

**INDIANA**
**POLICYHOLDER NOTICE**


**Questions regarding your policy or coverage should be directed to:**

**Liberty Insurance Underwriters Inc.**
**1-800-677-9163**

If you (a) need the assistance of the governmental agency that regulates insurance; or (b) have a complaint you have been unable to resolve with your insurer you may contact the Department of Insurance by mail, telephone or email:


State of Indiana Department of Insurance
Consumer Services Division
311 West Washington St.
Indianapolis, Indiana   46204

Consumer Hotline: (800) 622-4461; (317) 232-2395

Complaints can be filed electronically at www.in.gov/idoi.

**LIBERTY INSURANCE UNDERWRITERS INC.**

**ENDORSEMENT NO.**

This endorsement, effective **05/16/2014**          forms part of

Policy No. **FSS000083-0414**   issued to **USA Gymnastics**
_____

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**Fiduciary Liability Coverage with Shared Limit of Liability**

It is agreed that this Policy shall be amended as follows:

I.      **Section 1 (Insuring Agreement)** shall be amended to include the following additional Insuring Agreement:

Fiduciary Liability: The Insurer shall pay on behalf of the **Insureds** all **Loss** which they shall become legally obligated to pay as a result of a **Claim** first made during the **Policy Period** or **Discovery Period**, if applicable, against the **Insureds** for a **Fiduciary Wrongful Act** which takes place before or during the **Policy Period**.

II.     **Section 4 (Exclusions of Claims)** is amended to include the following additional exclusions:

for any **Fiduciary Wrongful Act** by any **Insured** with respect to any **Insured Plan** (i) sponsored by a **Subsidiary** if such **Fiduciary Wrongful Act** actually or allegedly occurred at any time when such entity was not a **Subsidiary,** or (ii) when such **Insured Plan** was not sponsored by an **Insured Organization;**

based upon, arising from, or in any way related to liability of others assumed by the **Insured** under any written contract or agreement, except to the extent that the **Insured** would have been liable in the absence of such contract or agreement or unless the liability was assumed in accordance with or under the agreement or declaration of trust pursuant to which the **Insured Plan** was established;

based upon, arising from, or in any way related to the failure of the **Insured** to comply with any law governing workers' compensation, unemployment insurance, or disability benefits; or

based upon, arising from, or in any way related to an **Insured** serving as a fiduciary of any plan, fund or program which is not an **Insured Plan**, even if such service is at the direction or request of an **Insured Organization**.

LIUI00DO380180507

III.    **Section 5 (Exclusions of Losses)** is amended to include the following additional exclusions:

based upon, arising from, or in any way related to the failure to fund an **Insured Plan** in accordance with **ERISA** or the **Insured Plan's** document or to collect contributions owed to an **Insured Plan:**

for benefits due or to become due under the terms of an **Insured Plan** unless, and to the extent that (i) the **Insured** is a natural person and such benefits are payable by such **Insured** as a personal obligation, and (ii) recovery for the benefits is based upon a covered **Fiduciary Wrongful Act**.

IV.    Solely with respect to Fiduciary Liability coverage granted by this endorsement, Section 4.4 of the Policy is deleted.

V.    The amount set forth in Item III of the declarations shall be the maximum Limit of Liability for all **Loss** under this Policy. The following amount shall be the maximum aggregate Limit of Liability for the Fiduciary Liability coverage granted under this endorsement: $ 1,000,000 . Such amount shall be a sub-limit, which is part of, and not in addition to, the Limit of Liability set forth in Item III of the Declarations.

VI.    Solely with respect to Fiduciary Liability coverage granted by this endorsement, Item IV of the Declarations is amended to include the following:

$ 1,000,000 in the aggregate each **Claim** for a **Fiduciary Wrongful Act**

VII.    Solely with respect to Fiduciary Liability coverage granted by this endorsement, Item V of the Declarations is amended to include the following:

Prior Litigation Date: 05/16/2011

VIII.    If during the **Policy Period**: (i) a **Change in Control** occurs, (ii) the responsibilities of the **Insured Organization** with respect to **any Insured Plan** is fully assumed by any other person or entity, or (iii) **the Insured Organization** terminates any **Insured Plan;**

coverage under this endorsement shall continue until termination of this Policy, but only with respect to **Claims** for **Fiduciary Wrongful Acts** committed or allegedly committed prior to the effective date of such **Change in Control**, termination, or assumption of responsibilities.

IX.    Solely with respect to Fiduciary Liability coverage granted by this endorsement, the definitions of the following terms are deleted and replaced with the following:

**23.3    "Claim"** means:

**(a)**    a written demand for monetary or non-monetary relief against an **Insured**;

**(b)**    the commencement of a civil or criminal judicial proceeding or arbitration against an **Insured**;

**(c)**    the commencement of a formal criminal, administrative or regulatory proceeding or investigation against an **Insured,** including any

brought before the Equal Employment Opportunity Commission or any similar state, local or territorial governmental agency; or

(d)    a fact finding investigation by the Department of Labor, the Pensions Benefit Guaranty Corporation, or similar government agency;

including any appeal therefrom, against an **Insured** for a **Fiduciary Wrongful Act**. A **Claim** will be deemed first made on the date an **Insured** receives a written demand, complaint, indictment, notice of charges, or order of formal investigation.

**23.10**    **"Insured(s)"** means the **Insured Persons,** the **Insured Organization,** the **Insured Plans** or any other organization, plan or natural person listed as an **Insured** on a schedule to this endorsement.

**23.12**    **"Insured Person(s)"** means one or more natural persons who were, now are, or shall hereafter be duly elected or appointed directors, trustees, officers, employees, committee members or volunteers of the **Insured Organization** or of any **Insured Plan** in his or her capacity as a **Fiduciary** or trustee of an **Insured Plan** or as a person performing **Administration** of an **Insured Plan,** or, with respect to a **Subsidiary** operating outside the United States, their functional equivalent, regardless of title.

**23.20**    **"Wrongful Act"** means a **Fiduciary Wrongful Act**.

X.    The following definitions are added to Section 23 (Definitions);

**"Administration"** means:

(a)    handling records, or giving advice, counsel or interpretation to employees regarding an **Insured Plan**; or

(b)    affecting enrollment of employees, and termination, or cancellation of benefits under an **Insured Plan.**

**"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended.

**"Fiduciary"** means a fiduciary as defined by **ERISA** of an **Insured Plan**, or a person or entity who exercises discretionary control with respect to the management of an **Insured Plan** or the disposition of its assets.

**"Fiduciary Wrongful Act"** means:

(a)    any breach of the responsibilities, obligations, or duties imposed upon **Fiduciaries** of any **Insured Plan** by **ERISA** or by the common or statutory law of the United States, any state, or other jurisdiction anywhere in the world;

(b)    any other matter claimed against any **Insured** solely by reason of their service as **Fiduciaries** of any **Insured Plan**;

(c)    any negligent act, error, or omission solely in the **Administration** of any **Insured Plan**.

**"Insured Plan(s)"** means:

(a) any welfare benefit plan as defined in **ERISA** or any similar common or statutory law of the United States or other jurisdiction anywhere in the world, which is sponsored solely by the **Insured Organization** or jointly by the **Insured Organization** and a labor organization solely for the benefit of the employees of the **Insured Organization** located anywhere in the world and which:

    (i) existed on the Inception Date of this Policy; or

    (ii) is created or acquired by the **Insured Organization** after the Inception Date of this Policy, provided that if the assets of such created or acquired plan exceed 35% of the total plan assets of all **Insured Plans** as of the Inception Date of this Policy, the **Insured Organization** shall give written notice of such creation or acquisition to the Insurer within ninety (90) days of such creation or acquisition, shall provide such information as the Insurer may require, and shall pay an additional premium required by the Insurer.

Coverage for any plan described in subsection (ii) above shall only be afforded with respect to **Fiduciary Wrongful Acts** taking place after the date such plan was created or acquired;

(b) any non-qualified plan not subject to regulation under Title I of **ERISA** or which does not meet the qualification requirements under Section 401(a) of the Internal Revenue Code of 1986, as amended, but only with respect to conduct described in subsection (c) of the definition of **Fiduciary Wrongful Act**;

(c) any Employee Pension Benefit Plan as listed by attachment to the Liberty Mutual Group Fiduciary Coverage Application.

All other terms, conditions, and exclusions of this Policy remain unchanged.

_____
Authorized Representative of
Liberty Insurance Underwriters Inc.

6/17/2014 _____
Date



# LIBERTY INSURANCE UNDERWRITERS INC.

## ENDORSEMENT NO.

This endorsement, effective 05/16/2014       forms part of

Policy No. FSS000083-0414   issued to USA Gymnastics

_____

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### General Professional Services Exclusion
### (Management Carve-out)

It is agreed that Section __4__ of the Policy is amended by the addition of the following:

4.10_____ based upon, arising from, or in any way related to any **Insured's** performance of or failure to perform professional services for others and caused by an act, error or omission related thereto.

This exclusion shall not apply to any **Claim** brought by or maintained by or on behalf of a security holder(s) of the **Insured Organization** other than an **Insured Person**, whether directly, by class action, or by derivative action, where such **Claim** is based upon the failure of an **Insured Person** to properly supervise or manage such professional services, or based upon improper disclosure or nondisclosure of material information relating to such professional services.

All other terms, conditions, and exclusions of this Policy remain unchanged.

_____
Authorized Representative of
Liberty Insurance Underwriters Inc.

_____
6/17/2014
Date

LIUI00DO380190507 (2)



# LIBERTY INSURANCE UNDERWRITERS INC.

## ENDORSEMENT NO.

This endorsement, effective 05/16/2014     forms part of

Policy No. FSS000083-0414    issued to USA Gymnastics

_____

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### Sub-Limit Endorsement for Wage & Hour Claims

It is agreed that Item III of the Declarations Page is hereby amended by the addition of the following:

ITEM III.      SUB-LIMIT OF LIABILITY:    $150,000 in the aggregate for the **Policy Year**

It is further agreed that the Sub-Limit of Liability provided under this endorsement is part of, and not in addition to, the Limit of Liability provided for in Item III of the Declarations and shall only apply as respects to:

**Defense Costs** for **Claims** based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving any federal, state, local or foreign wage and hour laws, including, without limitation, the Fair Labor Standards Act (**FSLA Claims**).  Sums that any **Insured** shall become legally obligated to pay as damages (including settlements and judgments) from such **Claims** shall continue to be excluded from the definition of **Loss** except for those resulting from any actual or alleged retaliatory treatment of the claimant by the **Insured** on account of the claimant's exercise of rights pursuant to any such law or amounts owed under the Equal Pay Act of 1963.

It is further agreed that Section 9.1 is deleted and replaced with the following

**9.1**     The Insurer's maximum aggregate Limit of Liability for all **Loss** under this Policy shall be the amount set forth in Item III of the Declarations.  Amounts incurred as **Defense Costs** shall be in addition to the Limit of Liability except for those incurred on **FLSA Claims**.

All other terms, conditions, and exclusions of this Policy remain unchanged.

_____

Authorized Representative of
Liberty Insurance Underwriters Inc.

_____
06/17/2014

Date

LIUI00DO38028 2 (05/07)



**LIBERTY INSURANCE UNDERWRITERS INC.**

**ENDORSEMENT NO.**

This endorsement, effective 05/16/2014       forms part of

Policy No. FSS000083-0414    issued to   USA Gymnastics

_____

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**Application of Retention to Defense Costs**

It is agreed that Section 23.14 (a) of the Policy is deleted and replaced as follows:

**23.14 (a)**      sums which the **Insureds** are legally obligated to pay solely as a result of any **Claim** insured by this Policy, including **Defense Costs,** damages, judgments, settlement amounts, legal fees and costs awarded pursuant to judgments, punitive or exemplary damages, and the multiple portion of any multiplied damage award; and

It is further agreed that for such **Claims**, Section 10 is deleted and replaced with the following:

**10.**    **Retention:** The Insurer shall be liable to pay only the amount of covered **Loss** in excess of the applicable Retention amount set forth in Item IV of the Declarations. Such applicable Retention shall be uninsured, shall be applicable to **Defense Costs** and shall be borne by the **Insured Organization.** However, if an **Insured Person** is not indemnified for **Loss** solely by reason of the **Insured Organization's** financial insolvency or because indemnification is not legally permissible, an **Insured Person's** Retention shall be $0. This change in Retention shall not affect any other terms or conditions of this Policy.

All other terms, conditions, and exclusions of this Policy remain unchanged.

*Douglas P. Tobin*

6/17/2014

LIUI00DO381290207

05/16/2014
USA Gymnastics

132 E Washington St, Ste 700
Indianapolis, IN 46204


Effective:  05/16/2014


**POLICYHOLDER DISCLOSURE -TERRORISM INSURANCE PREMIUM NOTICE**

**This notice contains important information about the Terrorism Risk Insurance Act and its effect on your policy.  Please read it carefully.**

**THE TERRORISM RISK INSURANCE ACT**

The Terrorism Risk Insurance Act, including all amendments ("TRIA" or the "Act"), establishes a program to spread the risk of catastrophic losses from certain acts of terrorism between insurers and the federal government.  If an individual insurer's losses from a "certified act of terrorism" exceed a specified deductible amount, the government will reimburse the insurer for 85% of losses paid in excess of the deductible, but only if aggregate industry losses from such an act exceed $100 million. An insurer that has met its insurer deductible is not liable for any portion of losses in excess of $100 billion per year.  Similarly, the federal government is not liable for any losses covered by the Act that exceed this amount.   If aggregate insured losses exceed $100 billion, losses up to that amount may be pro-rated, as determined by the Secretary of the Treasury.


**MANDATORY OFFER OF COVERAGE FOR "CERTIFIED ACTS OF TERRORISM" AND DISCLOSURE OF PREMIUM**


TRIA requires insurers to make coverage available for any loss that occurs within the United States (or outside of the U.S. in the case of U.S. missions and certain air carriers and vessels), results from a "certified act of terrorism" AND that is otherwise covered under your policy.

A "certified act of terrorism" means:

> [A]ny act that is certified by the Secretary [of the Treasury], in concurrence with the Secretary of State, and the Attorney General of the United States
>
> (i) to be an act of terrorism;
> (ii) to be a violent act or an act that is dangerous to –
>
> > (I) human life;
> > (II) property; or
> > (III) infrastructure;

(iii)  to have resulted in damage within the United States, or outside of the United States in the case of –

    (I)  an  air carrier  (as defined in section 40102 of title 49, United States Code) or United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States); or

    (II)  the premises of a United States mission; and

(iv)  to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

## MANDATORY PREMIUM DISCLOSURE STATEMENT

Your policy does not contain an exclusion for losses resulting from "certified acts of terrorism." Coverage for such losses is still subject to, and may be limited by, all other terms, conditions and exclusions in your policy.

The premium charge for this coverage for the policy period is $0___

## YOU NEED NOT DO ANYTHING FURTHER AT THIS TIME.

The summary of the Act and the coverage under your policy contained in this notice is necessarily general in nature.  Your policy contains specific terms, definitions, exclusions and conditions.  In case of any conflict, your policy language will control the resolution of all coverage questions. Please read your policy.

If you have any questions regarding this notice please contact your sales representative or agent.

TRIA-N001-0208





## APPLICATION FOR
## NONPROFIT EXECUTIVE ADVANTAGE POLICY

THIS IS AN APPLICATION FOR A CLAIMS-MADE POLICY. THE POLICY FOR WHICH THIS APPLICATION IS MADE COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR DISCOVERY PERIOD, IF APPLICABLE, AND REPORTED TO THE INSURER AS SOON AS PRACTICABLE BUT IN NO EVENT LATER THAN 90 DAYS AFTER THE END OF THE POLICY PERIOD. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.

UNLESS AMENDED BY ENDORSEMENT, AMOUNTS INCURRED AS DEFENSE COSTS SHALL BE IN ADDITION TO THE LIMIT OF LIABILITY AND SHALL NOT BE APPLIED TO THE APPLICABLE RETENTION.

THE POLICY PROVIDES THE DUTY ON THE PART OF THE INSURER TO DEFEND.

*Instructions*
- *Please complete all questions.*
- *The term **"Insured Organization"** means the parent organization whose directors and officers are proposed to be insured under the Nonprofit Executive Advantage Policy for which this Application is made, along with any other entities in which such parent organization has or controls the right to elect more than 50% of the Board of Directors or other governing body of such entity if such right exists.*

1. Name of the **Insured Organization**: USA GYMNASTICS

2. Address of the **Insured Organization**: 132 E WASHINGTON ST #700
   City: INDIANAPOLIS   County: MARION   State: IN   Zip Code: 46204

3. Individual at **Insured Organization** designated to receive correspondence and notices from the Insurer:
   JOHN HEWETT (Name)   CFO (Title)
   Telephone: (317) 237-5050   Fax: (317) 237-5069   E-Mail Address: jhewett@usagym.org

4. **Insured Organization's** nature of operations: OLYMPIC SPORT NATIONAL GOVERNING BODY

5. a) Tax status: ● Exempt under Section 501(c) 3     o Taxable
   b) Date organized 1964
   c) Number of Employees 61
   d) Annual Salary/Wages Expense 3,612,818
   e) Total Assets 11,975,000

6. a) What was the employee turnover rate in the last 12 months? 2 INDIVIDUALS LEFT OUR EMPLOY
   b) Did this exceed the historical average of the prior 3 years? ..................................... o Yes ● No

7. Have there been any changes in Senior Management for reasons other than death, retirement at normal retirement age or term limitations ................................................................. o Yes ● No

303 W. Madison St., Suite 700, Chicago, IL 60606 (866) 879-6565 fax: (866) 720-5003
www.5starsp.com | Submissions: dando@5starsp.com

LIUI00DO110020507

1 of 4


**Specialty Programs**

8. Has the **Insured Organization** had in the past 12 months, or does it contemplate within the next 12 months consolidation, merger, sale or divestiture of a portion of its business? ........... o Yes ● No
If "Yes", was there, or will there be, a reduction in employees as a result? ................ o Yes o No
If "Yes", what was, or will be, the reduction as a percentage of prior employee count? o Yes o No

9. Does the **Insured Organization** provide any of the following? :
a) Promote, sponsor or provide any type of insurance to its members? ..................... ● Yes o No
b) Provide standard setting, disciplinary or peer review activities? ........................... ● Yes o No
c) Engage in any labor negotiations? ............................................................ ● Yes o No
d) Engage in any experimentation, research or product development? ..................... o Yes ● No
e) Provide any other professional services? ................................................... ● Yes o No
f) Engage in any business transactions with **Insured Persons** or businesses they control? o
(Yes) o No
If "Yes" for any of the above, please attach full details.

10. Has the **Insured Organization** previously held or does it now have any directors and officers liability insurance or similar insurance? ................................................ ● Yes o No
If "Yes", please provide the following details:

| Insurer | Policy Type | Deductible/Retention | Period From/To | Premium |
|---|---|---|---|---|
| Liberty Insurance Underwriters Inc | Claims Made | 20,000 | 5/16/13 - 5/16/14 | 14,302 |

11. Attach full details of any claim, notice of circumstance, or wrongful act which has been the subject of notice under such insurance in the last 5 years (if none, check the box). ................. o None
*See Liberty Insurance Underwriters, Inc. / US Pro Insurance Services*

12. Has any Insurer declined, cancelled, or refused to renew any directors and officers liability insurance or similar insurance within the past 5 years? .............................................. o Yes ● No
If "Yes", please attach full details.

**Do not complete questions #13 and #14 if this is a renewal policy with the same limit of liability with a member of the Liberty Mutual Group.**

13. During the last 5 years has the **Insured Organization** or any of its directors, officers, or employees been involved in any litigation that could have a material impact on the **Insured Organization**?
o Yes o No ................................................. If "Yes", please attach full details.

14. Does anyone for whom insurance is sought have any knowledge or information of any act, error, omission, fact, or circumstance which may give rise to a **Claim** which may fall within the scope of the proposed insurance? ................................................................ o Yes o No
If "Yes", please attach full details.

> IT IS UNDERSTOOD AND AGREED THAT IF ANYONE FOR WHOM THIS INSURANCE IS SOUGHT HAS ANY KNOWLEDGE OF ANY SUCH ACT, ERROR, OMISSION, FACT, OR CIRCUMSTANCE, ANY CLAIM EMANATING THEREFROM SHALL BE EXCLUDED FROM COVERAGE UNDER THE PROPOSED INSURANCE.

303 W. Madison St., Suite 700, Chicago, IL 60606 (866) 879-6565 fax: (866) 720-5003
www.5starsp.com | Submissions: dando@5starsp.com

LIU100DO110020507                                                                 2 of 4



5 Specialty Programs

**RENEWAL STATEMENT (Applicable to renewal polices only) –** It is agreed that this Renewal Application is a supplement to the Application(s) attached to the current Policy and said Applications, together with this Renewal Application, constitute the complete Application which shall be the basis of the contract should a Policy be issued and will be attached to and become part of the Policy.

**REQUIRED INFORMATION:** Risks exceeding $300,000 in salaries OR $1,000,000 in assets must submit a financial statement.

Signing this **Application** does not bind the undersigned to purchase or the Insurer to sell any insurance policy. If a policy is issued, this **Application** and its attachments shall be the basis of such policy and shall be deemed attached to and shall form part of such policy.

The undersigned, on behalf of all prospective Insureds, declares that the statements in this **Application** and its attachments are true and accurate. If there are material changes to any statements in this **Application** or its attachments prior to the inception date of the policy, the undersigned shall immediately notify the Insurer of such changes. Upon receipt of such notification, the Insurer shall have the right to modify or withdraw any outstanding terms or proposal.

**NOTICE TO ARKANSAS RESIDENTS:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**NOTICE TO COLORADO RESIDENTS:** It is unlawful to knowingly provide false, incomplete, or misleading facts, or information to an insurance company for the purpose of defrauding or attempting to defraud the company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant with regard to settlement or award payable from insurance proceeds shall be reported to the Colorado division of insurance with the department of regulatory agencies.

**NOTICE TO FLORIDA RESIDENTS:** Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

**NOTICE TO KENTUCKY RESIDENTS:**
Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

**NOTICE TO MAINE RESIDENTS:** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines or a denial of insurance benefits.

**NOTICE TO NEW JERSEY RESIDENTS:** Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties.

**NOTICE TO NEW MEXICO RESIDENTS:** ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL FINES AND CRIMINAL PENALTIES.

**NOTICE TO NEW YORK RESIDENTS:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

**NOTICE TO OHIO RESIDENTS:** Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

**NOTICE TO OKLAHOMA RESIDENTS:** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

**NOTICE TO OREGON RESIDENTS:** Any person who knowingly, and with intent to defraud or solicit another to defraud an insurer: (1) by submitting an application, or (2) by filing a claim containing a false statement as to any material fact, may be violating state law.

**NOTICE TO PENNSYLVANIA RESIDENTS** Any person who knowingly and with intent to defraud any insurance company or other person files and application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

**NOTICE TO TENNESSEE RESIDENTS:** It is a crime to knowingly provide false, incomplete, or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits

**This Application must be currently dated and signed by the association's insurance agent, broker, property manager or by a member of governing board of the association.**

Signed: _____     Title: _____
(Signature of President or Executive Director)

Date: _May 8, 2014_

**Submitting Producer Name**

_Patrick J. O'Connor_
Agency Name
_City Securities Insurance_
_8800 Keystone Crossing, Suite 300_
Agency Address
_Indianapolis IN 46240_
_____
License Number (FL Producers Only)

303 W. Madison St., Suite 700, Chicago, IL 60606 (866) 879-6565 fax (866) 720-5003
www.5starsp.com | Submissions: dando@5starsp.com

LIUI00DO110020507                                                                        4 of 4

## Application for Executive Advantage Policy

## Liberty Insurance Underwriters

5e. Asset amount provided as of last completed audited financial statement of 12/31/12. Financial statements and tax returns available on our website at usagym.org under About Us. Note that financial statements are prepared on a consolidated basis with our Foundation, the National Gymnastics Foundation, which is applying for its own policy. Assets indicated in 5e are USA Gymnastics assets only.

9a. USA Gymnastics provides secondary medical and catastrophic medical coverage to its participant members (approx 130,000) in sanctioned events (approx 3,500).

9b. In order to become a professional member of USA Gymnastics, which allows one on the floor of sanctioned competitions, the professional member must become safety certified, which results from passing a test based on a curriculum that has been developed and updated over the last 30 years by staff, industry members, legal counsel and insurance industry insight. In addition, USA Gymnastics has a code of ethics, and has a system in place to deal with member misconduct, including placing lifetime bans on them from participation in USA Gymnastics activities. In addition, each program discipline of USA Gymnastics establishes event procedures and standards, and committee and reporting structures.

9e. USA Gymnastics and its committees develop skill progression routines, whereby gymnasts at all ages and skill levels can develop the skills necessary to safely develop and demonstrate their proficiency at the different levels of competition.

9f. As the National Governing Body for the sport, USA Gymnastics enters into any number of business transactions with insured persons, provided that definition includes USA Gymnastics members. Members, who receive insurance and other benefits described in 9a above, participate in clinics, symposiums, competitions, and other assorted activities, for which they make payment to USA Gymnastics. Many of those same members are paid as independent contractors to facilitate those events. In addition, USA Gymnastics has control over the board of directors of the National Gymnastics Foundation, from whom they receive annual grants and on occasion make grants to the Foundation.